**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division**

---

|  |  |  |
|---|---|---|
| **JOHN DOE,** | ) | **Civil Action No._____** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CATHOLIC RELIEF SERVICES,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendant.** | ) | |

---

**COMPLAINT FOR DECLARATORY,
INJUNCTIVE, AND MONETARY RELIEF**

Plaintiff John Doe, by and through his undersigned counsel, hereby files this action for equitable and monetary relief against Defendant Catholic Relief Services for discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d)(1), for discrimination based on sex and sexual orientation in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.*, the Maryland Equal Pay for Equal Work Act ("MEPEWA"), Md. Code Ann., Lab. & Empl. § 3-301 *et seq.*, the denial of wages pursuant to the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501 *et seq.*, and common law claims for breach of contract, detrimental reliance, and negligent misrepresentation.

**JURISDICTION**

1.      This Court maintains subject matter jurisdiction over Mr. Doe's claims pursuant to 42 U.S.C. § 1988(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1343(a)(3) because his action addresses the vindication of his civil rights and contains a federal question, as it arises under the laws of the United States, specifically Title VII and the Equal Pay Act.

2.     This Court maintains supplemental jurisdiction over Mr. Doe's claims arising under the laws of Maryland pursuant to 28 U.S.C. § 1367(a) because those claims are part of the same case or controversy as those arising under Title VII and the Equal Pay Act.

3.     This Court maintains personal jurisdiction over Defendant Catholic Relief Services ("CRS") because CRS, at all times relevant to this Complaint, purposefully availed itself of the privilege of conducting employment activities within the state of Maryland, is currently registered to do business in the state of Maryland, and carried out its acts and omissions alleged herein in the state of Maryland. CRS maintains its headquarters at 228 W. Lexington Street, Baltimore, Maryland 21201 and, at all times material to this Complaint, conducted and maintained operations in Baltimore, Maryland.

4.     At all times material to this Complaint, CRS employed more than 5,000 employees and engaged in an "industry affecting commerce" within the meaning of 42 U.S.C. §§ 2000e-2(b) and (h).

## VENUE

5.     Venue is proper in the United States Court for the District of Maryland pursuant to 28 U.S.C. § 1391(b)(2) because CRS's headquarters is located in Baltimore, Maryland.

6.     Pursuant to 28 U.S.C. § 1391(b)(2), all acts or occurrences complained of occurred or failed to occur in Baltimore, Maryland.

## PARTIES

7.     Mr. Doe is a gay, cisgender male and Maryland resident who, at all times material to this Complaint, was subjected to discrimination on the basis of sex and sexual orientation during his employment with CRS.

8.      At all times material to this Complaint, Mr. Doe was an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e(f), MFEPA, State Gov't § 20-601(c)(1), MEPEWA, Lab. & Empl. § 3-301 *et seq.*, MWPCL, Lab. & Empl. § 3-501 *et seq.*, and the federal Equal Pay Act, 29 U.S.C. § 203(e)(1).

9.      CRS is a 501(c)(3) non-profit organization that is incorporated in the state of Maryland and, at all times material to this Complaint, conducted and maintained operations in Baltimore, Maryland. CRS maintains its headquarters at 228 W. Lexington Street, Baltimore, Maryland 21201.

10.      CRS is an "Employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), MFEPA, State Gov't § 20-601(d)(1), MEPEWA, Lab. & Empl. § 3-301(b), MWPCL, Lab. & Empl. § 3-501(b), and the federal Equal Pay Act, 29 U.S.C. § 203(d).

## FACTUAL BACKGROUND

11.      In mid-2016, a CRS recruiter contacted Mr. Doe regarding a potential job opportunity with the organization.

12.      Shortly thereafter, Mr. Doe traveled to the CRS office in Baltimore, Maryland for an in-person interview with a panel that included the hiring manager.

13.      A few days later, the recruiter contacted Mr. Doe to offer him a full-time position. The job duties for the position focused solely on CRS's business functions: providing technical and business support for all users of a CRS information management platform; troubleshooting issues that employees reported with the platform; expanding the functionality and use of the platform to support additional business tasks; and providing training on how to best utilize the platform.

14.     On the same day, the recruiter emailed Mr. Doe multiple documents detailing his employment benefits, including the Aetna Health Insurance Plan Summary entitled "Group Insurance Plan of Benefits for Catholic Relief Services."

15.     CRS's health insurance plan with Aetna includes health coverage for, *inter alia*, employees and their spouses.

16.     The eligibility provision of CRS's Group Insurance Plan stated that "dependent[s]" are covered, and the Plan defined "[d]ependent" as "wife or husband; children to age 26; regardless of student status."

17.     Mr. Doe is a married gay man in a legally recognized same-sex marriage.

18.     The recruiter subsequently contacted Mr. Doe via telephone to discuss the benefits package and other onboarding details. During this conversation Mr. Doe asked if his husband would be covered by CRS's spousal health insurance benefits, as reflected in the document sent to him the previous day. The recruiter responded, "All dependents are covered."

19.     Mr. Doe ultimately accepted the employment offer, and his family relocated to Baltimore, Maryland.

20.     As a part of his onboarding process, Mr. Doe received a more comprehensive insurance-related document entitled, "Benefit Plan: What Your Plan Covers and How Benefits are Paid." The document stated that it was prepared by Aetna exclusively for CRS. A copy of CRS's Benefit Plan with Aetna is attached hereto as Exhibit 1.

21.     CRS's Benefit Plan with Aetna contained a section entitled, "Obtaining Coverage for Dependents," which explained who was covered under the insurance plan:

> Your dependents can be covered under this Plan. You may enroll the following dependents:
>
> - Your spouse.

- Your dependent children.

Aetna will rely upon your employer to determine whether or not a person meets the definition of dependent for coverage under this Plan. *This determination will be conclusive and binding upon all persons for the purposes of this Plan.*

Ex. 1 at 2 (emphasis added).

22.     During his onboarding session, CRS's staff reiterated to Mr. Doe that all dependents would be covered under the CRS-sponsored health insurance, with no mention of exception for same-sex spouses. With this confirmation, Mr. Doe applied for his health insurance, including coverage for his husband by submitting his marriage certificate to human resources and registering himself and his husband on the CRS Employee Self-Service website.

23.     For approximately 16 months, Mr. Doe and his husband were both covered by CRS's insurance policy, both received insurance cards, and both used their insurance coverage at various times prior to October 1, 2017.

24.     In exchange for CRS's promise to provide Mr. Doe with, *inter alia*, spousal benefits, Mr. Doe satisfactorily performed all aspects of his employment. Indeed, Mr. Doe had consistently received evaluations that he was performing at or above expectations.

25.     Despite this assertion and advising Mr. Doe multiple times that his husband would be covered as a dependent, in November 2016, CRS informed Mr. Doe that CRS had mistakenly provided spousal coverage for his husband under the CRS-sponsored health insurance plan.

26.     CRS also informed Mr. Doe that the reason it should not have provided spousal coverage to Mr. Doe's husband was because it does not cover same-sex spouses under its medical insurance plan.

27.     On the day after CRS informed Mr. Doe about mistakenly providing coverage to his husband, it told Mr. Doe that his spousal benefits would be terminated by the end of the month,

and that the only recourse available to him was to write a letter to senior management explaining the situation and convincing CRS to continue covering his husband.

28.    In or around the same time, a CRS Human Resources executive raised the issue of Mr. Doe's spousal benefits with Mr. Doe. Mr. Doe met with the executive and another senior Human Resources employee. Again, Mr. Doe was informed that his spousal benefits would eventually be terminated, though on the date originally specified by CRS.

29.    For approximately 8 months, Mr. Doe had various conversations and communications with CRS management concerning his spousal benefits.

30.    In mid-2017, Mr. Doe met with another senior CRS official regarding his spousal benefits. During that meeting, the senior CRS official claimed that same-sex spouses were not covered by CRS's insurance plan.

31.    During that meeting, the senior CRS official informed Mr. Doe that "some people that oversee CRS" wanted Mr. Doe terminated. The senior CRS official also stated that, if Mr. Doe chose to "push the issue, doing so would hurt [Mr. Doe]."

32.    In or around the following month, the senior CRS official emailed Mr. Doe to inform him that his spousal coverage would be terminated on October 1, 2017.

33.    On information and belief, similarly situated women employees who are married to men and similarly situated men employees who are married to women are able to maintain spousal coverage under CRS's health insurance plan.

34.    Based on the senior CRS official's statements, in mid-2017, Mr. Doe raised the issue with his supervisor. Mr. Doe asked his supervisor to accompany him in a meeting with the senior CRS official to receive clarification on that senior official's statement that Mr. Doe would

be hurt should he push this issue. Mr. Doe then requested a meeting with the senior CRS official and Mr. Doe's supervisor, which occurred in mid to late 2017.

35.     During the meeting, the senior CRS official clarified that, if Mr. Doe were to pursue legal action, he would most likely be terminated.

36.     The senior CRS official subsequently told Mr. Doe something to the effect that if an employee was to raise a lawsuit against the organization, it is only natural that the employer would not want to continue paying that employee.

37.     Additionally, the senior CRS official shared that CRS had already updated its benefits summary, which is issued to finalists for open positions, to explicitly state that benefits would not be provided to same-sex spouses. However, upon information and belief, the most recent version (effective January 1, 2019) of CRS's Aetna "Benefit Plan" document does not include language expressly stating that same-sex spouses are excluded from aspects of CRS's insurance coverage or language stating that benefits are provided in line with Catholic social teachings.

38.     Mr. Doe's supervisor documented the meeting in a memorandum.

39.     After the meeting, in mid to late 2017, the senior CRS official emailed Mr. Doe a PDF entitled "Summary of Employee Benefits" and directed Mr. Doe's attention to a section that states, "Following the Catholic Church's definition of marriage, we cannot offer benefits to unmarried domestic partners, nor to same-sex spouses." Ex. 2, CRS Summary of Employee Benefits at 2. Notably, the language contained in the Summary of Employee Benefits is not contained in CRS's Benefit Plan with Aetna.

40.     In late 2019, Mr. Doe began working in a different position for CRS.  His job duties for this position focus solely on CRS's business functions including, *inter alia*: designing monitoring databases and dashboards; coordinating quarterly reporting to donors; ensuring

adherence to monitoring, evaluation, and accountability policies; and designing and conducting trainings on knowledge management and communication tools and approaches.

41.     During all times relevant to this Complaint, the only basis CRS provided for removing Mr. Doe's spousal coverage was that Mr. Doe's spouse is a man rather than a woman.

42.     In early 2017, Mr. Doe's husband had begun the process of having extensive dental work completed, which was covered by CRS's Benefit Plan with Aetna.

43.     On October 1, 2017, CRS terminated Mr. Doe's spousal health coverage.

44.     Due to the termination of Mr. Doe's spousal benefits, Mr. Doe was forced to secure alternative insurance coverage at rates higher than those afforded under CRS's plan. Mr. Doe's spouse had to delay dental work which resulted in an additional surgery that would not have been necessary had he been covered by CRS's Benefit Plan with Aetna.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

45.     On June 1, 2018, Mr. Doe timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against CRS.

46.     At all times material to this Complaint, there existed work-sharing agreements between the EEOC and the Maryland Commission on Civil Rights ("MCCR"). Pursuant to state and federal law, filing with one of these administrative agencies constitutes filing with the other for purposes of exhausting administrative remedies.

47.     In the Charge of Discrimination, Mr. Doe alleged discrimination based on sex, including sexual orientation, and retaliation under Title VII of the Civil Rights Act of 1964, MFEPA, MEPEWA, and the Federal Equal Pay Act.

48.     On May 10, 2019, the EEOC assigned Mr. Doe's charge, EEOC Charge No. 531-2018-02652, to an investigator.

49.     On May 4, 2020, Mr. Doe requested a notice of right to sue. More than 180 days had passed since the filing of Mr. Doe's charge.

50.     On May 27, 2020, the EEOC issued a right to sue letter, which Mr. Doe received on June 1, 2020.

51.     All conditions precedent to the filing of this lawsuit have been performed or have occurred as required by Title VII and MFEPA.

**Count I – Discrimination on the Basis of Sexual Orientation
in Violation of the Maryland Fair Employment Practices Act,
Md. Code Ann., State Gov't § 20-601 *et seq.***

52.     Mr. Doe re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

53.     At all times material to this Complaint, Mr. Doe was a member of a protected group within the meaning of the MFEPA, as he is a gay man. Md. Code Ann., State Gov't § 20-606(a)(1).

54.     At all times material to this Complaint, CRS was an employer for the purposes of the MFEPA. *Id.* § 20-601(d).

55.     MFEPA prohibits an employer from engaging in discriminatory compensation when "an individual is affected by application of a discriminatory compensation decision or other practice, including each time . . . benefits or other compensation is paid, resulting wholly or partly from the discriminatory compensation decision or other practice." *Id.* § 20-607(a).

56.     CRS engaged in an unlawful employment action when it terminated Mr. Doe's spousal benefits based on Mr. Doe's sexual orientation and sex.

57.     Based upon information and belief, similarly situated men and women employees who identify as heterosexual maintain their spousal benefits. Furthermore, based upon information

9

and belief, CRS has not terminated the spousal benefits of similarly situated women employees who are married to men.

58.     At all times material to this Complaint, Mr. Doe's job duties focused solely on CRS's business functions and were completely unrelated to any religious aspect of CRS. That is, Mr. Doe's job duties in his first position with CRS included, *inter alia*: providing technical and business support for all users of a CRS information management software platform; troubleshooting issues that employees reported with the platform; expanding the functionality and use of the platform to support additional business tasks; and providing training on how to best utilize the platform. As of late 2019, Mr. Doe's duties included, *inter alia*: designing monitoring databases and dashboards; coordinating quarterly reporting to donors; ensuring adherence to monitoring, evaluation, and accountability policies; and designing and conducting trainings on knowledge management and communication tools and approaches.

59.     CRS's acts were wanton, reckless, or in willful disregard of Mr. Doe's legal rights and intentionally violated MFEPA.

60.     As a direct result of CRS's discriminatory acts, Mr. Doe has suffered, and continues to suffer, economic harm and emotional distress, as well as professional harm. Mr. Doe has additionally suffered, and continues to suffer, from ongoing fear that he will not receive well-deserved promotions or, ultimately, will lose his job should he pursue legal action.

61.     In the absence of injunctive relief, CRS will continue to discriminate against Mr. Doe and other employees similarly affected.

**Count II – Discrimination on the Basis of Sex in Violation of
the Maryland Fair Employment Practices Act,
Md. Code Ann., State Gov't § 20-601 *et seq.***

62.     Mr. Doe re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

63.     At all times material to this Complaint, Mr. Doe was a member of a protected group within the meaning of the MFEPA. Md. Code Ann., State Gov't § 20-606(a)(1).

64.     At all times material to this Complaint, CRS was an employer for the purposes of the MFEPA. *Id.* § 20-601(d).

65.     MFEPA prohibits an employer from engaging in discriminatory compensation when "an individual is affected by application of a discriminatory compensation decision or other practice, including each time . . . benefits or other compensation is paid, resulting wholly or partly from the discriminatory compensation decision or other practice." *Id.* § 20-607(a).

66.     CRS discriminated against Mr. Doe based on his sex when it terminated Mr. Doe's spousal benefits because he was a man married to another man rather than a woman married to a man.

67.     CRS also discriminated against Mr. Doe based on pre-conceived gender stereotypes when it terminated Mr. Doe's spousal benefits because he failed to fit the gender stereotype that cisgender men should marry cisgender women.

68.     Based upon information and belief, CRS has not terminated the spousal benefits of similarly situated women employees who are married to men or similarly situated men employees who are married to women.

69.     At all times material to this Complaint, Mr. Doe's job duties focused solely on CRS's business functions and were completely unrelated to any religious aspect of CRS. That is,

11

Mr. Doe's job duties included, *inter alia*: providing technical and business support for all users of a CRS information management software platform; troubleshooting issues that employees reported with the platform; expanding the functionality and use of the platform to support additional business tasks; providing training on how to best utilize the platform; designing monitoring databases and dashboards; coordinating quarterly reporting to donors; ensuring adherence to monitoring, evaluation, and accountability policies; and designing and conducting trainings on knowledge management and communication tools and approaches.

70.     CRS's acts were wanton, reckless, or in willful disregard of Mr. Doe's legal rights and intentionally violated MFEPA.

71.     As a direct result of CRS's discriminatory acts, Mr. Doe has suffered, and continues to suffer, economic harm and emotional distress, as well as professional harm. Mr. Doe has additionally suffered, and continues to suffer, from ongoing fear that he will not receive well-deserved promotions or, ultimately, will lose his job should he pursue legal action.

72.     In the absence of injunctive relief, CRS will continue to discriminate against Mr. Doe and other employees similarly affected.

**Count III – Discrimination on the Basis of Sex in Violation of**
**the Maryland Equal Pay for Equal Work Act,**
**Md. Code Ann., Lab. & Empl. § 3-301 *et seq.***

73.     Mr. Doe re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

74.     At all times material to this Complaint, Mr. Doe was an employee within the meaning of the MEPEWA.

75.     At all times material to this Complaint, CRS was an employer within the meaning of the MEPEWA. Md. Code Ann., Lab. & Empl. § 3-301(b).

76.     At all times material to this Complaint, Mr. Doe was a member of a protected class within the meaning of the MEPEWA. *Id.* § 3-304(b).

77.     MEPEWA defines the term "wages" as "all compensation for employment," and Maryland courts have interpreted this term broadly and inclusively. *See Montgomery Cty. v. Deibler*, 423 Md. 54, 71 (2011) ("We determine, from our examination of the various instances in which the General Assembly has employed the word 'wage,' that its meaning is uniform and confirms our understanding of the commonly held, dictionary definition of 'wage' . . . [which] includes a wide range of employment remunerations[.]").

78.     CRS subjected Mr. Doe to unequal wages as compared to employees of another sex who do the same type of work when it terminated Mr. Doe's spousal benefits solely because Mr. Doe is a man who is married to a man rather than a woman married to a man.

79.     On information and belief, CRS did not terminate the spousal benefits of women employees who were married to men and who perform "work of comparable character or work on the same operation, in the same business, or the same type[.]" Lab. & Empl. § 3-304(b)(1)(i).

80.     The memorandum drafted by Mr. Doe's supervisor provides direct evidence that CRS terminated Mr. Doe's spousal benefits solely because he is a man married to a man rather than a woman married to a man.

81.     In the absence of injunctive relief, CRS will continue to discriminate against Mr. Doe and other employees similarly affected.

**Count IV – Failure to Pay Wages in Violation of the**
**Maryland Wage Payment & Collection Law, Md. Code Ann., Lab & Empl. § 3-501 *et seq.***

82.     Mr. Doe re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

83.     At all times material to this Complaint, CRS was an "employer" of Mr. Doe within the meaning of the MWPCL. Lab. & Empl. § 3-501(b).

84.     The MWPCL broadly defines the term "wage" to mean "all compensation that is due to an employee for employment," including, *inter alia*, "fringe benefit[s]," and "any other remuneration promised for service." *Id.* § 3-501(a), (c)(iii) & (v).

85.     The MWPCL prohibits an employer from making a deduction from the wage of an employee unless ordered by a court of competent jurisdiction, expressly authorized by the employee in writing, allowed by Maryland's Commissioner of Labor and Industry because the employee has received full consideration for the deduction, or otherwise made in accordance with any law or any rule or regulation issued by a governmental unit. *Id.* § 3-503.

86.     In the absence of a bona fide dispute, an employer who withholds the wage of an employee in violation of the MWPCL is liable for damages not to exceed three times the wage, as well as reasonable counsel fees and other costs. *Id.* § 3-507.2(b).

87.     CRS violated the MWPCL by failing to pay Mr. Doe wages in the form of spousal benefits to which he was otherwise entitled solely because he is a man who is married to a man.

88.     In the absence of injunctive relief, CRS will continue to discriminate against Mr. Doe and other employees similarly affected.

**Count V – Common Law Breach of Contract**

89.     Mr. Doe re-alleges and incorporates the allegations set forth in preceding paragraphs as though each and every allegation is fully set forth herein.

90.     At all times material to this Complaint, CRS and Mr. Doe were engaged in a written contract and/or a contract implied in fact.

91.     Specifically, CRS, through its written benefit plan documents, policies, express statements, and conduct of its authorized employees and agents, had a contractual agreement with

14

Mr. Doe. Mr. Doe agreed to perform services as an employee of CRS in exchange, in part, for healthcare coverage for his spouse.

92.    Mr. Doe has consistently and satisfactorily performed all aspects of his employment. Indeed, Mr. Doe had consistently received evaluations that he was performing at or above expectations.

93.    Until October 2017, CRS performed its end of the bargain by providing spousal benefits to Mr. Doe. The parties' mutual conduct establishes the parties' intent, as well as the terms and conditions of the written and/or implied-in-fact contract.

94.    CRS breached its contract with Mr. Doe when it terminated Mr. Doe's spousal benefits solely because Mr. Doe is a man who is married to a man rather than a woman married to a man.

95.    As a direct and proximate result of CRS's breach, Mr. Doe suffered damages, including increased out of pocket expenses.

**Count VI – Common Law Detrimental Reliance**

96.    Mr. Doe re-alleges and incorporates the allegations set forth in preceding paragraphs as though each and every allegation is fully set forth herein.

97.    CRS made a clear and definite promise to Mr. Doe that his spouse would be covered as a dependent under CRS's Benefit Plan with Aetna.

98.    Mr. Doe accepted the first position with CRS in mid-2016, and he and his spouse relocated to Baltimore, Maryland. Mr. Doe chose not to seek outside insurance for his husband in reliance on CRS's promise to provide Mr. Doe spousal benefits.

99.     Mr. Doe has requested that CRS provide him with the spousal benefits it once promised, but provision of those benefits has been wrongfully denied by CRS. Accordingly, injustice will result if CRS's promise is not enforced.

100.     CRS's failure to provide Mr. Doe with spousal benefits caused a detriment to Mr. Doe. For example, as a direct and proximate result of CRS's failure to provide spousal benefits, Mr. Doe has been forced to pay for alternative health and dental care coverage for his husband (i.e., independent coverage), who underwent additional oral surgery as a result of the delay in dental coverage that would cover the remaining procedures needed.

## Count VII – Common Law Negligent Misrepresentation

101.     Mr. Doe re-alleges and incorporates the allegations set forth in preceding paragraphs as though each and every allegation is fully set forth herein.

102.     At all times material to this Complaint, CRS owed a duty of care to Mr. Doe to provide him truthful and accurate information concerning his and his spouse's health benefits.

103.     CRS negligently represented through its employees and/or agents that Mr. Doe's spouse would be covered as a dependent under CRS's Benefit Plan with Aetna.

104.     CRS, through its employees and/or agents, intended that its statement that Mr. Doe's spouse would be covered as a dependent under CRS's Benefit Plan with Aetna would be acted upon by Mr. Doe.

105.     CRS had knowledge that Mr. Doe would probably rely on this statement, which, if erroneous, would cause loss or injury to Mr. Doe.

106.     Relying on CRS's statement that Mr. Doe's spouse would be covered as a dependent under CRS's Benefit Plan with Aetna, Mr. Doe chose not to search for outside insurance coverage for his husband.

107.     CRS's negligent misrepresentation directly and proximately caused damage to Mr. Doe. Specifically, as a direct and proximate result of CRS's failure to provide spousal benefits, Mr. Doe has been forced to pay for alternative health care coverage for his spouse.

### Count VIII – Discrimination in Violation of Title VII of The Civil Rights Act, 42 U.S.C. § 2000e-2(a).

108.     Mr. Doe re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

109.     At all times material to this Complaint, Mr. Doe was a member of the class of persons protected by federal statutes based on his sex. 42 U.S.C. § 2000e-2(a).

110.     CRS is an employer subject to Title VII, as amended, 42 U.S.C. § 2000e-2(a), and has a legal obligation to provide Mr. Doe and all employees a workplace free of unlawful discrimination.

111.     CRS discriminated against Mr. Doe on the basis of sex when it terminated Mr. Doe's spousal benefits solely because he is a man married to a man rather than a woman married to a man.

112.     Further, CRS discriminated against Mr. Doe based on pre-conceived gender stereotypes when it terminated Mr. Doe's spousal benefits because he failed to fit the gender stereotype that cisgender men should marry cisgender women.

113.     CRS also discriminated against Mr. Doe based on his association with his same-sex spouse.

114.     According to the memorandum drafted by Mr. Doe's supervisor detailing the meeting between Mr. Doe, the senior CRS official, and Mr. Doe's supervisor, the senior CRS official recognized: Mr. Doe was promised, and previously received, spousal coverage for his husband when Mr. Doe began his employment; Mr. Doe's spousal benefit was being terminated

because his husband is a man; and the Summary of Employee Benefits PDF was changed to state, "Following the Catholic Church's definition of marriage, we cannot offer benefits to unmarried domestic partners, nor to same-sex spouses." Ex. 2 at 2.

115.    On information and belief, CRS has not removed the spousal benefits of any other similarly situated cisgender woman employee who is married to a cisgender man.

116.    As a direct result of CRS's discriminatory acts taken against Mr. Doe, Mr. Doe has suffered, and continues to suffer, economic harm, emotional distress, and anxiety. Mr. Doe has additionally suffered, and continues to suffer, from ongoing fear that he will not receive well-deserved promotions or, ultimately, will lose his job should he pursue legal action. Therefore, Mr. Doe seeks full compensation for this emotional damage, as well as for his economic losses.

117.    CRS's actions were malicious, intentional, and repeated violations of federal civil rights law.

118.    In the absence of injunctive relief, CRS will continue to discriminate against Mr. Doe and other employees similarly affected.

## Count IX – Discrimination on the Basis of Sex in
## Violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1)

119.    Mr. Doe re-alleges and incorporates the allegations set forth in preceding paragraphs as though each and every allegation is fully set forth herein.

120.    At all times material to this Complaint, Mr. Doe was an "employee" of CRS within the meaning of the Equal Pay Act. 29 U.S.C. § 203(e)(1).

121.    At all times material to this Complaint, CRS was an "employer" within the meaning of the Equal Pay Act. 29 U.S.C. § 203(d).

122.    Health insurance benefits are considered "wages" within the meaning of the Equal Pay Act. 29 C.F.R. § 1620.11(a).

123.    CRS subjected Mr. Doe to unequal treatment on the basis of sex when it terminated Mr. Doe's spousal benefits solely because he is a man who is married to a man.

124.    On information and belief, CRS did not terminate the spousal benefits of women employees who were married to men and who perform "equal work on jobs the performance of which requires equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1).

125.    The memorandum drafted by Mr. Doe's supervisor provides direct evidence that CRS terminated Mr. Doe's spousal benefits solely because he is a cisgender man married to a man rather than a cisgender woman married to a man.

126.    In the absence of injunctive relief, CRS will continue to discriminate against Mr. Doe and other employees similarly affected.

**Count X – Retaliation in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, Equal Pay Act, 29 U.S.C. § 206(d)(1), Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq.*, and <u>Maryland Equal Pay for Equal Work Act, Md. Code Ann., Lab. & Empl. § 3-301 *et seq.*</u>**

127.    Mr. Doe re-alleges and incorporates the allegations set forth in preceding paragraphs as though each and every allegation is fully set forth herein.

128.    Federal and state anti-discrimination laws prohibit an employer from retaliating against an employee for engaging in protected activity such as opposing an unlawful employment practice as defined by those anti-discrimination laws. *See* Title VII, 42 U.S.C. § 2000e-3(a); EPA, 29 U.S.C. § 215(a)(3); MEPEWA, Lab. & Empl. § 3-308(a)(4); MFEPA, State Gov't § 20-606(f).

129.    Mr. Doe engaged in protected activity when he opposed the discriminatory termination of his husband's spousal benefits, as he reasonably believed that CRS's termination of spousal benefits violated federal and state antidiscrimination statutes. *See Netter v. Barnes*, 908 F.3d 932, 936-37 (4th Cir. 2018) (stating that, under the "opposition clause" of Title VII, an

employee must show that (1) he reasonably believed that the employment action he opposed constituted a Title VII violation, and that (2) his conduct in opposition was reasonable).

130.    CRS subjected Mr. Doe to retaliation when the senior CRS official attempted to deter Mr. Doe from engaging in protected activity by threatening him and telling him that, if he chose to "push the issue, doing so would hurt [Mr. Doe]."

131.    CRS further retaliated against Mr. Doe when the senior CRS official further implicated that CRS would terminate him if he pursued legal action and stating something to the effect that it is only natural that the employer would not want to continue paying that employee who filed a lawsuit against the employer.

132.    Finally, CRS retaliated against Mr. Doe when senior CRS official informed Mr. Doe that "some people who oversee CRS" would like to see him terminated.

133.    These statements were made by CRS employees to dissuade Mr. Doe from engaging in protected EEO activity.

134.    But for Mr. Doe's opposition to CRS's termination of spousal benefits, CRS would not have engaged in the above-mentioned retaliatory conduct in an attempt to dissuade him from engaging in future protected EEO activity.

135.    Mr. Doe was treated less favorably than other similarly situated employees who did not engage in protected activity.

136.    Thus, CRS's conduct, acting through executive and managerial employees, constitutes retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a), the Equal Pay Act, 29 U.S.C. § 215(a)(3), MEPEWA, Lab. & Empl. § 3-308(a)(4), and MFEPA, State Gov't § 20-606(f).

137.    As a direct result of CRS's retaliatory acts, Mr. Doe has suffered, and continues to suffer, economic harm, emotional distress, and anxiety. Mr. Doe has additionally suffered, and continues to suffer, from ongoing fear that he will not receive well-deserved promotions or, ultimately, will lose his job should he pursue legal action.

138.    CRS's retaliatory actions were malicious, intentional, and repeated.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Doe respectfully prays that this Court grant him the following:

A.    Declare that CRS's acts and practices violate state and federal laws prohibiting discrimination on the bases of sex and/or sexual orientation, association, and retaliation;

B.    Order CRS to cease its discrimination and retaliation;

C.    Order CRS to reinstate Mr. Doe's spousal benefits;

D.    Order CRS to modify its benefits policies to provide benefits for employees' same-sex spouses to the same extent it provides benefits to employees' opposite-sex spouses;

E.    Order CRS to implement anti-discrimination measures to ensure that CRS's unlawful employment practices are identified and eliminated, anti-discrimination training for CRS employees and agents, and to provide all other equitable relief to which Mr. Doe is entitled;

F.    Award Mr. Doe compensatory damages for the economic and emotional harms he experienced as a result of CRS's actions;

G.    Pursuant to 29 U.S.C. § 216(b) and/or Lab. & Empl. § 3-307(a)(1), award Mr. Doe any and all unpaid wages and an additional equal amount as liquidated damages, or, in the alternative, award Mr. Doe an additional two times his damages as liquidated damages pursuant to § 3-507.2(b).of the MWPCL;

H.    Award Mr. Doe punitive damages in an amount to be determined by a jury;

I.        Award all pre-judgment interest allowed by law;

J.        Award Mr. Doe reasonable attorneys' fees and costs as authorized by Title VII, the

Equal Pay Act, MFEPA, MEPEWA, and MWPCL; and

K.        Award any other such relief this Court deems just and proper.


Dated: June 12, 2020                 Respectfully submitted,

/s/ Eve L. Hill
/s/ Regina Kline
/s/ Anthony J. May

Eve L. Hill, Esq.
Regina Kline, Esq.
Anthony J. May, Esq.
Brown Goldstein Levy LLP
120 E. Baltimore St, Suite 1700
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
EHill@browngold.com
RKline@browngold.com
AMay@browngold.com

/s/ Shannon C. Leary

_____
Shannon C. Leary, Esq.
Gilbert Employment Law, P.C.
1100 Wayne Ave, Suite 900
Silver Spring, MD 20910
Tel: (301) 608-0880
Fax: (301) 608-0881
Sleary-efile@gelawyer.com

*Attorneys for Plaintiff*