**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
**Northern Division**

_____
                                                    )
JOHN DOE,                                )
                                                    )
      Plaintiff,                           )
                                                    )          **Civil Action No. CCB-20-1815**
      v.                                        )
                                                    )
CATHOLIC RELIEF SERVICES,      )
                                                    )
_____)

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS COUNTS I–VII**

Eve L. Hill, Esq. (Bar. No. 19938)
Anthony J. May, Esq. (Bar No. 20301)
Brown Goldstein Levy LLP
120 E. Baltimore St, Suite 1700
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
EHill@browngold.com
AMay@browngold.com

*Attorneys for Plaintiff*

Shannon C. Leary, Esq. (Bar No. 18396)
Gilbert Employment Law, P.C.
1100 Wayne Ave, Suite 900
Silver Spring, MD 20910
Tel: (301) 608-0880
Fax: (301) 608-0881
Sleary-efile@gelawyer.com

Filed September 21, 2020

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

LEGAL STANDARD .................................................................................................... 5

ARGUMENT ................................................................................................................. 6

I.      Under Maryland Law, Mr. Doe Has Adequately Alleged a Breach of Contract
        Claim Based on the Existence of a Written or Implied-In-Fact Contract. .............. 6

        A.      CRS's Benefit Plan Constitutes a Written Contract for the Provision
                of Spousal Benefits. ...................................................................................... 6

        B.      CRS's Conduct Created an Implied-in-Fact Contract with Mr. Doe. ........ 10

II.     Mr. Doe's Claims of Detrimental Reliance and Negligent Misrepresentation
        Are Equally Viable. ................................................................................................ 13

        A.      Mr. Doe's Allegations Satisfy the Elements of Detrimental Reliance. .... 14

        B.      Mr. Doe Has Adequately Alleged a Claim for Negligent
                Misrepresentation. ....................................................................................... 17

III.    Mr. Doe Has Adequately Alleged that CRS Failed to Pay Him Wages Due
        and Owing Pursuant to the MWPCL. .................................................................... 19

IV.     Mr. Doe Has Adequately Alleged Discrimination Against CRS in Violation
        of MFEPA and MEPEWA. ..................................................................................... 21

        A.      Mr. Doe Has Adequately Stated Claims for Both Sex Discrimination
                and Sexual Orientation Discrimination Under MFEPA. ......................... 21

        B.      Mr. Doe Has Adequately Stated a Claim for Sex Discrimination
                Under MEPEWA. ........................................................................................ 24

        C.      MFEPA's Provision Allowing Religious Entities to Refuse to Employ
                People on the Basis of Sexual Orientation Should Not Apply to the
                Discrimination at Issue Here. ..................................................................... 26

CONCLUSION ............................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*Adkins v. Peninsula Reg'l Med. Ctr.*,
224 Md. App. 115 (2015), *aff'd*, 448 Md. 197 (2016)..................................................26

*Alexander v. Marriott Int'l, Inc.*,
No. RWT–09–2402, 2011 WL 1231029 (D. Md. Mar. 29, 2011)..............................22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................5, 6

*Bagwell v. Peninsula Reg'l Med. Ctr.*,
106 Md. App. 470 (1995) ..............................................................................................10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................5, 10

*Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*,
No. ELH-18-3918, 2020 WL 1063060 (D. Md. Mar. 5, 2020) ....................................19

*B-Line Med., LLC v. Interactive Dig. Solutions, Inc.*,
209 Md. App. 22 (2012) ..................................................................................................7

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020).........................................................................................passim

*Burt v. Myer*,
71 Md. 467 (1889) ..........................................................................................................12

*Chappell v. S. Md. Hosp., Inc.*,
320 Md. 483 (1990) ........................................................................................................22

*Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*,
358 Md. 83 (2000) ..........................................................................................................12

*Cochran v. Norkunas*,
398 Md. 1 (2007) ........................................................................................................7, 8

*Cunningham v. Feinberg*,
441 Md. 310 (2015) .................................................................................................20–21

*Dahl v. Brunswick Corp.*,
277 Md. 471 (1976) ..........................................................................................................7

*Dialist Co. v. Pulford*,
42 Md. App. 173 (1979) ............................................................................................9, 15

*Dole v. Shenandoah Baptist Church*,
899 F.2d 1389 (4th Cir. 1990) ......................................................................................26

*E.E.O.C. v. Performance Food Grp., Inc.*,
16 F. Supp. 3d 584 (D. Md. 2014).................................................................................21

*Edgewood Mgmt. Corp. v. Jackson*,
212 Md. App. 177 (2013) ..............................................................................................22

*Gaskins v. Marshall Craft Assocs., Inc.*,
110 Md. App. 705 (1996) ..................................................................... 24

*Goldstein v. Miles*,
159 Md. App. 403 (2004) ..................................................................... 17

*Grant v. ISEC, Inc.*,
No. RDB 08-2791, 2010 WL 1569856 (D. Md. Apr. 19, 2010) ................ 20

*Grillo v. Lucent Techs., Inc.*,
No. L-04-2790, 2005 WL 8174562 (D. Md. Jan. 11, 2005)................... 15–16

*Hausfeld v. Love Funding Corp.*,
131 F. Supp. 3d 443 (D. Md. 2015)........................................................ 19

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
565 U.S. 171 (2012)............................................................................. 26

*Md. Shipbuilding & Drydock Co., Inc. v. Md. Comm'n on Human Rel.*,
70 Md. App. 538 (1987) ........................................................................ 22

*Mogavero v. Silverstein*,
142 Md. App. 259 (2002) ...................................................................... 11

*Molesworth v. Brandon*,
341 Md. 621 (1996)............................................................................. 29

*Mylan Labs., Inc. v. Matkari*,
7 F.3d 1130 (4th Cir. 1993) ................................................................. 5–6

*Obergefell v. Hodges*,
576 US 644 (2015)................................................................................. 9

*Pavel Enters., Inc. v. A.S. Johnson Co.*,
342 Md. 143 (1996)............................................................................. 15

*Peters v. Early Healthcare Giver, Inc.*,
439 Md. 646 (2014) ............................................................................. 21

*Raines v. Am. Fed'n of Teachers – Md. Prof'l Emps. Council, AFL-CIO Local 6197*,
No. ADC-19-1266, 2019 WL 4467132 (D. Md. Sept. 18, 2019)................ 25

*Safeway Stores, Inc. v. Altman*,
296 Md. 486 (1983) ............................................................................... 7

*Schilling v. Schmidt Baking Co., Inc.*,
876 F.3d 596 (4th Cir. 2017) ................................................................ 20

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
363 F.3d 299 (4th Cir. 2004) ................................................................ 26

*Slick v. Reinecker*,
154 Md. App. 312 (2003) ................................................................. 10–11

*State Farm Fire & Cas. Co. v. Baskett*,
No. 1:16-CV-02547-JMC, 2017 WL 2629497 (D.S.C. June 16, 2017) ........ 8

*Stevenson v. Branch Banking and Tr. Corp.*,
  159 Md. App. 620 (2004) ...................................................................... 9

*Suburban Hosp., Inc. v. Dwiggins*,
  324 Md. 294 (1991) ............................................................................. 6

*Tasciyan v. Med. Numerics*,
  820 F. Supp. 2d 664 (D. Md. 2011) .................................................... 12

*Taylor v. Giant of Md., LLC*,
  423 Md. 628 (2011) ........................................................................... 22

*Taylor v. NationsBank, N.A.*,
  365 Md. 166 (2001) ............................................................................. 6

*Thomas v. Capital Med. Mgmt. Assocs., LLC*,
  189 Md. App. 439 (2009) .............................................................. 7, 12

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
  471 U.S. 290 (1985) .......................................................................... 26

*Torrence v. Chicago Tribune Co.*,
  535 F. Supp. 748 (N.D. Ill. 1982) ...................................................... 16

*Vogel v. Independent Fed. Sav. Bank*,
  728 F. Supp. 1210 (D. Md. 1990) ...................................................... 16

*Whiting-Turner Contracting Co. v. Fitzpatrick*,
  366 Md. 295 (2001) ........................................................................... 19

*Wooldridge v. World Championship Sports Network, Inc.*,
  No. DKC 2007-3482, 2009 WL 3048677 (D. Md. Sept. 17, 2009) ............ 7, 9

*Yeibyo v. E-Park of DC, Inc.*,
  No. DKC 2007-1919, 2008 WL 182502 (D. Md. Jan. 18, 2008) ................ 19

**Statutes**

29 U.S.C. § 201 ................................................................................... 25

29 U.S.C. § 206 ..................................................................................... 1

42 U.S.C. § 2000 ................................................................................... 1

Md. Code Ann., Lab. & Empl. § 3-301 .................................................... 1

Md. Code Ann., Lab. & Empl. § 3-501 .................................................... 1

Md. Code Ann., State Gov't § 20-601 ...................................................... 1

Md. Code Ann., State Gov't § 20-604 ........................................ 21, 26, 27

iv

**Other Authorities**

1 Joseph M. Perillo, *Corbin on Contracts*, § 2.9 (Rev. ed. 1993) ..................................... 8

Annie Linskey, *O'Malley signs same-sex marriage bill*, Baltimore Sun (March 1, 2012), https://www.baltimoresun.com/politics/bs-xpm-2012-03-01-bs-md-marriage-signing-20120224-story.html (last visited Sept. 21, 2020) ......................... 8–9

*Careers and Jobs at CRS*, Catholic Relief Srvcs., https://www.crs.org/about/careers (last visited Sept. 18, 2020) ................................................................................... 27

Dan B. Dobbs, *Handbook on the Law of Remedies* § 4.2 (1973) ..................................... 11

*Fair Labor Standards Handbook for States, Local Governments and Schools* (Susan Prince ed., Supp. July 2019), 2005 WL 4891056 ......................................................... 25

*Restatement (Second) of Contracts* § 90(1) (1979) .......................................................... 15

**INTRODUCTION**

After filing a timely Charge of Discrimination with the Equal Employment Opportunity Commission, and subsequently receiving a right to sue letter on June 1, 2020, Plaintiff, John Doe, commenced this action against his employer, Defendant, Catholic Relief Services ("CRS"). Compl., ECF No. 1 (June 12, 2020) ¶¶ 45–51. In his ten-count Complaint, Mr. Doe seeks equitable and monetary relief from CRS for discrimination based on sex and sexual orientation in violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.*, (Counts I and II); discrimination on the basis of sex in violation of the Maryland Equal Pay for Equal Work Act ("MEPEWA"), Md. Code Ann., Lab. & Empl. § 3-301 *et seq.*, (Count III); the denial of wages pursuant to the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. § 3-501 *et seq.*, (Count IV); common law claims for breach of contract (Count V), detrimental reliance (Count VI), and negligent misrepresentation (Count VII); discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, (Count VIII) and the Federal Equal Pay Act ("FEPA"), 29 U.S.C. § 206(d)(1) (Count IX); and for retaliation pursuant to Title VII, FEPA, MFEPA, and MEPEWA.

CRS seeks to dismiss Mr. Doe's common law and MWPCL claims, alleging it has not violated state law by terminating Mr. Doe's spousal benefits based on the premise that Mr. Doe as an "at will employee."[1] But CRS ignores the plain language of its own Benefit

---

[1] CRS initially also moved to dismiss Mr. Doe's breach of contract, detrimental reliance, and negligent misrepresentation claims on the basis of the statute of limitations, but amended its motion to withdraw that argument in recognition of the tolling agreement entered by the parties. Def's Not. of Am. Mem. in Supp. of Def's Mot. to Dismiss Counts I–VII, ECF No. 16 (Aug. 28, 2020).

Plan (as defined below), which creates a contractual obligation to provide Mr. Doe spousal benefits, a determination that CRS made and is "binding and conclusive." Compl. Ex. 1 at 2. Accordingly, CRS's request to dismiss Mr. Doe's claims for breach of contract, detrimental reliance, negligent misrepresentation, and violation of the MWPCL should be denied.

Moreover, CRS attempts to thwart Mr. Doe's claims under MFEPA and MEPEWA on the faulty premise that those Maryland statutes are distinguishable from their federal counterparts. Because CRS ignores the expansive precedent interpreting MFEPA and MEPEWA the same as their federal analogs (federal claims that CRS has not moved to dismiss), CRS's requests to dismiss these counts should be similarly rejected.

Finally, CRS contends Mr. Doe's claim for discrimination on the basis of sex under MFEPA should be dismissed because it is a religious organization. Whether this religious exemption applies under the facts of this case is a question left unanswered, as evidenced by CRS's failure to move to dismiss Mr. Doe's Title VII claims on similar grounds, and it would be premature to dismiss his parallel state law claims on that basis. Accordingly, CRS's motion should be denied in its entirety.

## FACTUAL BACKGROUND

In 2016, CRS hired Mr. Doe to, among other things, provide technical and business support for users of CRS's information management platform. Compl. ¶ 13. He was first recruited by a CRS representative in mid-2016. Compl. ¶ 11. After Mr. Doe traveled to Baltimore from New York for an in-person interview, CRS offered him the position. Compl. ¶¶ 12–14.

On the day of the offer, CRS sent Mr. Doe documents explaining his employment benefits, which included a document from Aetna Health Insurance entitled "Group

2

Insurance Plan of Benefits for Catholic Relief Services." Compl. ¶ 14. Contained in that document was an eligibility provision stating that "dependent[s]" are covered, and the Plan defined "[d]ependent" as "wife or husband; children to age 26; regardless of student status." Compl. ¶ 16.

Mr. Doe is a gay, cisgender male who is, and was at the time CRS offered him a position, in a legally recognized same-sex marriage. Compl. ¶¶ 7, 17. Prior to accepting CRS's offer of employment, Mr. Doe sought confirmation that his husband would be covered by CRS's spousal health insurance based on the language in the documents he received. Compl. ¶ 18. He asked the recruiter, who told him clearly and unequivocally that "All dependents are covered." Compl. ¶ 18. Based, in part, on the recruiter's statement and the documents he had received, Mr. Doe accepted the position and relocated his family to Baltimore, Maryland. Compl. ¶ 19.

During his orientation and onboarding, Mr. Doe received a more comprehensive document concerning his benefits titled, "Benefit Plan: What your Plan Covers and How Benefits are Paid" ("Benefit Plan"). Compl. ¶ 20. That document stated, in no uncertain terms:

> Your dependents can be covered under this Plan. You may enroll the following dependents:
>
> - Your spouse
> - Your dependent children.

Compl. ¶ 21. The Benefit Plan also stated: "Aetna will rely upon your employer to determine whether or not a person meets the definition of dependent for coverage under this Plan. *This determination will be conclusive and binding upon all persons for the purposes of this Plan.*" Compl. ¶ 21 (emphasis added).

For sixteen months, the parties upheld their respective ends of the bargain: Mr. Doe satisfactorily performed all aspects of his employment; and CRS's Benefit Plan covered his spouse. Compl. ¶¶ 24–25. In November 2016, however, for the first time, CRS approached Mr. Doe to inform him that it had mistakenly provided spousal coverage and that it would be terminating Mr. Doe's spousal benefits. Compl. ¶¶ 26–27.

Mr. Doe engaged in a series of communications and met with various CRS officials over the next several months to discern why, suddenly, his legally recognized spouse would no longer be covered. *See, e.g.,* Compl. ¶¶ 27–39. CRS informed Mr. Doe that the sole reason his spousal benefits were being terminated was, counter to the plain language of the Benefit Plan Mr. Doe received, because same-sex spouses were not covered by CRS's insurance plan. Compl. ¶ 30; *see also* Def's Mem. in Supp. of Mot. to Dismiss Counts I–VII ("Mot. to Dismiss"), ECF No. 13-1 (Aug. 24, 2020) 26 ("[T]he sole reason why Plaintiff does not qualify for spousal health benefits is that Catholic teaching does not recognize same-sex marriage, and Catholic Relief Services is a Catholic Institution."). Although CRS provided Mr. Doe with a two-page document summary that purported to prohibit benefits to same-sex spouses, *see* Compl. Ex. 2 at 2, the language contained in that document was not provided to Mr. Doe when he began his employment and, upon information and belief, was not, at least as late as November 2016, reflected in CRS's Benefit Plan. Compl. ¶ 39; *see also* Compl. ¶ 37. As the document, itself, acknowledges, such a summary cannot override the provisions of the Benefit Plan. Compl. Ex. 2 at 2 ("If there are any discrepancies between this brochure and the Plan document, the Plan document prevails.").

During meetings with CRS officials, CRS's agents made various comments to Mr. Doe about what would happen should he challenge CRS's decision to terminate his spousal benefits. For example, a senior CRS official told Mr. Doe that if he chose to "push the issue, doing so would hurt [Mr. Doe]." Compl. ¶¶ 31, 130. That same senior official indicated that CRS would terminate him if he pursued legal action, stating that it would only be natural that an employer would not want to continue paying an employee who filed a lawsuit against the employer. Compl. ¶¶ 36, 131. The same senior CRS official also stated that "some people who oversee CRS" would like to see Mr. Doe terminated. Compl. ¶¶ 31, 132.

Ultimately, on October 1, 2017, CRS terminated Mr. Doe's spousal health coverage. Compl. ¶ 43. As a direct and proximate result of his spousal benefits termination, Mr. Doe was forced to secure alternative insurance coverage at higher rates than those afforded by CRS's Plan. Compl. ¶ 44. Additionally, CRS's termination of coverage resulted in delays in necessary dental work for Mr. Doe's spouse, including requiring an additional surgery that would not have been necessary had CRS maintained the coverage to which it previously determined Mr. Doe was entitled. Compl. ¶¶ 42, 44, 95, 100, 106–07.

## **LEGAL STANDARD**

This Court should deny CRS's motion because the facts alleged in the Complaint, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations, viewed in the light most favorable to Mr. Doe, need only "be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130,

1134 (4th Cir. 1993). The Court "draw[s] on its judicial experience and common sense" in deciding whether a complaint states a plausible claim for relief. *Iqbal*, 556 U.S. at 679.

## ARGUMENT

### I.   Under Maryland Law, Mr. Doe Has Adequately Alleged a Breach of Contract Claim Based on the Existence of a Written or Implied-In-Fact Contract.

The gravamen of CRS's Motion to Dismiss focuses narrowly on its position that Mr. Doe is an at-will employee. But CRS ignores entirely Mr. Doe's theory of the case that CRS's written Benefit Plan and its conduct created a contractual obligation that CRS was bound to perform for the duration of Mr. Doe's employment. CRS's failure to continue to provide the benefits it promised solely because of Mr. Doe's sex and sexual orientation breached that contract.

Mr. Doe's breach of contract claims are based on two separate theories, both of which are eminently plausible: (1) CRS's Benefit Plan is a written contract; and (2) CRS's conduct created an implied-in-fact contract for the provision of Mr. Doe's spousal benefits that CRS later breached when it terminated those benefits because of Mr. Doe's sex and sexual orientation. *See* Compl. ¶¶ 14–25, 90, 93.

### A.   CRS's Benefit Plan Constitutes a Written Contract for the Provision of Spousal Benefits.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001). Employers may make promises in their general policies that they are "contractually required to keep." *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 305–06 (1991). Indeed, "employer policy directives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." *Id.*

(alteration in original) (citations omitted); *see also Dahl v. Brunswick Corp.*, 277 Md. 471, 474–75 (1976) (concluding policy directive on severance pay constituted "an offer of a unilateral contract," even where employees had no written employment contracts).

"Maryland follows the objective theory of contract interpretation, which focuses on the written text: the construing court's task is to determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Thomas v. Capital Med. Mgmt. Assocs., LLC*, 189 Md. App. 439, 454 (2009) (internal quotation marks and citations omitted). "[W]hen the language of the contract is plain and unambiguous, there is no room for construction as the courts will presume that the parties meant what they expressed." *Wooldridge v. World Championship Sports Network, Inc.*, No. CIV.A. DKC 2007-3482, 2009 WL 3048677, at *5 (D. Md. Sept. 17, 2009) (citation and alteration omitted); *see also Cochran v. Norkunas*, 398 Md. 1, 16 (2007) ("If the language of a contract is unambiguous, [a court] give[s] effect to its plain meaning and do[es] not contemplate what the parties may have subjectively intended by certain terms at the time of formation.").

CRS's Benefit Plan establishes a written contract between CRS and Mr. Doe that requires it to provide benefits coverage to Mr. Doe's spouse for the duration of his employment. "The elements of a contract are offer, acceptance, and consideration." *B-Line Med., LLC v. Interactive Dig. Solutions, Inc.*, 209 Md. App. 22, 46 (2012); *Safeway Stores, Inc. v. Altman*, 296 Md. 486, 489 (1983) (citations omitted) ("One of the essential elements for formation of a contract is a manifestation of agreement or mutual assent by the parties to the terms thereof[.]"). At the time Mr. Doe joined CRS and before CRS stated that it would no longer provided spousal benefits to Mr. Doe, the Benefit Plan documents

7

contained material, relevant, and specific terms, stating that spouses were eligible dependents, without qualification. Compl. ¶ 21; *see also* Compl. Ex. 1 at 2. The Benefit Plan documents contained similar language until as late as January 1, 2019, and, to Mr. Doe's knowledge, remains today. Compl. ¶ 37. Mr. Doe received an offer that informed him he was eligible for these medical benefits. Compl. ¶¶ 18–20, 22–23.

CRS's determination at that time that Mr. Doe's spouse was covered by its Benefit Plan was "conclusive and binding upon all persons for the purpose of this Plan," *i.e.,* Mr. Doe and CRS. Compl. Ex. 1 at 2. *See Cochran*, 398 Md. at 13 (quoting 1 Joseph M. Perillo, *Corbin on Contracts*, § 2.9, p. 157–58 (Rev. ed. 1993)) (emphasis added) (explaining various ways contracting parties may contemplate memorializing their intent to be bound by an agreement, with the most express agreements "stat[ing] that they intend their present expression to be a <u>binding</u> agreement or contract" and that "such an express statement should be <u>conclusive</u> on the question of their 'intention.'"). There was no limitation period on the receipt of such benefits; indeed, the binding and conclusive nature of the benefits reveals they were to continue until Mr. Doe was no longer employed with CRS, or at the very least until the Benefit Plan is formally changed.

It can hardly be argued that the term "spouse" is ambiguous. *Cf. State Farm Fire & Cas. Co. v. Baskett*, No. 1:16-CV-02547-JMC, 2017 WL 2629497, at *3 (D.S.C. June 16, 2017) ("In analyzing the Policy's provision, the court finds that the language in the Policy is plain and unambiguous—the named insured designated as an individual in the Policy includes the named insured and spouse."). Indeed, same-sex marriage had been legally recognized in Maryland since January 1, 2013, *see* Annie Linskey, *O'Malley signs same-sex marriage bill*, Baltimore Sun (March 1, 2012),

https://www.baltimoresun.com/politics/bs-xpm-2012-03-01-bs-md-marriage-signing-20120224-story.html (last visited Sept. 21, 2020), and the Supreme Court recognized marriage as a constitutional right for same sex-couples in 2015, *see generally Obergefell v. Hodges*, 576 US 644 (2015). Thus, CRS can make no plausible argument that there is an unambiguous interpretation of its Benefit Plan that only opposite-sex spouses are covered.[2]

CRS relies on a single line in a brochure that was provided to Mr. Doe in mid to late 2017, months after he began working for CRS and after CRS provided Mr. Doe and his husband spousal benefits, for the proposition that CRS cannot be held liable for breach of contract. *See* Compl. Ex. 2 at 2 ("Following the Catholic Church's definition of marriage, we cannot offer benefits to unmarried domestic partners, nor to same-sex spouses[.]"). But CRS attempts to ignore the controlling Benefit Plan at the heart of this case, which states clearly and unequivocally that "Aetna will rely upon your employer to determine whether or not a person meets the definition of dependent for coverage under this Plan. This determination will be *conclusive and binding* upon all persons for the purpose of this Plan." Compl. Ex. 1 at 2. Mr. Doe's allegations are more than sufficient to establish a breach of contract claim.

---

[2] Even if the term spouse could somehow be found to be ambiguous, Mr. Doe's breach of contract claims should nevertheless survive CRS's Motion to Dismiss. When contract terms are ambiguous, extrinsic or parol evidence may be brought in to interpret them, so long as the parol evidence does not contradict the written contract. *Wooldridge*, 2009 WL 3048677, at *6. In *Stevenson v. Branch Banking and Tr. Corp.*, the court held that the defendant's verbal representation to the plaintiff that "stock option profits would be counted toward Termination Compensation was enough to get her to the jury." 159 Md. App. 620, 654 (2004); *see also Dialist Co. v. Pulford*, 42 Md. App. 173, 177 (1979) (finding employer's verbal promise admitted to interpret ambiguous contract term). Similarly, CRS's representations that Mr. Doe's husband was covered would be admissible evidence to interpret "ambiguous" words like "spouse" in CRS's Benefit Plan. And parol evidence is evaluated on an objective basis, making CRS's subjective intent irrelevant. *Stevenson*, 159 Md. App. at 650–51.

The terms of that policy formed a written contract with Mr. Doe. The subsequent single line in a CRS brochure does not dictate a different outcome. First the brochure, by its own terms, provides that, in the case of any inconsistency with the Benefit Plan, the Benefit Plan prevails. Compl. Ex. 2 at 2. Second, "[g]eneral statements of policy are no more than that and do not meet the contractual requirements of an offer." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 492–93 (1995). Indeed, as Mr. Doe has alleged, upon information and belief, as of January 1, 2019, CRS's Benefit Plan does not reflect any apparent "policy" that would permit CRS to refuse to provide spousal benefits to same-sex couples. Compl. ¶¶ 37, 39. CRS's determination that Mr. Doe's spouse met the definition of dependent for purposes of insurance coverage for sixteen months was "conclusive and binding" for the duration of Mr. Doe's employment, or at least until the Benefit Plan is amended.[3] Thus, Mr. Doe has alleged "enough factual matter (taken as true) to suggest that an agreement was made," *Twombly*, 550 U.S. at 556, and his claim for breach of contract should remain.

### B. CRS's Conduct Created an Implied-in-Fact Contract with Mr. Doe.

Moreover, CRS created an implied-in-fact contract to provide Mr. Doe with spousal benefits that it wrongfully terminated without justification. "An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'" *Slick v. Reinecker*, 154 Md. App. 312, 317 (2003)

---

[3] Even then, while a Benefit Plan may be amended non-discriminatorily for all employees, for example by eliminating spousal benefits for all employees, a Benefit Plan amendment based on illegal discrimination under MFEPA, MEPEWA, Title VII, and FEPA is invalid. As Mr. Doe's Title VII and FEPA claims are not the subjects of CRS's Motion to Dismiss, even if its Benefit Plan has been amended since 2019, the validity of that amendment, and the contract which it embodies, must await determination of those claims.

(quoting *Mogavero v. Silverstein*, 142 Md. App. 259, 275 (2002)). Contracts implied in fact are just as valid and enforceable as those in writing. *Id.*

> To be enforceable the terms of the implied contract must be clear:
>
> The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties.

*Mogavero*, 142 Md. App. at 272; *see also* Dan B. Dobbs, *Handbook on the Law of Remedies* § 4.2 (1973) ("The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words. In other words, the [implied in fact] contract is proved by circumstantial evidence.").

Here, CRS's verbal representations to Mr. Doe and the course of conduct between the parties sufficiently establishes a contract implied in fact. Mr. Doe asked specifically whether his same-sex spouse would be covered by CRS's healthcare plan, and CRS stated, without qualification, that he would be. Compl. ¶¶ 18, 22. Indeed, CRS does not dispute that it provided the benefits at issue for sixteen months. Mot. to Dismiss 11. Thus, the terms of the contract are both material and concrete: Mr. Doe would do his work in exchange, in part, for healthcare coverage for his husband.[4] The parties' conduct for the first sixteen months of Mr. Doe's employment, in which CRS accepted Mr. Doe's husband as a dependent, indicates that the parties understood these to be the terms of their agreement.

---

[4] It is undisputed that Mr. Doe has upheld his end of the bargain. *See* Mot. to Dismiss 33 (acknowledging that Mr. Doe "was initially hired to perform internal IT services . . . and was subsequently promoted to a position where he is responsible for designing databases and dashboards and performing related administrative and training services . . ."); *id.* at 24 ("Catholic Relief Services appreciates Plaintiff's good work . . .").

These facts, taken in the light most favorable to Mr. Doe, *Tasciyan v. Med. Numerics*, 820 F. Supp. 2d 664, 669 (D. Md. 2011), satisfy the plausibility standard.

In *Thomas*, 189 Md. App. at 459, the Maryland Court of Special Appeals held that parties' performance of their obligations under an allegedly deficient written contract evidenced an enforceable contract implied in fact. The Court concluded that although a written contract for the performance of radiology billing services did not include certain named parties, the parties' conduct "for a year after the [deficient a]greement was signed" created "an implied in fact contract . . . between the parties[.]" *Id.* at 458–59 (citing *See Burt v. Myer*, 71 Md. 467, 504 (1889)) (footnote omitted) ("It is true that where there is a failure to prove a special contract the law will imply a contract by the parties to do what *ex [a]equo et bono* they ought to do."); *see also County Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94 (2000) (internal quotation marks omitted) ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.").

CRS's argument that it was free to terminate Mr. Doe's benefits and that Mr. Doe "was free to accept the adjustment and continue working for [CRS] or quit," Mot. to Dismiss 10, ignores the factual allegations in Mr. Doe's Complaint. Try as it might, CRS cannot escape that it entered into an agreement, based on the Benefit Plan and the parties' conduct, that Mr. Doe's spouse would be covered.[5] The contract (as documented in the

---

[5] CRS's example that the "economic fallout from the COVID-19 pandemic" could give it a license to discriminate similarly misses the mark. Mot. to Dismiss 10–11. It is simply not the case that the existence of a devastating global pandemic could be a legitimate excuse for CRS to discriminatorily alter its benefits for a single employee. Although no such crisis existed when CRS took its challenged actions, and an economic crisis might provide a

Benefit Plan) remained in effect until at least 2019, and discovery will reveal whether it remains in effect to this day.

Under CRS's view of the law, an employer could make any discriminatory determination to provide unequal wages and benefits to any employee simply because the employee is "at-will," even in the presence of a valid contract. In other words, CRS could simply decide to pay all women employees half the salary of their male counterparts without penalty. Such a decision would undoubtedly be counter "to a system that prizes freedom of contract and economic mobility." Mot. to Dismiss 11. Mr. Doe has satisfied the pleading requirements and CRS's motion to dismiss his breach of contract claims should be rejected.

## II.   Mr. Doe's Claims of Detrimental Reliance and Negligent Misrepresentation Are Equally Viable.

Counts VI and VII of Mr. Doe's Complaint for detrimental reliance and negligent misrepresentation are equally viable based on CRS's written Benefit Plan, its representations, and its post-hiring conduct relating to Mr. Doe's spousal benefits.

Unlike the promises made in the cases CRS cites, CRS's promises to Mr. Doe were neither ambiguous nor facially unreasonable. Rather, CRS's statements regarding coverage of same-sex spouses were particular and supported by its written Benefit Plan. If, as CRS maintains, its recruiter's statements that same-sex couples are covered was "erroneous," Mot. to Dismiss 1, then the recruiter's statements were *false*. Whether those statements

---

legitimate basis for eliminating spousal benefits for all employees, it cannot justify, or even explain, a decision to discriminate against a single employee. As CRS readily admits, "the sole reason why Plaintiff does not qualify for spousal health benefits is that Catholic Teaching does not recognize same-sex marriage." *Id.* at 26. However, CRS recognized that Mr. Doe's spouse was eligible for coverage for sixteen months and points to no change in Catholic Teaching regarding same-sex marriage during that period to escape its "binding and conclusive" determination. Compl. Ex. 1 at 2.

constitute a negligent representation or a promise subject to detrimental reliance is an issue of fact not appropriate for resolution upon a Motion to Dismiss.

CRS's brief argues that its Benefit Plan once covered same-sex spouses (and therefore, Mr. Doe got the benefit of his bargain) and then CRS changed its Benefit Plan.[6] However, the facts as alleged in Mr. Doe's Complaint, which must be taken as true, could demonstrate that according to CRS's own interpretation of the Benefit Plan, it never covered same-sex spouses and CRS misrepresented its coverage to Mr. Doe's detriment.

As Mr. Doe alleges, CRS representatives told him that they had made a "mistake" in telling Mr. Doe his spouse would be covered, Compl. ¶¶ 25–27, meaning that the Benefit Plan never covered same-sex spouses. Further, as demonstrated by its own statements on the brochure it provided to Mr. Doe, CRS relies on "Catholic Teaching" for its argument that its Benefit Plan does not, in fact, cover same-sex spouses. Compl. Ex. 2 at 2. However, Catholic Teaching on this subject has not changed Mr. Doe joined CRS in 2016. Therefore, while Mr. Doe has adequately alleged breach of contract, in the alternative, Mr. Doe maintains, and CRS's arguments bear out, that CRS's representatives' statements that the Benefit Plan covered same-sex spouses were, at the time they were made, either an intentional or negligent misrepresentation of the meaning of the Benefit Plan. Mr. Doe was entitled to rely on that representation and CRS's negligent or *ex post facto* reinterpretation of the contractual language is baseless.

### A.  Mr. Doe's Allegations Satisfy the Elements of Detrimental Reliance.

To establish a plausible claim for detrimental reliance, a plaintiff must plead:

---

[6] Mr. Doe maintains that the Benefit Plan, which, on information and belief, remains unchanged, does, and always has, covered same-sex spouses by its terms and constitutes a contract that CRS has breached.

1. a clear and definite promise;

2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;

3. which does induce actual and reasonable action or forbearance by the promisee; and

4. causes a detriment which can only be avoided by the enforcement of the promise.

*Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 166 (1996) (emphasis omitted) (adopting *Restatement (Second) of Contracts* § 90(1) (1979)). Mr. Doe's Complaint meets these required elements.

Mr. Doe specifically asked about the scope of coverage for dependents and received a definite answer. Compl. ¶¶ 18, 22, 97. The availability of health insurance is a key factor in any employee's decision to take a job, *Dialist*, 42 Md. App. at 185, and the fact that Mr. Doe specifically asked about it gave CRS "a reasonable expectation" that its representation would "induce" Mr. Doe to accept the job. Mr. Doe did in fact rely on that promise in accepting the job. Compl. ¶¶ 98, 99. Mr. Doe incurred damages in the form of being forced to pay for alternative health and dental coverage for his husband, who underwent additional oral surgery as a result of the delay in dental coverage. Compl. ¶ 100; *see also* Compl. ¶¶ 42–44 (describing additional costs incurred and delay in dental work resulting in an additional surgery that would not have been necessary had Mr. Doe's spouse "been covered by CRS's Benefit Plan with Aetna.").

CRS suggests that "when the employment relationship is at will, allegations such as . . . that an employee rejected another job offer based on her employer's assurances that she will remain in her current job are insufficient as a matter of law to state a claim for detrimental reliance." Mot. to Dismiss 13 (citing *Grillo v. Lucent Techs., Inc.*, No. L-04-

2790, 2005 WL 8174562 (D. Md. Jan. 11, 2005)). But *Grillo* does not involve facts similar to those alleged in Mr. Doe's Complaint, namely that he was offered, accepted, and temporarily received spousal coverage based on CRS's Benefit Plan in exchange for performing his employment responsibilities. CRS's determination that Mr. Doe's spouse was entitled to coverage was "binding and conclusive." Compl. Ex. 1 at 2. Nothing about the terms "binding and conclusive" could be read to authorize CRS to then terminate the coverage because "Catholic teaching does not recognize same-sex marriage." Mot. to Dismiss at 26. Indeed, CRS was well aware of both the sex of Mr. Doe's spouse and the Church's stance on same-sex marriage when it conclusively determined Mr. Doe was entitled to spousal benefits.

This Court's ruling in *Vogel v. Independent Federal Savings Bank*, 728 F. Supp. 1210 (D. Md. 1990), is instructive. The Court rejected an argument that an employer could never be estopped from discontinuing coverage based on the terms of an ERISA plan because ERISA requires the terms of any plan to be in writing. The Court noted that, "[u]nlike the question of the specifics of a plan's terms, the question of an individual's coverage admits of only two possible answers: either the individual is covered or he is not. . . ." *Id.* at 1231. The Court explained that "if . . . officials are permitted to affirmatively mislead current participants in this manner, the fiduciary duty to provide pension benefits to those participants constitutes nothing more than a hollow formalism." *Id.* at 1232 (quoting *Torrence v. Chicago Tribune Co.*, 535 F. Supp. 748, 750 (N.D. Ill. 1982)). Similarly, if, as in *Vogel*, "the defendants here are allowed to disavow their assurances to [Mr. Doe] that h[is] husband would receive continued coverage under the [Aetna] plan, then their fiduciary duty would amount to 'nothing more than a hollow formalism.'" *Id.* Mr.

Doe's claims are sufficient under the facts as alleged here to satisfy the pleading standard to plausibly establish that CRS's determination that Mr. Doe's spouse was entitled to benefits was "binding and conclusive," and Mr. Doe's claim for detrimental reliance should not be dismissed.

### B.  Mr. Doe Has Adequately Alleged a Claim for Negligent Misrepresentation.

Mr. Doe has sufficiently pled a claim for negligent misrepresentation. To prove a claim for negligent misrepresentation, a plaintiff must prove:

> (1) the defendant, owing a duty of care to the plaintiff, negligently assert[ed] a false statement;

> (2) the defendant intend[ed] that his statement [would] be acted upon by the plaintiff;

> (3) the defendant ha[d] knowledge that the plaintiff [would] probably rely on the statement, which, if erroneous, [would] cause loss or injury;

> (4) the plaintiff, justifiably, [took] action in reliance on the statement; and

> (5) the plaintiff suffer[ed] damage proximately caused by the defendant's negligence.

*Goldstein v. Miles*, 159 Md. App. 403, 435 (2004) (alterations in original) (citations omitted).

CRS's recruiter clearly and unequivocally stated that "All dependents are covered." Compl. ¶ 18; *see also* Mot. to Dismiss 1 (emphasis added) ("Catholic Relief Services had provided benefits to Plaintiff for the first sixteen months of Plaintiff's employment *because of erroneous statements by a Catholic Relief Services recruiter*."). If, as CRS claims, "the sole reason why Plaintiff does not qualify for spousal benefits is that Catholic teaching does not recognize same-sex marriage," *id.* at 26, then CRS knew that the recruiter's statement was false.

17

Puzzlingly, CRS posits that no false statements were made by its agents, Mot. to Dismiss 16, despite its concession to the contrary. Mot. to Dismiss 1; *see also id.* at 15 (claiming CRS "had no obligation to maintain that insurance coverage in which Plaintiff has been erroneously enrolled beyond the sixteen months for which it provided the coverage . . ."). CRS cannot have it both ways. If CRS's Benefit Plan did not provide insurance coverage for Mr. Doe's spouse pursuant to CRS's conclusive and binding determination that Mr. Doe's spouse met the definition of coverage, Compl. Ex. 1 at 2, then CRS's recruiter's statement was, indeed, false. And if, as Mr. Doe contends, CRS's decision to provide spousal benefits for at least sixteen months was binding and conclusive, then it could not later terminate those benefits without a formal change in policy that has yet to occur. *See* Compl. ¶¶ 37, 39. In either situation, the facts set forth in Mr. Doe's Complaint adequately state that CRS's recruiter in fact made an affirmative statement that "All dependents are covered," Compl. ¶ 18, CRS did not correct the statement, despite having months to do so during which it provided those benefits, and CRS's provision of spousal benefits consistent with that statement were "conclusive and binding upon" CRS "for the purposes of" its Benefit Plan, Compl. Ex. 1 at 2.

Contrary to CRS's assertion, Plaintiff has alleged damages significant to sustain his negligent misrepresentation claim. Mr. Doe has been forced to pay for alternative health and dental coverage for his husband, including out-of-pocket expenses for an additional oral surgery resulting from the delay in dental coverage. Compl. ¶¶ 42–44, 95, 100, 107. Those damages flow directly from CRS's representation that it would provide benefits, only to later terminate them without cause because, according to CRS, its Benefit Plan did not, in fact, provide for such coverage in the first place. Mot. Dismiss 15; Compl. ¶¶ 25–

39. Mr. Doe would not have incurred these damages had CRS upheld its end of the bargain, as it was and has always been required to do.

### III.   Mr. Doe Has Adequately Alleged that CRS Failed to Pay Him Wages Due and Owing Pursuant to the MWPCL.

Mr. Doe has satisfied the pleading requirements alleged in Count IV for violations of the MWPCL. As CRS concedes, "[t]he [Maryland] Court of Appeals made clear that the MWPCL provides a cause of action to recover wages or compensation such as bonuses and fringe benefits . . . if such compensation was agreed to in advance by both parties (employer and employee)." Mot. to Dismiss 19 (citing *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 303–305 (2001)). Indeed, CRS recognizes that "this Court should construe the statue as written—as Maryland courts have done—and apply it in cases where a plaintiff seeks to recover promised wages that were unjustifiably withheld or delayed." *Id.* (citing *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, No. ELH-18-3918, 2020 WL 1063060, at *11 (D. Md. Mar. 5, 2020)).

That is precisely what Mr. Doe asks this Court to do. As explained above, CRS made a conclusive and binding determination that Mr. Doe was promised benefits for his spouse through CRS's Benefit Plan. *See Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 456 (D. Md. 2015) ("Hausfeld's MWPCL claim for unpaid wages is effectively a contract claim."); *Yeibyo v. E-Park of DC, Inc.*, No. DKC 2007-1919, 2008 WL 182502, at *5 (D. Md. Jan. 18, 2008) (holding that an MWPCL claim sounds in contract because "employment relationships are paradigmatically contractual in nature"). These fringe benefits were a form of compensation agreed to in advance by CRS and Mr. Doe in exchange for Mr. Doe performing certain IT roles for CRS. Compl. ¶¶ 24, 92. It is undisputed that Mr. Doe has adequately upheld his end of the bargain, Mot. to Dismiss 24,

33, and it is undisputed that, since October 2017, CRS has failed to pay the spousal benefits it owes. Compl. ¶ 43. Nothing further is needed to plausibly allege a cause of action under the MWPCL.

CRS's attempt to argue that an MWPCL claims cannot coexist with a discrimination claim lacks merit. CRS provides no support for its claim that "[it] is not the proper scope of the [MWPCL]" to provide a remedy for failure to pay owed wages if the basis for the failure happens to be a discriminatory one. Mot. to Dismiss 21. In fact, it admits that Maryland authority is "[a]bsent." *Id.* at 23.

However, the text of MWPCL provides for liability without regard to the reason for the failure to pay wages or any additional remedies an injured party may have. And while Title VII, FEPA, MFEPA, and MEPEWA prohibit unlawfully withholding wages for discriminatory reasons, the MWPCL provides an independent cause of action for payment of those wages. CRS discriminated against Mr. Doe when it unjustifiably terminated his spousal benefits *and* it unjustifiably withheld those benefits that it was contractually obligated to pay. In fact, the discriminatory and unlawful basis for the withholding of the benefits is what makes the withholding unjustifiable under MWPCL. Neither of the cases Defendants cite, *Grant v. ISEC, Inc.*, No. RDB 08-2791, 2010 WL 1569856, at *4 (D. Md. Apr. 19, 2010), *aff'd*, 396 F. App'x 941 (4th Cir. 2010) (per curiam) and *Schilling v. Schmidt Baking Co., Inc.*, 876 F.3d 596, 603 & n.7 (4th Cir. 2017), involved a scenario where a plaintiff was contractually owed past-due wages in the form of benefits that the employer failed to pay, and are thus distinguishable from this case.

What constitutes an unjustifiable or unlawful withholding of spousal benefits is an issue of fact. *See Cunningham v. Feinberg*, 441 Md. 310, 349 (2015) (recognizing that

"additional facts must be found on remand before" the merits of a claim for violation of the MWPCL "may be adjudicated finally"). Because Mr. Doe has sufficiently alleged that a contract exists and that wages due have been unlawfully withheld, his MWPCL claim is appropriate and should remain. *See Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 654–55 (2014) (recognizing employees have a right to bring a private cause of action under the MWPCL to recover unlawfully withheld wages).

IV. **Mr. Doe Has Adequately Alleged Discrimination Against CRS in Violation of MFEPA and MEPEWA.**

Mr. Doe's claims in Counts I through III of his Complaint are based on the discrimination CRS subjected him to by terminating his spousal benefits because he is both gay and a man. MFEPA and MEPEWA protect Mr. Doe from CRS's wrongful termination of these benefits because he was discriminated against due to both his sex and sexual orientation. Maryland law makes clear that discrimination on either basis violates both statutes. And the discrimination alleged does not implicate the purposes of any religious exception under Md. Code Ann., State Gov't § 20-604(2), such that CRS could escape liability for its conduct.

A. **Mr. Doe Has Adequately Stated Claims for Both Sex Discrimination and Sexual Orientation Discrimination Under MFEPA.**

As to Counts I and II, MFEPA prohibits an employer from discriminating because of, *inter alia*, an individual's sex or sexual orientation. Md. Code Ann., State Gov't § 20-606(a)(1). CRS appears to acknowledge that Mr. Doe has adequately alleged discrimination based on sexual orientation pursuant to MFEPA. *See also E.E.O.C. v. Performance Food Grp., Inc.*, 16 F. Supp. 3d 584, 590 (D. Md. 2014) ("There is no heightened pleading standard in employment discrimination cases.").

However, CRS argues that discrimination on the basis of sexual orientation (Count I) can never also constitute discrimination on the basis of sex and, therefore, Mr. Doe's sex discrimination claim (Count II) must fail. Not only does the Supreme Court's analysis in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), contradict CRS's claim, but Mr. Doe's allegations in this case demonstrate precisely the facts under which an employer's discrimination is based on *both* sexual orientation and sex, and may be challenged on both bases. While no Maryland court has yet addressed the issue, the fact that MFEPA prohibits both sex discrimination and sexual orientation discrimination does not imply that an employee such as Mr. Doe cannot experience, and challenge, both.

*Bostock* addressed Title VII of the Civil Rights Act of 1964, which addressed only discrimination on the basis of sex. CRS's argument that Count II should be dismissed because, according to Defendant, "under Maryland law . . . 'sexual orientation' and 'sex' are distinct categories," Mot. to Dismiss 27, ignores longstanding Maryland precedent interpreting MFEPA in accordance with its federal counterpart.

The MFEPA "is the state law analogue of Title VII[.]" *Alexander v. Marriott Int'l, Inc.*, No. RWT–09–2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011). Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority. *See, e.g., Taylor v. Giant of Md., LLC*, 423 Md. 628, 652 (2011); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494 (1990); *Md. Shipbuilding & Drydock Co., Inc. v. Md. Comm'n on Human Rel.*, 70 Md. App. 538, 545–50 (1987); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8 (2013).

The *Bostock* majority concluded that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual

based on sex." 140 S. Ct. at 1741. As the Court in *Bostock* stated in addressing a situation similar to that presented by Mr. Doe:

> Imagine an employer who has a policy of firing any employee known to be homosexual. The employer hosts an office holiday party and invites employees to bring their spouses. A model employee arrives and introduces a manager to Susan, the employee's wife. Will that employee be fired? If the policy works as the employer intends, the answer depends entirely on whether the model employee is a man or a woman. To be sure, that employer's ultimate goal may be to discriminate on the basis of sexual orientation. But to achieve that purpose the employer must, along the way, intentionally treat an employee worse based in part on that individual's sex.

*Id.* at 1742. Like Maryland's statutes, the Court recognized that "homosexuality and transgender status are distinct concepts from sex. But . . . discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex[.]" *Id.* at 1746–47. The Supreme Court concluded that sexual orientation, like sexual harassment, can be both "conceptually distinct from sex discrimination" while also "fall[ing] within [the] sweep" of sex discrimination. *Id.* at 1747.

CRS attempts to stand that analysis on its head by drawing impenetrable barriers between the concepts of sexual orientation and sex. Although the Court stated, "it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it," *id.* at 1744, CRS would make the labels mean everything. According to CRS, when both forms of discrimination are covered, they must never overlap—*i.e.,* a victim of discrimination must choose only one. Like the argument rejected in *Bostock*, CRS's "argument unavoidably comes down to a suggestion that sex must be the sole or primary cause of an adverse employment action for [sex discrimination] liability to follow." *Id.* at 1748. The argument is no more persuasive in regard to Maryland's anti-discrimination law than it was in regard to federal law.

CRS argues that, in MFEPA, both sexual orientation and sex discrimination are explicitly covered and, therefore, *Bostock's* conclusion that sex discrimination includes sexual orientation discrimination should be rejected. Ironically, according to CRS, in Maryland, unlike throughout the United States, sexual orientation is never a form of sex discrimination.

In fact, in this case, Mr. Doe alleges both discrimination on the basis of his sexual orientation and discrimination on the basis of his sex. While discrimination on the basis of his status as a gay man constitutes both forms of discrimination, according to *Bostock*, Mr. Doe has also experienced discrimination on the basis of his sex, in that he has been denied spousal benefits because his spouse is a man, even though a woman married to a man would not be denied such benefits. Unlike the cases at issue in *Bostock,* where only sexual orientation and transgender status were at issue (the two employees were fired solely because of their status as gay and transgender, respectively), here Mr. Doe was treated differently from similarly-situated members of the opposite sex—the essence of sex discrimination. Therefore, Mr. Doe has plausibly stated claims under MFEPA based on both sexual orientation and sex.

## B.  Mr. Doe Has Adequately Stated a Claim for Sex Discrimination Under MEPEWA.

CRS argues, without support, that because MEPEWA, like Title VII, covers sex discrimination, but does not explicitly mention sexual orientation, it must be interpreted not to cover sexual orientation discrimination at all.

"The Maryland Equal Pay for Equal Work Act was patterned after the Federal Equal Pay Act," *Gaskins v. Marshall Craft Assocs., Inc.*, 110 Md. App. 705, 709 n.1 (1996) (citations omitted), and courts "appl[y] the same analysis" to claims under both statutes,

*Raines v. Am. Fed'n of Teachers – Md. Prof'l Emps. Council, AFL-CIO Local 6197*, No. ADC-19-1266, 2019 WL 4467132, at *10 (D. Md. Sept. 18, 2019). The federal EPA is part of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and in relevant part governed by the same principles. *Fair Labor Standards Handbook for States, Local Governments and Schools* app. II § 1620.1(a) (Susan Prince ed., Supp. July 2019), 2005 WL 4891056 ("Since the Equal Pay Act . . . is a part of the Fair Labor Standards Act . . . it has the same basic coverage as the FLSA . . . .").

CRS asks this Court to read a great deal into the minds of the Maryland General Assembly. CRS speculates that "it is not plausible that the legislature overlooked that category in updating the [MEPEWA]." Mot. to Dismiss 30–31. But the Supreme Court in *Bostock* cautioned against this "particularly dangerous" attempt to read the minds of legislatures when they did not do something:

> Since 1964, . . . Congress has considered several proposals to add sexual orientation to Title VII's list of protected characteristics, but no such amendment has become law. Meanwhile, Congress has enacted other statutes addressing other topics that do discuss sexual orientation. This postenactment legislative history, [defendants] urge, should tell us something. . . . But what? There's no authoritative evidence explaining why later Congresses adopted other laws referencing sexual orientation but didn't amend this one. Maybe some in the later legislatures understood the impact Title VII's broad language already promised for cases like ours and didn't think a revision needed. Maybe others knew about its impact but hoped no one else would notice. Maybe still others, occupied by other concerns, didn't consider the issue at all. All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a "particularly dangerous" basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt.

140 S. Ct. at 1747.

CRS points to no language in MEPEWA's legislative history to support the notion that the Maryland General Assembly even considered, let alone affirmatively omitted, the term sexual orientation within the context of MEPEWA. And while Maryland's Legislature

sought, in 2001, to make perfectly clear that employees were protected from sexual orientation discrimination, regardless of whether it was labeled as sex discrimination or sexual orientation discrimination, those terms are now a distinction without a difference. *See id.* at 1741; *accord Adkins v. Peninsula Reg'l Med. Ctr.*, 224 Md. App. 115, 132 (2015), *aff'd*, 448 Md. 197 (2016) (emphasis added) ("Beginning in 1965, Maryland passed the Maryland Fair Employment Practices Law, codified at Article 49B, *patterned after federal law, and amended it to comport with federal law as it was updated*.").

### C. MFEPA's Provision Allowing Religious Entities to Refuse to Employ People on the Basis of Sexual Orientation Should Not Apply to the Discrimination at Issue Here.[7]

CRS seeks to dismiss Count I by asserting that MFEPA exempts religious entities from liability for refusing to employ people to perform work connected with the activities of the religious entity based on their sexual orientation. Md. Code Ann., State Gov't § 20-604(2). As discussed above, Mr. Doe's Complaint alleges both sex discrimination and sexual orientation discrimination and Md. Code Ann., State Gov't § 20-604(2) provides no defense to sex discrimination.

---

[7] There is no general religious exception to FLSA or MEPEWA. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 298 (1985) ("There was thus broad congressional consensus that ordinary commercial businesses should not be exempted from [FLSA] simply because they happened to be owned by religious or other nonprofit organizations."); *accord Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 305 (4th Cir. 2004). In *Dole v. Shenandoah Baptist Church*, the Fourth Circuit held that the Equal Pay Act applied to "church-operated schools." 899 F.2d 1389, 1395 (4th Cir. 1990). Although there exists a ministerial exception to the Equal Pay Act, *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 196 (2012), it is undisputed that Mr. Doe's employment with CRS is not in the capacity as a minister. Thus, any argument by CRS that a religious exemption applies to Mr. Doe's state MEPEWA or federal EPA claims should be wholly rejected.

In addition, the discrimination alleged by Mr. Doe does not involve CRS's religious interest in employing only people who are not gay. In fact, CRS asserts no such interest. CRS was aware of Mr. Doe's sexual orientation, and his same-sex marriage, when it hired him and throughout his continuing career there. CRS proclaims itself to be an equal opportunity employer, including stating that "[s]election and hiring decisions are made without regard to sex, gender identity, race, age, disability, religion, national origin, color, veteran status or any other protected area." *Careers and Jobs at CRS*, Catholic Relief Srvcs., https://www.crs.org/about/careers (last visited Sept. 18, 2020).

What CRS seeks here is not the ability to decline to hire gay people based on its religious beliefs, as permitted by § 20-604(2), but the ability to exploit them after they are hired. CRS sees no burden from employing a person whose marriage conflicts with its faith, but wants to invent a legal loophole that would allow it to mislead applicants in same-sex marriages into working for CRS, and then exploiting them by paying them less than every other employee. There is no non-discriminatory reason for drawing the line at one versus the other. Even if CRS had the legal option under Maryland law to refuse to hire persons who violate its Catholic beliefs, CRS cannot decline to exercise that option and then argue that it is permitted to discriminate against them, pay them less (or not at all), and otherwise treat them as second-class citizens. In short, while gaining the benefits of proclaiming itself to be "An Equal Opportunity Employer," CRS cannot, at the same time, deny gay employees the actual benefits of equal employment opportunity.

Mr. Doe is not asking that CRS recognize his marriage as a Catholic marriage. Furthermore, as CRS's benefits package covers "dependents," it logically applies to "dependents" of any variety—whether a marriage between two persons of the Hindu faith,

Jewish faith, or even those of no faith at all—and it has not provided any evidence or indication that its benefits package does not extend to these various non-Catholic marriages. Nor does CRS's benefits package require employees or dependents to comply with Catholic standards in their marriages. For example, it does not exclude "open" marriages or marriages where the participants live separately, nor does it condition coverage of child dependents on those children being raised Catholic, on the sexual orientation or gender identity of the children, or on whether traditional conception methods are used. Rather, far from enforcing its Catholic faith on its married employees, CRS provides dependent benefits to employees' spouses and children as long as their marriages or other dependent relationships are officially recognized by the state. Mr. Doe seeks no more than what CRS offers its other employees in non-Catholic marriages.

Nor do the job duties for Mr. Doe's position relate at all to CRS's religious activities. Specifically, Mr. Doe provided technical and business support for all Salesforce computer software users within CRS. This included troubleshooting issues that employees reported with the program and expanding the functionality and use of the software to support additional business tasks, as well as providing training on how to best utilize Salesforce software. Compl. ¶¶ 13, 40, 58. And Mr. Doe is not seeking to require CRS to cover any particular medical procedure that would violate its religious beliefs, such as contraception, abortion, gender confirmation surgery, etc. Rather, Mr. Doe is simply seeking to have the opportunity to participate in CRS's health insurance program that it provides to his co-workers and that covers medical procedures and benefits that it is comfortable providing. Thus, while CRS does not need to provide a medical procedure that conflicts with its faith, it may not exclude a person from the benefits it does provide simply

because CRS does not approve of the person's use of a procedure CRS does not provide.[8] CRS explicitly does not require its employees to comply with its faith, and does not condition employment benefits on such compliance. Thus, it is discrimination on the basis of sex to impose Catholic compliance conditions only on same-sex spouses.

Finally, as explained above, Title VII and MFEPA are typically interpreted as affording similar protections. *See Molesworth v. Brandon*, 341 Md. 621, 632–33 (1996) (explaining MFEPA was "modeled on federal anti-discrimination legislation" and "in the absence of contrary legislative pronouncements on the Maryland law, we may turn to the legislative history of the federal law to discern the legislative intent behind" MFEPA). The Supreme Court in *Bostock* left open the question CRS seeks to have this Court definitively decide with respect to MFEPA. 140 S. Ct. at 1754 (recognizing that Congress "included an express statutory exception for religious organizations," but holding that "how these doctrines protecting religious liberty interact with Title VII are questions for future cases[.]"). Tellingly, CRS has not moved to dismiss Defendant's Title VII claims on the basis of a religious exemption, and Mr. Doe's state analog claims should not be dismissed until the parties have an opportunity to reach that issue.[9]

---

[8] For example, CRS's Catholic faith opposes in vitro fertilization (IVF) and CRS presumably does not cover IVF in its benefits package. However, CRS cannot refuse to extend dependent benefits to employees' children because they were conceived through IVF. Nor can CRS refuse to extend its usual maternal health or family leave benefits to employees who conceive through IVF.

[9] For the same reasons, Mr. Doe's claims for retaliation claims under Title VII, the Federal EPA, MFEPA, and MEPEWA, should also remain.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Doe respectfully requests that Catholic Relief

Service's Motion to Dismiss Counts I through VII, ECF No. 13, be denied in its entirety.

Date: September 21, 2020                          Respectfully submitted,

                                             _____

                                             Eve L. Hill, Esq. (Bar. No. 19938)
                                             Anthony J. May, Esq. (Bar No. 20301)
                                             Brown Goldstein Levy LLP
                                             120 E. Baltimore St, Suite 1700
                                             Baltimore, MD 21202
                                             Tel: (410) 962-1030
                                             Fax: (410) 385-0869
                                             EHill@browngold.com
                                             AMay@browngold.com

                                             Shannon C. Leary, Esq. (Bar No. 18396)
                                             Gilbert Employment Law, P.C.
                                             1100 Wayne Ave, Suite 900
                                             Silver Spring, MD 20910
                                             Tel: (301) 608-0880
                                             Fax: (301) 608-0881
                                             Sleary-efile@gelawyer.com

                                             *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **Plaintiff's Opposition to Defendant's Motion to Dismiss Counts I–VII** was served on all counsel of record via the Court's CM/ECF system, in accordance with the rules of electronic filing of documents.

Eve L. Hill, Esq.
Brown Goldstein Levy LLP
120 E. Baltimore St, Suite 1700
Baltimore, MD 21202
Tel: (410) 962-1030
Fax: (410) 385-0869
EHill@browngold.com

31