## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN DOE | * | |
| | * | |
| | * | |
| v. | * | Civil Action No. CCB-20-1815 |
| | * | |
| | * | |
| CATHOLIC RELIEF SERVS. | * | |
| | ****** | |

### MEMORANDUM

Now pending in this civil rights and employment action is defendant Catholic Relief Services ("CRS")'s motion to dismiss (ECF 13) the plaintiff's complaint. The motion is fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the following reasons, the motion will be granted in part and denied in part.

### BACKGROUND

The plaintiff is a gay cisgender male and is legally married to a man. (ECF 1, Compl. ¶¶ 7, 17). In mid-2016, a recruiter from CRS contacted the plaintiff regarding a job opportunity with CRS. Plaintiff interviewed for a position, and the same recruiter contacted the plaintiff several days after the interview to offer the plaintiff a full-time position. (*Id.* ¶¶ 11–13). The position offered to the plaintiff involved providing technical and business support for and management of a CRS information management platform. (*Id.* ¶ 13).[1] Along with the offer, the recruiter provided the plaintiff with documents detailing his proposed employment benefits, which included an Aetna Health Insurance Plan Summary entitled "Group Insurance Plan of Benefits for Catholic Relief Services." (*Id.* ¶ 14). That document stated that "dependents" were covered under CRS's group

---

[1] The plaintiff remained in this position until late 2019, when he accepted a different position with CRS that focused on other business functions of the organization. (*Id.* ¶ 40).

insurance plan and defined "dependent" as "wife or husband" (with no mention of the sex or gender identity of the primary insured) and "children to age 26[,] regardless of student status." (*Id.* ¶ 16). The CRS recruiter and the plaintiff subsequently had a telephone conversation in which the plaintiff asked the recruiter if his husband, a man, would be covered by CRS's spousal insurance benefits. The recruiter told the plaintiff, "All dependents are covered." (*Id.* ¶18).

The plaintiff accepted CRS's offer of employment, and he and his family relocated to Baltimore, Maryland. (*Id.* ¶ 19). After he accepted the offer, the plaintiff received from CRS an additional insurance document titled "Benefit Plan: What Your Plan Covers and How Benefits are Paid" (hereinafter "Benefit Plan"). (*Id.* ¶ 20; ECF 1-5, Ex. 1 to Compl.). The title page of the Benefit Plan states that it was "Prepared Exclusively for Catholic Relief Services." (ECF 1-5, Ex. 1 to Compl.). The Benefit Plan states that regular full-time employees of CRS who have elected coverage under the Plan "may enroll the following dependents: – Your Spouse. – Your dependent children." (*Id.* at 2). The Benefit Plan goes on to state that "Aetna will rely upon your employer to determine whether or not a person meets the definition of a dependent for coverage under this Plan. This determination will be *conclusive and binding upon all persons* for the purposes of this Plan." (*Id.*) (emphasis added). The Benefit Plan also describes when coverage ends for dependents. Among other reasons, "[c]overage for [the employee's] dependents will end if . . . [the employee's] dependent is no longer eligible for coverage. Coverage ends at the end of the calendar month when [the] dependent does not meet the plan's definition of a dependent[.]" (*Id.* at 58). Nothing in the Benefit Plan promises a spouse will be eligible for dependent coverage; rather the Benefit Plan states it relies on CRS to determine whether a person meets the definition of a dependent. (*Id.* at 2).

During the plaintiff's onboarding process, CRS staff reiterated to the plaintiff that "all dependents would be covered" under the Plan; no staff member informed the plaintiff that a dependent "spouse" could not include a same-sex spouse. (ECF 1, Compl. ¶ 22). The plaintiff received no further information regarding CRS's health insurance coverage policies before applying for CRS health insurance.

Believing that his husband qualified as a dependent under the Plan, the plaintiff applied for CRS's health insurance, including coverage for his husband, by submitting his marriage certificate to CRS's human resources department and registering himself and his husband on the CRS Employee Self-Service website. (*Id.* ¶ 22). The plaintiff and his husband subsequently received health care coverage from CRS. The couple received insurance cards and used their insurance coverage without comment from CRS until November 2016. (*Id.* ¶¶ 23, 25).

In November 2016, CRS informed the plaintiff that it had mistakenly provided insurance coverage to his husband, because CRS does not cover same-sex spouses under the Plan, contrary to its assertions prior to the plaintiff's application for coverage. (*Id.* ¶¶ 25, 26). CRS informed the plaintiff that the benefits to his husband would terminate at the end of that month but told him that he could write a letter to senior management to attempt to convince CRS to continue coverage for his husband. (*Id.* ¶ 27). Over the next eight months, the plaintiff had several conversations with CRS's senior human resources employees and other senior officials regarding his spousal benefits. During this time, the plaintiff's husband remained on the Plan, but CRS would not agree to change its position that his coverage should eventually be terminated. (*Id.* ¶¶ 28, 29).

In mid-2017, a senior CRS official reiterated to the plaintiff that same-sex spouses were not dependents under CRS's plan, and informed the plaintiff that "some people that oversee CRS" wanted him terminated and that if the plaintiff continued to "push the issue, doing so would hurt

[him]." (*Id.* ¶¶ 30–31). The same official emailed the plaintiff about a month later to inform him that his husband's benefits would terminate on October 1, 2017. (*Id.* ¶ 32). Based on these communications, the plaintiff raised the issue of his spousal benefits with his supervisor and asked his supervisor to accompany him to a meeting with the senior CRS official. The plaintiff hoped to receive clarification regarding the statement that continuing to "push the issue" would "hurt" him. (*Id.* ¶ 34). In that meeting with his supervisor and the senior CRS official, the official told the plaintiff that if he pursued legal action regarding his spousal benefits, he would likely be terminated. (*Id.* ¶ 35).

During the same meeting, the senior CRS official told the plaintiff that the summary of benefits issued to finalists for open CRS positions had been updated to explicitly state that benefits would not be provided to same sex spouses. After the meeting, the official emailed the plaintiff a document entitled "Summary of Employee Benefits" which includes the following language: "Employees may enroll eligible dependents through proof of relationship. Following the Catholic Church's definition of marriage, we cannot offer benefits to unmarried domestic partners, nor to same-sex spouses." (*Id.* ¶ 39; ECF 1-6, Ex. 2 to Compl. at 2). The plaintiff claims this language is not included in the most recent version (effective Jan. 1, 2019) of the Aetna Benefit Plan, and he did not receive such language prior to accepting employment from CRS and applying for coverage. (ECF 1, Compl. ¶¶ 37, 39).

CRS terminated the plaintiff's spousal benefits on October 1, 2017. Earlier that year, the plaintiff's husband had begun extensive dental work, which was, at that time, covered by the Plan. Due to the termination of the plaintiff's spousal benefits, the plaintiff alleges his husband had to delay that dental work, which resulted in additional surgery that would not have been necessary had he been able to remain on the Plan. The reason for the delay in the plaintiff's husband receiving

dental work is unclear. The plaintiff does not allege that he attempted to secure alternative insurance coverage during the sixteen months in which he was aware of CRS's position that his husband should not be covered under the Plan but before benefits were terminated, nor does he allege that he missed an opportunity to obtain other insurance or that his husband experienced a gap in coverage. The plaintiff ultimately secured alternative insurance coverage at rates higher than those under the Plan. (*Id.* ¶¶ 42–44).

On June 1, 2018, the plaintiff filed a charge of discrimination with the EEOC against CRS, alleging discrimination based on sex and sexual orientation, and retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Equal Pay Act, 29 U.S.C. § 206(d)(1); the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.*; and the Maryland Equal Pay for Equal Work Act ("MEPWA"), Md. Code Ann., Lab. & Empl. § 3-301 *et seq.* (ECF 1, Compl. ¶ 47). The plaintiff received a right to sue letter from the EEOC on June 1, 2020. On June 12, 2020, the plaintiff filed this lawsuit.

The plaintiff alleges ten counts against CRS: discrimination on the basis of sexual orientation and sex, in violation of MFEPA, (Counts I and II); discrimination on the basis of sex, in violation of MEPWA (Count III); denial of wages, in violation of the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann. Lab. & Empl. § 3-501 *et seq.* (Count IV); breach of contract (Count V); detrimental reliance (Count VI); negligent misrepresentation (Count VII); discrimination on the basis of sex, in violation of Title VII and the Equal Pay Act (Counts VIII and IX); and retaliation, in violation of Title VII, the Equal Pay Act, MFEPA, and MEPWA (Count X). (ECF 1, Compl ¶¶ 52–138).

CRS moves to dismiss Counts I–VII in their entirety, and the MFEPA retaliation claim in Count X. (ECF 13; ECF 16-1, Amended Mem. at 34 n.5).

**STANDARD OF REVIEW**

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart,* 680 F.3d 359, 365 (4th Cir. 2012)).

**DISCUSSION**

**I.       Counts I–III: Discrimination under MFEPA and MEPWA**

CRS concedes that the facts alleged in the plaintiff's complaint plausibly state a claim for sexual orientation discrimination but argues that the plaintiff's state law discrimination claims must nevertheless be dismissed. As to Count I, the claim for sexual orientation discrimination under MFEPA, CRS contends that because it is a religious organization, MFEPA exempts it from discrimination claims relating to the employment of individuals of a particular sexual orientation. As to Counts II and III, for sex discrimination under MFEPA and MEPWA, CRS claims that

Maryland law distinguishes claims of sex discrimination from claims of sexual orientation discrimination, and the plaintiff only plausibly alleges the latter under Maryland law.[2]

MFEPA is "the state law analogue of" and in large part modeled after Title VII. *Schwenke v. Ass'n of Writers & Writing Programs*, --- F. Supp. 3d ----, No. CV DKC 20-1234, 2021 WL 22422, at *3 (D. Md. Jan. 4, 2021) (quoting *Alexander v. Marriot Int'l, Inc.*, No. RWT-09-cv-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011)); s*ee also Molesworth v. Brandon*, 341 Md. 621, 632–33 (1996). Accordingly, the Maryland Court of Appeals frequently looks to federal case law arising under Title VII when it interprets provisions of MFEPA. *See, e.g.*, *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652 (2011); *Molesworth*, 341 Md. at 632–33; *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494 (1990). The same is true of the relationship between MEPWA and the federal Equal Pay Act. *See Cohens v. Md. Dep't of Hum. Res.*, 933 F. Supp. 2d 735, 745 (D. Md. 2013) ("'[C]ourts have applied the same analysis in reviewing MEP[W]A and EPA claims,' because '[t]he MEP[W]A essentially mirrors . . . the EPA.'") (quoting *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 861–62 (D. Md. 2000)); *Gaskins v. Marshall Craft Assocs. Inc.*, 110 Md. App. 705, 709 n.1 (1996). "In the absence of legislative intent to the contrary," the court

---

[2]     Counts I and II are based on § 20-606(a)(1) of MFEPA, which provides, in relevant part, that "[a]n employer may not . . . discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of . . . the individual's race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability . . . [.]" Md. Code Ann., State Gov't § 20-606(a)(1).

Count III is predicated on § 3-304(b)(1)(i) of MEPWA, which provides, in relevant part, that "[a]n employer may not discriminate between employees in any occupation by . . . paying a wage to employees of one sex or gender identity at a rate less than the rate paid to employees of another sex or gender identity if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business or of the same type[.]" Md. Code Ann., Lab. & Empl. § 3-304(b)(1)(i).

will read MFEPA and MEPWA "in harmony" with their federal corollaries. *Chappell*, 320 Md. at 494.

Title VII and the Equal Pay Act prohibit, respectively, discrimination in the "terms, conditions, or privileges of employment, because of . . . sex," 42 U.S.C. § 2000e-2(a), and discrimination "on the basis of sex by paying wages to employees . . . at a rate less than the rate . . . [paid] to employees of the opposite sex . . . for equal work[,]" 29 U.S. C. § 206(d). In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the United States Supreme Court resolved that discrimination against gay or transgender employees is discrimination "on the basis of sex" for purposes of Title VII, because "to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1742. For example, an employer who "fires [a] male employee for no reason other than the fact he is attracted to men," but tolerates the same trait (sexual attraction to men) in a female employee "singles out an employee to fire based in part on the employee's sex." *Id.* at 1741. The employer would not have fired the employee had he been a woman.

CRS concedes that the plaintiff's Title VII sex discrimination claim is plausible under *Bostock* and assumes for the purposes of this motion the same with regard to his sex discrimination claim under the Equal Pay Act (ECF 16-1, Amended Mem. at 26–27).[3] Yet CRS argues *Bostock*'s interpretation of discrimination on the basis of "sex" under Title VII has no bearing on the viability of the plaintiff's sex discrimination claims under MFEPA and MEPWA because "it is clear under Maryland law" that "'sexual orientation' and 'sex' are distinct categories" that cannot overlap

---

[3] CRS notes that the plaintiff's federal claims implicate a question left open by *Bostock*, whether the Religious Freedom Restoration Act of 1993 ("RFRA") protects its decision to revoke the plaintiff's benefits on the basis of sex, *see Bostock*, 140 S. Ct. at 1754, but does not ask the court to decide that question at this stage. (ECF 16-1, Amend. Mem. at 2).

under those statutes. (ECF 16-1, Amended Mem. at 27). The argument goes that Maryland's express inclusion of sexual orientation and gender identity as protected classes under MFEPA and of gender identity as a protected class under MEPWA demonstrates that the Maryland General Assembly believed that discrimination on those bases was not covered by the existing prohibitions in each law of sex discrimination. But no Maryland court appears to have addressed this distinction, the application of *Bostock* to its employment statutes, or the legislature's intent when it included sexual orientation as a separate class,[4] and it is unclear to the court why, given the Maryland courts' longstanding practice of looking to federal employment law in interpreting MFEPA and MEPWA, *Bostock* is necessarily irrelevant to the plaintiff's claims. At least one judge in this district has concluded, even after *Bostock*, that sex discrimination claims under MFEPA and Title VII are "coterminous,"—*Bostock's* "expansion of Title VII" simply "include[s], in its definition of sex discrimination, protections already made explicit under Maryland Law[.]" *Schwenke*, 2021 WL 22422, at *3–4 (denying motion to dismiss a single count of gender discrimination under Title VII and MFEPA arising out of the plaintiff's claim that she was terminated because of her gender identity). Thus, because this case will proceed through discovery on the Title VII and Equal Pay Act claims in any event, and it is possible there will be further guidance on this issue from the Maryland courts, the court finds it is best to consider whether the plaintiff's state law sex discrimination claims (Counts II and III) are co-extensive with the federal

---

[4] CRS's citation to *Conway v. Deane*, 401 Md. 219 (2007), *abrogated in part on other grounds by Obergefell v. Hodges*, 576 U.S. 644 (2015) is inapposite. In *Conway*, the Maryland Court of Appeals considered a challenge under the Maryland Equal Rights Amendment to a state statute that deemed only a marriage between a man and a woman valid under Maryland law. The court rejected the challenge, holding that the Amendment was specifically intended to "put men and women on equal ground" and the statute "prohibits equally both men and women from the same conduct." *Id.* at 260, 264. The Court of Appeals did not address and did not have occasion to address the scope of "sex discrimination" under the state employment statutes at issue in this matter.

discrimination claims at the same time it considers the federal claims. Accordingly, the court will deny CRS's motion with respect to Counts II and III.

For similar reasons, the court will deny CRS's motion with respect to Count I, the plaintiff's sexual orientation discrimination claim under MFEPA. MFEPA does not apply to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity." Md. Code Ann., State Gov't § 20-604(2). CRS argues that the plaintiff's claim must fail under this exemption because his job responsibilities plainly constitute "work connected with the activities" of CRS. (ECF 16-1, Amended Mem. at 32). Here again, Maryland courts have not yet construed this provision. The court acknowledges there is some support for CRS's position in federal case law interpreting Title VII's similar provision that exempts religious corporations and the like from Title VII "with respect to the employment of individuals of a particular religion to perform *work connected with the carrying on by such corporation[s] . . . of its activities.*" 42 U.S.C. § 2000e-1(a) (emphasis added).[5] In *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011), the Fourth Circuit Court of Appeals held that § 2000e-1(a) was not limited to only hiring and firing decisions and noted that the text and legislative history of the provision made clear that the exemption

---

[5] CRS also cites a number of federal cases rejecting discrimination claims that triggered religious exemptions of other states' anti-discrimination statutes, none of which assist the court in interpreting the scope of MFEPA's exemption, as they address statutory exemptions that do not include similar language requiring the employee's work to be "connected with" the activities of the covered organization. *See e.g.*, *Horn v. Azusa Pac. Univ.*, No. 2:18-cv-09948-CAS-PLAx, 2019 WL 1557445, at *4–5 (C.D. Cal. Apr. 9, 2019); *Castellano v. Brigham Young Univ.*, No. 2:16-cv-01205-JNP-EJF, 2018 WL 4271039, at *2 (D. Utah Aug. 16, 2018), *recommendation and report adopted*, 2018 WL 4258164 (D. Utah Sept. 6, 2018), *appeal docketed*, No. 18-4142 (10th Cir. Oct. 2, 2018); *Knodel v. Providence Health and Servs.*, No. C10-5292BHS, 2011 WL 3563912, at *3 (W.D. Wash. Aug. 15, 2011); *King v. Warner Pac. Coll.*, 437 P.3d 1172, 1179–80 (Or. Ct. App. 2019).

includes "any activities of religious organizations, regardless of whether those activities are religious or secular in nature." *Id.* at 192–94. At the same time, CRS argues that the scope of Maryland's exemption may be affected depending on whether sex discrimination under MFEPA after *Bostock* includes sexual orientation discrimination, as § 20-604 does not exempt religious employers from sex discrimination claims. (*See* ECF 16-1, Amended Mem. at 28). The Maryland Court of Appeals has advised that Maryland statutory provisions which are part of a larger statutory scheme must be interpreted within "the context of the entire statutory scheme" to avoid leaving the provision at issue ineffective, duplicative, or nugatory. *Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302–03 (2001). In keeping with this practice, the court prefers to defer ruling on the scope of MFEPA's religious exemption as it relates to this matter until it can interpret the exemption together with the issue raised regarding the definition of "sex discrimination" under the statute, which, as explained above, should be considered alongside the plaintiff's federal claims.[6] Accordingly, CRS's motion to dismiss Counts I–III will be denied.

## II.     Counts IV and V: Breach of Contract and Maryland Wage Payment and Collection Law

Under Maryland law, "the formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013) (internal quotation marks and alterations omitted). The plaintiff alleges a contract was formed between him and CRS to provide him with

---

[6] Because of the uncertainty regarding the scope of § 20-604 and whether the facts alleged give rise to a sex discrimination claim under MFEPA, the court will also defer any consideration of whether the plaintiff reasonably believed he was opposing a practice that violated MFEPA such that his MFEPA retaliation claim (in Count X) can stand. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015) ("In the context of . . . a retaliation claim, an employee is protected when [he] opposes not only employment actions actually unlawful . . . but also employment actions [he] reasonably believes to be unlawful.") (internal quotation marks and alterations omitted).

spousal health insurance benefits when CRS informed him that it was the organization's policy to provide insurance to "all dependents" regardless of their sex, determined his husband was eligible for coverage, and the plaintiff accepted that policy. He additionally points to language in the Benefit Plan which states that Aetna would rely on CRS "to determine whether or not a person meets the definition of a dependent for coverage under [the] Plan" and that "determination [was] conclusive and binding upon all persons for the purposes of [the] Plan." (ECF 1-5, Ex. 1 to Compl. at 2). When CRS determined it would no longer provide spousal benefits in accordance with its initial determination that the plaintiff's husband was a dependent, it breached its agreement.

CRS contends these allegations are insufficient to make out a claim for breach of contract because the plaintiff is an at-will employee whose terms and conditions of employment can be changed unilaterally by CRS. In Maryland, employees are presumed to be at-will employees unless a contract for employment reflects "a mutual understanding that rebuts this prima facie presumption," such as by including a just-cause requirement or by specifying a duration of employment in the contract. *Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 12–13 (2014). The plaintiff's allegations include no facts that would rebut the assumption of at-will employment, but it is not the case that CRS can have no obligation to maintain any agreements with an at-will employee such as the plaintiff. "[E]mployer policy directives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 305–06 (1991). In *Dwiggins*, an employer published in its policies that it would follow a particular grievance procedure. "By creating and disseminating [those] procedures, [the employer] promised . . . that they would be followed." *Id.* at 307. But the employer also retains the freedom, "so long as reasonable notice is given," "to modify unilaterally the contractual relationship that it had

previously established with its employees as a result of" its stated policies, *Elliott v. Bd. of Trustees*, 104 Md. App. 93, 104, 105 (Md. Ct. Spec. App. 1995), and "[b]y continuing to work, an employee is deemed to indicate his consent to the modification." *Sarkissian v. Vaticor, Inc.*, No. CV AW-04-995, 2005 WL 8174720, at *3 (D. Md. Nov. 29, 2005).[7] *See also Tarquini v. Superior Prods, Inc.*, No. JKB-05-3292, 2007 WL 763186, at *5 (D. Md. Mar. 12, 2007) ("[A]n at-will employee continuing in employment after a change in conditions of employment is deemed to have accepted the change" if the employee "has been given unequivocal notice of such change.")

The plaintiff's allegations, taken in the light most favorable to him, at most support an inference that CRS initially promised, through its assurances to the plaintiff that his husband would be considered a dependent, to provide spousal benefits; that is, it is plausible that CRS created and disseminated a policy that the plaintiff's husband was initially eligible for benefits. *See Dwiggins*, 324 Md. at 307. But even if this is true, because the plaintiff is an at-will employee, CRS may lawfully change its policy at any time and because the plaintiff continued his employment, he is deemed to have accepted the new terms of the health Plan so long as he has notice of the change. *See Elliot*, 104 Md. App. at 104–05. Here, whether CRS revoked its initial promise because it never intended to consider the plaintiff's husband a dependent or because it changed its definition of a dependent, it is clear CRS changed the plaintiff's initial benefits and that the plaintiff had ample notice of the change. The plaintiff initially learned CRS would terminate his spousal benefits in November 2016, (ECF 1, Compl. ¶¶ 25, 26), and officials at CRS continued to inform him over the next sixteen months that the benefits would eventually be terminated, (*id.* ¶¶ 27–39). CRS provided additional notice of its change to the plaintiff's benefits when it provided the plaintiff

---

[7] Unpublished opinions are cited for the soundness of their reasoning and not for any precedential value.

with the "Summary of Employee Benefits" which stated "[f]ollowing the Catholic Church's definition of marriage, we cannot offer benefits to unmarried domestic partners, nor to same-sex spouses." (*Id.* ¶ 39; ECF 1-6, Ex. 2 to Compl. at 2).

The Benefit Plan does not, as the plaintiff contends, create a written contract that requires it to provide spousal benefits to the plaintiff for the duration of his employment. The Benefit Plan explicitly states that it is within CRS's discretion "to determine whether or not a person meets the definition of a dependent for coverage under this Plan." (ECF 1-5, Ex. 1 to Compl. at 2). The additional language that "[t]his determination will be conclusive and binding upon all persons for the purposes of th[e] Plan," (*id.*), is not reasonably interpreted to mean that CRS can never change its definition of a dependent or reevaluate its determination that a person qualifies as a dependent. Maryland follows the objective theory of contracts, which "look[s] at what a reasonably prudent person in the same position [as the parties] would have understood as to the meaning of the agreement." *Cochran v. Norkunas*, 398 Md. 1, 17 (2007). The agreement must also "be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Id.* (quoting *Sagner v. Glenangus Farms*, 234 Md. 156, 167 (1964)). Read in context with other provisions in the Benefit Plan, it is clear that no part of the benefits package is guaranteed for the duration of employment. The Benefit Plan contemplates the termination of coverage of dependents: "Coverage for [the employee's] dependents will end if . . . [the employee's] dependent is no longer eligible for coverage. Coverage ends at the end of the calendar month when [the] dependent does not meet the plan's definition of a dependent[.]" (*Id.* at 58). And the "General Provisions" section broadly states that the "medical benefits plan may be changed or discontinued with respect to your coverage."

14

(*Id.* at 63). Taking the Benefit Plan as a whole, no reasonable person would have understood the "conclusive and binding" language to mean that CRS had no power to change plan benefits after its initial determination that a person met the definition of a dependent. Accordingly, the plaintiff's breach of contract claim will be dismissed.

The parties generally agree that the plaintiff's MWPCL claim rises and falls with his breach of contract claim, because the MWPCL provides a cause of action to recover unlawfully withheld wages and other forms of remuneration, including "fringe benefits" if the remuneration is "promised to the employee as compensation for work performed." Md. Code Ann., Labor & Empl. § 3-501(c) (defining "wage"); *Whiting-Turner Contracting*, 366 Md. at 303. (*See also* ECF 16-1, Amended Mem. at 18–19; ECF 19, Opp'n at 19). Though a MWPCL action may be brought independent of an action for breach of contract, "the cause of action assumes the existence of some sort of underlying contract[.]" *Cunningham v. Feinberg*, 441 Md. 310, 325–26 (2015). Because the plaintiff has not plausibly alleged that CRS was contractually obligated to provide spousal benefits for the duration of his employment, it follows that the benefits have not been "promised . . . as compensation for work performed" and thus are not wages required to be paid under the MWPCL. *See Whiting-Turner Contracting*, 366 Md. at 303. Accordingly, the motion to dismiss the plaintiff's MWPCL claim will be granted.

**III.     Counts VI and VII: Detrimental Reliance and Negligent Misrepresentation**

The plaintiff's detrimental reliance and negligent misrepresentation counts are premised on the contention that the plaintiff, in reasonable reliance on the CRS's recruiter's statement (under a negligent representation theory), or promise (under a detrimental reliance theory) that "[a]ll dependents are covered" and the "binding and conclusive" language in the Benefit Plan, was led to believe he would receive spousal benefits for the duration of his employment and suffered

damages in the form of increased health care costs once those benefits were terminated. CRS contends that the complaint contains insufficient facts to show either that the plaintiff could have reasonably assumed a promise or a representation for benefits for the duration of employment or that his damages were caused by the recruiter's pre-employment statements. The court agrees with CRS.

"[I]n its most general sense, negligent misrepresentation arises when the defendant owes a duty of care in communicating information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff." *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 11 (2000). There are five elements to this claim:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Newton v. Kenific Grp.*, 62 F. Supp. 3d 439, 442 (D. Md. 2014) (citing *Weisman v. Connors*, 312 Md. 428, 444 (1988)).

The Maryland Court of Appeals has recognized that a potential employer owes a duty to exercise reasonable care in making representations to a prospective employee in pre-employment negotiations. "[P]re-contractual employment negotiations manifestly require the employer to impart, and the prospective employee to digest, relevant and accurate information concerning the . . . employment[.] . . . A prospective employee has a great stake in obtaining accurate information from his or her potential future employer and an employer reasonably should foresee that negligent misrepresentation of employment information may result in economic harm to the prospective employee." *Griesi*, 360 Md. at 16 (citing *Weisman*, 312 Md. at 449). This duty exists even where the employment relationship is intended to be at-will. *Id.* at 19–20 ("The employer's post-

employment right to terminate the employment relationship logically or legally cannot immunize the employer from liability for a tort committed before the termination occurred."). The employer's asserted "present intention to perform future acts within his control may support an action for negligent misrepresentation," but a "predictive statement[] of future events" is not actionable. *Newton*, 62 F. Supp. 3d at 443–44.

Here, the recruiter's statement, "all dependents are covered," can reasonably be construed as an assertion of CRS's existing policies regarding dependent coverage at the time the plaintiff was offered his initial position. That this assertion turned out to be inaccurate, in that CRS later revealed that providing insurance to same-sex spouses was *never* its policy, is not alone sufficient to state a claim for negligent misrepresentation. Because the representation was as to CRS's existing polices and not as to whether those policies would continue without any modification, the plaintiff could not have justifiably relied on the recruiter's statement for the belief that his husband would be covered for the entirety of his at-will employment with CRS. In this way, the plaintiff's allegations are distinguishable from cases like *Griesi*, in which an employer represents that an employment offer exists, making a false statement regarding a present fact, and the prospective employee relies on that statement to give up other opportunities. *See* 360 Md. at 20–21. Here, there was no assertion that benefits would continue—the recruiter only promised that dependents were covered at the time, and as previously discussed, the "conclusive and binding" language is not reasonably susceptible to the interpretation that CRS was bound to provide benefits indefinitely once it determined a person was a dependent under the Plan. To the extent it was reasonable to rely on what *was* stated, *i.e.* his husband's initial eligibility for benefits, the plaintiff received spousal benefits in line with the recruiter's initial representation for more than a year. The only damages alleged for revoking these spousal benefits are the expenses paid to buy the plaintiff's

husband alternative insurance and other out-of-pocket costs for surgery resulting from delays in dental coverage. (ECF 1, Compl. ¶ 42–44, 95, 100, 107). Those expenses are only tangentially related to the recruiter's initial misstatement. The facts alleged support an inference that the plaintiff relied on the recruiter's misstatement to apply for benefits, but it was CRS's much later decision to terminate the benefits that forced the plaintiff to seek alternate insurance. The plaintiff has not alleged, for example, that he turned down other opportunities in light of the recruiter's statement, *see, e.g.*, *Griesi*, 360 Md. at 17–18, or that he would not have taken the job without this promise. To the extent the plaintiff alleges the initial misrepresentation caused him to forego seeking outside insurance for his husband at the beginning of his employment (ECF 1, Compl. ¶ 98), he has not demonstrated that any damages flow from that decision. Accordingly, the plaintiff's negligent misrepresentation claim will be dismissed.

The plaintiff's detrimental reliance claim fails for similar reasons. An action for detrimental reliance or promissory estoppel requires the plaintiff to show 1) a clear and definite promise by the defendant; 2) the defendant has a reasonable expectation that the offer will induce action or forbearance on the part of the plaintiff; 3) the plaintiff actually and reasonably relies on the promise; and 4) the promise causes a detriment which can only be avoided by the enforcement of the promise. *Newton*, 62 F. Supp. 3d at 444 (quoting *Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 168 (1996)).

As is the case for claims of negligent misrepresentation in the at-will employment context, an at-will employer's promise to take some action in the future is generally insufficient as a matter of law to state a claim for detrimental reliance. *See, e.g.*, *Grillo v. Lucent Tech., Inc.*, No. CV L-04-2790, 2005 WL 8174562, at *3 (D. Md. Jan. 11, 2005) (employer's promise to the plaintiff that she would not be terminated through a reduction in force insufficient to state a detrimental reliance

claim). Courts in this district have sustained detrimental-reliance claims brought by at-will employees where the employer made a pre-employment promise to hire the employee and then rescinded the offer, *see e.g.*, *Newton*, 62 F. Supp. 3d at 445, and where an employer with a fiduciary duty under ERISA to provide benefits made a clear promise of continued health insurance coverage, *see Vogel v. Independence Fed. Sav. Bank*, 728 F. Supp. 1210, 1231–32 (D. Md. 1990). In these cases, the plaintiff is limited to reliance damages. *See Newton*, 62 F. Supp. 3d at 446.

This case is distinguishable from both *Newton* and *Vogel*. In *Vogel*, the court relied heavily on the existence of the employer's fiduciary duty to find that it was reasonable for the insured's family to rely on the employer's oral promise of continued coverage. *See* 728 F. Supp. at 1231–32. And in *Newton*, the employer made an explicit promise to hire the plaintiff, telling him the offer was "rock solid," and the plaintiff suffered financial loss when he quit his current position in reliance on the offer. *See* 62 F. Supp. 3d at 444–45. In both cases the plaintiff could reasonably rely on the employers' promises. Here, no fiduciary relationship exists, and as previously discussed, there are insufficient facts on which to infer that the plaintiff reasonably relied on a promise for spousal benefits for the duration of his employment. CRS, at most, promised initial, but not indefinite, eligibility, and his damages were not caused by any reliance on the initial promise—instead, they resulted from CRS's subsequent decision to terminate the benefits. Accordingly, the detrimental reliance claim will be dismissed.

## CONCLUSION

For the foregoing reasons, CRS's motion to dismiss will be granted in part and denied in part. The plaintiff's breach of contract, detrimental reliance, negligent misrepresentation, and MWPCL claims will be dismissed. All other claims will be permitted to proceed. A separate Order follows.

__3/26/2021__                                              _____/S/_____
Date                                                      Catherine C. Blake
                                                          United States District Judge