# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JOHN DOE,                                    *

      Plaintiff                          *

      v.                                 *          No. CCB-20-1815

CATHOLIC RELIEF SERVICES,                    *

      Defendant                          *      **REDACTED VERSION**

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**MEMORANDUM IN SUPPORT OF DEFENDANT CATHOLIC RELIEF SERVICES'
RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT, CROSS-MOTION FOR SUMMARY JUDGMENT, AND MOTION TO
<u>EXCLUDE EXPERT OPINION TESTIMONY BY DR. TODD A. SALZMAN</u>**

776768

# TABLE OF CONTENTS

Page(s)

Introduction ....................................................................................................................... 1

Undisputed Facts .............................................................................................................. 4

Standard of Review .......................................................................................................... 14

Argument ......................................................................................................................... 14

    I.    The First Amendment bars the Court from exercising jurisdiction over Plaintiff's claims, which would require the Court to analyze competing religious beliefs and decide which health benefits policies are required by Catholic teaching. ................................................ 14

    II.    Statutory exemptions block Plaintiff's claims under Title VII and the Maryland Fair Employment Practices Act, while Plaintiff's claim under the Maryland Equal Pay for Equal Work Act fails on its merits. ................................................................................... 17

        A.    The Title VII religious employer exemption allows Catholic Relief Services to favor conduct compatible with its sincere religious beliefs. ................................................ 17

        B.    The Maryland Fair Employment Practices Act exempts Catholic Relief Services from sexual orientation discrimination claims by persons employed to "perform work connected with the activities of the religious entity." ................................................ 19

        C.    The Maryland General Assembly created a deliberate framework of laws that distinguish between claims for sex and sexual orientation discrimination. ............... 21

    III.    Plaintiff's federal discrimination claims are barred by RFRA, and his federal and state claims are barred by the Free Exercise Clause. ................................................................ 25

        A.    RFRA applies to "all Federal law, and the implementation of that law," including in suits between private parties. ...................................................................................... 25

        B.    Any requirement that Catholic Relief Services provide spousal health benefits, or their equivalent, to the same-sex spouses of employees would substantially burden Catholic Relief Services' religious exercise. .......................................................... 28

        C.    The relief sought by Plaintiff is not the least restrictive means of furthering a compelling governmental interest. .............................................................................. 36

        D.    Because the statutes on which Plaintiff relies exempt certain secular activity but not comparable religious activity, the statutes are not neutral and generally applicable, and their enforcement here would violate Free Exercise. ........................................... 40

        E.    The canon of constitutional avoidance requires the Court to construe the employment statutes and RFRA in a manner that is protective of Catholic Relief Services' religious freedom. ........................................................................................................ 43

    IV.    Plaintiff's allegations about "threats" to his employment do not support his claim of retaliation by an employer that has treated him favorably. ................................................ 44

V.   No reasonable jury could find that the termination of Plaintiff's spousal health benefits caused any measurable damage to Plaintiff. ................................................................... 46

    A.    The $5,000 technical increase in Plaintiff's salary more than offset his out-of-pocket expenses. ....................................................................................................... 46

    B.    Catholic Relief Services bears no responsibility for Plaintiff's spouse's delay in his dental treatment. ..................................................................................... 48

    C.    A reasonable jury could not apportion responsibility for Plaintiff's emotional difficulties to Catholic Relief Services without engaging in speculation. .................. 50

    D.    Catholic Relief Services' exercise of its sincere religious beliefs does not constitute malice or indifference to Plaintiff's rights, particularly in light of the unsettled state of the law, so punitive damages would be improper. .................................................. 52

VI.   The opinions of Plaintiff's retained theologian, who concedes that his beliefs diverge from those of Catholic Relief Services, are irrelevant and inadmissible. ...................... 55

Conclusion .................................................................................................................................. 57

776768

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aparicio v. Christian Union, Inc.*,
  No. 18-CV-0592 (ALC), 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019) ...............................15

*Aucoin v. Kennedy*,
  355 F. Supp. 2d 830 (E.D. La. 2004) ....................................................................................53

*Ball v. Memphis Bar-B-Q- Co.*,
  228 F.3d 360 (4th Cir. 2000) ................................................................................................46

*Bear Creek Bible Church v. EEOC*,
  — F. Supp. 3d —, 2021 WL 5449038 (N.D. Tex. Nov. 22, 2021) ................................. *passim*

*Billard v. Charlotte Catholic High Sch.*,
  No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ........................................38

*Booth v. Md. Dep't of Pub. Safety & Corr. Servs.*,
  No. RDB 05-1972, 2008 WL 2484937 (D. Md. June 18, 2008) ............................................42

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020) ................................................................................................ *passim*

*Bryan v. Lucent Techs., Inc.*,
  307 F. Supp. 2d 726 (D. Md. 2004) ......................................................................................45

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) ........................................................................................15, 38

*Burlington N. & Santa Fe Ry. Co. v. White*,
  548 U.S. 53 (2006) ...............................................................................................................44

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ........................................................................................................33, 38

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ........................................................................................................39, 41

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
  450 F.3d 130 (3d Cir. 2006) .................................................................................................17

*Daughtry v. Nadel*,
  248 Md. App. 594 (2020) .....................................................................................................21

iii

*Demkovich v. St. Andrew the Apostle Parish*,
    3 F.4th 968 (7th Cir. 2021) ...................................27

*Doe v. Catholic Relief Servs.*,
    529 F. Supp. 3d 440 (D. Md. 2021) ...................................13, 17, 20, 22

*Doe v. Montgomery Cnty. Bd. of Elections*,
    406 Md. 697 (2008) ...................................23

*Dole v. Shenandoah Baptist Church*,
    899 F.2d 1389 (4th Cir. 1990) ...................................38

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) ...................................25

*EEOC v. Fremont Christian Sch.*,
    781 F.2d 1362 (9th Cir. 1986) ...................................32

*EEOC v. Great Steaks, Inc.*,
    667 F.3d 510 (4th Cir. 2012) ...................................27

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
    884 F.3d 560 (6th Cir. 2018) ...................................33

*El Ali v. Barr*,
    473 F. Supp. 3d 479 (D. Md. 2020) ...................................28

*Emp. Div. v. Smith*,
    494 U.S. 872 (1990) ...................................26

*Fowler v. Land Mgmt. Groupe, Inc.*,
    978 F.2d 158 (4th Cir. 1992) ...................................55

*Franklin v. Mazda Motor Corp.*,
    704 F. Supp. 1325 (D. Md. 1989) ...................................50

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ................................... *passim*

*Garner v. Kennedy*,
    713 F.3d 237 (5th Cir. 2013) ...................................36

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
    617 F.3d 402 (6th Cir. 2010) ...................................25

*Goddard v. Apogee Retail LLC*,
    No. DKC 19-3269, 2021 WL 2589727 (D. Md. June 24, 2021) ...................................25

776768

*Goodall ex rel. Goodall v. Stafford Cty. Sch. Bd.*,
  60 F.3d 168 (4th Cir. 1995) .................................................36

*Haas v. Lockheed Martin Corp.*,
  396 Md. 469 (2007) ...........................................................20

*Hankins v. Lyght*,
  441 F.3d 96 (2d Cir. 2006).................................................25

*Hedin v. Thompson*,
  355 F.3d 746 (4th Cir. 2004) .............................................27

*Hellman v. Weisberg*,
  360 F. App'x 776 (9th Cir. 2009) .......................................45

*Hernandez v. Commissioner*,
  490 U.S. 680 (1989)...........................................................36

*Hopkins v. Balt. Gas & Elec. Co.*,
  77 F.3d 745 (4th Cir. 1996) ...............................................54

*Hubbard v. J Message Grp. Corp.*,
  325 F. Supp. 3d 1198 (D.N.M. 2018) ...............................16

*Hustler Mag., Inc. v. Falwell*,
  485 U.S. 46 (1988).............................................................27

*Jimmy Swaggart Ministries v. Bd. of Equalization*,
  493 U.S. 378 (1990)...........................................................36

*Johnson v. Nationwide Mut. Ins. Co.*,
  388 Md. 82 (2005) .............................................................21

*Jones v. Wolf*,
  443 U.S. 595 (1979)...........................................................15

*Kane v. De Blasio*,
  19 F.4th 152 (2d Cir. 2021) .................................30, 31, 35

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
  344 U.S. 94 (1952)..........................................................2, 15

*Kennedy v. St. Joseph's Ministries, Inc.*,
  657 F.3d 189 (4th Cir. 2011) .............................................17

*Kiviti v. Pompeo*,
  467 F. Supp. 3d 293 (D. Md. 2020) ..................................43

v

*Kolstad v. Am. Dental Ass'n*,
    527 U.S. 526 (1999)................................................................53, 54

*Lawrence v. CNF Transp., Inc.*,
    340 F.3d 486 (8th Cir. 2003) ...............................................................53

*Listecki v. Official Comm. of Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ...............................................................27

*Little v. Wuerl*,
    929 F.2d 944 (3d Cir. 1991)..................................................................17

*Mast v. Fillmore County*,
    141 S. Ct. 2430 (2021) .............................................................37, 38, 40

*McDaniel v. Paty*,
    435 U.S. 618 (1978)..........................................................................26, 43

*Mykland v. CommonSpirit Health*,
    No. 3:21-cv-05061-RAJ, 2021 WL 4209429 (W.D. Wash. Sept. 16, 2021)....................22, 23

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)................................................................................27

*Navajo Nation v. U.S. Forest Serv.*,
    535 F.3d 1058 (9th Cir. 2008) ...............................................................35

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)..........................................................................24, 36

*OT, LLC v. Harford County*,
    No. SAG-17-02812, 2019 WL 5538057 (D. Md. Oct. 24, 2019)...........................14

*Price v. City of Charlotte*,
    93 F.3d 1241 (4th Cir. 1996) ...............................................................50

*Raines v. Am. Fed'n of Teachers—Md. Prof'l Emps. Council*,
    No. ADC-19-1266, 2019 WL 4467132 (D. Md. Sept. 18, 2019) .....................46, 53

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) ...............................................................15, 18

*Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince
George's County*,
    17 F.4th 497 (4th Cir. 2021) ...............................................................37

*Religious Sisters of Mercy v. Azar*,
    513 F. Supp. 3d 1113 (D.N.D. 2021).....................................................36

776768

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995)........................................................................34

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006)..........................................................................34

*Schmidt v. Town of Cheverly*,
212 F. Supp. 3d 573 (D. Md. 2016) ............................................44, 46

*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
611 F.3d 1238 (10th Cir. 2010) .....................................................38

*Snapp v. Unlimited Concepts, Inc.*,
208 F.3d 928 (11th Cir. 2000) .......................................................53

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021)................................................................42, 43

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*,
450 U.S. 707 (1981)........................................................................57

*Thorn v. Sebelius*,
766 F. Supp. 2d 585 (D. Md. 2011) ...............................................31

*Vance v. S. Bell Tel. & Tel. Co.*,
863 F.2d 1503 (11th Cir. 1989) .....................................................52

*W.C. English, Inc. v. Rummell, Klepper & Kahl, LLP*,
No. 6:17-cv-00018, 2021 WL 4782274 (W.D. Va. Oct. 13, 2021) .......56

*Watson v. Jones*,
80 U.S. (13 Wall.) 679 (1871) .......................................................15

*Wheelabrator Balt., LP v. Mayor of Balt.*,
449 F. Supp. 3d 549 (D. Md. 2020) ...............................................14

*Williamson v. Lee Optical of Okla., Inc.*,
348 U.S. 483 (1955)........................................................................24

*Wilson v. Montgomery Cnty. Bd. of Trs.*,
No. PWG-17-2784, 2018 WL 4300498 (D. Md. Sept. 10, 2018)...........44

*In re Young*,
141 F.3d 854 (8th Cir. 1998) .........................................................25

**Statutes and Ordinances**

29 U.S.C. § 206................................................................................39

29 U.S.C. § 213 ................................................................................................39

29 U.S.C. § 215 ................................................................................................46

29 U.S.C. § 216 ................................................................................................53

29 U.S.C. § 260 ................................................................................................54

42 U.S.C. § 1981a .............................................................................................53

42 U.S.C. § 2000bb ..........................................................................................26

42 U.S.C. § 2000bb-1 .......................................................................................28

42 U.S.C. § 2000bb-3 .......................................................................................26

42 U.S.C. § 2000e .............................................................................................17

42 U.S.C. § 2000e-1 ..........................................................................................17

42 U.S.C. § 2000e-2 ..........................................................................................39

I.R.C. § 1 ..........................................................................................................48

I.R.C. § 3101 ....................................................................................................48

Balt. City Code, art. 28, § 18-2 ........................................................................48

Md. Code Ann., Lab. & Empl. § 3-304 .......................................................22, 41

Md. Code Ann., Lab. & Empl. § 3-307 ............................................................53

Md. Code Ann., Lab. & Empl. § 3-307(a)(1) ...................................................55

Md. Code Ann., State Gov't § 20-101 ..............................................................23

Md. Code Ann., State Gov't § 20-601 ..............................................................41

Md. Code Ann., State Gov't § 20-604 ..............................................................19

Md. Code Ann., State Gov't § 20-606 ..............................................................22

Md. Code Ann., State Gov't § 20-1013 ............................................................53

**Legislative Materials**

2001 Leg., 415th Sess. (Md. 2001) .............................................................20, 21

2016 Leg., 436th Sess. (Md. 2016) ..................................................................24

776768

**Rules and Regulations**

Fed. R. Civ. P. 56 ...................................................................................................................14

Fed. R. Evid. 702 ...................................................................................................................56

Rev. Proc. 2016-55 ................................................................................................................48

Rev. Proc. 2018-57 ................................................................................................................48

Rev. Proc. 2019-44 ................................................................................................................48

Treas. Reg. § 1.106-1 ............................................................................................................35

**Secondary Sources**

*Between Man and Woman: Questions and Answers About Marriage and Same-Sex Unions*, U.S. Conf. Catholic Bishops, https://www.usccb.org/topics/promotion-defense-marriage/between-man-and-woman-questions-and-answers-about-marriage-and (last visited Feb. 28, 2022) .................................................................................................................6

*Catechism of the Catholic Church § 2358*, Holy See, https://www.vatican.va/archive/ENG0015/__P85.HTM (last visited Feb. 28, 2022) .................................................................................................................1

*Catholic Values of CRS:  Outcomes Powered by Faith*, Catholic Relief Servs., https://www.crs.org/about/catholic-identity (last visited Feb. 28, 2022) ..................................5

*EEOC Releases Fiscal Year 2020 Enforcement and Litigation Data*, EEOC.gov (Feb. 26, 2021), https://www.eeoc.gov/newsroom/eeoc-releases-fiscal-year-2020-enforcement-and-litigation-data (last visited Feb. 28, 2022) .......................................26

*The Meaning of Marriage & Sexual Difference*, U.S. Conf. Catholic Bishops, https://www.usccb.org/topics/promotion-defense-marriage/faqs-meaning-marriage-sexual-difference (last visited Feb. 28, 2022) .......................................................30

*Mission Statement*, Catholic Relief Servs., https://www.crs.org/about/mission-statement (last visited Feb. 28, 2022) ...................................................................................4

Rachel Baye, *Lawsuit Says Catholic Relief Services Discriminates Against Gay Employee*, WYPR News (June 16, 2020, 6:54 p.m.), https://www.wypr.org/wypr-news/2020-06-16/lawsuit-says-catholic-relief-services-discriminates-against-gay-employee (last visited Feb. 28, 2022) ...........................13

776768

*The Number of Firms and Establishments, Employment and Annual Payroll by State, Industry, and Enterprise Employment Size: 2018*, U.S. Census Bureau (May 28, 2021), https://www2.census.gov/programs-surveys/susb/tables/2018/us_state_naics_detailedsizes_2018.xlsx (last visited Feb. 28, 2022) ........................................................................................................................40

Congregation for the Doctrine of the Faith, *Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons*, Holy See (June 3, 2003), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20030731_homosexual-unions_en.html (last visited Feb. 28, 2022) ........................................................................................................................30

776768

## Introduction

In the closing sentences of Plaintiff John Doe's Motion for Partial Summary Judgment, after pages and pages of doctrinal critiques of the religious beliefs of Defendant Catholic Relief Services—United States Conference of Catholic Bishops, Plaintiff declares: "Although CRS may distinguish between 'just' and 'unjust' discrimination, the law does not." Mem. in Supp. of Pl. John Doe's Mot. for Partial Summ. J. ("Motion for Partial Summary Judgment") at 47 [ECF No. 41-1]. The distinction between just and unjust discrimination is not something Catholic Relief Services invented; it is a sincerely held religious belief enshrined in the Catechism of the Catholic Church.[1]

This anecdote points to a fundamental, jurisdictional problem with what Plaintiff is trying to do here. Plaintiff, who holds himself out as agnostic about religion, believes that he, and the Court, can dictate the correct understanding of Catholicism to Catholic Relief Services, an arm of the Church. To Plaintiff, the lines Catholic Relief Services has drawn—by employing persons who identify as LGBT but withholding spousal health benefits from persons who are not spouses in the eyes of the Church, or by providing benefits to the children of gay employees but not those employees' partners—are arbitrary. To the Church and its institutions, including Catholic Relief Services, these lines are compulsory. To Plaintiff, the notion that his receipt of spousal health benefits could trigger scandal within the Church seems farfetched. To Catholic Relief Services, this concept is derived from sacred scripture. *See* 1 *Corinthians* 8:4-13. To Plaintiff, enrollment of his spouse in Catholic Relief Services' self-insured dependent health benefit plan would not

---

[1] *Catechism of the Catholic Church* § 2358, Holy See, https://www.vatican.va/archive/ENG0015/__P85.HTM (last visited Feb. 28, 2022).

enmesh the organization in his personal moral and sexual choices.[2]  To Catholic Relief Services, provision of spousal health benefits to a same-sex partner would be an endorsement of and cooperation with marriage that is contrary to Church teaching.

Matters of faith, to state the obvious, are not cut and dry; and civil courts have no business deciding what a Catholic organization must practice and believe.  But because this case cannot be adjudicated without an inherently religious judgment about the moral consequences of providing spousal health benefits or their equivalent to a same-sex spouse, the case is not properly before the Court.  For over 150 years, the Supreme Court has upheld a "spirit of freedom for religious organizations . . . in short, power to decide for themselves, free from state interference, matters of . . . faith and doctrine."  *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (citing *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871)).  Plaintiff's claims are incompatible with that fundamental right of religious freedom.  The Court must dismiss this case for lack of subject-matter jurisdiction.

Alternatively, Plaintiff's claims fail on their merits.  Catholic Relief Services is a religious organization, and Plaintiff is involved in its activities, so the religious exemptions under Title VII and the Maryland Fair Employment Practices Act foreclose Plaintiff's discrimination claims.  Additionally, because the Maryland Equal Pay for Equal Work Act proscribes sex discrimination but not sexual orientation discrimination, and because those categories are distinct under Maryland law, Plaintiff cannot recover under that statute for his claims that sound in sexual orientation discrimination.

Plaintiff's federal discrimination claims also are foreclosed by the Religious Freedom Restoration Act, or RFRA.  Because Catholic Relief Services has demonstrated that any

---

[2]  Catholic Relief Services acknowledges that Plaintiff is lawfully married to his spouse under the laws of the State of Maryland.  Catholic Relief Services' references herein to Plaintiff's "spouse" are solely in recognition of that fact.

requirement that it provide spousal health benefits to a same-sex spouse would substantially burden its exercise of religion, Plaintiff must prove that the relief he requests is the least restrictive means of furthering a compelling governmental interest. Plaintiff cannot carry that burden, both because Catholic Relief Services provided alternative compensation to Plaintiff that more than made him whole, and because the federal statutes on which Plaintiff relies exempt some purely secular activity, including for reasons as tenuous as administrative convenience. For that same reason—because some secular activity is treated more favorably than comparable religious activity—none of the statutes on which Plaintiff relies (federal or state) are neutral and generally applicable, and their application as against Catholic Relief Services would violate the Free Exercise Clause of the First Amendment.

While the Court should either dismiss this case for lack of subject-matter jurisdiction or grant summary judgment in Catholic Relief Services' favor on all remaining counts, there are additional reasons that the Court should grant summary judgment to Catholic Relief Services on Plaintiff's claim of "retaliation" due to purported threats to his employment. Assuming the truth of some version of Plaintiff's shifting narrative, a reasonable person in his position could not have perceived that his job was in peril (notwithstanding his threats to sue Catholic Relief Services and malign the organization in the media, as he has proceeded to do), where Plaintiff concedes he was told his job *was not in peril* and where he has received numerous raises and promotions. The better-reasoned cases also recognize, in any event, that a mere threat of an adverse employment action, without more, does not constitute actionable retaliation.

The Court should also find that Plaintiff has adduced insufficient evidence to present his damages claims to the jury. Catholic Relief Services more than made up the out-of-pocket costs that Plaintiff sustained when his spouse was removed from Catholic Relief Services' spousal

776768

health benefits.  The delays in dental treatments for Plaintiff's spouse, about which Plaintiff has

complained, are unrelated to the termination of his spousal health benefits but were instead a

result of his spouse's busy school schedule and reluctance to visit the dentist.  And Plaintiff's

emotional and psychological problems are the product of apparent childhood trauma and other

factors unrelated to Catholic Relief Services—and Plaintiff, who did not designate a damages

expert, could not present a reliable case for emotional distress damages to the jury.

Finally, while the "expert" opinions of Plaintiff's retained counter-theologian, Dr. Todd

A. Salzman, are conspicuously absent from Plaintiff's Motion for Partial Summary Judgment,

the Court should exclude those opinions in all further proceedings.  Dr. Salzman's disputed

views about what good Catholics should, or should not, believe and practice, have no more

relevancy in these proceedings than do Plaintiff's personal views on those subjects.

The Court should deny Plaintiff's Motion for Partial Summary Judgment and grant

Catholic Relief Services' Cross-Motion for Summary Judgment and Motion to Exclude Expert

Opinion Testimony by Dr. Todd A. Salzman.

## Undisputed Facts

### The Bishops' Relief Agency

Catholic Relief Services is an official agency of the Catholic Church that "carries out the

commitment of the Bishops . . . to assist the poor and vulnerable overseas"[3]  The members of

Catholic Relief Services are the members of the United States Conference of Catholic Bishops,

or USCCB; and more than fifty percent of Catholic Relief Services' board seats are held by

bishops.  Am. & Restated Bylaws of Catholic Relief Servs. at 2 of 10, attached as Exhibit 1.

Catholic Relief Services' decisions "need to be in line with the USCCB . . . to represent [the

---

[3] *Mission Statement*, Catholic Relief Servs., https://www.crs.org/about/mission-statement (last visited Feb. 28, 2022).

organization's] Catholic identity." Extract of Tr. of Dec. 6, 2021 Dep. of S. Callahan ("Callahan Dep.") at 15:22 – 16:2, attached as Exhibit 2. As Catholic Relief Services' website makes clear, the organization partners with outside groups in carrying out its humanitarian mission but "is always and only focused on activities that are fully consistent with Catholic teaching."[4] Dr. John Haas, president emeritus of the National Catholic Bioethics Center and a long-time ethics counselor to Catholic Relief Services, characterized the organization as the "Bishop[s'] Relief Agency." Extract of Tr. of Dec. 7, 2021 Dep. of J. Haas ("Haas Dep.") at 196:4, attached as Exhibit 3; *see id.* at 195:14-20 ("CRS is constituted by the bishops of the United States so that there's a much heavier burden on them to make sure that the witness that they give . . . doesn't promote scandal . . . .").

While Catholic Relief Services employs a diverse workforce at its domestic headquarters in Baltimore and in its international operations, the organization ensures that its personnel understand its Catholic identity and refrain from conduct that could call into question the organization's sincere commitment to Catholic values. All employees are bound by a Code of Conduct and Ethics, which is informed by the "teachings of the Catholic Church" that "are central to CRS' identity." CRS Code of Conduct and Ethics, attached as Exhibit 4. All employees who disclose their affiliation with Catholic Relief Services on social media must not "say, support, or advocate for anything that is contrary to any CRS policies or positions, or that is contrary to CRS values or Church policy." CRS Policy on Social Media at CRS00015549, attached as Exhibit 5. All new employees attend a presentation on Catholic identity as part of their onboarding. June 1, 2016 Onboarding Schedule and Participants, attached as Exhibit 6.

---

[4] *Catholic Values of CRS:  Outcomes Powered by Faith*, Catholic Relief Servs., https://www.crs.org/about/catholic-identity (last visited Feb. 28, 2022).

And Catholic Relief Services' human resources materials clearly state that the organization

designs and administers its employee benefits programs consistent with Catholic values.  2022

CRS Benefits, attached as Exhibit 7; 2016 CRS Summary of Employee Benefits, attached as

Exhibit 8; 2015 CRS Summary of Employee Benefits, attached as Exhibit 9.[5]

Among those Catholic values prioritized by the organization is the Catholic

understanding that "marriage is between a man and a woman" and is "ordered to the procreation

of children."  Extract of Tr. of Dec. 13, 2021 Dep. of R. Twele ("Twele Dep.") at 119:2-5,

attached as Exhibit 12.  The Church teaches that the "matrimonial covenant, by which a man and

a woman establish between themselves a partnership of the whole of life and which is ordered by

its nature to the good of the spouses and the procreation and education of offspring, has been

raised by Christ the Lord to the dignity of a sacrament between the baptized."  Statement of Dr.

John M. Haas on the Immorality of Providing Spousal Benefits to Same-Sex Couples ("Haas

Report") at 7 (quoting Code of Canon Law can. 1055, § 1), attached as Exhibit 13.  The corollary

to this Catholic understanding of marriage as a union between one man and one woman is that

same-sex unions, including those that are deemed marital unions by the state, are forbidden.  As

the USCCB explains, same-sex unions are "not based on the natural complementarity of male

and female," and the "natural purpose of sexual union cannot be achieved by a same-sex union."[6]

---

[5] ██████████████████████████████████████████████████████████████ " Motion for Partial Summary Judgment at
6. ████████████████████████████████████████████ . ████████ , as former Executive Vice
President for Human Resources Shawn Mood testified, Catholic Relief Services prohibited spousal health benefits
for same-sex spouses, though Mood felt that the description of that transparent policy around the time of Plaintiff's
onboarding could itself have been clearer.  *See* Extract of Tr. of Oct. 1, 2021 Dep. of S. Mood ("Mood Dep.") at
34:13-21; 54:15-21; 109:11-16, attached as Exhibit 10; *see also* Aug. 18, 2017 email fr. S. Mood to J. McCuen,
attached as Exhibit 11.

[6] *Between Man and Woman:  Questions and Answers About Marriage and Same-Sex Unions*, U.S. Conf. Catholic
Bishops, https://www.usccb.org/topics/promotion-defense-marriage/between-man-and-woman-questions-and-
answers-about-marriage-and (last visited Feb. 28, 2022).

776768

Moreover, Catholic organizations, including Catholic Relief Services, "cannot engage in activities that would, through their agency, provide any recognition of the liceity of what civil law now calls a 'marriage' between two persons of the same sex." Haas Report (Ex. 13) at 12. That prohibition extends to the provision of spousal health benefits. As Dr. Haas opines, and as Catholic Relief Services sincerely believes, "[i]t is never morally permissible to extend spousal benefits to an employee who has entered into a legally recognized same-sex union," as doing so would "amount[] to formal cooperation with the application of gravely unjust laws" and would "further[] practices that the Church has declared to be injurious to the social order." *Id.* at 12-13; *see* Callahan Dep. (Ex. 2) at 26:15-20 ("██████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████.").

## Catholic Relief Services Welcomes Plaintiff

███████████████████████████████████████████████ ██████████████████████████. Extract of Tr. of Sept. 21, 2021 Dep. of J. Doe ("Doe Dep.") at 22:8 – 24:15, attached as Exhibit 14. █████████████████████████ ██████████████████████. *Id.* at 22:2-9. █████████████████████████ ████████████████████████████████████. *Id.* at 25:17 – 26:1. ██████ ████████████████████████." *id.* at 40:20 – 41:2, █████████████████████ ███████████████████████████████████████████████████ ███████████████████████." *Id.* at 34:16-18. ███████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████



. *Id.* at 35:2-13.

. *Id.* at 40:5-16.

. *Id.* at 41:14-18.

. *Id.* at 19:4-9, 18-21; 21:4-12.

. *Id.* at 21:13-20.

. *Id.* at 89:15 – 90:5.

**A Mistake and a Compromise**

.” *Id.* at 30:12-13.

.” *Id.* at 30:16-20.

Subsequently, Plaintiff's same-sex spouse was enrolled in Catholic Relief Services' spousal health benefits program. That enrollment was a mistake, as Catholic Relief Services does not provide spousal health benefits for the same-sex spouses of employees. Extract of Def. Catholic Relief Services' Answers to Pl. John Doe's 1st Set of Interrogs. at 30, attached as Exhibit 15.

Around the same time that Plaintiff joined Catholic Relief Services, another employee had inquired about benefits for his same-sex spouse, and Debra Jones, a former benefits manager, incorrectly told that employee's supervisor that Catholic Relief Services' benefit programs are "set up to allow employees to cover their legally married spouses on the plans regardless of gender." Aug. 11, 2016 email fr. D. Jones to L. Kuennen, attached as Exhibit 16.

The source of the misinformation appears to have been Jones's supervisor at the time. Aug. 11, 2016 email (Ex. 16). When the acting executive vice president for human resources, David Palasits, learned about this miscommunication by Jones, Aug. 23, 2016 email fr. D. Palasits to J. Overton, attached as Exhibit 17, he acted quickly to correct the mistake, Sept. 3, 2016 email fr. D. Palasits to ████████, attached as Exhibit 18. Several months later, Jones brought to Palasits's attention the fact that Plaintiff, too, had been misinformed about his eligibility for spousal health benefits, and had in fact been enrolled in those benefits. Nov. 11, 2016 email fr. D. Palasits to D. Jones & R. Keller, attached as Exhibit 19. ████████████████████

████████████████████████████████████████████████████████

████. Extract of Tr. of Oct. 15, 2021 Dep. of D. Jones ("Jones Dep.") at 16:4-8, attached as Exhibit 20.

Palasits was "deeply disappointed to learn of this situation" with Plaintiff, as it was a "very serious issue." Nov. 11, 2016 email (Ex. 19); *see also* Nov. 11, 2016 email fr. D. Palasits to S. Callahan, attached as Exhibit 21. Palasits subsequently met with Plaintiff and an employee relations manager. During the meeting, Palasits "████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████."

Extract of Tr. of Sept. 9, 2021 Dep. of D. Palasits ("Palasits Dep.") at 70:9-17, attached as Exhibit 22. ████████████████████████████████

████████████████████████████████████████████████

████. *E.g.*, Mar. 23, 2017 email fr. D. Jones to D. Palasits, attached as Exhibit 23; Mar. 30, 2017 email fr. D. Palasits to P. Nelson, [J. Doe] & D. Jones, attached as Exhibit 24; Apr. 11,

2017 meeting invite fr. D. Jones to [J. Doe], attached as Exhibit 25; Apr. 6, 2017 email fr. D. Jones to D. Palasits, attached as Exhibit 26.

In the early summer of 2017, Shawn Mood replaced David Palasits as Executive Vice President for Human Resources.  Jones emailed Plaintiff on June 22, 2017, to inform him that Mood had "taken the lead on this matter and was working with the CRS legal team on this." June 22, 2017 email fr. D. Jones to [J. Doe] & S. Mood, attached as Exhibit 27.  ███████

███████████████████████████████████████████████████████████."

June 26, 2017 email fr. S. Mood to [J. Doe] & D. Jones, attached as Exhibit 28.  ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

█████████████████████████████████████████████."

Mood Dep. (Ex. 10) at 56:3-17.

### Plaintiff's Publicity Campaign

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████.

2016–2017 Meeting Notes at DOE 0000281, attached as Exhibit 29; *see also* Facebook messages between [J. Doe] and M. Wynne at DOE 0000406, attached as Exhibit 30.  On August 7, 2017, Mood informed Plaintiff that he had received a technical increase in his salary of $5,000, effective as of the next pay period.  *See* Aug. 7, 2017 email fr. S. Mood to [J. Doe], attached as Exhibit 31.  ███████████████████████████████████████████████

████████████████████."  Aug. 7, 2017 email fr. S. Mood to [J. Doe] at DOE

0000385–86, attached as Exhibit 32. █████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* at DOE 0000383–85.

███████████████████████████████████████████████████

████████████████████████████████. *Id.* at DOE 0000380. ███████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████" Decl. of Amy Damsker at DOE

0000337, attached as Exhibit 33. ███████████████████████████████████

████████████████████████████████████." *Id.* ███████████████████

█████████████████████████████████████████████████████

████████." *Id.* █████████████████████████████████████████." *Id.* ████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████." *Id.*; *see* Doe Dep. (Ex. 14) at 224:9-20; Decl. of Amy Damsker (Ex. 33) at ¶¶ 17, 21.

██████████████████████████████████████. Mood Dep. (Ex. 10) at 123:8 – 124:25.

As previewed in Mood's August 7, 2017 email, Plaintiff's spousal health benefits were

terminated effective October 1, 2017. ████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████. Extract of Pl. John Doe's Answers to Def. Catholic Relief Services'

1st Set of Interrogs. ("Plaintiff's First AINs") at 16-17, attached as Exhibit 34. Even after his

multiple conversations with Mood and others about Catholic Relief Services' policy regarding spousal health benefits, Plaintiff continued, in his words, "testing" the system to see whether he could enroll his same-sex spouse for benefits for which he was not eligible. ███████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████. Dec. 11, 2017 email fr. S. Mood to [J. Doe], attached as Exhibit 35; *see also* Dec. 1, 2017 email fr. [J. Doe] to M. McCullough at CRS00000025, attached as Exhibit 36 (Plaintiff stating that he was "curious how long it will take them to catch it this time"). In January 2020, Plaintiff tried to enroll his spouse for supplemental life insurance benefits, Jan. 6, 2020 email fr. C. Bryan to [John Doe], attached as Exhibit 37, despite language in Catholic Relief Services' benefits materials that makes clear *all* benefit programs are administered pursuant to Catholic Relief Services' Catholic values, 2020 CRS Benefits Guide, attached as Exhibit 38; 2016 CRS Summary of Employee Benefits (Ex. 8).

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████." Sept. 6, 2017 email fr. [J. Doe] to T. Purekal at DOE 0000573, attached as Exhibit 39. ███████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████." Facebook messages (Ex. 30) at DOE 0000400, 402. ███████████

██████████████████████████████████████" *Id.* at DOE 0000398. ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

12

███████████████████.” Mood Dep. (Ex. 10) at 136:9-13. Shortly after this lawsuit was

filed, Plaintiff ███████████████████████████████████ gave what he later

described as a "███████" to the Baltimore affiliate of NPR. *See* Rachel Baye, *Lawsuit Says*

*Catholic Relief Services Discriminates Against Gay Employee*, WYPR News (June 16, 2020,

6:54 p.m.), https://www.wypr.org/wypr-news/2020-06-16/lawsuit-says-catholic-relief-services-

discriminates-against-gay-employee (last visited Feb. 28, 2022) [hereinafter "*WYPR Press*

*Release*"]; June 17, 2020 email fr. [J. Doe] to Kellie, attached as Exhibit 40.

## Procedural History

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████.” June 1, 2018 [J. Doe's] EEOC Charge of Discrimination form, attached as

Exhibit 41. ████████████████████████████████████, EEOC's Notice of Right

to Sue to [J. Doe], attached as Exhibit 42, and Plaintiff then filed this action, seeking, among

other remedies, an order requiring Catholic Relief Services to reinstate his spousal health

benefits and modify its policies to "provide benefits for employees' same-sex spouses to the

same extent it provides benefits to employees' opposite-sex spouses." Compl. for Declaratory,

Injunctive & Monetary Relief ("Compl.") at 21 [ECF No. 1]. The Court dismissed several of

Plaintiff's state-law claims, *Doe v. Catholic Relief Services*, 529 F. Supp. 3d 440 (D. Md. 2021),

and the case proceeded to discovery on six counts for sex and sexual orientation discrimination

and retaliation.[7]

---

[7] Remaining after this Court's Order of March 26, 2021 were: Count I (sexual orientation discrimination under Maryland Fair Employment Practices Act), Count II (sex discrimination under Maryland Fair Employment Practices

On January 31, 2022, Plaintiff filed his Motion for Partial Summary Judgment, requesting that the Court enter judgment in his favor as to Catholic Relief Services' liability for discrimination (but not retaliation).  The Court should deny Plaintiff's motion and dismiss the entire case, as Plaintiff's claims are inseparably entangled in religious questions that the Court lacks jurisdiction to resolve.  Even if the Court could adjudicate this dispute without wandering into a theological thicket, Plaintiff cannot make out a cause of action under the statutes on which he relies; and any such action would be barred, in any event, by RFRA and the First Amendment.

## Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, 'in the light most favorable to the party opposing the motion.'"  *OT, LLC v. Harford County*, No. SAG-17-02812, 2019 WL 5538057, at *4 (D. Md. Oct. 24, 2019).  Where parties cross-move, the court will "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Wheelabrator Balt., LP v. Mayor of Balt.*, 449 F. Supp. 3d 549, 559 (D. Md. 2020) (citations and internal quotation marks omitted).

## Argument

**I.    The First Amendment bars the Court from exercising jurisdiction over Plaintiff's claims, which would require the Court to analyze competing religious beliefs and decide which health benefits policies are required by Catholic teaching.**

In opposing Catholic Relief Services' religious freedom defenses, Plaintiff points to alternatives to spousal health benefits, such as the "plus one" model that some organizations

---

Act), Count III (sex discrimination under Maryland Equal Pay for Equal Work Act), Count VIII (discrimination under federal Title VII), Count IX (sex discrimination under federal Equal Pay Act), and Count X (retaliation).

have adopted, which Plaintiff and his retained expert believe to be compatible with a Catholic

worldview.  Plaintiff also questions why Catholic Relief Services provides benefits to some

employees whose marriages do not strictly conform to Catholic teaching.  *See* Motion for Partial

Summary Judgment at 35-36, 38-39.  The lines Catholic Relief Services has drawn in its benefits

programming are supported by authoritative Catholic doctrine, but the Court cannot wade into

this dispute, as civil courts may "exercise no jurisdiction" over the subject matter of a "dispute,

strictly and purely ecclesiastical in its character," including "a matter which concerns theological

controversy."  *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871).  Religious organizations are

constitutionally entitled to "independence from secular control or manipulation, in short, power

to decide for themselves . . . matters of . . . faith and doctrine."  *Kedroff*, 344 U.S. at 116.

Sometimes, disputes involving religious organizations can be resolved pursuant to

"neutral principles of law" that allow full and fair adjudication of the disputes without

consideration of church doctrine.  *Jones v. Wolf*, 443 U.S. 595, 604 (1979).  Church property

disputes present the classic fact pattern where neutral principles may allow a court to determine

ownership without delving into religion.  Similarly, "employment decisions" by religious

organizations may be reviewed under Title VII and similar statutes "where the decision does not

involve the [organization's] spiritual functions."  *Rayburn v. Gen. Conf. of Seventh-Day*

*Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985).  But where the "alleged misconduct is 'rooted

in religious belief,'" church autonomy will bar a court from resolving the allegations—even if

comparable allegations in a secular context could be readily adjudicated.  *Bryce v. Episcopal*

*Church in the Diocese of Colo.*, 289 F.3d 648, 657, 659 (10th Cir. 2002) (citation omitted); *see*

*Aparicio v. Christian Union, Inc.*, No. 18-CV-0592 (ALC), 2019 WL 1437618, at *9-10

(S.D.N.Y. Mar. 29, 2019) (plaintiff's Title VII retaliation claim was barred by the church

autonomy doctrine); *Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198, 1221 (D.N.M. 2018) (plaintiff's common law tort claims were barred by the church autonomy doctrine).[8]

Plaintiff's litigation strategy confirms the inherently religious nature of this dispute. Plaintiff grilled Catholic Relief Services' leadership about the so-called "plus one" alternative to spousal health benefits. He subpoenaed documents and information from other Catholic organizations. He hired a theologian, Dr. Salzman, who wrote a 28-page report ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████." Ex. 2 to Pl.'s Expert Disclosure at 27, attached as Exhibit 43. As evidenced by Plaintiff's lengthy discussion and critique of Catholic Relief Services' beliefs, the Court could not even begin to resolve this dispute in a manner fair to both parties without evaluating and deciding discrete questions of religious doctrine and faith. Plaintiff does not dispute that the sincerely held religious beliefs of Catholic Relief Services are the sole basis on which Catholic Relief Services denied spousal health benefits to his husband. Motion for Partial Summary Judgment at 14. The crux of this dispute is a religious one; Plaintiff disagrees with Catholic Relief Services' religious beliefs and moral analysis, and asks the Court to endorse the Plaintiff's view rather than the view of Catholic Relief Services. The First Amendment prohibits that inquiry. Accordingly, the Court should dismiss this case for lack of subject-matter jurisdiction.

---

[8] The church autonomy doctrine sweeps more broadly than the ministerial exception to Title VII and other employment laws, which Plaintiff discusses at length but which Catholic Relief Services has not asserted.

**II.    Statutory exemptions block Plaintiff's claims under Title VII and the Maryland Fair Employment Practices Act, while Plaintiff's claim under the Maryland Equal Pay for Equal Work Act fails on its merits.**

   **A.    The Title VII religious employer exemption allows Catholic Relief Services to favor conduct compatible with its sincere religious beliefs.**

Judgment on Count VIII (discrimination under federal Title VII) should be entered in favor of Catholic Relief Services because of the express statutory exemption for religious corporations such as Catholic Relief Services.  Section 702(a) of Title VII, 42 U.S.C. § 2000e-1(a), provides that the statute "shall not apply to . . . a religious corporation . . . with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation . . . of its activities."  The exemption is "not limited to only hiring and firing decisions," and its text and legislative history "made clear that the exemption includes 'any activities of religious organizations, regardless of whether those activities are religious or secular in nature.'"  *Doe*, 529 F. Supp. 3d at 448 (quoting *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011)).  "Religion" is defined in Title VII as " all aspects of religious observance and practice, as well as belief."  42 U.S.C. § 2000e(j); *see Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) ("[T]he permission to employ persons 'of a particular religion' includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts."), *cited favorably by Kennedy*, 657 F.3d at 194.  Section 702(a) therefore "is not limited to religious discrimination claims; rather, it also exempts religious employers from other forms of discrimination under Title VII, so long as the employment decision was rooted in religious belief."  *Bear Creek Bible Church v. EEOC*, — F. Supp. 3d —, 2021 WL 5449038, at *6 (N.D. Tex. Nov. 22, 2021), *appeal docketed*, No. 22-10145 (5th Cir. Feb. 14, 2022); *see Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 141 (3d Cir. 2006) (affirming dismissal of sex discrimination claim because

776768

"Congress has not demonstrated a clear expression of an affirmative intention" that Title VII applies "in situations where it is impossible to avoid inquiry into a religious employer's religious mission or the plausibility of its religious justification for an employment decision").

While "[c]ourts do not agree on the scope of [the section 702(a)] exemption," *Bear Creek*, 2021 WL 5449038, at *5, the Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), indicated that the exemption sweeps more broadly than the narrow protection against religious discrimination claims that Plaintiff contemplates. In responding to the concern that "complying with Title VII's requirement . . . may require some employers to violate their religious convictions," the Court wrote: "We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." *Bostock*, 140 S. Ct. at 1754. The Court pointed out that "[a]s a result of its deliberations in adopting the law, Congress included an express statutory exception for religious organizations." *Id.* If this "express statutory exception" could protect only against claims of "*[r]eligious* discrimination" where "promoting . . . religious 'activities' is the purpose of the individual's employment,'" Motion for Partial Summary Judgment at 14-15 (alteration in original) (citation omitted), the exception would have minimal relevancy in cases involving *Bostock*-type claims, rendering the Supreme Court's assurance hollow.

Plaintiff cites the Fourth Circuit's decision in *Rayburn* for the proposition that "Title VII does not confer upon religious organizations a license to make . . . decisions on the basis of race, sex, or national origin." Motion for Partial Summary Judgment at 15 (quoting *Rayburn*, 772 F.2d at 1166). That is true as a general matter, but *Rayburn* also recognized that section 702 "makes clear that religious institutions may base relevant hiring decisions upon religious preferences." *Rayburn*, 772 F.2d at 1166. In other words, a religious employer cannot avoid

776768

Title VII as a matter of course, but if the employer takes an action because of religious preference (in this case, preference for opposite-sex marriages that align with Catholic values), the exemption applies and the Title VII claim is not permitted.  If the law were otherwise, employees of religious organizations could plead around the exemption by calling a challenged action anything other than "religious discrimination."  As the Supreme Court forecast in *Bostock*, Congress enacted section 702(a) to extend robust protection to religious organizations (including protection from the types of claims Plaintiff brings in this case)—not to invite pleading games. Catholic Relief Services' "sincerely held religious beliefs, which Mr. Doe does not dispute," Motion for Partial Summary Judgment at 14, were the sole reason that Catholic Relief Services terminated Plaintiff's spousal health benefits.  Plaintiff's Title VII claims are foreclosed.

**B.**      **The Maryland Fair Employment Practices Act exempts Catholic Relief Services from sexual orientation discrimination claims by persons employed to "perform work connected with the activities of the religious entity."**

Judgment on Count I (sexual orientation discrimination under the Maryland Fair Employment Practices Act) should be entered in favor of Catholic Relief Services because of the express statutory exemption for religious corporations such as Catholic Relief Services.  The Maryland Fair Employment Practices Act "does not apply to . . . a religious corporation . . . with respect to the employment of individuals of a particular . . . sexual orientation . . . to perform work connected with the activities of the religious entity."  Md. Code Ann., State Gov't § 20-604.  Plaintiff does not dispute that Catholic Relief Services is a "religious corporation," and he does not dispute that he is employed to perform work connected with Catholic Relief Services' "activities."  His claim for "sexual orientation discrimination" in Count I thus is barred by the statutory exemption.[9]

---

[9] Catholic Relief Services had moved to dismiss Count I on the basis of this statutory exemption, and this Court "defer[red] ruling on the scope of [the] religious exemption as it relates to this matter until it can interpret the

In trying to argue around the exemption, Plaintiff notes that federal and state employment statutes are often interpreted *pari passu*, and then suggests that the Court should ignore the explicit Maryland statutory exemption since there is no similar explicit federal exemption from claims of sexual orientation discrimination. However, as the Court of Appeals of Maryland made clear in *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 492 (2007), a court must not sidestep the plain meaning of a statute "in favor of relying on federal decisional law construing Title VII as a surrogate for analysis of the meaning of the terms used in the Maryland enactments." While Title VII should be construed to bar Plaintiff's claims for the reasons discussed in Part II.A, even if the Court disagrees, the Court should construe the Maryland Fair Employment Practices Act to bar Plaintiff's claims because the Maryland exemption—unlike the Title VII exemption—expressly applies to claims for sexual orientation discrimination.

Plaintiff points to the early legislative history of the Maryland Fair Employment Practices Act to try to tie the statute to developments in federal law. As Plaintiff acknowledges, though, the Maryland statute (but not Title VII) was updated in 2001 to proscribe sexual orientation discrimination and also extend the religious employer exemption to protect against sexual orientation discrimination claims. The Antidiscrimination Act of 2001 described the legislature's intent to "provid[e] immunity from liability for certain acts taken by employers in response to certain charges." S. 205, 2001 Leg., 415th Sess. (Md. 2001), attached as Exhibit 44. By 2001, decades had passed since the legislature had expanded the exemption to apply to all "activities" of a religious employer, not just "religious activities." If the legislature had intended,

---

exemption together with the issue raised regarding the definition of 'sex discrimination' under the statute, which . . . should be considered alongside the plaintiff's federal claims." *Doe*, 529 F. Supp. 3d at 448-49. As no Maryland court has offered further guidance as to the scope of the exemption, the Court should enforce the statute as written.

776768

as Plaintiff suggests, to turn back the clock and limit the exemption to claims relating to an employer's religious activities, it surely would have said so explicitly.[10]

As a fallback, Plaintiff argues that the Maryland Fair Employment Practices Act was intended to be "remedial" in nature and that Maryland has a broad public policy disfavoring sex (and, presumably, sexual orientation) discrimination. Motion for Partial Summary Judgment at 25-26. Yet the "words of the statute itself delineate the extent of the statute's reach." *Johnson v. Nationwide Mut. Ins. Co.*, 388 Md. 82, 95-96 (2005) (citing *Mayor of Baltimore v. Cassidy*, 338 Md. 88, 97 (1995), for the proposition that a court may not disregard the plain meaning of remedial statutes "in the name of liberal construction"). The Maryland General Assembly enshrined two public policy goals in the Maryland Fair Employment Practices Act: protection against discrimination due to suspect classifications, and protection of religious exercise. Plaintiff's claim in Count I is barred by the religious employer exemption.

**C.    The Maryland General Assembly created a deliberate framework of laws that distinguish between claims for sex and sexual orientation discrimination.**

Judgment on Counts II and III (sex discrimination under the Maryland Fair Employment Practices Act and the Maryland Equal Pay for Equal Work Act) should be entered in favor of Catholic Relief Services because, under the specific statutory scheme enacted by the Maryland

---

[10] Plaintiff's citations to a Thomson Reuters subscription service and a *Maryland Bar Journal* article, Motion for Partial Summary Judgment at 24, do not override the plain language of the statute. *See Daughtry v. Nadel*, 248 Md. App. 594, 612 (2020) ("[T]o determine [the General Assembly's] purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant." (alteration in original) (citation omitted)). Additionally, while Plaintiff states that the Maryland Commission on Human Relations made its recommendations "based on U.S. Government Accountability Office reports that recommended *narrowing* the proposed exemption for religious entities," Motion for Partial Summary Judgment at 26 n.6, there is no indication in the *Interim Report of the Special Commission to Study Sexual Orientation Discrimination in Maryland*, attached as Exhibit 45, that this was the Commission's intent. Nor is Plaintiff correct that the GAO "recommended" narrowing of the religious employer exemption; the language Plaintiff cites is a neutral description of proposed legislation. By contrast, in its testimony in connection with the Antidiscrimination Act of 2001, the Commission on Human Relations observed that the amendments would not "force faith-based organizations to extend jobs to those who do not live in accordance with their religious beliefs." Extract of bill file for S. 205, H.D. 307, 2001 Leg., 415th Sess. (Md. 2001), attached as Exhibit 46 (PDF at 2).

776768

General Assembly, claims of "sexual orientation" discrimination cannot be additionally pursued as claims of "sex" discrimination. The Maryland General Assembly, unlike Congress, treats "sex" and "sexual orientation" as distinct categories in employment statutes. The Maryland Fair Employment Practices Act generally prohibits discrimination on the bases of sex, sexual orientation, and gender identity, Md. Code Ann., State Gov't § 20-606(a)(1)(i), but expressly exempts religious employers from claims of sexual orientation or gender identity discrimination, *id.* § 20-604(2). The Maryland Equal Pay for Equal Work Act generally prohibits wage discrimination based on sex or gender identity but says nothing about sexual orientation. Md. Code Ann., Lab. & Empl. § 3-304(b). The Court previously acknowledged these distinctions but determined that it was "best to consider whether the plaintiff's state law sex discrimination claims . . . are co-extensive with the federal discrimination claims at the same time it considers the federal claims." *Doe*, 529 F. Supp. 3d at 448. Subsequent to the Court's ruling, and as of this filing, no reported Maryland case has addressed whether sex discrimination and sexual orientation discrimination are coterminous under these statutes. No Maryland court has so much as cited *Bostock* in any reported decision. But the *Bostock* Court itself downplayed the concern of employers that its "decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination," as "none of these other laws" were before the Court and the Court had "not had the benefit of adversarial testing about the meaning of their terms." *Bostock*, 140 S. Ct. at 1753.

In *Mykland v. CommonSpirit Health*, No. 3:21-cv-05061-RAJ, 2021 WL 4209429 (W.D. Wash. Sept. 16, 2021), a federal court considered, post-*Bostock*, whether "sex" and "sexual orientation" are discrete categories under the Washington Law Against Discrimination. The court concluded that they are discrete, not only because the terms are defined separately in the

776768

Washington law but also because the law "list[s] both characteristics separately." *Id.* at *8.[11]

Similarly, this Court should presume, in the absence of any contrary guidance from the Court of Appeals of Maryland, that the Maryland General Assembly was not merely repeating itself when it separately proscribed sex discrimination and sexual orientation discrimination in the Maryland Fair Employment Practices Act. Of course, the point is not that sex and sexual orientation are conceptually unrelated; the point is that the legislature's choice to implement a scheme that accords differing protections against sex discrimination and sexual orientation discrimination is entitled to deference, and the laws should be enforced as written. Plaintiff's preferred interpretation of the Maryland Fair Employment Practices Act would not only render a portion of the general proscription surplusage; it would render the religious employer exemption meaningless. Every employee with a claim that, like Plaintiff's claim, sounds in sexual orientation discrimination would simply style the claim as one for sex discrimination and avoid the exemption. That cannot possibly have been the legislature's intent. *See Doe v. Montgomery Cnty. Bd. of Elections*, 406 Md. 697, 712 (2008).

The Maryland Equal Pay for Equal Work Act, like the Maryland Fair Employment Practices Act, proscribes sex discrimination (in the form of wage discrimination), and was updated in 2016 to proscribe gender identity discrimination—but not sexual orientation discrimination. As of 2016, several years had passed since Maryland voters approved, by referendum, the Civil Marriage Protection Act,[12] and the Supreme Court had recently decided in

---

[11] The Maryland Fair Employment Practices Act does not include a specific definition for sex, but Title 20 of the State Government Article, in which the Act appears, does define "sexual orientation" and "gender identity." Sexual orientation is defined as "the identification of an individual as to male or female homosexuality, heterosexuality, or bisexuality." Md. Code Ann., State Gov't § 20-101(i). That definition can be contrasted with the common understanding of "sex," *i.e.*, the "sum of the peculiarities of structure and function that distinguish a male from a female organism," *Sex*, *Black's Law Dictionary* (11th ed. 2019).

[12] *See* Annie Linskey, *Voters Approve Same-Sex Marriage Law*, Balt. Sun (Nov. 7, 2012), https://www.baltimoresun.com/politics/bs-md-same-sex-ballot-20121106-story.html (last visited Feb. 28, 2022).

776768

*Obergefell v. Hodges*, 576 U.S. 644 (2015), that the Constitution protects the right to marriage (including same-sex marriage). Given these recent developments and the publicity surrounding the legal status of same-sex relationships, it is inconceivable that the Maryland General Assembly simply forgot to include sexual orientation as a protected category in the Maryland Equal Pay for Equal Work Act. Likewise, it is inconceivable that, years before *Bostock* was decided, the same legislature that had seen fit back in 2001 to include sexual orientation as a discrete category in the Maryland Fair Employment Practices Act was banking on the possibility that courts would eventually decide that sexual orientation discrimination is a superfluous category. Rather, the legislature updated the Maryland Equal Pay for Equal Work Act to address well-documented concerns about pay disparities due to gender identity—not sexual orientation, or any of the other suspect classifications that receive protection under federal or state law. *See* H.D. 1003, 2016 Leg., 436th Sess. (Md. 2016), attached as Exhibit 47 (bill file with references to gender or gender identity highlighted); S. 481, 2016 Leg., 436th Sess. (Md. 2016), attached as Exhibit 48 (bill file with references to gender or gender identity highlighted).

The Maryland General Assembly is permitted to legislate incrementally, as problems "in the same field may be of different dimensions and proportions, requiring different remedies. . . . Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955). Additionally, the Maryland General Assembly is permitted to prohibit certain practices by secular employers while carving out an exemption for religious employers that protects their free exercise of religion. The Court should interpret and apply the Maryland employment statutes as they are written, reject Plaintiff's attempt to recast as sex discrimination

his claims that sound in sexual orientation discrimination under Maryland law, and enter

judgment in Catholic Relief Services' favor on Counts II and III.

### III. Plaintiff's federal discrimination claims are barred by RFRA, and his federal and state claims are barred by the Free Exercise Clause.

#### A. RFRA applies to "all Federal law, and the implementation of that law," including in suits between private parties.

Courts have divided over whether RFRA provides an affirmative defense to private-party

claims. The Second Circuit says it does, *see Hankins v. Lyght*, 441 F.3d 96, 103-04 (2d Cir.

2006), at least as to federal laws that are equally enforceable by private parties and federal

agencies, because the "substance of [statutory] prohibitions cannot change depending on whether

[they] are enforced by the EEOC or an aggrieved party." The Eighth Circuit, by comparison,

recognized that "RFRA . . . has effectively amended the Bankruptcy Code, and has engrafted the

additional clause . . . that a recovery that places a substantial burden on a debtor's exercise of

religion will not be allowed unless it is the least restrictive means to satisfy a compelling

interest." *In re Young*, 141 F.3d 854, 861 (8th Cir. 1998). The D.C. Circuit also held, in a case

brought by the EEOC and a private party, that "the EEOC's and [the private party's] claims are

barred by . . . RFRA." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 470 (D.C. Cir. 1996).

Other courts have declined to apply RFRA in a suit between private parties, *e.g.*, *Gen. Conf.*

*Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411-12 (6th Cir. 2010), and the Fourth

Circuit has not weighed in on this circuit split, which the Supreme Court has left unresolved.[13]

Plaintiff argues that RFRA applies only to government action because of references in the

statute to "government." Motion for Partial Summary Judgment at 28. That simplistic analysis

---

[13]  In a paragraph in *Goddard v. Apogee Retail LLC*, No. DKC 19-3269, 2021 WL 2589727, at *8 (D. Md. June 24, 2021), Judge Chasanow dismissed the pro se plaintiff's incoherent RFRA claim, which "does not come with any explanation of who is alleged to have discriminated against Plaintiff on the basis of his religion or how." Given those circumstances, Plaintiff's reliance on *Goddard* to substantiate his assertion that "Fourth Circuit courts have agreed that RFRA does not apply to private parties," Motion for Partial Summary Judgment at 27, is dubious at best.

776768

ignores that RFRA "applies to all Federal law, and the implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb-3(a). If the statute were to apply only in cases in which federal claims are asserted by federal agencies, Congress's intent to "restore the compelling interest test as set forth in *Sherbert v. Verner* . . . and *Wisconsin v. Yoder* . . . and to guarantee its application in *all* cases where free exercise of religion is substantially burdened," 42 U.S.C. § 2000bb(b)(1) (emphasis added), would be thwarted. Plaintiff's interpretation also would lead to the absurd result that, in the small fraction of employment discrimination cases litigated by the EEOC, employers' religious exercise would be entitled to maximum statutory protection, whereas in the vast majority of cases litigated by private parties who receive a right to sue letter, employers' religious exercise would receive far less statutory protection. *See EEOC Releases Fiscal Year 2020 Enforcement and Litigation Data*, EEOC.gov (Feb. 26, 2021), https://www.eeoc.gov/newsroom/eeoc-releases-fiscal-year-2020-enforcement-and-litigation-data (last visited Feb. 28, 2022) (EEOC resolved 70,804 charges in fiscal year 2020 but filed just 93 lawsuits). This result would be particularly absurd given that the EEOC generally devotes its limited enforcement resources to the strongest cases. *See id.* ("The EEOC achieved a successful outcome in 95.8 percent of all district court resolution."). It is not plausible that Congress intended, through RFRA, to give religious employers a leg up only in those generally meritorious cases litigated by the EEOC.

Congress's stated intent to restore the compelling interest test of *Sherbert* and *Yoder* is further indication that Congress meant RFRA to apply as a defense to the implementation of federal law in cases litigated by government agencies and private parties alike. That test, which had been abrogated by *Employment Division v. Smith*, 494 U.S. 872 (1990), applied to private-party litigation. *See McDaniel v. Paty*, 435 U.S. 618, 621 (1978) (suit brought by

candidate for delegate to constitutional convention against candidate who was ordained minister). In other contexts, defendants likewise have asserted First Amendment defenses against private plaintiffs. *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988). And, obviously, the First Amendment's ministerial exception to Title VII is routinely asserted as a defense to private-party claims, including post-*Smith*. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) (en banc). The Congress that sought to accomplish through statute what *Sherbert* and *Yoder* once held as a matter of constitutional law likely would be surprised to learn, as some courts have incorrectly held, that the statute it enacted applies only as against government litigants.

Citing *Listecki v. Official Committee of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015), Plaintiff argues that "a private party cannot step into the shoes of the 'government' and demonstrate a compelling governmental interest and that it is the least restrictive means of furthering that compelling governmental interest." Motion for Partial Summary Judgment at 30. Neither Plaintiff nor *Listecki* explain why that is so. *Listecki* merely observed that the statute says "'government' must make this showing." *Listecki*, 780 F.3d at 736. But that begs the question whether a private citizen, like Plaintiff here, could *step in* for government to carry the strict scrutiny burden, just as private citizens *step in* for government every day when they file Title VII cases after receiving right-to-sue letters. "A court must attempt to interpret a statute so as to give each word meaning and to avoid creating surplusage." *Hedin v. Thompson*, 355 F.3d 746, 750 (4th Cir. 2004). Catholic Relief Services' reading of RFRA, but not Plaintiff's, would comply with that canon. The plaintiff, acting as a private attorney general under Title VII and the federal Equal Pay Act, *see EEOC v. Great Steaks, Inc.*, 667 F.3d 510, 516 (4th Cir. 2012),

776768

steps into the shoes of the EEOC. The plaintiff therefore must carry the government's burden to show that the relief he requests—here, damages and broad equitable relief requiring Catholic Relief Services to change its policies for the benefit of Plaintiff and any other married LGBT employees—is the least restrictive means of furthering a compelling governmental interest.

**B.** **Any requirement that Catholic Relief Services provide spousal health benefits, or their equivalent, to the same-sex spouses of employees would substantially burden Catholic Relief Services' religious exercise.**

RFRA prohibits the implementation of federal law in a manner that would "substantially burden a person's exercise of religion," unless the "application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). A substantial burden is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs," or one that requires an adherent to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." *El Ali v. Barr*, 473 F. Supp. 3d 479, 525 (D. Md. 2020) (alterations in original) (citations omitted).

In Dr. Haas's Statement on the Immorality of Providing Spousal Benefits to Same-Sex Couples, which Catholic Relief Services has adopted as its statement of theological position, *see* Decl. of Robert Augustine Twele ("Twele Decl."), Dr. Haas describes the two primary reasons why the relief Plaintiff seeks would substantially burden Catholic Relief Services' religious exercise. First, "provision of spousal health benefits . . . for the same-sex partners of employees would amount to formal cooperation with evil." Haas Report (Ex. 13) ¶ 57. Second, provision of these benefits could generate "scandal," *i.e.*, any "activity in which a Catholic may engage that would lead another into sin." *Id.* ¶ 67.

776768

As Dr. Haas explains, the principle of cooperation was "developed by Catholic moralists to delineate the circumstances in which a Catholic might legitimately cooperate with someone doing evil in order to achieve a common good." *Id.* ¶ 52. "Formal cooperation," which "occurs when an action . . . can be defined as a direct participation in an [immoral] act . . . or a sharing in the immoral intention of the person committing it," is never morally licit. *Id.* ¶ 55. Material cooperation *can* be licit, but only if "a great good is being achieved or a significant evil avoided, and one does not directly contribute to the immoral act of the Principal Agent." *Id.* ¶ 56. Scandal, by comparison, may occur even where the "actions of a cooperator with an 'evil-doer' . . . may be entirely licit according to the conditions of the Principle of Cooperation." Response to the Expert Witness Statement of Dr. Todd Salzman in the Case of *Doe vs Catholic Relief Services*, No. CCB-20-1815 (D. Md.) ("Haas Response") at 4, attached as Exhibit 49. If the Catholic cooperator's actions would "lead a third party to believe that the Catholic's action implies that he or she agrees with the evil acts of the principal agent, so that the third party would engage in the evil act believing it to be morally licit, then scandal has occurred." *Id.*

Plaintiff, who is agnostic about religion, disputes Catholic Relief Services' understanding of Catholic teaching, pointing out that (i) other organizations that identify as Catholic have different benefits policies; and (ii) Dr. Haas acknowledged that—in a vacuum—an organization hypothetically could implement a "plus one" benefits model for the purpose of expanding healthcare coverage. *See* Motion for Partial Summary Judgment at 35; Haas Dep. (Ex. 3) at 144:19 – 145:14. ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████. *See* Haas Dep. (Ex. 3) at 195:14-20; Callahan Dep. (Ex. 2) at 26:15-20;

Twele Dep. (Ex. 12) at 27:22 – 28:7.  As the Second Circuit recently observed, denial of a religious accommodation "based on someone else's publicly expressed religious views . . . runs afoul of the Supreme Court's teaching that '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, *or the validity of particular litigants' interpretations of those creeds*.'"  *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (alterations added and in original) (citations omitted).  The Vatican's Congregation for the Doctrine of the Faith teaches that where homosexual unions have been given the legal status and rights belonging to marriage, "clear and emphatic opposition is a duty.  One must refrain from any kind of formal cooperation in the enactment or application of such gravely unjust laws and, as far as possible, from material cooperation on the level of their application."[14]  The USCCB also has warned of the perils to religious freedom threatened by the "legal redefinition of marriage," including that government could "force religious institutions to extend any employment or other benefit they afford to marriage to same-sex 'marriage' as well."[15]

As to Plaintiff's argument about the potential liceity of a "plus one" benefits model, Dr. Haas explained that the model, while "potentially morally licit in the abstract, is largely unworkable and at the very least would substantially burden Catholic religious exercise, particularly at large institutions like Catholic Relief Services."  Haas Report (Ex. 13) ¶ 67. Problems with the "plus one" model include the erosion of the Church's witness to the "unique and irreplaceable role of marriage and family in society"; contribution to the "support of sexually

---

[14] Congregation for the Doctrine of the Faith, *Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons*, Vatican (June 3, 2003), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20030731_homosexual-unions_en.html (last visited Feb. 28, 2022).

[15] *The Meaning of Marriage & Sexual Difference*, U.S. Conf. Catholic Bishops, https://www.usccb.org/topics/promotion-defense-marriage/faqs-meaning-marriage-sexual-difference (last visited Feb. 28, 2022).

776768

illicit relationships on the part of some employees"; a diminution in support for true marriages; and scandal, which turns not on the intent of the Catholic actor but rather on the perception of third parties who stumble into sin. *Id.*; *see* Haas Dep. (Ex. 3) at 134:17 – 135:12, 144:19 – 145:5. Plaintiff's line of questioning about a hypothetical "plus one" model adopted to increase access to benefits conveniently ignores that the whole reason the "plus one" model was even considered at Catholic Relief Services—and the reason Plaintiff has made it a central theme in this litigation—is the idea (which Catholic Relief Services has rejected) that the model might conceivably provide a workaround to the Catholic prohibition on benefits for same-sex spouses. *See* Haas Dep. (Ex. 3) at 154:6 – 155:4.

Moreover, while Plaintiff seems to at least tacitly acknowledge that a requirement that Catholic Relief Services provide *spousal* health benefits to his same-sex spouse would be contrary to Catholic Relief Services' sincerely held religious beliefs, *see* Motion for Partial Summary Judgment at 35, his proposal that Catholic Relief Services replace its existing health benefits program with a "plus one" model is untethered to the relief he sought in his charge of discrimination before the EEOC and his Complaint in this Court. Neither pleading says anything about a "plus one" model. *See Thorn v. Sebelius*, 766 F. Supp. 2d 585, 596 (D. Md. 2011) ("Civil suits may not present . . . entirely new theories of liability not found in the initial EEOC complaint."). Rather, Plaintiff asks the Court to "Order CRS to reinstate Mr. Doe's spousal benefits" and "modify its benefits policies to provide benefits for employees' same-sex spouses to the same extent it provides benefits to employees' opposite-sex spouses." Compl. at 21. So Plaintiff's "plus one" proposal (which is morally unacceptable to Catholic Relief Services in any event) has no bearing on any question before this Court. If the Court finds that requiring Catholic Relief Services to give Plaintiff *spousal* health benefits would substantially burden

Catholic Relief Services' religious exercise, the Court must grant summary judgment to Catholic Relief Services unless Plaintiff demonstrates that his request is the least restrictive means of advancing a compelling interest (it is not, for the reasons discussed below).

Plaintiff also invites the Court to parse Catholic Relief Services' religious beliefs—an exercise the First Amendment prohibits—in light of the benefits made available to other categories of employees whose lifestyles are not wholly consonant with Catholic teaching. *See* Motion for Partial Summary Judgment at 36-37. As Dr. Haas and Catholic Relief Services' Rule 30(b)(6) designee, Fr. Twele, testified, Catholic Relief Services distinguishes between a public "marriage" between persons of the same sex and nonpublic (or at least nonobvious) lifestyle choices, such as a remarriage without annulment or conception of a child through in vitro fertilization. *See* Haas Dep. (Ex. 3) at 207:15-19 ("giving public testimony . . . to the fact that one believes in and encourages same-sex relationships to be on a par with God's plan for marriage [is] what can't be acceptable"); Twele Dep. (Ex. 12) at 128:14-15, 22 – 129:5 ("IVF is not a public act like marriage to a person of the same sex. . . . [O]ne could not impute that CRS is somehow trying to condone some . . . behavior that is a private act between . . . people.").

Unlike in *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1986), where a religious school (i) had previously abandoned a practice of paying scriptural "heads of household" at a higher rate due to concerns about liability and (ii) provided various benefits—but not health benefits—to men and women employees alike, at Catholic Relief Services *no* spousal benefits are available to same-sex spouses, as the provision of such benefits would violate Catholic Relief Services' sincerely held religious beliefs. *See* Twele Dep. (Ex. 12) at 120:8 – 121:20. For that matter, it is not clear that the Ninth Circuit's analysis in *Fremont Christian* would apply under RFRA, which was not enacted until 1993. For example, the Supreme Court

emphasized in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014), that "federal courts have no business addressing . . . whether the religious belief asserted in a RFRA case is reasonable."[16]

Continuing his assault on Catholic Relief Services' religious beliefs with out-of-circuit case law, Plaintiff cites *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), one of the underlying cases in *Bostock* (wherein the Supreme Court did not address the relationship between Title VII and RFRA), for the proposition that the "presumed biases" of others would not establish a substantial burden under RFRA. Motion for Partial Summary Judgment at 37. In *Harris Funeral Homes*, the defendant argued that mourners might be distracted by the presence of a transgender person in the funeral home. 884 F.3d at 586. Catholic Relief Services' argument is not that third parties might be disturbed by its provision of spousal health benefits to same-sex spouses; its argument is first that its own religious exercise would be burdened and also that third parties might perceive that Catholic Relief Services has joined the evolution of some liberal Catholic organizations toward a recognition of same-sex marriage. The concern is at least reasonable given the public debate about marriage and religion, including within the Church; indeed, Plaintiff relies on that public debate in arguing that Catholic Relief Services (among the nation's most prominent Catholic organizations) should follow the lead of some other Catholic-affiliated organizations in its benefits programming. Moreover, █
█████████████████████ , *see* Doe Dep. (Ex. 14) at 76:21 – 78:12, self-appointed Catholic watchdog organizations routinely harangue Catholic Relief Services for perceived moral slippage, and a

---

[16] ████████████████████████████████████████████████████████████████████
████████████████████████████████████████ " Motion for Partial Summary Judgment at 36 (emphasis omitted). While this particular issue has not arisen at Catholic Relief Services, Fr. Twele testified on behalf of the organization that he understands a same-sex spouse would *not* be eligible for emergency evacuation services. *See* Twele Dep. (Ex. 12) at 65:13 – 66:13. The document about which Mr. Mood was questioned at his deposition does not state otherwise. *Compare* Mood Dep. (Ex. 10) at 92:21-25, *with* Sept. 26, 2017 email fr. D. Palasits to S. Mood, attached as Exhibit 50.

776768

change in policy to accommodate Plaintiff's demands would almost certainly generate publicity.

That is not, as Plaintiff puts it, "speculation"; it is Catholic Relief Services' lived experience.

*See* May 31, 2016 email fr. P. Eagle to Exec. Leadership Team, attached as Exhibit 51; June 3,

2016 email fr. J. Rosenhauer to C. Woo, attached as Exhibit 52; June 2, 2016 email fr. P. Eagle

to C. Woo, attached as Exhibit 53; Aug. 3, 2016 email fr. M. Mitchell to Board Members,

attached as Exhibit 54.

      Plaintiff's demand that Catholic Relief Services affirmatively provide spousal health

benefits to same-sex spouses is patently distinguishable from the law schools' flimsy concern in

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006), that the

mere presence of recruiters on campus could be seen as an endorsement by the schools of the

recruiters' speech; or the concern of lower courts in *Rosenberger v. Rector & Visitors of*

*University of Virginia*, 515 U.S. 819, 841 (1995), that the religious orientation of a student

publication could somehow be imputed to the university. Rather, much as Catholic Social

Services concluded in *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021), that

"certification" of foster parents in same-sex relationships "is tantamount to endorsement,"

Catholic Relief Services has concluded that provision of spousal health benefits to the same-sex

spouses of employees "would indicate that CRS . . . did consider these non-spouses to be

spouses." Haas Dep. (Ex. 3) at 148:9-14; *see id.* at 186:16 – 190:7 (Haas explaining why a

technical adjustment or enrollment in COBRA-like coverage to remedy a mistaken enrollment of

a same-sex spouse for health benefits could be morally licit); Twele Dep. (Ex. 12) at 100:6

– 102:21 (Twele distinguishing COBRA-like coverage from Catholic Relief Services' dependent

health benefits). "And 'religious beliefs need not be acceptable, logical, consistent, or

comprehensible to others in order to merit First Amendment protection.'" *Fulton*, 141 S. Ct. at

1876 (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981), and rejecting the city's argument that certification does not equal endorsement). For that matter, "scandal" in the sense used by Catholic Relief Services is itself a religious concept, *see* Haas Report (Ex. 13) ¶ 67; Haas Response (Ex. 49) at 4-5; 1 *Corinthians* 8:4-13, which the Court is prohibited under the First Amendment from explicating, *see Kane*, 19 F.4th at 168.

Plaintiff's demands also take this case far outside the reasoning of *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1063 (9th Cir. 2008), another out-of-circuit case on which Plaintiff relies, where the presence of artificial snow on a sacred mountain was "offensive to the Plaintiffs' feelings about their religion and [would] decrease the spiritual fulfillment Plaintiffs get from practicing their religion on the mountain." Catholic Relief Services does not merely contend that the remedy Plaintiff seeks would cause it to experience a diminution in spiritual fulfillment. Catholic Relief Services sincerely believes that provision of spousal health benefits to the same-sex spouses of employees would amount to formal cooperation with wrongdoing and promote scandal within the Church.

Finally, Plaintiff contends that the administrative hurdles Catholic Relief Services would encounter in overhauling its benefits program to implement a "plus one" program (which Plaintiff did not request in his charge of discrimination or his Complaint) would not be substantial. Motion for Partial Summary Judgment at 42-43. The "plus one" model is fraught because, among other reasons, only certain relationships qualify for tax-exempt employee health benefits. *See* Treas. Reg. § 1.106-1. Any plausible deniability a Catholic organization might claim through the model would be lost if the organization were required, for tax compliance reasons, to audit each employee's "plus one" selection to determine whether the tax exemption might apply. Thus, the administrative burden here is not solely one of cost, as in the cases

Plaintiff cites, *see Jimmy Swaggart Ministries v. Board of Equalization*, 493 U.S. 378, 391

(1990); *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *Goodall ex rel. Goodall v.

Stafford County School Board*, 60 F.3d 168, 172 (4th Cir. 1995); *cf. Garner v. Kennedy*, 713

F.3d 237, 244, 246 (5th Cir. 2013) (substantial burden undisputed; *government's* cost

justification insufficient to survive strict scrutiny). █████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████." Twele Dep. (Ex. 12) at 114:4-14; *see* Callahan Dep. (Ex. 2)

at 26:15-20; Haas Dep. (Ex. 3) at 216:3-11.  It is Catholic Relief Services' religious opposition to

providing spousal health benefits—or a façade for such benefits—to the same-sex spouses of

employees that is the primary driver of the organization's policy that Plaintiff challenges here.

*See Religious Sisters of Mercy v. Azar*, 513 F. Supp. 3d 1113, 1147 (D.N.D. 2021) ("Plaintiffs

have explained that their religious beliefs . . . prevent them from facilitating gender transitions

through . . . insurance coverage.  The Defendants in no way dispute the sincerity of those beliefs.

Nor is it this Court's domain to question them." (citations omitted)).

C.    **The relief sought by Plaintiff is not the least restrictive means of furthering a
      compelling governmental interest.**

Assuming that Title VII and the federal Equal Pay Act could be construed to apply to

Catholic Relief Services' termination of Plaintiff's spousal health benefits, enforcement of those

statutes as against Catholic Relief Services is not the least restrictive means of advancing a

compelling governmental interest, as RFRA requires.  While the government undoubtedly has an

interest in addressing invidious discrimination by employers, it also has an interest in perfecting

the First Amendment's promise of free exercise of religion, a promise RFRA was enacted to

advance.  *See Obergefell*, 576 U.S. at 679-80 ("The First Amendment ensures that religious

36

organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.").  Moreover, any compelling interest asserted by the government—or, here, by Plaintiff, standing in the shoes of the government—cannot be stated "at a high level of generality," as strict scrutiny under RFRA (and the First Amendment) "demands a more precise analysis."  *Fulton*, 141 S. Ct. at 1881.  "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'"  *Id.* (alteration in original) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-32 (2006)); *see Mast v. Fillmore County*, 141 S. Ct. 2430, 2432 (2021) (mem.) (Gorsuch, J., concurring in the decision to grant, vacate, and remand) ("[T]he County and courts below erred by treating the County's *general* interest in sanitation regulations as 'compelling' without reference to the *specific* application of those rules to *this* community."); *Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's County*, 17 F.4th 497, 510 (4th Cir. 2021) ("A 'compelling interest' . . . must be particular to the specific case; namely, the interest requires the infringement of a particular right in this case due to an interest of the highest order." (citations omitted)).

Plaintiff does not even try to explain why the government's "compelling interest in eradicating discrimination," Motion for Partial Summary Judgment at 45, requires the remedy he seeks as against a single religious corporation.  Indeed, he does not tie his analysis to Catholic Relief Services at all, favoring instead generalized statements about broadly formulated interests that courts have found inadequate under strict scrutiny.  With one exception, the cases on which Plaintiff relies in his terse discussion about strict scrutiny, *see* Motion for Partial Summary

776768

Judgment at 45-47, all predate the Supreme Court's recent guidance in *Fulton* and *Mast*.[17] While the Fourth Circuit held in *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir. 1990), that there was "no principled way of exempting [the defendant school from the Fair Labor Standards Act] without exempting all other sectarian schools and thereby the thousands of lay teachers and staff members on their payrolls," there is no reason for this Court to infer that a decision upholding Catholic Relief Services' religiously informed administration of its employee health benefits programming would similarly impact "thousands" of employees. Plaintiff himself stresses, repeatedly, that other Catholic-affiliated organizations have made different decisions about dependent benefits for the same-sex spouses of employees. Conversely, Plaintiff has not identified any other current employees of Catholic Relief Services whose benefits would be impacted by the policy change he demands.

Regardless whether Plaintiff could establish a compelling interest, his claims would still violate RFRA because the remedy he seeks is not the least restrictive means of advancing any such interest. *See Hobby Lobby*, 573 U.S. at 728 ("The least-restrictive-means standard is exceptionally demanding . . . ."). Quite the contrary, Catholic Relief Services has already offered a less restrictive alternative to Plaintiff: it provided him with a technical adjustment in his salary that, as shown in Part V.A, more than made up for the out-of-pocket expenses he claims. That technical adjustment is compatible with Catholic Relief Services' sincere exercise of its Catholic beliefs. *See* Haas Dep. (Ex. 3) at 186:16 – 190:7.

---

[17] The exception is *Billard v. Charlotte Catholic High School*, No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021), a poorly reasoned case that did not cite or discuss *Fulton* or *Mast* and also did not address Free Exercise jurisprudence generally—except in the context of the ministerial exception, which *Billard* erroneously characterized as the sole application of the church autonomy doctrine in employment cases. *See id.* at *12. *But see Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1242 n.4 (10th Cir. 2010) ("'Th[e] church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity.' Out of this broad prohibition, the courts have carved a narrower ministerial exception . . . 'that prevents adjudication of Title VII employment discrimination cases brought by ministers against churches.'" (alterations added and in original) (citations omitted)); *accord Bryce*, 289 F.3d at 658 n.2.

776768

Even if Catholic Relief Services had not squared the circle with a compromise that is fair to both Plaintiff and the organization, Plaintiff could not establish that the relief he seeks is the least restrictive means of advancing the "broadly formulated interests" on which he relies, because Title VII and the federal Equal Pay Act contain numerous exceptions for secular activity. Title VII excludes, among others, employers with respect to "the employment of aliens outside any State," 42 U.S.C. § 2000e-1(a); the federal government or its wholly owned corporations, *id.* § 2000e(b); Indian tribes, *id.*; and "businesses with fewer than fifteen employees," for "no apparent reason other than administrative convenience," *Bear Creek*, 2021 WL 5449038, at *25. The statute also permits employers to take otherwise unlawful adverse actions against members of the Communist Party of the United States and other communist affiliates, 42 U.S.C. § 2000e-2(f). The federal Equal Pay Act applies, with limited exceptions, only to those employees "engaged in commerce or in the production of goods for commerce, or . . . employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a). The prohibition against sex discrimination (and the requirement of a minimum wage more generally) is subject to a litany of secular exceptions, including for employees of certain amusement or recreational establishments and camps; employees employed in the fishing and aquaculture industries; employees employed in connection with the publication of small newspapers; switchboard operators employed by independently owned public telephone companies with no more than 750 stations; border patrol agents; and professional baseball players. *See* 29 U.S.C. § 213(a)(3), (5), (8), (10), (18), (19).

"It is established in . . . strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Church of the Lukumi Babalu Aye, Inc. v. City of*

776768

*Hialeah*, 508 U.S. 520, 547 (1993) (alteration in original) (citations omitted).  Congress saw fit, for whatever reasons, to exclude millions of employees from Title VII and the federal Equal Pay Act.  Indeed, the small business exception to Title VII alone exempts over seventeen million employees from the statute's coverage, based on 2018 data.[18]  Since the government "extend[s] these exemptions to nonreligious decisions," it "must treat requests for religious exemptions the same."  *Bear Creek*, 2021 WL 549038, at *25; *see Mast*, 141 S. Ct. at 2432 (Gorsuch, J., concurring in the decision to grant, vacate, and remand) ("Under strict scrutiny doctrine, the County must offer a compelling explanation why the same flexibility extended to others cannot be extended to the Amish."); *Fulton*, 141 S. Ct. at 1882 ("The creation of a system of exceptions . . . undermines the City's contention that its non-discrimination policies can brook no departures.  The City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others." (citation omitted)).

D. **Because the statutes on which Plaintiff relies exempt certain secular activity but not comparable religious activity, the statutes are not neutral and generally applicable, and their enforcement here would violate Free Exercise.**

As discussed in Part III.C, *supra*, both Title VII and the federal Equal Pay Act exempt numerous categories of employees from coverage under the statutes.  Maryland's employment include similar exemptions.  The Maryland Fair Employment Practices Act applies only to those employers with "15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year" (unless an employer with fewer employees has been accused of harassment, in which case the statute applies if the employer has "one or more employees for each working day in each of 20 or more calendar weeks in the current or

---

[18]  *See The Number of Firms and Establishments, Employment and Annual Payroll by State, Industry, and Enterprise Employment Size: 2018*, U.S. Census Bureau (May 28, 2021), https://www2.census.gov/programs-surveys/susb/tables/2018/us_state_naics_detailedsizes_2018.xlsx (last visited Feb. 28, 2022).

776768

preceding calendar year"). Md. Code Ann., State Gov't § 20-601(d)(1). Like Title VII, the statute does not apply to "an employer with respect to the employment of aliens outside of the State." The Maryland Equal Pay for Equal Work Act, by comparison, allows an employer to "pay[] a wage to employees of one sex or gender identity at a rate less than the rate paid to employees of another sex or gender identity," even where "both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type," if, *inter alia*, the variation is based on "work that is performed on different shifts or at different times of day." Md. Code Ann., Lab. & Empl. § 3-304(b)-(c).

As discussed in Part II, statutory exemptions in Title VII and the Maryland Fair Employment Practices Act require the Court to enter judgment in Catholic Relief Services' favor on Counts I and VIII of Plaintiff's Complaint, while the discrete treatment under Maryland employment law of "sex" and "sexual orientation" requires the Court to enter judgment in Catholic Relief Services' favor on Counts II and III. As discussed earlier in Part III, RFRA is an additional basis on which the Court is required to enter judgment in Catholic Relief Services' favor on Count VIII (federal Title VII) and Count IX (federal Equal Pay Act). If the Court disagrees with that analysis and finds that the statutes would proscribe Catholic Relief Services' termination of Plaintiff's spousal health benefits, then enforcement of any of the statutes as against Catholic Relief Services would violate the Free Exercise Clause of the First Amendment.

The Supreme Court has repeatedly held that, under the Free Exercise Clause, any statute that is not "neutral and generally applicable" cannot be used to substantially burden a sincerely held religious belief unless the application of the statute to the religious adherent is the least restrictive means of achieving a compelling interest. *Lukumi*, 508 U.S. at 531-32. RFRA

41

extended this standard as to all federal laws even if they were neutral and generally applicable. In this case, the federal and state statutes relied upon by Plaintiff are not "neutral and generally applicable" because, as the Supreme Court recently held, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *see Fulton*, 141 S. Ct. at 1877 ("A law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.")[19]

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 141 S. Ct. at 1296-97 (comparing state interests in regulating pandemic-era access to retail facilities versus home churches). As Plaintiff argues, and as the plain text of the statutes makes clear, the purpose of Title VII, the federal Equal Pay Act, and the Maryland Fair Employment Practices Act and Equal Pay for Equal Work Act, is to curtail invidious discrimination in employment. But there would be no basis for the Court to conclude that the government has a stronger or more particularized interest in rooting out discrimination by religious employers versus, for example, small businesses, the federal government, oyster farms, telephone companies, or employers whose men and women employees work opposite shifts. Nor has Plaintiff—who bears the burden to prove a compelling interest and least restrictive means— made any effort whatsoever to explain how the multitude of exemptions under the statutes on which he relies carve out conduct so dissimilar from religious exercise that the government could

---

[19] The same analysis would apply with respect to Article 36 of the Maryland Declaration of Rights, as "Maryland courts have repeatedly decided cases on the assumption that the free exercise provision of Article 36 is in *pari materia* with the First Amendment." *Booth v. Md. Dep't of Pub. Safety & Corr. Servs.*, No. RDB 05-1972, 2008 WL 2484937, at *8 (D. Md. June 18, 2008).

776768

rightly regulate the latter while exempting the former. *See Bear Creek*, 2021 WL 5449038, at

*26 ("Defendants have not articulated how granting specific exemptions for [religious]

employers . . . will harm the asserted interests in 'preventing discrimination.' . . . [T]he Free

Exercise Clause of the First Amendment compels Defendants to permit [religious employers] to

make employment decisions consistent with their cited religious beliefs as embodied in their

employment practices in the Title VII context.").

     For the reasons discussed in Parts III.B-C, the remedy Plaintiff seeks would substantially

burden Catholic Relief Services' religious exercise, and a ruling requiring Catholic Relief

Services to provide spousal health benefits to Plaintiffs and other employees with same-sex

spouses would not be the least restrictive means of furthering *any* governmental interest, let

alone a compelling one. Since the Free Exercise Clause indisputably supplies an affirmative

defense in private-party litigation, *see McDaniel*, 435 U.S. at 621, and since the United States

Constitution supersedes all laws—both state and federal—that are contrary to its guarantees, the

Court should enter summary judgment in Catholic Relief Services' favor on all counts.

### E.    The canon of constitutional avoidance requires the Court to construe the employment statutes and RFRA in a manner that is protective of Catholic Relief Services' religious freedom.

     This case presents weighty constitutional questions, including those arising from the

recent Supreme Court decisions in *Tandon* and *Fulton*. To the extent the Court deems any

statutory provisions ambiguous, the Court should construe those provisions in a manner that is

protective of Catholic Relief Services' religious exercise so that the Court is not required to

decide those constitutional questions. "Under the constitutional-avoidance canon, when statutory

language is susceptible of multiple interpretations, a court may shun an interpretation that raises

serious constitutional doubts and instead may adopt an alternative that avoids those problems."

*Kiviti v. Pompeo*, 467 F. Supp. 3d 293, 312-13 (D. Md. 2020) (citation omitted). Since only

776768

Catholic Relief Services' interpretation of RFRA and the employment statutes would allow the Court to resolve this case without deciding constitutional questions, the Court should adopt Catholic Relief Services' interpretation.

**IV.**   **Plaintiff's allegations about "threats" to his employment do not support his claim of retaliation by an employer that has treated him favorably.**

Plaintiff's retaliation claim in Count X is based on alleged statements by former Executive Vice President for Human Resources Shawn Mood. █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████." Plaintiff's First AINs (Ex. 34) at 7. █████████████████

████████████████████, *see* Mood Dep. (Ex. 10) at 77:1 – 78:8; 122:5 – 124:25; Damsker Decl. (Ex. 33) at DOE 0000337. Even if the jury were to credit Plaintiff's testimony over Mood's and find that Mood made some version of the statements as recounted by Plaintiff, any such finding would not support a claim for retaliation under Title VII. Rather, Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations omitted); *see Schmidt v. Town of Cheverly*, 212 F. Supp. 3d 573, 579-80 (D. Md. 2016) (retaliation claims under Title VII and Maryland Fair Employment Practices Act subject to equivalent analysis). While the Fourth Circuit appears not to have decided this issue, numerous courts have rejected the proposition that a threat of termination by a supervisor, without more, could constitute actionable retaliation in violation of Title VII or analogous employment statutes. *See Wilson v. Montgomery Cnty. Bd. of Trs.*, No. PWG-17-2784, 2018 WL 4300498, at *8 (D. Md. Sept. 10, 2018) ("[N]one of the following constitutes an

776768

adverse employment action in a retaliation claim: . . . 'a formal letter of reprimand,' or 'a proposed termination.'"); *Bryan v. Lucent Techs., Inc.*, 307 F. Supp. 2d 726, 741 (D. Md. 2004) ("A superior's mere *threat* to take an employment action, like his unsuccessful *attempt* to take such an action, that is never realized, does not constitute an adverse employment action supporting a discrete act disparate treatment discrimination (or retaliation) claim."); *accord Hellman v. Weisberg*, 360 F. App'x 776, 779 (9th Cir. 2009).

If ever there were a case in which the mere threat of termination by a supervisor could be deemed sufficiently adverse to give rise to actionable retaliation, this case certainly is not it. ███

████████████████████████████████████████████████████████████

██████████████████████████████████. *See* Doe Dep. (Ex. 14) at 19:4-21; 21:4-20; 89:15 – 90:5; [J. Doe] benefits sheet, attached as Exhibit 55. Moreover, Plaintiff's conduct is inconsistent with any notion that Mood's "threats" chilled his exercise of his rights under Title VII and the other employment statutes. ████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████. *See* Plaintiff's First AINs (Ex. 34) at 11; Doe Dep. (Ex. 14) at 121:12 – 123:15. ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████." Mood Dep. (Ex. 10) at 136:9-13. Plaintiff also gave a radio interview to Baltimore's local NPR affiliate shortly after the lawsuit was filed, without masking his voice. *See WYPR Press Release*; June 17, 2020 email (Ex. 40) (███████████████████████████████████████████████████████

███████████████████████"). Plaintiff's dissemination of the details of this case runs counter to his argument that he should be permitted to litigate under a pseudonym. *See* Nov. 17, 2021

Dep. of Denise Corrado ("Corrado Dep.") at 30:12-20, attached as Exhibit 56 (██████████

████████████████████████████████████████████████████████████████████ ").

Regardless, his retaliation claim is entirely without merit.  The Court should not allow the claim

to proceed to the jury.[20]

## V.      No reasonable jury could find that the termination of Plaintiff's spousal health benefits caused any measurable damage to Plaintiff.

### A.      The $5,000 technical increase in Plaintiff's salary more than offset his out-of-pocket expenses.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████."  Plaintiff's First AINs (Ex. 34) at 18; *accord*

Callahan Dep. (Ex. 2) at 85:13-19; Mood Dep. (Ex. 10) at 56:3-24.  Plaintiff also admits that the

chart he produced in discovery as DOE 0001141 accurately summarizes the out-of-pocket costs

allocable to the termination of his spousal health benefits as of November 9, 2021, some

undefined portion of which are costs that he personally absorbed.  Pl. John Doe's Objections &

Answers to Def. Catholic Relief Services' Reqs. for Admissions ("Plaintiff's Responses to

RFAs") at 9, attached as Exhibit 57; *see* Oct. 5, 2021 email fr. A. May to J. Dugan, attached as

---

[20] Plaintiff's retaliation claim under the federal Equal Pay Act fails for the additional reason that the only acts that Plaintiff characterizes as retaliatory occurred long before he filed his charge of discrimination, yet the Fair Labor Standards Act—of which the Equal Pay Act is a part—proscribes discrimination against an employee who "has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3); *see Ball v. Memphis Bar-B-Q- Co.*, 228 F.3d 360, 364 (4th Cir. 2000) ("The FLSA proscribes retaliation against an employee because he has given testimony in a 'proceeding' or because he is "about" to give testimony in a 'proceeding.'  In either case, the existence of a 'proceeding' is essential to the statutory circumstance.").  As for Plaintiff's state law retaliation claims, which would be analyzed pursuant to the Title VII framework, *see Schmidt v. Town of Cheverly*, 212 F. Supp. 3d 573, 579 (D. Md. 2016); *Raines v. Am. Fed'n of Teachers—Md. Prof'l Emps. Council*, No. ADC-19-1266, 2019 WL 4467132, at *10 (D. Md. Sept. 18, 2019), Plaintiff could not have "reasonably believe[d]," *Schmidt*, 212 F. Supp. 3d at 578, that the termination of his spousal health benefits amounted to actionable sexual orientation discrimination under the Maryland Fair Employment Practices Act (which excludes such claims as against religious corporations) or sex discrimination under Maryland law (which treats sex and sexual orientation as discrete categories).

776768

Exhibit 58 (Plaintiff's counsel declining to specify which expenses were covered by Plaintiff). Plaintiff additionally admits that he and his spouse filed joint federal and state tax returns for tax years 2017 through 2020 and that their federal and state taxable income did not exceed $153,100 and $150,000, respectively, in any of those years. Plaintiff's Responses to RFAs (Ex. 57) at 6-7.

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████:



**Table 1: Expenses based on Plaintiff's chart and technical increase computed through first pay period of November 2021 (federal income tax rates sourced from I.R.C. § 1(j)(2); Rev. Proc. 2019-44; Rev. Proc. 2018-57; Rev. Proc. 2016-55; FICA rate sourced from I.R.C. § 3101; Maryland income tax rate sourced from Md. Code Ann., Tax-Gen. § 10-105(a)(2); Baltimore income tax rate sourced from Balt. City Code, art. 28, § 18-2).**

     **B.    Catholic Relief Services bears no responsibility for Plaintiff's spouse's delay in his dental treatment.**

Plaintiff alleges that because his spousal health benefits were terminated, his spouse "had to delay dental work which resulted in an additional surgery that would not have been necessary had he been covered by CRS's Benefit Plan with Aetna." Compl. ¶ 44. 

," *see* Plaintiff's First AINs (Ex. 34) at 18-19; and it is even less clear how Plaintiff would have standing to collect damages corresponding to any pain and suffering that his spouse may have experienced. But the Court does not need to decide the standing issue, because Plaintiff's spouse conceded that the delay had nothing to do with Catholic Relief Services.



. *Id.* at 15.

█████████████████████████████████████████████████████████████████

███████████████████████████████████████." Extract of Tr. of Oct. 19, 2021 Dep. of ████████████

("████ Dep.") at 38:17 – 39:9, attached as Exhibit 62; *see id.* at 39:8-9 ("████████████

███████████████████"). █████████████████████████████████████████████

███████████████████████████████████████████. Plaintiff's First AINs (Ex.

34) at 15. █████████████████████████████████████████████████████████

███████████████. ██████ Dep. (Ex. 62) at 41:13 – 42:6. ████████████████████

███████████████████████████. Plaintiff's First AINs (Ex. 34) at 15; *see* Nottingham

Oral Surgery Ctr. letter to ██████████, attached as Exhibit 63; Nottingham Oral Surgery Ctr letter

to ██████, attached as Exhibit 64. ██████████████████████████████████████

██████████████████, ██████ Dep. (Ex. 62) at 42:13-18, ██████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████, *id.* at 42:19 – 43:18; *see also* Doe

Dep. (Ex. 14) at 137:20 – 138:2.

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████. *See* ██████ Dep. (Ex. 62) at 49:21 – 52:7; Doe Dep. (Ex. 14) at

145:15 – 146:15; 148:18 – 149:7; "Search for plan that will cover ████████ crown" notes,

attached as Exhibit 65.

In light of those facts, a reasonable jury could conclude only that any additional

discomfort Plaintiff's spouse may have experienced, or any other damage allocable to the

delayed placement of the crown, was self-inflicted.  The Court should grant summary judgment to Catholic Relief Services with respect to any claim by Plaintiff for damages allocable to his spouse's dental treatments.

### C. A reasonable jury could not apportion responsibility for Plaintiff's emotional difficulties to Catholic Relief Services without engaging in speculation.

Plaintiff's Complaint includes a prayer for relief in the form of "compensatory damages for the economic and emotional harms he experienced as a result of CRS's actions."  Compl. at 21.  Because Plaintiff failed to adduce sufficient (or any) evidence to distinguish his prior and concurrent emotional and psychological problems that are unrelated to Catholic Relief Services from any emotional injury fairly allocable to the termination of his spousal health benefits, a reasonable jury could not award Plaintiff non-pecuniary damages without engaging in rank speculation.  Therefore, Plaintiff is unable to recover damages for purported emotional harms.

A plaintiff must "reasonably and sufficiently explain the circumstances of [an] injury and not resort to mere conclusory statements" to recover emotional damages, because "emotional distress [is] fraught with vagueness and speculation, [and] is easily susceptible to fictitious and trivial claims."  *Price v. City of Charlotte*, 93 F.3d 1241, 1250-51 (4th Cir. 1996) (internal quotation marks omitted).  Further, although "proof of damage need not be precise, its calculation must not be subject to guess work or speculation."  *Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1332 (D. Md. 1989), *superseded by statute in part on other grounds.*  In the ordinary course, plaintiffs retain expert psychiatrists or psychologists, whose opinions can provide a reasonable framework from which a jury might compute emotional distress damages.

Plaintiff did not engage an expert psychiatrist, or any other expert, to assess his purported emotional injuries. ███████████████████████████████████████

███████████████████████████████████████████████████

50



Doe Dep. (Ex. 14) at 202:15–203:2.

,” Nov. 18, 2021 email fr. A. May to J. Dugan, attached as Exhibit 66; *see* Def. Catholic Relief Services' 1st Reqs. for Prod. of Docs. to Pl. John Doe at 6, attached as Exhibit 67,

. *See, e.g.*, Arcadian Telepsychiatry Progress Notes, attached as Exhibit 68.

.” *Id.* at DOE 0001098; *see* Corrado Dep. (Ex. 56) at 49:19-50:8 (

").

.” *Id.* at 51:7-10.

. Pl. John Doe's Answers to Def. Catholic Relief Services' 2d Set of Interrogs. at 7, attached as Exhibit 69.

. While Catholic Relief Services does not contest that Plaintiff may have experienced emotional trauma in the past, no reliable evidence shows that Catholic Relief

Services is responsible for Plaintiff's emotional or psychological issues. .”  Apr. 8, 2020 email

fr. [J. Doe] to K. Merkel, attached as Exhibit 70.

Plaintiff's inability to provide any rubric or reliable information from which the jury

could determine what portion of his emotional distress, if any, is allocable to the termination of

his spousal health benefits would render any jury award totally speculative and impermissible.

*See Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1516 (11th Cir. 1989) (affirming reduction

of a jury's award for emotional harm caused by racial discrimination because "there were many

other unpleasant factors in [plaintiff's] life which almost certainly contributed to her . . .

distress"), *abrogated in part on other grounds by Harris v. Forklift Sys., Inc.*, 510 U.S. 17

(1993); *Doe v. City of Chula Vista*, 196 F.R.D. 562, 569 (S.D. Cal. 1999) ("[T]o insure a fair

trial, particularly on the element of causation, the court concludes that defendants should have

access to evidence that [plaintiff's] emotional state was caused by something else.  Defendants

must be free to test the truth of [plaintiff's] contention that she is emotionally upset *because of*

the defendants' conduct.").  The Court should grant summary judgment to Catholic Relief

Services with respect to Plaintiff's claim for emotional distress damages.

**D.**     **Catholic Relief Services' exercise of its sincere religious beliefs does not constitute malice or indifference to Plaintiff's rights, particularly in light of the unsettled state of the law, so punitive damages would be improper.**

Plaintiff seeks exemplary damages under the federal Equal Pay Act and the Maryland

Equal Pay for Equal Work Act, as well as "punitive damages in an amount to be determined by a

jury."  Compl. at 21.  Even if Plaintiff were to prevail on the merits of his claims against Catholic

Relief Services, he would not be entitled to these additional damages.  To recover punitive

damages under Title VII, an employee must show that the employer "engaged in a

discriminatory practice . . . with malice or with reckless indifference to the federally protected

rights of an aggrieved individual."  42 U.S.C. § 1981a(a)(1), (b)(1).  Similarly, under the

Maryland Fair Employment Practices Act, a court "may award punitive damages" if the court

finds that the employer "engaged in . . . an unlawful employment practice with actual malice."

Md. Code Ann., State Gov't § 20-1013(e)(1).  The better-reasoned cases hold that punitive

damages are not available under the federal Equal Pay Act, *Snapp v. Unlimited Concepts, Inc.*,

208 F.3d 928, 934 (11th Cir. 2000); *Aucoin v. Kennedy*, 355 F. Supp. 2d 830, 841 (E.D. La.

2004); and in the absence of any statutory language or Maryland case law to the contrary, the

Court should presume that the same rule applies with respect to the Maryland Equal Pay for

Equal Work Act, *see Raines*, 2019 WL 4467132, at *10.  Instead, those statutes authorize an

award of "an additional equal amount as liquidated damages."  29 U.S.C. § 216(b); Md. Code

Ann., Lab. & Empl. § 3-307(a)(1).

   "Plaintiffs who seek punitive damages in employment discrimination cases face a

formidable burden."  *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 495 (8th Cir. 2003).  The

"very structure" of 42 U.S.C. § 1981a, which allows punitive damages for some Title VII claims,

"suggests a congressional intent to authorize punitive awards in only a subset of cases involving

intentional discrimination. . . . Congress plainly sought to impose two standards of liability—one

for establishing a right to compensatory damages and another, higher standard that a plaintiff

must satisfy to qualify for a punitive award."  *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534

(1999).  Punitive damages are inappropriate where the "employer discriminates with the distinct

belief that its discrimination is lawful," because the "underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a . . . statutory exception to liability." *Id.* at 537.

Catholic Relief Services terminated Plaintiff's spousal health benefits effective October 1, 2017, nearly three years before the Supreme Court held in *Bostock* that Title VII encompasses claims (at least as against secular employers) of sexual orientation discrimination. Lower courts had divided over the question, and the Fourth Circuit had recognized that "Title VII does not prohibit conduct based on the employee's sexual orientation." *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 751 (4th Cir. 1996), *abrogated by Bostock*, 140 S. Ct. 1731. Since *Bostock* had not yet been decided as of October 1, 2017, obviously no court had occasion to consider the relationship between the Supreme Court's reasoning in that case and religious freedom defenses that may be available under RFRA or the First Amendment. ██████████████████

███████████████████████████████████████████████████████████████

███████████████████████. June 17, 2020 email chain (Ex. 40) at DOE 0000868.

Nor had the Court of Appeals of Maryland addressed—as of October 1, 2017 or, indeed, as of this filing—the scope of the religious employer exemption from sexual orientation discrimination claims in the Maryland Fair Employment Practices Act, or the differing meanings of "sex" and "sexual orientation" in Maryland's employment statutes. Against this backdrop, and given Catholic Relief Services' religious beliefs that Plaintiff does not contest, a reasonable jury could not find that Catholic Relief Services discriminated against Plaintiff with malice or with reckless indifference to his rights. Accordingly, punitive damages would be inappropriate.

Liquidated damages under the wage discrimination statutes likewise would be inappropriate. "Under the terms of 29 U.S.C. § 260, an employer in violation of the Equal Pay

54

Act will be liable for liquidated damages . . . unless the employer demonstrates 'to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not violative of the [Act].'" *Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 162 (4th Cir. 1992). By comparison, liability (for compensatory or liquidated damages) will attach under the Maryland Equal Pay for Equal Work Act only where an employer "knew or reasonably should have known that the employer's action" violated the statute. Md. Code Ann., Lab. & Empl. § 3-307(a)(1). Here again, the unsettled state of the law prior to *Bostock* and the lack of Maryland case law expounding on the meaning of "sex" under the Maryland Equal Pay for Equal Work Act counsel against any damages multiplier. For that matter, (i) *Bostock* did not address whether the federal Equal Pay Act proscribes sexual orientation discrimination (let alone whether the Maryland Equal Pay for Equal Work Act does so); and (ii) no Fourth Circuit precedent has addressed either question. The Court should rule in Catholic Relief Services' favor as to Plaintiff's claims, but if the Court allows any of Plaintiff's claims to proceed, the Court would have no reason to conclude that Catholic Relief Services acted other than in good faith and with the reasonable belief that its religious exercise was compatible with federal and state law.

## VI. The opinions of Plaintiff's retained theologian, who concedes that his beliefs diverge from those of Catholic Relief Services, are irrelevant and inadmissible.

While Plaintiff does not rely in his opening brief on the opinions of his retained expert, Dr. Todd Salzman, the Court should nevertheless exclude all opinion testimony by Dr. Salzman and disregard any portion of Dr. Salzman's expert report on which Plaintiff may rely in his consolidated response/reply brief.

Catholic Relief Services designated an expert witness, Dr. John Haas—a longtime affiliate of Catholic Relief Services who previously served on an external advisory committee—

to educate the Court about Catholic Relief Services' particular Catholic beliefs, in the event that the Court determines it has subject-matter jurisdiction to decide this inherently religious dispute.[21]  Since this case largely turns (on the merits) on whether Plaintiff's requested relief would substantially burden Catholic Relief Services' religious exercise, Dr. Haas's "specialized knowledge will help the trier of fact to understand the evidence [and] to determine a fact in issue," Fed. R. Evid. 702(a), namely, the specific ways that Catholic Relief Services' religious exercise would be burdened.  Dr. Haas is intimately familiar with Catholic social and sexual ethics, and as set forth in the Declaration of Fr. Robert Twele, Catholic Relief Services has adopted his reports as its statement of theological position in this matter. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████."  Ex. 2 to Pl.'s Expert Disclosure (Ex. 43) at 1. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████"  *Id.* at 16, 22.

Dr. Salzman's opinions are irrelevant and inadmissible.  The only religious beliefs that are germane to this case are those held by Catholic Relief Services, and Catholic Relief Services endorses Dr. Haas's analysis and rejects Dr. Salzman's analysis.  *See* Twele Decl.  Inevitably, people and institutions that identify as Catholic hold to a variety of theological and moral views;

---

[21]  In a footnote, Plaintiff asserts, without any evidentiary support or substantive argument, that he "maintains that . . . Dr. John Haas, would not be qualified as an expert and his testimony would be inadmissible at trial."  Motion for Partial Summary Judgment at 35 n.12.  Plaintiff may "maintain" that, but he has not developed the point.  "A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *W.C. English, Inc. v. Rummell, Klepper & Kahl, LLP*, No. 6:17-cv-00018, 2021 WL 4782274, at *5 n.6 (W.D. Va. Oct. 13, 2021) (citation omitted).

776768

Dr. Salzman admitted as much in his deposition.  *See* Extract of Tr. of Dec. 14, 2021 Dep. of

Todd A. Salzman at 39:18 – 40:14; 56:8-9, attached as Exhibit 71.  Dr. Salzman also

acknowledged that the Congregation for the Doctrine of the Faith, a Vatican institution, holds

that the faithful "can't formally cooperate with laws that promote same-sex marriage or civil

unions," *id.* at 126:22 – 127:4; and he conceded that a Catholic organization could sincerely

believe that any actions that could lead a third party to perceive that same-sex marriages are

permissible must be avoided at all costs, *id.* at 123:5 – 125:3.  Crucially, Dr. Salzman—whose

writings have been criticized by the USCCB's Committee on Doctrine as applying a deficient

theological methodology—admitted that his views on sexual ethics diverge from those of the

USCCB and Catholic Relief Services.  *Id.* at 181:21 – 188:7.  In view of that divergence, Dr.

Salzman is, to put it mildly, totally unqualified to offer any opinions in this case about what

Catholic Relief Services believes or how Plaintiff's requested relief would burden Catholic

Relief Services' religious exercise.  Nor can Dr. Salzman offer any material insights about

Catholic doctrine, since "[i]ntrafaith differences . . . are not uncommon among followers of a

particular creed, and the judicial process is singularly ill equipped to resolve such differences

. . . . Courts are not arbiters of scriptural interpretation."  *Thomas*, 450 U.S. at 715-16.  Dr.

Salzman's irrelevant, inadmissible opinions would only confuse the jury and should be excluded

in their entirety in all further proceedings.

## Conclusion

The Court should grant Catholic Relief Services' Cross-Motion for Summary Judgment.

776768

Respectfully Submitted,

**GALLAGHER EVELIUS & JONES LLP**

_____*/s/ Joseph C. Dugan*_____
David W. Kinkopf, Fed. Bar No. 23366
dkinkopf@gejlaw.com
Joseph C. Dugan, Fed. Bar No. 19637
jdugan@gejlaw.com
Collin J. Wojciechowski, Fed. Bar No. 21112
cwojciechowski@gejlaw.com
Emily A. Levy, Fed. Bar No. 21403
elevy@gejlaw.com
218 N. Charles Street
Baltimore, Maryland 21201
Tel: (410) 727-7702
Fax: (410) 468-2786

*Attorneys for Defendant Catholic Relief Services*

Date:  February 28, 2022

776768