**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JOHN DOE, | * | |
| Plaintiff | * | |
| v. | * | No. CCB-20-1815 |
| CATHOLIC RELIEF SERVICES, | * | |
| Defendant | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

**DEFENDANT CATHOLIC RELIEF SERVICES' REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE
<u>EXPERT OPINION TESTIMONY BY DR. TODD A. SALZMAN</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Introduction ....................................................................................................................... 1

Argument ........................................................................................................................... 3

   I.     The plain language of the Maryland employment statutes on which Plaintiff relies does not proscribe the termination of his spousal health benefits, so the Court should grant summary judgment to Catholic Relief Services on Counts I-III. .................................... 3

   II.    Because Plaintiff's narrow reading of Title VII's religious employer exemption is contrary to *Bostock* and would invite gamesmanship, the Court should grant summary judgment to Catholic Relief Services on Count VIII .................................................... 7

   III.   Plaintiff's federal discrimination claims are contrary to RFRA, and his federal and state discrimination claims are contrary to the First Amendment, so the Court should grant summary judgment to Catholic Relief Services on Counts I-III and VIII-IX. ...... 9

      A.    Plaintiff, who chose to work for an arm of the Church and sued it over its religious exercise, offers no neutral framework for the disposition of his discrimination claims. .............................................................................................................. 9

      B.    Congress enacted RFRA to restore the *Sherbert–Yoder* framework, not to give the faithful a leg up only in litigation opposite government actors. ............................... 12

      C.    Unrebutted evidence in the summary judgment record confirms that the relief Plaintiff seeks would substantially burden Catholic Relief Services' religious exercise. ......................................................................................................... 15

      D.    Where Congress and the Maryland General Assembly have carved out secular exceptions from the employment statutes on which Plaintiff relies, those statutes are neither neutral nor generally applicable, nor the least restrictive means of furthering a compelling governmental interest. ......................................................... 18

   IV.   Assuming the worst version of Plaintiff's varying accounts of "threats," mere threats to terminate employment are not actionable retaliation, so the Court should grant summary judgment to Catholic Relief Services on Count X ......................................... 22

   V.    Plaintiff did not carry his burden to adduce sufficient evidence of damages to present to a jury, so the Court should grant summary judgment to Catholic Relief Services on Plaintiff's claims for damages under all counts ............................................................ 24

      A.    Plaintiff has adduced no reliable evidence of pecuniary damages or damages allocable to his spouse's delayed dental treatment. .................................................. 24

      B.    Plaintiff's emotional distress claim calls for impermissible speculation ................. 28

      C.    Plaintiff's demand for punitive damages is contrary to the undisputed facts and the relevant legal standard. ............................................................................................ 30

   VI.   Plaintiff's anticipated battle of the clerics would violate Federal Rule of Evidence 701 and the Establishment Clause of the First Amendment, so the Court should exclude expert opinion testimony by Dr. Todd Salzman. .......................................................... 32

Conclusion ....................................................................................................................... 35

i

## Cases

*Abdulhaseeb v. Calbone*,
  600 F.3d 1301 (10th Cir. 2010) ............................................................33

*Ace Am. Ins. Co. v. McDonald's Corp.*,
  No. GLR-11-3150, 2012 WL 2523883 (D. Md. June 28, 2012) .........................................28

*Am. Union of Baptists, Inc. v. Trs. of Particular Primitive Baptist Church at Black
  Rock, Inc.*,
  335 Md. 564 (1994) ............................................................35

*Aparicio v. Christian Union, Inc.*,
  No. 18-CV-0592 (ALC), 2019 WL 1437618 (S.D.N.Y. Mar. 29, 2019) .............................11

*Bear Creek Bible Church v. EEOC*,
  — F. Supp. 3d —, 2021 WL 5449038 (N.D. Tex. Nov. 22, 2021) .........................................9

*Billard v. Charlotte Catholic High Sch.*,
  No. 3:17-cv-00011, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021)....................................8, 11

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020)............................................................1, 2, 6, 7

*Bryan v. Lucent Techs., Inc.*,
  307 F. Supp. 2d 726 (D. Md. 2004) ............................................................22

*Bryant v. Aiken Reg'l Med. Ctrs. Inc.*,
  333 F.3d 536 (4th Cir. 2003) ............................................................28, 29

*Bryce v. Episcopal Church in the Diocese of Colo.*,
  289 F.3d 648 (10th Cir. 2002) ............................................................11

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)............................................................1, 16

*Carter v. Blakely*,
  No. 1:97CV00982, 1999 WL 1937226 (M.D.N.C. Sept. 1, 1999)........................................29

*Colo. Christian Univ. v. Weaver*,
  534 F.3d 1245 (10th Cir. 2008) ............................................................34

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*,
  450 F.3d 130 (3d Cir. 2006)............................................................8

*Edley-Worford v. Va. Conf. of United Methodist Church*,
  430 F. Supp. 3d 132 (E.D. Va. 2019) ............................................................10

i

*EEOC v. Consol Energy, Inc.*,
860 F.3d 131 (4th Cir. 2017) ........................................................................26

*EEOC v. Fremont Christian Sch.*,
781 F.2d 1362 (9th Cir. 1986) ......................................................................16

*EEOC v. Mississippi Coll.*,
626 F.2d 477 (5th Cir. 1980) ........................................................................10

*EEOC v. Tree of Life Christian Schs.*,
751 F. Supp. 700 (S.D. Ohio 1990) ..............................................................16

*Emp. Div. v. Smith*,
494 U.S. 872 (1990)........................................................................12, 14, 20

*Ferdinand-Davenport v. Children's Guild*,
742 F. Supp. 2d 772 (D. Md. 2010) ..............................................................23

*Ford v. McGinnis*,
352 F.3d 582 (2d Cir. 2003)..........................................................................33

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) ........................................ *passim*

*Goodman v. Archbishop Curley High Sch., Inc.*,
149 F. Supp. 3d 577 (D. Md. 2016) ..............................................................10

*Goza v. Memphis Light, Gas & Water Div.*,
398 F. Supp. 3d 303 (W.D. Tenn. 2019)........................................................16

*Hall v. Baptist Mem'l Health Care Corp.*,
215 F.3d 618 (6th Cir. 2000) ..........................................................................8

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006)............................................................................15

*Helton v. Hunt*,
330 F.3d 242 (4th Cir. 2003) ..........................................................................6

*Henderson v. Kennedy*,
253 F.3d 12 (D.C. Cir. 2001) ........................................................................16

*Henrietta D. v. Bloomberg*,
331 F.3d 261 (2d Cir. 2003)..........................................................................29

*Hernandez v. Commissioner*,
490 U.S. 680 (1989)......................................................................................33

*Hopkins v. Balt. Gas & Elec. Co.*,
77 F.3d 745 (4th Cir. 1996) ..........................................................................31

ii

*Hydro Invs., Inc. v. Trafalgar Power Inc.*,
   227 F.3d 8 (2d Cir. 2000).....................................................................................29

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94 (1952).............................................................................................11

*Kelley v. Decatur Baptist Church*,
   No. 5:17-cv-01239-HNJ, 2019 WL 8014314 (N.D. Ala. Mar. 27, 2019) ...............12

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011) ...........................................................................4,8

*Kerr v. Enoch Pratt Free Library of Balt. City*,
   149 F.2d 212 (4th Cir. 1945) .............................................................................16

*Kolstad v. Am. Dental Ass'n.*,
   527 U.S. 526 (1999)......................................................................................30, 31

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
   191 F.3d 229 (2d Cir. 1999)..............................................................................28

*Levitan v. Ashcroft*,
   281 F.3d 1313 (D.C. Cir. 2002) .........................................................................33

*Little v. Wuerl¸*
   929 F.2d 944 (3d Cir. 1991)................................................................................7

*Mast v. Fillmore County*,
   141 S. Ct. 2430 (2021)......................................................................................21

*McCallum v. Billy Graham Evangelistic Ass'n*,
   824 F. Supp. 2d 644 (W.D.N.C. 2011) ..............................................................10

*McDaniel v. Paty*,
   435 U.S. 618 (1978)..........................................................................................13

*Mentch v. E. Savings Bank, FSB*,
   949 F. Supp. 1236 (D. Md. 1997) .....................................................................23

*Mykland v. CommonSpirit Health*,
   No. 3:21-cv-05061-RAJ, 2021 WL 4209429 (W.D. Wash. Sept. 16, 2021)............5

*Neal v. United States*,
   No. ELH-19-1033, 2022 WL 374526 (D. Md. Feb. 8, 2022).................................24

*Oglesby v. State*,
   441 Md. 673 (2015) ............................................................................................7

iii

*Price v. City of Charlotte*,
    93 F.3d 1241 (4th Cir. 1996) ............................................................................24

*Ramirez v. Collier*,
    — S. Ct. —, 2022 WL 867311 (2022) ...............................................................21

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) ..........................................................................10

*Redhead v. Conf. of Seventh-Day Adventists*,
    566 F. Supp. 2d 125 (E.D.N.Y. 2008) .............................................................34

*Ricks v. Abbott Labs.*,
    198 F.R.D. 647 (D. Md. 2001) .........................................................................29

*Russell v. Pallito*,
    No. 5:15-CV-126-GWC-JMC, 2019 WL 6271358 (D. Vt. Nov. 25, 2019) ....32, 33

*Schwekne v. Ass'n. of Writers & Writing Programs*,
    510 F. Supp. 3d 331 (D. Md. 2021) ....................................................................5

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ..........................................................................12, 13, 14

*Sloas v. CSX Transp., Inc.*,
    616 F.3d 380 (4th Cir. 2010) .......................................................................26, 27

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ........................................................................... *passim*

*Tinoco v. Thesis Painting, Inc.*,
    No. GJR-16-752, 2018 WL 4599677 (D. Md. Sept. 24, 2018) ...........................28

*True v. Pleasant Care, Inc.*,
    No. 2:97CV20-DE, 2000 WL 33706383 (E.D.N.C. 2000)...................................29

*United States v. Selby*,
    333 F. Supp. 2d 367 (D. Md. 2004) .................................................................14

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*,
    888 F.3d 651 (4th Cir. 2018) ...........................................................................24

*Whitney v. Greater N.y. Corp. of Seventh-Day Adventists*,
    401 F. Supp. 1363 (S.D.N.Y. 1975).................................................................10

*Wilson v. Montgomery Cnty. Bd. of Trs.*,
    No. PWG-17-2784, 2018 WL 4300498 (D. Md. Sept. 10, 2018)...........................22

780973

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)................................................................................12, 13, 14

*In re Young*,
   141 F.3d 854 (8th Cir. 1998) ....................................................................13

**Statutes**

11 U.S.C. § 548..................................................................................................13

29 U.S.C. § 213..................................................................................................19

42 U.S.C. § 1981................................................................................................31

42 U.S.C. § 2000bb..............................................................................12, 13, 14

42 U.S.C. § 2000e ................................................................................... *passim*

42 U.S.C. § 2000e-1......................................................................................4, 7

42 U.S.C. § 2000e-2............................................................................................19

42 U.S.C. § 2000e-5............................................................................................13

Act of May 4, 1965, ch. 717, 1965 Md. Laws 1046 ....................................4

Act of May 8, 2020, ch. 428, 2020 Md. Laws ch. 428 .................................6

Act of May 21, 1973, ch. 493, 1973 Md. Laws 1104 ...................................4

Act of May 30, 2021, ch. 369, 2021 Md. Laws ch. 369 ...............................6

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 (1964) ..........3, 4

Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103,
   104 (1972)........................................................................................................4

Md. Code Ann., Crim. Law § 2-207 ................................................................6

Md. Code Ann., Crim. Law § 3-209 ................................................................6

Md. Code Ann., Lab. & Empl. § 3-304 ..........................................................19

Md. Code Ann., State Gov't § 20-601 ..........................................................19

Md. Code Ann., State Gov't § 20-604 ......................................................3, 19

Md. Code Ann., State Gov't § 20-610 ............................................................6

780973

Religious Liberty and Charitable Donation Protection Act of 1998, § 6, Pub. L.
No. 105-183, 112 Stat. 517 (1998) ........................................................................13

**Legislative Materials**

H.R. Rep. No. 103-88, at 2 (1993)...........................................................................14

**Rules**

Fed. R. Civ. P. 26...................................................................................................28

Fed. R. Evid. 701 ...................................................................................................32

Fed. R. Evid. 702 ...................................................................................................34

**Secondary Sources**

Carrie Campbell Severino, Fulton *Extends the Court's Record of Religious-*
*Liberty Victories*, Nat'l Rev. (June 18, 2021, 12:41 p.m.),
https://www.nationalreview.com/bench-memos/fulton-extends-the-courts-
record-of-religious-liberty-victories/. ......................................................................2

Committee on Doctrine, USCCB, *Inadequacies in the Theological Methodology*
*and Conclusions of* The Sexual Person:  Toward a Renewed Catholic
Anthropology *by Todd A. Salzman and Michael G. Lawler* (2010). ......................32

Douglas Laycock, *The Broader Implications of* Masterpiece Cakeshop, 2019
BYU L. Rev. 167, 176. ...........................................................................................20

Jim Oleske, Tandon *Steals* Fulton*'s Thunder:  The Most Important Free Exercise*
*Decision Since 1990*, SCOTUSblog (Apr. 15, 2021, 10:30 a.m.),
https://www.scotusblog.com/2021/04/tandon-steals-fultons-thunder-the-most-
important-free-exercise-decision-since-1990/ .........................................................20

Mark Joseph Stern, *The Supreme Court Broke Its Own Rules to Radically*
*Redefine Religious Liberty*, Slate (Apr. 12, 2021, 2:51 p.m.),
https://slate.com/news-and-politics/2021/04/supreme-court-religious-liberty-
covid-california.html................................................................................................20

*Mission Statement*, Catholic Relief Servs., https://www.crs.org/about/mission-
statement ...................................................................................................................4

USCCB, *U.S. Catholic Bishops' Administrative Committee Calls for Protection of*
*Marriage*, Sept. 10, 2003, https://www.usccb.org/news/2003/us-catholic-
bishops-administrative-committee-calls-protection-marriage. ................................17

780973

## Introduction

In *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020), the Supreme Court expressed "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution," as "that guarantee lies at the heart of our pluralistic society." While the *Bostock* Court construed Title VII to generally proscribe discrimination on the bases of sexual orientation or gender identity, the Court observed that "Congress included an express statutory exception for religious organizations." *Id.* The Court further recognized that the Religious Freedom Restoration Act of 1993, or RFRA, "operates as a kind of super statute, displacing the normal operation of other federal laws," and might "supersede Title VII's commands in appropriate cases." *Id.* The Court, in other words, went out of its way to reassure religious employers, like Catholic Relief Services—United States Conference of Catholic Bishops ("USCCB"), that the Court's ruling should not be understood to impose an arduous new burden on their religious exercise.

Plaintiff would have this Court impose such a burden now. Despite that his claims are legally analogous to those of the plaintiffs in *Bostock*—that is, he alleges an adverse employment action attributable to his sexual orientation—he contends that the Supreme Court's cautionary language has no application here. He argues, as some lower courts mistakenly have held, that RFRA does not even apply in employment actions brought by private parties, despite that the statute was enacted to "provide very broad protection for religious liberty," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014), and to revive a robust Free Exercise doctrine that for decades had protected religious litigants from claims by government actors and private parties alike. Plaintiff also argues that Title VII's religious employer exemption does not shield these employers from discrimination claims challenging their religiously motivated acts unless

the claims are styled as "religious" discrimination.  If Plaintiff is right about RFRA and Title VII,

*Bostock*'s promise to religious employers is empty.

Plaintiff's argument, though, would not just render *Bostock*'s assurances nugatory.  It

also would:

- Read an express exemption out of a Maryland statute (Count I);

- Conflate "sex" and "sexual orientation" under Maryland law, disrupting a delicate legislative balance and introducing surplusage into the statutes (Counts II-III);

- Disregard recent Supreme Court case law that endorsed a "most favored nation" status for religious exemptions under the First Amendment's Free Exercise Clause (Counts I-III and VIII-IX);

- Introduce a new theory of retaliation-by-empty-threat, contrary to rulings of prior courts, including this Court (Count X); and

- Invite the Court to parse religious doctrine and decide which version of Catholicism—the version practiced by Catholic Relief Services or the version endorsed by Plaintiff's counter-theologian—is determinative of the substantial burden on Catholic Relief Services' religious exercise (Counts I-III and VIII-IX).

Were Plaintiff employed by a secular organization, this case might be straightforward:

the logic of *Bostock* might compel the organization to extend benefits without regard to its

employees' sexual orientations.  But Catholic Relief Services' status as not only a religious

organization but an official arm of the Catholic Church changes the analysis.  While *Bostock* did

not squarely decide the questions presented in this case, the writing is on the wall.  The Supreme

Court is building on a strong foundation of legal protection for religious freedom with new cases

that expand the Court's Free Exercise jurisprudence and subject many laws to the strict scrutiny

framework.  *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021); *Tandon v. Newsom*, 141

S. Ct. 1294 (2021) (per curiam); Carrie Campbell Severino, Fulton *Extends the Court's Record*

*of Religious-Liberty Victories*, Nat'l Rev. (June 18, 2021, 12:41 p.m.),

https://www.nationalreview.com/bench-memos/fulton-extends-the-courts-record-of-religious-liberty-victories/.  This Court should follow the Supreme Court's guidance, decline Plaintiff's request for relief that would substantially burden Catholic Relief Services' religious exercise, and grant Catholic Relief Services' Cross-Motion for Summary Judgment.

<u>Argument</u>

I.    **The plain language of the Maryland employment statutes on which Plaintiff relies does not proscribe the termination of his spousal health benefits, so the Court should grant summary judgment to Catholic Relief Services on Counts I-III.**

***Sexual orientation discrimination.***  The Maryland Fair Employment Practices Act provides that the Act "does not apply to . . . a religious corporation . . . with respect to the employment of individuals of a particular religion, sexual orientation, or gender identity to perform work connected with the activities of the religious entity."  Md. Code Ann., State Gov't § 20-604(2).  The Maryland Equal Pay for Equal Work Act, by comparison, prohibits employers from "paying a wage to employees of one sex or gender identity at a rate less than the rate paid to employees of another sex or gender identity" where the employees perform comparable work, but the statute says nothing about sexual orientation.  Md. Code Ann., Lab. & Empl. § 3-304(b)(1)(i).  Since (i) Catholic Relief Services, indisputably, is a religious corporation; (ii) Plaintiff performs work connected with Catholic Relief Services' "activities"; and (iii) Plaintiff's claims sound in sexual orientation discrimination, the plain text of these statutes precludes his claims in Counts I through III.

Plaintiff tries to manufacture ambiguity in the Maryland Fair Employment Practices Act, arguing that the phrase "connected with the activities of the religious entity" is "susceptible to two different interpretations."  Reply in Supp. of Pl. John Doe's Mot. for Partial Summ. J. & Opp'n to Defs.' Cross-Mot. for Summ. J. & Mot. to Exclude Expert Testimony ("Plaintiff's Response & Reply") at 8-9 [ECF No. 49] (quoting Md. Code Ann., State Gov't § 20-604).  The

780973

phrase could not be clearer: "connected with the activities" means *all* the activities, not some

subset of "religious" activities (if it were even possible to distinguish between "religious" and

other activities of Catholic Relief Services, whose mission is defined by its Catholic identity, *see*

*Mission Statement*, Catholic Relief Servs., https://www.crs.org/about/mission-statement).

Plaintiff's argument is particularly muddled because he relies on parallels between Title

VII and the Maryland Fair Employment Practices Act, yet Title VII also exempts religious

corporations "with respect to the employment of individuals of a particular religion to perform

work *connected with the carrying on by such corporation . . . of its activities*." 42 U.S.C.

§ 2000e-1(a) (emphasis added). Both Title VII and the Maryland Fair Employment Practices

Act formerly limited their exemptions to *religious* activities but later expanded their exemptions

to *all* activities. *Compare* Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 255,

extract attached as Exhibit 1 (original language in Title VII), *and* Equal Employment

Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103, 104 (1972), extract attached as

Exhibit 2 (amended language in Title VII), *with* Act of May 4, 1965, ch. 717, 1965 Md. Laws

1046, extract attached as Exhibit 3 (original language in Maryland Fair Employment Practices

Act), *and* Act of May 21, 1973, ch. 493, 1973 Md. Laws 1104, extract attached as Exhibit 4

(amended language in Maryland Fair Employment Practices Act). To the extent that Title VII

jurisprudence provides an interpretive clue as to the meaning of "activities," the Fourth Circuit

has recognized that the exemption "include[s] any activities of religious organizations, regardless

of whether those activities are religious or secular in nature." *Kennedy v. St. Joseph's Ministries,*

*Inc.*, 657 F.3d 189, 192 (4th Cir. 2011).

What Plaintiff is really arguing is that when the Maryland General Assembly exempted

religious corporations from sexual orientation discrimination claims in 2001, it meant to turn

back the clock to reinstate the old "religious activities" limitation in the exemption.  Plaintiff

cites no authority for that argument, nor does he explain how the Court could ignore the plain

language of the statute and the fact that the state legislature (unlike Congress) saw fit to

expressly prohibit sexual orientation discrimination against employees while also expressly

exempting religious employers from the prohibition.  Plaintiff's sexual orientation discrimination

claim in Count I is barred by Maryland law.

*Sex discrimination.*  In response to Catholic Relief Services' arguments about Plaintiff's

sex discrimination claims in Counts II and III, Plaintiff has little to say.  He takes issue with

*Mykland v. CommonSpirit Health*, No. 3:21-cv-05061-RAJ, 2021 WL 4209429 (W.D. Wash.

Sept. 16, 2021), but he relies for his argument on this Court's prior citation to *Schwekne v.*

*Association of Writers & Writing Programs*, 510 F. Supp. 3d 331 (D. Md. 2021), and the overlap

between Title VII (post-*Bostock*) and Maryland statutes was not contested in *Schwenke*.  *See id.*

at 335.

While the only Maryland statutes at issue in this case are the Fair Employment Practices

Act and the Equal Pay for Equal Work Act, other Maryland statutes similarly treat "sex" and

"sexual orientation" as discrete categories.  For instance, section 14-5F-10 of the Health

Occupations Article prohibits discrimination against applicants or licensees to practice

naturopathic medicine on the basis of "sex, age, race, color, creed, sexual orientation, gender

identity, or national origin."  That statute was enacted in 2014, two years before the Maryland

General Assembly amended the Equal Pay for Equal Work Act to proscribe gender identity

discrimination but not sexual orientation discrimination.  In 2015, one year before that

amendment, the Maryland General Assembly enacted a law proscribing discrimination in

internships on the basis of "race, color, religion, sex, age, national origin, marital status, sexual

orientation, gender identity, or disability." Md. Code Ann., State Gov't § 20-610(b)(1).  In 2020,

the year *Bostock* was decided, the legislature amended Md. Code Ann., Health-Gen. § 19-355 to

prohibit discrimination by hospitals on the basis of sex, gender identity, and sexual orientation,

among other categories.  Act of May 8, 2020, ch. 428, 2020 Md. Laws ch. 428, attached as

Exhibit 5.  In 2021, the year after *Bostock* was decided, the legislature amended Md. Code Ann.,

Crim. Law §§ 2-207 and 3-209 to provide that a defendant's perception of a victim's "race,

color, national origin, sex, gender identity, or sexual orientation" is no defense to charges of

murder or assault.  Act of May 30, 2021, ch. 369, 2021 Md. Laws ch. 369, attached as Exhibit 6.

The General Assembly knows how to identify those suspect classifications for which it intends to

extend protection—and it continues to treat sex and sexual orientation as separate categories,

even after *Bostock*.

Plaintiff complains that it "defies common sense that the General Assembly would amend

[the Maryland Equal Pay for Equal Work Act], a remedial statue, to expand protections for

gender identity while curtailing the rights of others based on sexual orientation."  Plaintiff's

Response & Reply at 11.  Plaintiff has that backwards:  the 2016 amendments to the Maryland

Equal Pay for Equal Work Act did not *curtail* rights based on sexual orientation because the

statute never addressed sexual orientation discrimination in the first place.  As the bill files

appended to Catholic Relief Services' opening brief (which Plaintiff does not address) make

clear, the Maryland General Assembly was concerned in its 2016 legislation with sex and gender

identity discrimination, not sexual orientation discrimination.  "[T]here is no mandate that a state

must address its problems wholesale."  *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003).

Plaintiff offers no justification for the Court to disregard the deliberate lines that the

Maryland General Assembly has drawn among different categories of discrimination, and he

offers no interpretation of the Maryland statutes that would accord meaning to all statutory language and avoid surplusage. *See Oglesby v. State*, 441 Md. 673, 687 (2015) ("Our canons of statutory interpretation . . . forbid us to construe a statute . . . so that [a] word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." (citations omitted) (alterations added and in original)). The Court should enter summary judgment in Catholic Relief Services' favor on Counts II and III.

II.     **Because Plaintiff's narrow reading of Title VII's religious employer exemption is contrary to *Bostock* and would invite gamesmanship, the Court should grant summary judgment to Catholic Relief Services on Count VIII.**

Title VII exempts from its coverage religious corporations "with respect to the employment of individuals of a particular religion to perform work" connected with those corporations' "activities." 42 U.S.C. § 2000e-1(a). The statute defines "religion" as "all aspects of religious observance and practice, as well as belief." *Id.* § 2000e(j). If Congress had intended a narrow exemption only from claims of "religious discrimination," it easily could have drafted such a statute. Instead, in light of the exemption and the definition, Congress enacted a statute that exempts religious corporations from *any* employment discrimination claims arising from the religious observance and practice of employees. In other words, if a religious employer takes an adverse action due to an employee's departure from the standards of conduct required by the employer's religion, Title VII does not apply to that adverse action. If the law were otherwise, *Bostock*'s reference to the "express statutory exception for religious organizations" contained in Title VII, 140 S. Ct. at 1753, would be cold comfort for religious employers, since an employee with a claim sounding in sexual orientation discrimination would avoid the exemption so long as the employee steered clear in its pleadings from any reference to "religious" discrimination.

In advocating for a much narrower exemption, Plaintiff fails to address *Little v. Wuerl*¸ 929 F.2d 944, 951 (3d Cir. 1991), which held that the permission to employ persons of a

particular religion "includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts."  *Accord Kennedy*, 657 F.3d at 194; *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000).  Plaintiff also fails to address *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130, 141 (3d Cir. 2006), which affirmed dismissal of a sex discrimination claim because "Congress has not demonstrated a clear expression of an affirmative intention" that Title VII must apply in cases where "it is impossible to avoid inquiry into a religious employer's religious mission or the plausibility of its religious justification for an employment decision."

Plaintiff, and the U.S. District Court for the Western District of North Carolina in *Billard v. Charlotte Catholic High School*, worry that a plain-language interpretation of the religious employer exemption in Title VII would "let religious employers completely bypass Title VII liability, if they could prove their discrimination was related to a religious justification." Plaintiff's Response & Reply at 7 (quoting *Billard v. Charlotte Catholic High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *10 (W.D.N.C. Sept. 3, 2021)).  But Congress already has excluded millions of employees from Title VII by, for instance, defining "employer" as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks . . . ."  42 U.S.C. § 2000e(b).  The same Congress that saw fit, for whatever reason, to enact a civil rights statute that only applies to a subset of employers certainly could have concluded that the statute should also accord broad protection for the religious exercise rights of religious employers.

For that matter, if the Court were to conclude that Congress did *not* extend the same protection for religious employers that it did for small businesses or other exempt employers, then Title VII could apply as against Catholic Relief Services only if Plaintiff could satisfy strict

8

scrutiny under the First Amendment.  This is so because "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296 (emphasis in original); *see Bear Creek Bible Church v. EEOC*, — F. Supp. 3d —, 2021 WL 5449038, at *25 (N.D. Tex. Nov. 22, 2021) (applying *Tandon* in Title VII analysis), *appeal docketed*, No. 22-10145 (5th Cir. 2022).  As discussed in Part III.D, *infra*, Plaintiff cannot carry the heavy burden that strict scrutiny requires.  But the Court can avoid the constitutional analysis if it applies the religious employer exemption as written and exempts Catholic Relief Services from Plaintiff's discrimination claims that challenge religiously motivated acts.[1]

**III.** **Plaintiff's federal discrimination claims are contrary to RFRA, and his federal and state discrimination claims are contrary to the First Amendment, so the Court should grant summary judgment to Catholic Relief Services on Counts I-III and VIII-IX.**

> **A.**    **Plaintiff, who chose to work for an arm of the Church and sued it over its religious exercise, offers no neutral framework for the disposition of his discrimination claims.**

Plaintiff accuses Catholic Relief Services of "attempt[ing] to insert its religion into this case to usurp the Court's jurisdiction."  Plaintiff's Response & Reply at 3.  To be clear, Plaintiff:

- ███████████████████████████████████████████, Extract of Tr. of Sept. 21, 2021 Dep. of J. Doe ("Doe Dep.") at 34:16 – 35:13, attached as Exhibit 7;

- █████████████████████████████████████████████████

---

[1]  For this reason, Plaintiff is wrong to discount the constitutional avoidance doctrine.  While it may not have been obvious, before *Fulton* and *Tandon*, that Title VII is not neutral and generally applicable, it is now clear that any statute with such expansive secular exceptions must show equal favor to religion (or satisfy strict scrutiny).  Catholic Relief Services' interpretation of the religious employer exemption, which has the benefit of being truer to all the statutory text (including the statutory definition of "religion"), would allow the Court to avoid the constitutional issues.  If the Court were to adopt Plaintiff's narrow construction of the exemption and also find that RFRA does not supply a defense in this case, the requirements of the Free Exercise Clause would then be squarely at issue.

 Extract of Pl. John Doe's Answers to Def. Catholic Relief Services'
1st Set of Interrogs. ("Plaintiff's First AINs") at 18, attached as Exhibit 8;

- Hired a counter-theologian to try to persuade the Court that Catholic Relief
Services misunderstands what Catholic teaching requires; and

- ███████████████████████████████, Plaintiff's Response & Reply at 6 n.2.

Religion is not some minor background detail in this case; it is *the* central issue.  Catholic Relief

Services did not "insert" religion into this dispute over its religious exercise.  Nor is there any

evidence (and Plaintiff certainly points to none) that Catholic Relief Services' justification for its

termination of Plaintiff's spousal health benefits could be pretextual.[2]  Unlike in *Whitney v.*

*Greater New York Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363, 1368 (S.D.N.Y. 1975),

where "[n]othing in the record indicates that . . . [typist's] discharge was based on the doctrinal

policies" of the church, here Catholic Relief Services terminated Plaintiff's spousal health

benefits as a consequence of its "spiritual functions," *Rayburn v. Gen. Conf. of Seventh-Day*

*Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985), that is, its commitment to carrying out its

humanitarian mission in a manner consonant with Catholic values, *see Mission Statement*,

---

[2]  Plaintiff's citations to *Goodman v. Archbishop Curley High School, Inc.*, 149 F. Supp. 3d 577 (D. Md. 2016),
*Edley-Worford v. Virginia Conference of United Methodist Church*, 430 F. Supp. 3d 132 (E.D. Va. 2019), and
*McCallum v. Billy Graham Evangelistic Association*, 824 F. Supp. 2d 644 (W.D.N.C. 2011) are inapposite because
those cases involved rulings on preliminary motions to dismiss.  Had Catholic Relief Services moved to dismiss on
jurisdictional grounds, perhaps Plaintiff might have argued that he should be entitled to take discovery relative to
Catholic Relief Services' policies and procedures, to determine whether its stated religious justification for the
challenged action is sincere.  *Compare Goodman*, 149 F. Supp. 3d at 589 n.6 ("Through discovery, Plaintiff may
uncover evidence that creates a genuine dispute as to whether Defendants' non-retaliatory explanation for her
termination is a pretext . . . ."), *with McCallum*, 824 F. Supp. 2d at 652 ("As a practical matter, the Court
contemplates that as the case proceeds there will be certain doctrinal topics that will, in fact, remain 'off-limits.'");
*see also EEOC v. Mississippi Coll.*, 626 F.2d 477, 487 (5th Cir. 1980) ("The nature of the burden that might be
imposed upon the College by the application of Title VII to it is largely hypothetical at this stage of the
proceedings.").  Catholic Relief Services did not resist discovery; Plaintiff had ample opportunity to build his
record; and that record conclusively establishes that Catholic Relief Services terminated Plaintiff's spousal health
benefits because of its sincere objection to engaging in any conduct that would promote or have the appearance of
endorsing same-sex marriage.  *See generally* Statement of Dr. John M. Haas on the Immorality of Providing Spousal
Benefits to Same-Sex Couples ("Haas Report"), attached as Exhibit 9.

*supra*.[3]  The Court cannot decide this dispute without determining whether the remedy Plaintiff

seeks would substantially burden Catholic Relief Services' religious exercise, and it cannot

undertake that inquiry without resolving a strictly theological debate, *i.e.*, the extent to which the

provision of spousal health benefits to the same-sex spouses of employees would constitute

formal cooperation with wrongdoing and/or promote scandal in the Church.

In arguing that the Court may assert jurisdiction over his claims, Plaintiff relies on

*Billard*'s narrow conception of the church autonomy doctrine.  *See* Plaintiff's Response & Reply

at 4.  *Billard* mistakenly held that in the "context of employment, the church autonomy doctrine

is limited only to employees who perform spiritual functions that qualify for the ministerial

exception."  2021 WL 4037431, at *12.  *Billard*'s holding is incompatible with the Supreme

Court's description of the doctrine as radiating a "spirit of freedom for religious organizations,

an independence from secular control or manipulation, in short, power to decide for themselves,

free from state interference, matters of church government as well as those of faith and doctrine."

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116

(1952); *see Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 n.2 (10th Cir.

2002) (church autonomy is broader than ministerial exception).  Courts repeatedly have declined

to exercise jurisdiction over employment-related claims that would require them to intrude into

matters of faith, including in cases where the ministerial exception might not apply.  *E.g.*,

*Aparicio v. Christian Union, Inc.*, No. 18-CV-0592 (ALC), 2019 WL 1437618, at *7, 10



[3] ████████████████████████████████████████

Extract of Tr. of Dec. 13, 2021 Dep. of R. Twele ("Twele Dep.") at 144:1-15, attached as Exhibit 10.

780973

(S.D.N.Y. Mar. 29, 2019) (plaintiff was director of public affairs); *Kelley v. Decatur Baptist Church*, No. 5:17-cv-01239-HNJ, 2019 WL 8014314, at *1 (N.D. Ala. Mar. 27, 2019) (plaintiff was daycare custodian).

Plaintiff erroneously states that "matters of religious doctrine are only at issue if a RFRA defense applies." Plaintiff's Response & Reply at 5. If the Court determines that RFRA is unavailable in this action, it must then decide whether the relief Plaintiff seeks would violate the Free Exercise Clause—and the ensuing substantial burden / compelling interest analysis is identical to the analysis the Court would undertake pursuant to RFRA. Far from identifying any kind of neutral framework that would allow the Court to give appropriate consideration to Plaintiff's claims and Catholic Relief Services' defenses, ██████████████████████ ████████████████████████████████████████████████. *See* Plaintiff's Response & Reply at 6 & n.2, 40. As discussed in Part VI, Plaintiff's trial plan would only further entangle the Court in matters of religion, in violation of the Establishment Clause of the First Amendment.

### B. Congress enacted RFRA to restore the *Sherbert–Yoder* framework, not to give the faithful a leg up only in litigation opposite government actors.

Congress took the unusual step of codifying its intent in enacting RFRA. Congress found that "in *Employment Division v. Smith*, 494 U.S. 872 (1990)[,] the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," and explained that RFRA was enacted to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in *all cases* where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(a)(4), (b)(1) (emphasis added). That compelling interest test requires a court to find that "any incidental burden on the free exercise of [a party's]

religion may be justified by a compelling state interest in the regulation of a subject within the

State's constitutional power to regulate." *Sherbert*, 374 U.S. at 403 (citation and internal

quotation marks omitted); *accord Yoder*, 406 U.S. at 220-21; 42 U.S.C. §2000bb-1(b).  As

Catholic Relief Services explained in its opening brief, the *Sherbert–Yoder* framework, like other

First Amendment doctrines, applies with equal force whether an opposing party is a government

or private actor.  *E.g.*, *McDaniel v. Paty*, 435 U.S. 618, 621 (1978).

Plaintiff is correct that some courts have declined to apply RFRA in private-party

litigation, though the Fourth Circuit has yet to resolve the question.[4]  Plaintiff does not explain,

however, how his narrow reading of the statute, or that of some of other courts, is compatible

with Congress's express objective to reinstate the *Sherbert–Yoder* test or Congress's direction

that the statute applies to "all Federal law, and the implementation of that law, whether statutory

or otherwise."  42 U.S.C. § 2000bb-3(a).  Plaintiff's speculation that Congress might have

envisioned a different standard for employment discrimination cases brought by the EEOC

cannot be squared with the statutory reference to *all* federal law and its implementation.  While

Plaintiff complains that it would be "unfair" for him to be required to carry the government's

burden in responding to a RFRA defense, Plaintiff's Response & Reply at 13, Plaintiff is already

required to carry what would otherwise be the government's burden in litigating his

discrimination claims in the first place.  *See* 42 U.S.C. § 2000e-5(f).

---

[4]  Plaintiff's attempt to distinguish *In re Young*, 141 F.3d 854 (8th Cir. 1998) on the basis that it predated the
Religious Liberty and Charitable Donation Protection Act of 1998 is without merit.  The Religious Liberty and
Charitable Donation Protection Act mechanically applies to qualifying charitable contributions without any showing
of substantial burden (or, for that matter, religious exercise).  *See* 11 U.S.C. § 548(a)(2).  The statute thus prohibits a
trustee in bankruptcy from avoiding certain donative transfers that would not have been protected under RFRA.
Moreover, the Religious Liberty and Charitable Donation Protection Act explicitly states that the Act is not
"intended to limit the applicability of the Religious Freedom Restoration Act of 1993."  Religious Liberty and
Charitable Donation Protection Act of 1998, § 6, Pub. L. No. 105-183, 112 Stat. 517 (1998).  These statutes address
two different, sometimes overlapping, problems.  The existence of the one says nothing about the scope of the other.

780973

RFRA's legislative history confirms that Congress did not, to borrow from Plaintiff who borrowed from Justice Scalia, "hide elephants in mouse holes [*sic*]."  Plaintiff's Response & Reply at 14 (citation omitted).  Congress was transparent about its intentions and the effect of the law.  The report issued by the House Committee on the Judiciary in advance of the statute's passage explains that "the clarity of the Constitution has not prevented government from burdening religiously inspired action," and that "facially neutral laws of general applicability have nefariously burdened the free exercise of religion in the United States throughout American history."  H.R. Rep. No. 103-88, at 2 (1993), attached as Exhibit 11.  The report criticizes the *Smith* majority for "strain[ing] its reading of the First Amendment and ignor[ing] years of precedent in which the compelling governmental interest test was applied in a variety of circumstances."  *Id.* at 4.  RFRA was designed to restore the compelling interest test, with "the definition of governmental activity covered by the bill . . . meant to be all inclusive," and the "test applies whenever a law *or* an action taken by the government to implement a law burdens a person's exercise of religion."  *Id.* at 6 (emphasis added); *see id.* at 6-7 ("It is the Committee's expectation that the courts will look to free exercise of religion cases decided prior to *Smith* for guidance in determining whether or not religious exercise has been burdened and the least restrictive means have been employed in furthering a compelling governmental interest.").

The Court need not rely on legislative history, because the text of RFRA is unambiguous: it applies to the implementation of *all* federal law, not just implementation by government coercion.  42 U.S.C. § 2000bb-3(a).  But if there were any doubt what Congress intended, the legislative record confirms that RFRA prescribed by statute what *Sherbert* and *Yoder* once held as a matter of constitutional law.  *See United States v. Selby*, 333 F. Supp. 2d 367, 370 (D. Md. 2004) ("If the 'statutory language is plain and admits of not more than one meaning, the duty of

780973

interpretation does not arise.'  Nonetheless, if after considering the language, the court finds it to be unclear and ambiguous, then the court is permitted to inquire into the statute's legislative history in order to effect the intent of the legislature." (citations omitted)).  Apart from citing nonbinding cases, Plaintiff offers no justification for the Court to override the plain legislative intent and eliminate RFRA as a defense in privately litigated employment actions.  Title VII, after all, is "enforceable by the EEOC as well as private plaintiffs, and the substance of [Title VII's] prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party."  *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006).

> **C.    Unrebutted evidence in the summary judgment record confirms that the relief Plaintiff seeks would substantially burden Catholic Relief Services' religious exercise.**

Catholic Relief Services included in its opening brief a detailed discussion of the reasons why the relief Plaintiff requests is contrary to Catholic Relief Services' sincerely held religious beliefs.  Specifically, any requirement that Catholic Relief Services must provide LGBT employees with spousal health benefits (or their equivalent) would force Catholic Relief Services to formally cooperate with wrongdoing and would promote scandal in the Church.  In response, Plaintiff argues that "complying with equal pay laws by providing all employees equal benefits is not a religious exercise as a matter of law," Plaintiff's Response & Reply at 21, but Plaintiff does not get to decide what does, or does not, qualify as religious exercise.  Catholic Relief Services' mission and operations are infused with Catholic belief, and everything the organization—an arm of the Church—does must be compatible with Catholic teaching.  As Dr. John Haas explained, "CRS is constituted by the bishops of the United States so . . . there's a much heavier burden on them to make sure that the witness that they give . . . doesn't promote scandal . . . and is on all occasions morally licit."  Extract of Tr. of Dec. 7, 2021 Dep. of J. Haas at 195:14-20, attached as Exhibit 12; *see also* Twele Dep. (Ex. 10) at 119:9-14 ("[F]or a Catholic organization

15

that does not recognize same-sex spouses as spouses . . . to be providing a spousal benefit to someone who in our understanding is not truly a spouse would be a scandal.  It would be wrong.").  Religious exercise involves "'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'"  *Hobby Lobby*, 573 U.S. at 710 (citation omitted).  Catholic Relief Services abstains from providing spousal health benefits to the same-sex spouses of its employees because of its religion.

For his substantial burden argument, Plaintiff relies on *EEOC v. Tree of Life Christian Schools*, 751 F. Supp. 700 (S.D. Ohio 1990), and *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001).  *Tree of Life*, which is "almost identical," 751 F. Supp. at 710, to *EEOC v. Fremont Christian School*, 781 F.2d 1362 (9th Cir. 1986), found that an equal pay requirement would impose a minimal burden where the school "concede[d] that the Bible does not mandate that men must be paid more than women for identical tasks."  *Tree of Life*, 751 F. Supp. at 711. *Henderson* rejected a challenge to a regulation prohibiting commercial activity in portions of the National Mall, brought by sellers of t-shirts who (i) did "not claim to belong" to any "religious group that has as one of its tenets selling t-shirts on the National Mall," and (ii) did not allege that "selling t-shirts in that particular area of the District of Columbia is central to the exercise of their religion."  253 F.3d at 16.  Catholic Relief Services, by contrast, has established that its religion forbids same-sex unions; that it is morally prohibited from cooperating with same-sex unions or taking actions that might be perceived as supportive of same-sex unions; and that the sacramental understanding of marriage is fundamental to Catholic identity.  *See* Haas Report (Ex. 9) at 2-3, 12.

Plaintiff also cites a pair of cases that have nothing to do with religious freedom, *Kerr v. Enoch Pratt Free Library of Baltimore City*, 149 F.2d 212 (4th Cir. 1945), and *Goza v. Memphis*

780973

*Light, Gas & Water Division*, 398 F. Supp. 3d 303 (W.D. Tenn. 2019), in arguing that the risk of scandal is not a substantial burden.  Once again, Plaintiff has conflated the common, modern meaning of the word, which is informed by television dramas and Twitter spats, with the theological concept that is of concern to Catholic Relief Services.  As Dr. Haas explained in his report, if a Catholic organization engages in otherwise licit conduct that leads others into sin, the organization itself sins.  Plaintiff may not view a religious employer's provision of spousal health benefits to the same-sex partners of employees as tantamount to endorsement.  But Plaintiff, to state the obvious, knows very little about the Church and the issues that are of central importance to its institutions.  *See* USCCB, *U.S. Catholic Bishops' Administrative Committee Calls for Protection of Marriage* (Sept. 10, 2003), https://www.usccb.org/news/2003/us-catholic-bishops-administrative-committee-calls-protection-marriage.

*Fulton*, in any event, precludes Plaintiff's argument, as the Supreme Court refused in that case to second-guess Catholic Social Services' belief that "certification is tantamount to endorsement."  141 S. Ct. at 1876.  Plaintiff calls *Fulton*'s discussion about endorsement "dicta," insisting that the Court "limit[ed] its holding to whether the mechanism for granting exemptions was generally applicable."  Plaintiff's Response & Reply at 22.  That is incorrect.  Under the Free Exercise Clause, the determination of whether a law is or is not generally applicable is just part of the analysis, and the Supreme Court did not stop there:  it went on to hold that the "refusal of Philadelphia to contract with CSS for the provision of foster care services unless it agrees to certify same-sex couples as foster parents cannot survive strict scrutiny, and violates the First Amendment."  141 S. Ct. at 1882.  To get to that holding, the Court first had to find a substantial burden.  The Court did so, holding that "it is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or

approving relationships inconsistent with its beliefs." *Id.* at 1876. Catholic Relief Services'
concerns about scandal and Catholic Social Services' concerns about endorsement are two sides
of the same coin.[5] For that matter, Catholic Relief Services' primary argument on substantial
burden concerns the theological principle of cooperation. On that point, Plaintiff offers no
substantive response—nor could he, without intruding deep into territory that the First
Amendment closes off from judicial review.

> **D.** **Where Congress and the Maryland General Assembly have carved out**
> **secular exceptions from the employment statutes on which Plaintiff relies,**
> **those statutes are neither neutral nor generally applicable, nor the least**
> **restrictive means of furthering a compelling governmental interest.**

The Supreme Court held in *Tandon* that "government regulations are not neutral and
generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause,
whenever they treat *any* comparable secular activity more favorably than religious exercise."
141 S. Ct. at 1296 (emphasis in original). Whether two activities are comparable for purposes of
this analysis "must be judged against the asserted government interest that justifies the regulation
at issue." *Id.* Under the strict scrutiny framework, "narrow tailoring requires the government to
show that measures less restrictive of the First Amendment activity could not address its
interest." *Id.* As the Supreme Court clarified in *Fulton*, courts must scrutinize the "asserted
harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S. Ct. at
1881 (citation omitted). "The question . . . is not whether the [government] has a compelling
interest in enforcing its non-discrimination policies generally, but whether it has such an interest
in denying an exception to [the religious party]." *Id.*

---

[5] The USCCB appeared as amicus curiae in support of Catholic Social Services' position. *See* Br. *Amici Curiae* of
the U.S. Conf. of Catholic Bishops & Pa. Catholic Conf. in Support of Pets., *Fulton v. City of Philadelphia*, No. 19-
123 (U.S. June 3, 2020), https://www.supremecourt.gov/DocketPDF/19/19-123/144762/20200603125603444_19-
123tsacUnitedStatesConferenceofCatholicBishops.pdf.

Plaintiff concedes, as he must, that Title VII, the federal Equal Pay Act, and the Maryland Fair Employment Practices Act and Equal Pay for Equal Work Act contain numerous exceptions for purely secular conduct.[6]  Plaintiff does not argue that Catholic Relief Services' employment relationships are materially different from the secular employment relationships that are exempt from these statutes, such that government has a stronger interest in regulating Catholic Relief Services' relationships. Under *Tandon*, the existence of these statutory exemptions, and Plaintiff's failure to articulate any reason why religious employers are not comparable (in light of the government's regulatory objectives) to secular employers, triggers a strict scrutiny analysis under the First Amendment regardless of whether RFRA applies in private-party litigation.  Because Plaintiff "offers no compelling reason why [the government] has a particular interest in denying an exception to [Catholic Relief Services] while making them available to others," *Fulton*, 141 S. Ct. at 1882, he cannot carry the heavy burden that strict scrutiny requires.

Plaintiff tries to distinguish *Fulton* on the ground that the city contract at issue in that case included a mechanism for individualized exemptions.  That is true, but irrelevant.  The existence of individualized exemptions will preclude a finding that a law is neutral and generally applicable.  So, too, will statutory exemptions that treat secular activity more favorably than comparable religious activity.  *See Tandon*, 141 S. Ct. at 1296.  Either scenario requires the Court to apply strict scrutiny to the law at issue.  At that point, the party charged with defending

---

[6]  These include exceptions under Title VII for, *e.g.*, small businesses, Indian tribes, and employment actions against employees affiliated with Communist organizations, 42 U.S.C. §§ 2000e(b), 2000e-2(f); exceptions under the federal Equal Pay Act for, *e.g.*, employees of local newspapers, fisheries, and professional baseball organizations, 29 U.S.C. § 213(a)(5), (8), (19); exceptions under the Maryland Fair Employment Practices Act for, *e.g.*, small businesses and employment actions against aliens employed outside Maryland, Md. Code Ann., State Gov't §§ 20-601(d)(1), -604(1); and exceptions under the Maryland Equal Pay for Equal Work Act for, *e.g.*, employees who perform comparable work on separate shifts, Md. Code Ann., Lab. & Empl. § 3-304(c)(5).

the law (here, Plaintiff) must offer a compelling justification for the denial of an exemption to the religious actor, and must also show that the ends are served by the least restrictive means.

Plaintiff gives short shrift to *Tandon*, but that case reshaped Free Exercise jurisprudence through its adoption of a "most favored nation" status for religious exemption claims.  *See* Jim Oleske, Tandon *Steals* Fulton*'s Thunder:  The Most Important Free Exercise Decision Since 1990*, SCOTUSblog (Apr. 15, 2021, 10:30 a.m.), https://www.scotusblog.com/2021/04/tandon-steals-fultons-thunder-the-most-important-free-exercise-decision-since-1990/ ("Under the [most favored nation] theory, even if a law broadly covers both secular and religious conduct, it would not be considered 'neutral and generally applicable' for purposes of *Smith* if it contains any exemptions that are deemed 'comparable' to the requested religious exemption.").  As Professor Douglas Laycock explained in a prescient 2019 article, under the "most favored nation" theory,

> many laws will fail the test of general applicability; many laws that burden religion will require compelling justification.  Any time the government prohibits a religious practice but exempts some analogous secular practice that undermines the alleged government interest, it decides that the secular practice is more important, more valuable, more something that makes it more deserving of an exemption.  Government devalues the religious practice as compared to the secular practice.

Douglas Laycock, *The Broader Implications of* Masterpiece Cakeshop, 2019 BYU L. Rev. 167, 176.  Even those commentators who are critical of the Roberts Court's embrace of Free Exercise grudgingly acknowledge that *Tandon* "radically altered the law of religious liberty."  Mark Joseph Stern, *The Supreme Court Broke Its Own Rules to Radically Redefine Religious Liberty*, Slate (Apr. 12, 2021, 2:51 p.m.), https://slate.com/news-and-politics/2021/04/supreme-court-religious-liberty-covid-california.html.

How does Plaintiff respond to this landmark ruling?  He calls Title VII's panoply of exemptions "well reasoned" and "widely accepted as the least restrictive means of achieving

20

their goals," and then cites cases that long predate *Tandon* and *Fulton*.  Plaintiff's Response &

Reply at 20.  Plaintiff cannot carry his strict scrutiny burden through conclusory statements and

citations to abrogated authority.[7]

Plaintiff also misunderstands the strict scrutiny framework, arguing that Catholic Relief

Services' compromise—a technical increase in his compensation in lieu of spousal health

benefits—does not adequately address "his right to be free of discrimination."  Plaintiff's

Response & Reply at 17.  Elsewhere he refers to "Mr. Doe's Compelling Interest to be Free from

Employment Discrimination at CRS."  *Id.* at 14.  But, *Fulton* teaches, the inquiry under strict

scrutiny is not whether the government has a compelling interest in *implementing* federal law; it

is whether the government has a compelling interest in *denying an exemption* to a party whose

religious exercise would be substantially burdened by the implementation of that law.  The Court

must determine whether the government (through Plaintiff's private enforcement of Title VII and

other statutes) has a compelling interest "in denying an exception" to Catholic Relief Services.

*Fulton*, 141 S. Ct. at 1881; *see Mast v. Fillmore County*, 141 S. Ct. 2430, 2432 (2021) ("[T]he

County must offer a compelling explanation why the same flexibility extended to others cannot

be extended to the Amish."); *Ramirez*, 2022 WL 867311, at *9 ("Under RLUIPA, the

government cannot discharge [its] burden by pointing to 'broadly formulated interests.'  It must

___

[7]  Nor can Plaintiff carry his burden by relying on the "slippery slope" fallacy.  *Compare* Plaintiff's Response & Reply at 15, *with Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 421 (2006) ("Here the Government's uniformity argument rests not so much on the particular statutory program at issue as on slippery slope concerns that could be invoked in response to any RFRA claim for an exception to a generally applicable law, *i.e.*, 'if I make an exception for you, I'll have to make one for everybody, so no exceptions.'  But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to 'rule[s] of general applicability.'" (alteration in original) (citation omitted)), *and Ramirez v. Collier*, — S. Ct. —, 2022 WL 867311, at *12 (2022) ("RLUIPA . . . requires that courts take cases one at a time, considering only 'the particular claimant whose sincere exercise of religion is being substantially burdened.'" (citation omitted)).  Plaintiff characterizes as "disingenuous[]" Catholic Relief Services' observation that Plaintiff has not identified other current employees whose benefits would be impacted by the policy change he demands.  Plaintiff's Response & Reply at 16 n.4. ████

21

instead 'demonstrate that the compelling interest test is satisfied through application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened." (alteration in original) (citations omitted)).

*Fulton* rejected the "interest of the City in the equal treatment of prospective foster parents and foster children" as sufficient to "justify denying [Catholic Social Services] an exception for its religious exercise," as the "creation of a system of exceptions . . . undermines the City's contention that its non-discrimination policies can brook no departures."  141 S. Ct. at 1882.  *Tandon* and *Fulton* are dispositive of Plaintiff's discrimination claims, and the Court should enter summary judgment in Catholic Relief Services' favor on Counts I-III and VIII-IX.

**IV.  Assuming the worst version of Plaintiff's varying accounts of "threats," mere threats to terminate employment are not actionable retaliation, so the Court should grant summary judgment to Catholic Relief Services on Count X.**

Plaintiff insists that disputed "threats" to his employment by former Executive Vice President for Human Resources Shawn Mood were retaliation in violation of federal and state law, but he does not cite a single case that recognizes that threats alone, without any corresponding action, could give rise to a claim for retaliation.  Plaintiff also does not respond to or even acknowledge the cases cited by Catholic Relief Services in its opening brief, which recognize that threats alone do *not* give rise to a retaliation claim.  *E.g.*, *Wilson v. Montgomery Cnty. Bd. of Trs.*, No. PWG-17-2784, 2018 WL 4300498, at *8 (D. Md. Sept. 10, 2018); *Bryan v. Lucent Techs., Inc.*, 307 F. Supp. 2d 726, 741 (D. Md. 2004).  Nor does Plaintiff respond to Catholic Relief Services' argument that his retaliation claim is unavailable (i) under the federal Equal Pay Act, because the purported "threats" predated any proceedings in connection with Plaintiff's claims; and (ii) under state law, because Plaintiff could not reasonably have believed (in 2017) that he had engaged in conduct protected by the Maryland Fair Employment Practices Act or the Maryland Equal Pay for Equal Work Act.  Plaintiff's concessions, together, doom his

retaliation claim. *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D.

Md. 2010) ("By her failure to respond to [an] argument, the plaintiff abandons [the

corresponding] claim."); *Mentch v. E. Savings Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md.

1997) (same).

 Catholic Relief Services disputes that the "threats," as Plaintiff presents them, were ever

made.  *Compare*

Extract of 2016–2017 Meeting Notes, attached as Exhibit 13, *with* Extract of Tr. of Oct. 1, 2021

Dep. of S. Mood at 123:8 – 124:4, attached as Exhibit 14.

. 

May 17, 2018 email fr. J. Doe to E. Tromans,

attached as Exhibit 15.

*See* Doe Dep. (Ex. 7) at 242:13 – 243:8 (

).

 Even if a jury were to credit Plaintiff's most recent version of events, it would make no

difference because the purported statements simply do not add up to actionable retaliation. That

is particularly true given that Catholic Relief Services continues to reward Plaintiff with raises

and promotions, even as he disparages the organization in litigation in which he, but not Catholic

Relief Services, proceeds pseudonymously. Plaintiff's retaliation claim, like his claim for

damages, is a pretext designed to bolster his case in the eyes of the jury. The Court should

disallow that sideshow and grant summary judgment to Catholic Relief Services on Count X.

**V.    Plaintiff did not carry his burden to adduce sufficient evidence of damages to present to a jury, so the Court should grant summary judgment to Catholic Relief Services on Plaintiff's claims for damages under all counts.**

Plaintiff makes no serious effort to rebut Catholic Relief Services' factual and legal

arguments about his nonexistent damages, relying instead on the truism that damages are "classic

issues of fact." Plaintiff's Response & Reply at 28. But Plaintiff bears the burden, in response

to Catholic Relief Services' summary judgment motion, to offer "sufficient proof in the form of

admissible evidence" to establish a "genuine issue of material fact for trial." *Variety Stores, Inc.*

*v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (citations and internal quotation

marks omitted). "To be recoverable, economic damages must be proven with reasonable

certainty, and may not be based on speculation or conjecture." *Neal v. United States*, No.

ELH-19-1033, 2022 WL 374526, at *22 (D. Md. Feb. 8, 2022) (citations and internal quotation

marks omitted). Similarly, "evidence of . . . emotional distress must be demonstrable, genuine,

and adequately explained." *Price v. City of Charlotte*, 93 F.3d 1241, 1252 (4th Cir. 1996).

**A.    Plaintiff has adduced no reliable evidence of pecuniary damages or damages allocable to his spouse's delayed dental treatment.**

In its Requests for Admission, Catholic Relief Services asked Plaintiff to admit that the

damage chart produced by him as DOE 0001141-43 accurately summarizes the out-of-pocket

expenses incurred by Plaintiff or his spouse and allocable to the termination of Plaintiff's spousal

health benefits as of November 9, 2021. Plaintiff made that admission. *See* Pl. John Doe's

Objections & Answers to Def. Catholic Relief Services' Reqs. for Admissions at 9, attached as

Exhibit 16. Catholic Relief Service propounded its request because Plaintiff's damage claim has

been a moving target. He produced four versions of his damage chart in discovery (as DOE

0000586-88, DOE 000884-86, DOE 0001105-07, and DOE 0001141-43) and significantly

reduced his claim after his deposition, ███████████████████████████████

███████████████████████████████████████████████████. *See* Doe Dep. (Ex.

7) at 181:9-20.

Now, Plaintiff has produced a fifth version of his damage chart.  This version not only

adds his spouse's recent out-of-pocket expenses (postdating November 9, 2021), but also adjusts

the claim corresponding to prior months.  In particular, rows 6, 8, 28, and 44 of Plaintiff's

new-and-improved chart reflect new or increased charges that predate the start of discovery in

this litigation, while two earlier claimed amounts have been removed.  Plaintiff's spouse's

monthly medical and dental insurance premiums also appear to have increased by over 67%,

from $181.13 at the end of 2021 to $303.18 in early 2022.  Discovery has long since closed, and

Catholic Relief Services has no pretrial mechanism to investigate the reason for the increase.

Setting aside the endless adjustments to Plaintiff's damage claim, it remains unclear what

amount he contends the jury should award him, or the basis for any such award.  Presumably,

Catholic Relief Services is not responsible for Plaintiff's spouse's insurance premiums for life.

Any "damage" would cease the moment Plaintiff obtains new employment, or the moment his

spouse obtains employment with comparable health benefits at an equal or lesser rate than

Catholic Relief Services charges for spousal health benefits.  Plaintiff, however, did not engage a

damage expert.  He has not disclosed actuarial evidence that would allow a jury to reasonably

compute the length of time for which Catholic Relief Services could be on the hook for any

portion of his spouse's health-related costs. ████████████████████████████

████████████  *See* Doe Dep. (Ex. 7) at 168:7 – 170:1.  Plaintiff has not even produced a copy of his

spouse's new health insurance plan with Kaiser Permanente, so there is nothing in the record

from which the Court could ascertain whether the plan provides benefits comparable to those available to spouses of Catholic Relief Services' employees.



*See* Plaintiff's Response & Reply at 29-30. Plaintiff's First AINs (Ex. 8) at 18; *see* Mood Dep. (Ex. 14) at 56:3-24, 65:9-18; Extract of Dec. 6, 2021 Dep. of S. Callahan at 85:7-19, attached as Exhibit 17; Extract of Def. Catholic Relief Services' Answers to Pl. John Doe's 1st Set of Interrogs. ("Catholic Relief Services' First AINs") at 25, attached as Exhibit 18.

Unlike the employer contributions to a statutory disability program in *Sloas v. CSX Transportation, Inc.*, 616 F.3d 380 (4th Cir. 2010), or the pension fund contributions required by a collective bargaining agreement in *EEOC v. Consol Energy, Inc.*, 860 F.3d 131 (4th Cir. 2017), Catholic Relief Services made a "one-time accommodation" to Plaintiff "in consideration of the fact that a recruiter appears to have miscommunicated Catholic Relief Services' spousal health benefits policy" to him.  Catholic Relief Services' First AINs (Ex. 18) at 25.  For the Court or jury to

780973

discount that extra $5,000 of compensation per year would be to require Catholic Relief Services to "pay twice for the same [purported] damage," *Sloas*, 616 F.3d at 390 (citation omitted).[8]

Plaintiff also misunderstands Catholic Relief Services' argument about his spouse's delayed dental treatment by focusing on mitigation of damages. *See* Plaintiff's Response & Reply at 31. The point is not that Plaintiff's spouse, Mr. ███████ failed to mitigate his damages: the point is that Catholic Relief Services did not cause ███████ harm in the first place. ███████ chose to delay his dental procedures and is responsible for the consequences of that delay. *Compare* Extract of Oct. 19, 2021 Tr. of E. ███████ ("███████ Dep.") at 39:5-8, attached as Exhibit 19 ████████████████████████████████████████████████████ *with id.* at 42:13-18 ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

Because Plaintiff did not engage an expert in dental procedures (or any other expert, other than his counter-theologian), the jury would have no basis to conclude that the additional surgery ████ apparently required only became necessary because of the delay between June 2018 (when Plaintiff and ████ first learned that ████ insurance policy would not pay for a crown) and December 2018 (when the couple selected a new policy). For that matter, even if a jury were to account for that window of time (but not the earlier August 2017 through May 2018 window), ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[8] ████████████████████████████████████████████████████ ." Plaintiff's Response & Reply at 31. Once again, Plaintiff is trying to displace Catholic Relief Services' understanding of Catholicism with his own and that of his "expert." Catholic Relief Services' religion requires it to refrain from formally cooperating with or appearing to endorse same-sex marriage. For Catholic Relief Services, provision of spousal health benefits to Plaintiff's same-sex partner is impermissible, but provision of a technical increase to compensate for a genuine mistake is not. *See* Haas Dep. (Ex. 12) at 187:12-19.

████████████████████████████████████.  *See* Doe Dep. (Ex. 7) at 148:18-21; ████ Dep.

(Ex. 19) at 51:20 – 52:7.

It is not obvious that Plaintiff even has standing to claim as damage to him any pain and

suffering his spouse may have experienced.  *See Laborers Local 17 Health & Benefit Fund v.*

*Philip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir. 1999) ("[W]here a plaintiff complains of injuries

that are wholly derivative of harm to a third party, plaintiff's injuries are generally deemed

indirect and as a consequence too remote, as a matter of law, to support recovery.").  Regardless,

he has offered no reliable evidence that would allow a jury to fashion a remedy that reasonably

aligns the harm with the challenged conduct (the termination of his spousal health benefits).  The

Court should grant summary judgment to Catholic Relief Services on these damage claims.

> ### B.     Plaintiff's emotional distress claim calls for impermissible speculation.

Plaintiff, █████████████████████████████████████████, Pl. John Doe's

Answers to Def. Catholic Relief Services' 2d Set of Interrogs. at 7, attached as Exhibit 20, and

████████████████████████████████████████████████████████████████

███████████, would have the jury parse his distress and assign some percentage of responsibility

to Catholic Relief Services.  He would have the jury do so based on his self-serving testimony,

without any expert analysis.  While Plaintiff has retained no expert psychologist or psychiatrist,[9]

he cites *Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536 (4th Cir. 2003); *Tinoco v.*

---

[9]  Plaintiff cites a case that predated the 2010 amendments to the Federal Rules of Civil Procedure for the proposition that Denise █████ his therapist, was "not subject to Rule 26 expert disclosure" given her status as a "'hybrid' witness."  Plaintiff's Response & Reply at 34 n.10.  "Since December 2010, however, Rule 26(a)(2)(C) requires that the disclosure of hybrid fact/expert witnesses must include more than mere identification.  Rule 26(a)(2)(C) expanded the disclosures required for Rule 26(a)(2)(A) witnesses to include a disclosure of the subject matter on which the witness is expected to present evidence . . . as well as a summary of the facts and opinions to which the witness is expected to testify."  *Ace Am. Ins. Co. v. McDonald's Corp.*, No. GLR-11-3150, 2012 WL 2523883, at *3 (D. Md. June 28, 2012) (citations and internal quotation marks omitted).  Plaintiff did not provide those disclosures for Ms. █████ indeed, at the time of her deposition Plaintiff had produced fewer than half of her progress notes.  *See* Nov. 18, 2021 email fr. A. May to J. Dugan, attached as Exhibit 21.  Under the Federal Rules, Plaintiff may not elicit expert opinion testimony at trial from Ms. █████.

*Thesis Painting, Inc.*, No. GJR-16-752, 2018 WL 4599677 (D. Md. Sept. 24, 2018); and *Ricks v.*

*Abbott Laboratories*, 198 F.R.D. 647 (D. Md. 2001), for the proposition that his testimony alone

could support his claim for emotional distress damages.  But to recover such damages, Plaintiff

"must also 'show a causal connection between the violation and [his] emotional distress.'"

*Bryant*, 333 F.3d at 547.  None of these cases addressed the problem of apportionment of

emotional distress allocable to past and present circumstances, and Plaintiff has offered no

reliable methodology that the jury could use to apportion damages.  ██████████████████

████████████████████████████████████████████████████████████

████████████████████████  *See* Arcadian Telepsychiatry Progress Notes, attached as Exhibits

22-23.[10]

     Plaintiff also relies on discussions in *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227

F.3d 8 (2d Cir. 2000) (a case about failed hydroelectric projects), and *Henrietta D. v. Bloomberg*,

331 F.3d 261 (2d Cir. 2003), about the "substantial factor" theory of proximate causation.

Catholic Relief Services does not dispute that Plaintiff's employment experience is among the

many issues that Plaintiff relayed to his therapist as causing him distress (including issues that

long predated his employment at Catholic Relief Services).  The question is whether Plaintiff can

reliably demonstrate, for purposes of a damage award, *how much* of his distress is fairly

---

[10]  In *True v. Pleasant Care, Inc.*, No. 2:97CV20-DE, 2000 WL 33706383 (E.D.N.C. 2000), another case on which Plaintiff relies, the plaintiffs had "offered sufficient evidence for the jury to make an informed decision (rather than merely speculate) as to what caused [one plaintiff's] emotional distress," where the plaintiffs proffered testimony by a psychotherapist and a clinical psychologist that made "specific correlations between Defendants' alleged pollution and [the plaintiff's] depression-related symptoms."  In *Carter v. Blakely*, No. 1:97CV00982, 1999 WL 1937226, at *7 (M.D.N.C. Sept. 1, 1999), the plaintiff set forth "evidence to support a probability, rather than a mere possibility, that [the defendant's] conduct caused [the plaintiff] to suffer emotional distress," including "[m]ost importantly" testimony by the plaintiff's psychiatrist that the "sexual harassment increased [the plaintiff's] already chronic pain and caused her to suffer emotional distress."  Plaintiff cannot present similar evidence at trial, since he failed to engage an expert psychologist or psychiatrist and also failed to properly disclose Ms. █████ as a hybrid witness.

allocable to his employment experience.  He has failed to do so, and also has failed to offer any framework from which a jury could do so without engaging in speculation.

Plaintiff's emotional distress claim is further flawed because he is trying to make Catholic Relief Services pay for emotional harm allocable to the hypothetical acts of third parties, or Plaintiff's own acts.  Plaintiff writes ███████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████ Plaintiff's Response & Reply at 33 (alteration in original) (citing Doe Dep. (Ex. 7) at 75:19-20).  █████████████████████ ██████████████████████████████████████████████ Doe Dep. (Ex. 7) at 76:3-22.  Catholic Relief Services does not wish any harm on Plaintiff—the organization zealously defends its employees in the face of cyber-bullying, *e.g.*, May 31, 2016 email fr. P. Eagle to Executive Leadership Team, attached as Exhibit 24—███████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████. Doe Dep. (Ex. 7) at 246:9 – 247:1.  Plaintiff has not carried his burden to establish a triable question of fact as to his claim for emotional distress damages, so the Court should enter summary judgment in Catholic Relief Services' favor as to this claim.

**C.** **Plaintiff's demand for punitive damages is contrary to the undisputed facts and the relevant legal standard.**

Plaintiff cites *Kolstad v. American Dental Association*, 527 U.S. 526 (1999), in speculating that Catholic Relief Services might have perceived a risk that terminating Plaintiff's

780973

spousal health benefits could violate federal or state law.  Plaintiff's Response & Reply at 37.

The very next sentences of *Kolstad* defeat Plaintiff's punitive damage argument:

> There will be circumstances where intentional discrimination does not give rise to punitive damages liability under this standard.  In some instances, the employer may simply be unaware of the relevant federal prohibition.  There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful.  The underlying theory of discrimination may be novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a . . . statutory exception to liability.

*Id.* at 536-37.

Plaintiff argues that Catholic Relief Services should have appreciated that courts might not apply RFRA as a defense to a private claim (an issue still unresolved in the Fourth Circuit), but even if true, that would not salvage his claim for punitive damages.  RFRA, and for that matter the Free Exercise Clause (which Plaintiff does not address), only come into play if there is liability to begin with.  As of 2017, the law of the Fourth Circuit was that "Title VII does not prohibit conduct based on the employee's sexual orientation."  *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 751 (4th Cir. 1996), *abrogated by Bostock*, 140 S. Ct. 1731.  To this day, no Maryland court has addressed, in any published opinion, the religious employer exemption from sexual orientation discrimination claims under the Maryland Fair Employment Practices Act, or whether sex and sexual orientation are coterminous under the Maryland Fair Employment Practices Act and the Maryland Equal Pay for Equal Work Act.  Catholic Relief Services did not act unreasonably, let alone with "malice or with reckless indifference to the . . . rights of an aggrieved individual," 42 U.S.C. § 1981a(b)(1), by following the law of this Circuit and reading statutes as they are written.[11]

---

[11] ████████████████████████████████████████████████████████████████████████

780973

VI.   **Plaintiff's anticipated battle of the clerics would violate Federal Rule of Evidence 701 and the Establishment Clause of the First Amendment, so the Court should exclude expert opinion testimony by Dr. Todd Salzman.**

Plaintiff characterizes Catholic Relief Services' argument about Dr. Salzman's proffered expert testimony as "based on the singular premise that he disagrees with CRS's expert." Plaintiff's Response & Reply at 39.  Actually, Catholic Relief Services objects to Dr. Salzman's proffered expert testimony because Dr. Salzman disagrees with Catholic Relief Services, the USCCB, and the Roman Catholic Church.  *See* Committee on Doctrine, USCCB, *Inadequacies in the Theological Methodology and Conclusions of* The Sexual Person:  Toward a Renewed Catholic Anthropology *by Todd. A. Salzman and Michael G. Lawler* (2010), attached as Exhibit 25; Extract of Tr. of Dec. 14, 2021 Dep. of T. Salzman at 45:6-12, attached as Exhibit 26 (███████████████████████████████████████████████████████); *id.* at 187:6 – 188:7 (█████████ ███████████████████████████████████████████████████████ ██████████████████).  While Catholic Relief Services' expert, Dr. Haas, would assist the trier of fact in understanding what Catholic Relief Services believes and how its religious exercise would be burdened by the relief Plaintiff demands, *see* Decl. of Robert Augustine Twele [ECF No. 45-2], Dr. Salzman's opinions are irrelevant and inadmissible.

To justify his proposed battle of the clerics, Plaintiff relies on *Russell v. Pallito*, No. 5:15-CV-126-GWC-JMC, 2019 WL 6271358 (D. Vt. Nov. 25, 2019), a prisoner RLUIPA case in which a U.S. Magistrate Judge from the District of Vermont allowed expert testimony by a Muslim religious scholar whose qualifications and reliability the plaintiff had not challenged. The *Russell* court recognized that the scholar's testimony would have "little probative value for

---

██████████████████████████████████████████████████████████████████████

780973

the purpose of evaluating the sincerity of Russell's religious beliefs," but his testimony "may be probative of whether Russell's beliefs . . . are religious in nature."  *Id.* at \*4.  As noted above, there is no fact dispute in this case concerning whether Catholic Relief Services terminated Plaintiff's spousal health benefits because of its religious beliefs.  If ever there were a RFRA case in which expert opinion testimony by a counter-theologian could be appropriate, despite that it is "not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds," *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989), this certainly is not that case.  Catholic Relief Services' views and practices align with the views and practices of the USCCB and the Vatican, whereas Plaintiff is trying to rewrite Church law through the insights of a scholar whose "basic methodology of . . . moral theology is unsound and incompatible with the Catholic tradition." Committee on Doctrine (Ex. 25), at 2.

The other prisoner cases Plaintiff cites to bolster his argument cut against his position. *Compare Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1314 (10th Cir. 2010) ("[T]he issue is not whether the lack of a halal diet that includes meats substantially burdens the religious exercise of any Muslim practitioner, but whether it substantially burdens *Mr. Abdulhaseeb's* own exercise of his sincerely held religious beliefs."), *and Ford v. McGinnis*, 352 F.3d 582, 593 (2d Cir. 2003) ("The district court found that Ford had not established a substantial burden because 'given that the Muslim clerics testified that participation in the Eid ul Fitr is not religiously required . . . deprivation of a post-Eid meal can be seen as a de minimis burden on Ford's religious freedom.' . . . Insofar as the district court implied that in order for a burden to be substantial the burdened practice must be mandated by an adherent's religion, we disagree."), *with Levitan v. Ashcroft*, 281 F.3d 1313, 1321 (D.C. Cir. 2002) ("[A] court may determine whether the litigants' views

33

have any basis whatsoever in the creed or community on which they purport to rest their claim. For example, a Catholic litigant who asserted that it was part of his religion to wear sunglasses would be making a claim 'so bizarre . . . as not to be entitled to protection' under the First Amendment.").  There is nothing "bizarre" about Catholic Relief Services' adherence to Catholic orthodoxy around sexual ethics, so there is nothing for Dr. Salzman to probe.

Plaintiff's battle of the clerics would violate Federal Rule of Evidence 702, because Dr. Salzman's rogue beliefs would not help the jury "understand the evidence or . . . determine a fact in issue."  The battle also would violate the First Amendment, which prohibits courts from "trolling through a person's or institution's religious beliefs."  *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1261 (10th Cir. 2008).  "Most often, this principle has been expressed in terms of a prohibition of 'excessive entanglement' between religion and government."  *Id.*  As discussed in *Redhead v. Conference of Seventh-Day Adventists*, 566 F. Supp. 2d 125 (E.D.N.Y. 2008), a case on which Plaintiff relies,

> entanglement may be substantive—where the government is placed in the position of deciding between competing religious views—or procedural—where the state and church are pitted against one another in a protracted legal battle.  In other words, courts should consider both the substance and effect of a lawsuit in order to determine whether its resolution will cause excessive government entanglement with religion.

*Id.* at 133 (citations and internal quotation marks omitted).

It is hard to conceive of a more blatant case for unconstitutional entanglement than the trial Plaintiff envisions.  If the Court does not uphold Catholic Relief Services' religious freedom defenses at the summary judgment stage, the parties will proceed before the jury with conflicting expert opinion testimony about the meaning of scripture and sacred texts.  They will spar over papal decrees and Vatican directives.  They will explicate the Catholic principle of cooperation and argue about the meaning of scandal.  And the Court will police this process through

evidentiary rulings that, inevitably, will require the Court to assess the trustworthiness of religious sources and standards in the Catholic bioethical tradition.  That, after all, is the Court's gatekeeping role—to ensure that only reliable expert opinion testimony winds up in front of the jury.  The Court could not undertake that analysis without wading deep into the "theological thicket," where, with sincere respect, the Court does not belong.  *Am. Union of Baptists, Inc. v. Trs. of Particular Primitive Baptist Church at Black Rock, Inc.*, 335 Md. 564, 574 (1994).

The foregoing analysis, of course, is not limited to Plaintiff's expert strategy.  Even if the Court bars Dr. Salzman from offering his irrelevant opinions at trial, the Court's adjudication of the merits of this case will require the Court to probe matters of religion.  That was true when Plaintiff filed the case; it is truer still now that the Supreme Court has adopted a "most favored nation" status for religious exemption claims under the Free Exercise Clause.  Even if the Court agrees with all of Plaintiff's statutory interpretation arguments, the Court must still grapple with the substantial burden on Catholic Relief Services' religious exercise, a constitutional inquiry for which Plaintiff has offered no neutral framework.

Plaintiff chose to work for an arm of the Church.  The issues of faith and religious doctrine that infuse this case must be addressed by the Church alone:  that is the First Amendment's promise.  There is no more fundamental, or fundamentally American, right than freedom of religion.  The Court should uphold that right for Catholic Relief Services—United States Conference of Catholic Bishops.

## Conclusion

The Court should grant Catholic Relief Services' Cross-Motion for Summary Judgment.

780973

Respectfully Submitted,

**GALLAGHER EVELIUS & JONES LLP**

_____/s/ Joseph C. Dugan_____
David W. Kinkopf, Fed. Bar No. 23366
dkinkopf@gejlaw.com
Joseph C. Dugan, Fed. Bar No. 19637
jdugan@gejlaw.com
Collin J. Wojciechowski, Fed. Bar No. 21112
cwojciechowski@gejlaw.com
Emily A. Levy, Fed. Bar No. 21403
elevy@gejlaw.com
218 N. Charles Street
Baltimore, Maryland 21201
Tel: (410) 727-7702
Fax: (410) 468-2786

*Attorneys for Defendant Catholic Relief Services*

Date:  April 11, 2022

780973