## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JOHN DOE | Civil Action No. CCB-20-1815 |
| v. | |
| CATHOLIC RELIEF SERVICES | |

### MEMORANDUM

John Doe is a data analyst who sued his employer, Catholic Relief Services (CRS), when CRS terminated spousal health insurance benefits because Doe is a gay man married to another man. Now pending are cross motions for summary judgment on a variety of state and federal discrimination claims, a retaliation claim, and a motion to exclude a theological expert retained by Doe.[1] The motion is fully briefed, and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2021). For the following reasons, the motions will be granted in part and denied in part.

### BACKGROUND

Defendant Catholic Relief Services (CRS) is a Catholic Church social services agency constituted by the United States Conference of Catholic Bishops and charged with "carr[ying] out the commitment of the Bishops . . . to assist the poor and vulnerable overseas." *Mission Statement*, Catholic Relief Servs., https://www.crs.org/about/mission-statement (last visited July 27, 2022). CRS employs a diverse workforce, though it retains a Catholic identity as an

---

[1] Both parties have filed cross-motions for summary judgment on Doe's federal Title VII sex discrimination claim (Count VIII), federal Equal Pay Act sex discrimination claim (Count IX), Maryland Fair Employment Practices Act sexual orientation (Count I) and sex (Count II) discrimination claims, Maryland Equal Pay for Equal Work Act sex discrimination claim (Count III), and Retaliation claim (Count X). CRS has also moved for summary judgment on the question of Doe's damages and has moved to exclude testimony from Doe's retained theological expert. Counts IV, V, VI, and VII were dismissed in the court's order of March 26, 2021. (ECF 24, Order on Motion to Dismiss ¶ 2).

organization and binds its employees to a Code of Conduct and Ethics informed by the teachings

of the Church. Its human resources materials state that the organization designs and administers

its employee benefits programs consistent with Catholic values. (ECF 45-8, Ex. 7, 2022 CRS

Benefits; ECF 45-9, Ex. 8, 2016 CRS Summary of Employee Benefits; ECF 45-10, Ex. 9, 2015

CRS Summary of Employee Benefits). According to CRS, those values include the

understanding that "marriage is between a man and a woman." (ECF 46-9, Ex. 12, Twele Dep. at

119:2-14).

Plaintiff John Doe is a gay, cisgender man married to another man. In 2016, shortly after

finishing his master's degree, Doe attended a job fair and met a CRS recruiter. Doe and the

recruiter discussed positions at CRS, and the recruiter later followed up with Doe about a data

analyst position. In his conversations with the recruiter, Doe asked whether CRS would provide

health benefits to his husband, and the recruiter replied — mistakenly, according to CRS — that

all dependents were covered.

CRS hired Doe in June 2016, at which point Doe enrolled his husband through CRS's

spousal benefits enrollment system, administered by Aetna. CRS approved Doe's husband's

enrollment at the time; CRS maintains that the enrollment was a mistake, as CRS does not

provide spousal health benefits to employees' same-sex spouses. (ECF 46-11, Ex. 15, CRS's

Answers to Pl. John Doe's 1st Set of Interrogs. at 2–3 of 6 (numbered pages 30–31), answer to

interrogatory 10). The parties dispute whether CRS had clear policies concerning the provision

of health insurance to same-sex spouses; Doe asserts that no such policy existed, whereas CRS's

Executive Vice President for Human Resources asserts that a transparent policy existed but the

description of that policy around the time of Doe's onboarding could have been clearer. (ECF

42-12, Ex. 13, Mood Dep. at 45:5–46:7; ECF 41-2, Ex. 1, Doe Dep. at 96:3-20, 115:20–116:5;

2

ECF 41-12, Ex. 11, CRS 30(b)(6) Dep. at 41:17-21; ECF 46-7, Ex. 10, Mood. Dep. at 34:13-21, 54:15-21, 109:11-16).

Around this time, another gay CRS employee had inquired about health benefits for his husband, and a CRS benefits manager had — again, erroneously, according to CRS — told that employee that his husband was eligible for benefits. An acting human resources executive learned of this and moved in September 2016 to correct the error.

Two months later, in November 2016, Aetna flagged Doe's same-sex spousal coverage, and the HR executive again intervened. In the middle of that month, CRS's benefits manager met with Doe to tell him that CRS's Aetna health plan prohibited dependent benefits for same-sex spouses and that CRS had mistakenly approved his husband's enrollment. They met again the next day, and the benefits manager told Doe that his husband's health insurance would be dropped at the end of November 2016.

But Doe's husband was not dropped at the end of that month, and instead he remained covered through the winter and spring. The acting human resources executive attempted in March 2017 to find a solution that would address Doe's financial needs while adhering to CRS's position that it would not provide spousal health insurance benefits to same-sex spouses.

That effort continued into the summer of 2017, when Shawn Mood became the permanent Executive Vice President for Human Resources and took over Doe's case. Two meetings are relevant to this litigation: one in summer 2017 and one in fall 2017. Mood, Doe, and the benefits manager met in July 2017, where they discussed Mood's three-part proposal: (1) Doe's husband would be moved to CRS's COBRA-like insurance alternative; (2) the COBRA window would be extended to thirty-six months; and (3) Doe would receive an immediate $5,000 raise or technical adjustment "so that it would fund most of the out-of-pocket

3

expenses that he would incur." (ECF 46-7, Ex. 10, Mood. Dep. at 56:3-17). Mood acknowledged

that the out-of-pocket costs to Doe would be approximately $6,400. (ECF 42-12, Ex. 13, Mood

Dep. at 88:1-5 (a "rough estimate")). The plan was to take effect on October 1, 2017.

In September 2017, Mood and Doe met again, this time with Doe's supervisor, Amy

Damsker, at Doe's request. At that meeting, Mood confirmed that CRS had modified its

documents to more clearly explain that CRS does not provide dependent benefits to same-sex

spouses. According to Damsker, Mood made statements suggesting that Doe should stop

pressing the issue of his spousal benefits, including "something to the effect of 'things aren't

going to turn out well.'" (ECF 46-29, Ex. 33, Damsker Decl. ¶ 14). Damsker asked Mood to

clarify that Doe's job was not being threatened because Doe was asking questions about his

benefits, and Mood responded that "as far as he knew, that was correct." (*Id.* ¶ 16). Doe and

Damsker also say that Mood added that if an employee were to sue CRS, "it is only natural that

the employer would not want to continue paying the employee." (*Id.* ¶ 17; ECF 41-2, Ex. 1, Doe

Dep. at 224:9-20). Mood denies making that further statement. (ECF 46-7, Ex. 10, Mood. Dep. at

123:8–124:25).

CRS terminated Doe's husband's health insurance on October 1, 2017. The parties

dispute the extent of the damages Doe suffered due to the termination; for example, Doe cites

dental procedures his husband delayed due to the situation, but CRS argues these delays were

due to his husband's unwillingness and professional commitments, not due to CRS's actions.

## PROCEDURAL HISTORY

Doe filed a charge of discrimination before the Equal Opportunity Employment

Commission (EEOC) on June 1, 2018. On May 27, 2020, the EEOC issued a right to sue letter,

and Doe filed this lawsuit on June 12, 2020. After this court granted in part and denied in part

CRS's motion to dismiss, 529 F. Supp. 3d 440 (D. Md. 2021), CRS filed its answer in April 2021 and the case proceeded to discovery on six counts: Count I (sexual orientation discrimination under the Maryland Fair Employment Practices Act), Count II (sex discrimination under MFEPA), Count III (sex discrimination under the Maryland Equal Pay for Equal Work Act), Count VIII (discrimination under federal Title VII), Count IX (sex discrimination under the federal Equal Pay Act), and Count X (retaliation). Doe moved for partial summary judgment (ECFs 41, 42) in January 2022, and CRS responded in opposition and filed its own cross-motion for summary judgment (ECFs 45, 46) in February 2022. Doe replied (ECFs 49, 50), and CRS replied (ECFs 53, 54).

## LEGAL STANDARD

Both parties have moved for summary judgment. Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122

5

F.3d 58, 62 n.4 (1st Cir. 1997)). For each individual motion, the court must view the evidence in

the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650 (2014) (per

curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372,

378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d

562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported

claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346

F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## ANALYSIS

### I.   Church Autonomy Doctrine jurisdictional challenge

In what the court construes as a renewed motion to dismiss for lack of subject matter

jurisdiction under Rule 12(b)(1) and Rule 12(h)(3), CRS argues that the case should be dismissed

because the Church Autonomy Doctrine removes this case from the court's jurisdiction.

The Church Autonomy Doctrine relies on the principle that the First Amendment gives

churches the "power to decide for themselves, free from state interference, matters of church

government as well as those of faith and doctrine."[2] *See Rayburn v. Gen. Conf. of Seventh–Day

Adventists*, 772 F.2d 1164, 1166–67 (4th Cir. 1985). CRS insists that any judicial inquiry into

this case inevitably requires an inquiry into matters of Catholic faith and doctrine. This is not so;

this case concerns a social service organization's employment benefit decisions regarding a data

analyst and does not involve CRS's spiritual or ministerial functions. *See Rayburn*, 772 F.2d at

1171. This court need not question the sincerity or content of CRS's religious beliefs to assess

---

[2]  The doctrine is most commonly applied via a particular corollary — the ministerial exception — by which the Free Exercise Clause and Establishment Clause together "bar the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC*, 132 S.Ct. 694, 702 (2012) (detailing historical bases for First Amendment jurisprudence).

6

the applicability of neutral and generally applicable statutes. CRS's renewed motion to dismiss will be denied.

## II.    Title VII sex discrimination (Count VIII)

Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Health insurance falls under "compensation, terms, conditions, or privileges of employment." *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 682 (1983). A plaintiff may prove a Title VII violation by offering direct evidence of discrimination under ordinary principles of proof. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

When an employer discriminates against an employee based on sexual orientation, "it necessarily and intentionally discriminates against that individual in part because of sex. And that is all Title VII has ever demanded to establish liability." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1744 (2020).

There is no genuine dispute over the fact that CRS revoked Doe's dependent health insurance because of his sex — in particular, that he was a man married to another man, which CRS does not cover under its medical insurance plan. Doe's sex was indisputably a but-for cause of CRS's employment action. *See id* at 1739, 1744. Instead, the parties dispute whether Title VII should apply to CRS in this case. CRS argues that (A) Title VII itself exempts CRS as a religious organization discriminating based on conduct and beliefs motivated by its religion; (B) the Religious Freedom Restoration Act applies as a super-statute to preclude enforcement of Title VII in Doe's case; and (C) Title VII itself is not a neutral and generally applicable law, so enforcement in this case would burden CRS's religious activities impermissibly and violate the Free Exercise Clause of the First Amendment. The court considers each in turn, finding

7

ultimately that none of CRS's arguments succeed and awarding summary judgment to Doe on Count VIII.

## A. *Section 702 does not apply because it does not exempt sex discrimination*

Title VII includes an exception for employees of religious entities. The subchapter "shall not apply . . . to a religious corporation . . . with respect to the employment of *individuals of a particular religion* to perform work connected with the carrying on by such corporation . . . of its activities." 42 U.S.C. § 2000e-1(a) ("§ 702(a)"). The exemption includes "any activities of religious organizations, regardless of whether those activities are religious or secular in nature." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192, 192–94 (4th Cir. 2011).

This is a narrow exception whose wording "may fairly be construed to prohibit some forms of state involvement in ecclesiastical decisions of employment" but "does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985) (citations omitted) (prospective associate in pastoral care[3] was not barred by Title VII from suing for sex and race discrimination, though she was barred by the religion clauses). "The statutory exemption applies to one particular reason for employment decision — that based upon religious preference." *Id.*

CRS argues for an expansive reading of the exception, applying it to allow religious organizations to discriminate not just in favor of co-religionists but also against those who do not share particular beliefs or conduct standards tied to its religious identity. Thus, § 702(a) would apply not just to employment decisions regarding co-religionists but more broadly to any

---

[3] The ministerial exception to federal antidiscrimination laws is not at issue in this case. *See Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 n.7 (4th Cir. 2011); ECF 46-1, Def.'s Mem. Opp. and Cross-Mot. Summ. J. at 16 n.8 (ministerial exception not at issue).

characteristic — protected by Title VII or not — that the religious organization could sincerely tie to its religious beliefs.

Though CRS cites *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991), for the proposition that the "permission to employ persons 'of a particular religion' includes permission to employ only persons whose beliefs and conduct are consistent with the employer's religious precepts," controlling Fourth Circuit precedent holds that § 702(a) does not exempt religious organizations from the bar on forms of discrimination based on protected characteristics other than religion. *See Kennedy*, 657 F.3d at 192; *accord Rayburn*, 772 F.2d at 1166.

A plain reading of § 702(a) reveals Congress's intent to protect religious organizations seeking to employ co-religionists, but the reading urged by CRS would cause a relatively narrowly written exception to swallow all of Title VII, effectively exempting religious organizations wholesale. Had Congress wished to exempt religious organizations in this manner, it could have done so, but it "plainly did not." *Rayburn* at 1166–67. Accordingly, Title VII § 702(a) does not apply in this case.

### B. *RFRA does not apply to suits between purely private parties*

CRS asserts that the Religious Freedom Restoration Act provides it with an affirmative defense against Doe's discrimination claims. The Religious Freedom Restoration Act provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). This provision aims to prohibit the government from burdening a person's free exercise of religion except in certain circumstances. The parties dispute the legal question of whether RFRA applies to disputes between private parties like CRS and Doe, or whether it only applies when the government is a party. The Fourth Circuit has not weighed in. *Goodman v. Archbishop Curley High School, Inc.*, 149 F. Supp. 3d 577, 588–89

(D. Md. 2016) (identifying circuit split and declining to dismiss case under RFRA); *see also Goddard v. Apogee Retail LLC*, No. 19-cv-3269-DKC, 2021 WL 2589727, at *8 (D. Md. June 24, 2021) ("[RFRA] places restrictions on the government, not private parties, and so any claim predicated on RFRA against Apogee fails and will be dismissed with prejudice.");[4] *Hammons v. Univ. of Md. Med. Sys. Corp.*, No. 20-2088-DKC, 2022 WL 1027777, at *3 (D. Md. April 6, 2022); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-11, 2021 WL 4037431, at *15–22 (W.D.N.C. Sept. 3, 2021) (performing extended textual analysis of RFRA and surveying caselaw on the question of its applicability to suits between private parties). Only one jurisdiction — the Second Circuit — is on CRS's side of the split, and the Second Circuit itself questioned the decision at issue just two years later. *See Rweyemamu v. Cote*, 520 F.3d 198, 198, 201 n.2 (2d Cir. 2008) (stating doubts about the reasoning in *Hankins v. Lyght*, 441 F.3d 96, 104 (2d Cir. 2006)).

To be sure, Congress enacted RFRA "in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). CRS points to language in *Bostock* in which the Court acknowledged employer fears about complying with Title VII's application to sexual orientation and gender identity in conflict with the employers' religious convictions. *Bostock*, 140 S. Ct. 1731, 1753–54 (2020). The Court pointed to numerous protections: Title VII's statutory exception, the judicial exception for employment of ministers, and RFRA's prohibition on the "federal government from substantially burdening a person's exercise of religion." *Bostock*, 140 S. Ct. at 1754. But the fact that the Court mentioned RFRA's protections in a general description of the law's protections of free exercise does not mean the Court was explicitly extending RFRA; it merely left open the question of Title VII's interaction

---

[4] Unpublished cases are cited for persuasive reasoning rather than binding precedent.

10

with RFRA. RFRA's stated purposes are to restore the earlier "compelling interest" test and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b) (emphasis added). By its plain meaning, RFRA concerns relief "against a government." 42 U.S.C. § 2000bb-1(c). This court finds as a matter of law that RFRA restricts the government rather than private parties, and so CRS may not assert RFRA as an affirmative defense against Doe's claims.

### C. *Title VII is neutral and generally applicable, so no Free Exercise analysis is needed*

CRS argues in the alternative that if RFRA does not apply to a suit between private parties, Doe's federal claims still violate the Free Exercise Clause of the First Amendment. CRS urges an analysis in the vein of *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1876–77 (2021) (proceeding to a constitutional free exercise analysis because Philadelphia's policy was not neutral and generally applicable).

The Free Exercise Clause of the First Amendment, incorporated against the states by the Fourteenth Amendment, "forbids state governments from adopting laws designed to suppress religious beliefs or practices. *Hines v. S.C. Dep't of Corrections*, 148 F.3d 353, 357 (4th Cir. 1998) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940)). "[A] facially neutral and generally applicable regulation is subject only to rational basis review, 'even where it has the incidental effect of burdening religious exercise.'" *Canaan Christian Church v. Montgomery Cnty., Md.*, 29 F.4th 182, 198 (4th Cir. 2022) (discussing free exercise in the land use context, citing the *Fulton* court's decision not to overrule *Smith*). Still, "a government restriction that is not neutral but is meant to infringe upon or restrict practices because of their religious motivation is subject to strict scrutiny." *Id.* (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)); *see Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–23 (2022).

11

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi Babalu Aye*, 508 U.S. at 533; *see also Fulton*, 141 S. Ct. at 1877 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature."). If a law selectively burdens religiously motivated conduct while exempting comparable secularly motivated conduct, it is not generally applicable.[5] *Lukumi Babalu Aye*, 508 U.S. at 543; *see Fulton*, 141 S. Ct. at 1877.

Title VII and the federal Equal Pay Act, according to CRS, are not neutral and generally applicable because they exempt certain secular activity but not comparable religious activity. These laws therefore would represent government substantially burdening a person's exercise of religion even though "the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

In *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam), the Court found California's COVID-19 prohibition of religious gatherings of more than three households not to be neutral and generally applicable, because the policy did not cover comparable secular activities like hair salons, personal care services, and movie theaters, and indoor restaurants that brought together more than three households at a time. Government regulations are not neutral and generally applicable, the Court wrote, "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id.* at 1296. Here, CRS cites a number of secular exceptions under Title VII, noting that the statute's definition of "employer" does not include small businesses, the United States, and bona fide tax-exempt private membership clubs. *See* 42

---

[5] Additionally, "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877 (internal citations and quotations omitted). Individualized exemption mechanisms are not at issue in this case.

U.S.C. § 2000e(b). CRS's argument seems to be that these statutory exemptions treat secular activity (small businesses, the United States, etc.) more favorably than CRS's supposedly comparable religious activity.

CRS is too liberal in its understanding of the word "comparable." The *Tandon* court found home religious gatherings of three or more households to be comparable to commercial gatherings of three or more households, despite differences in duration and mitigation feasibility. *See Tandon*, 141 S. Ct. at 1298 (Kagan, J., dissenting). While reasonable minds can disagree over whether those differences too thoroughly erode the comparison between commercial and religious gatherings, at the very least, the categories are similar in that they each involved people from multiple households occupying the same indoor physical space during a pandemic. *See Fulton*, 141 S. Ct. at 1921–22 (Alito, J., concurring) (discussing the complexity of identifying appropriate secular comparators for burdened religious activities under *Smith*, which the *Fulton* court declined to overturn). CRS offers no such relatively close comparison, instead asking this court to find that — for the purposes of laws against employment discrimination — businesses with 15 or fewer employees, the United States government, and bona-fide tax-exempt private membership clubs are secular activities comparable to the religious activity of a social services nonprofit with over 7000 employees.[6] CRS has pointed to secular institutions not covered by Title VII, but it has not pointed to reasonably comparable institutions. Our Constitution's solicitousness of religious exercise is not *carte blanche* for any religious institution wishing to place itself beyond the reach of any neutral and generally applicable law. This court need not engage in a strict scrutiny analysis that would apply if a truly comparable secular institution were being treated favorably compared to CRS.

---

[6] Give.org, *Catholic Relief Services*, https://give.org/charity-reviews/national/Relief-and-Development/Catholic-Relief-Services-in-Baltimore-md-475 (last visited July 22, 2022).

## III.   Federal Equal Pay Act sex discrimination (Count IX)

Both parties also move for summary judgment on Doe's sex discrimination claim under

the federal Equal Pay Act, which prohibits discrimination "on the basis of sex by paying wages

to employees . . . at a rate less than the rate . . . [paid] to employees of the opposite sex . . . for

equal work[.]" 29 U.S.C. § 206(d)(1). Pay under the EPA includes the failure to provide equal

health insurance benefits.

To make out a prima facie case under the EPA, a plaintiff must show that: (1) the

"employer pays different wages to employees of opposite sexes"; (2) for "equal work on jobs the

performance of which requires equal skill, effort, and responsibility"; and (3) "which are

performed under similar working conditions." *Corning Glass Works v. Brennan*, 417 U.S. 188,

195 (1974) (internal citation omitted). "In interpreting the EPA, equal means substantially

equal." *Wheatley v. Wicomico Ct.*, 390 F.3d 328, 332 (4th Cir. 2004) (internal quotation marks

omitted and emphasis in original). Courts look to whether the jobs require substantially equal

skills and responsibilities. *See id.* at 333. "The crucial finding on the equal work issue is whether

the jobs to be compared have a common core of tasks, i.e., whether a significant portion of the

two jobs is identical. The inquiry then turns to whether the differing or additional tasks make the

work substantially different." *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir. 1986) (internal

quotation marks and citations omitted).

When an employee establishes a prima facie case of liability under the federal EPA, both

"[t]he burden of production *and* persuasion then shift to the defendant 'to show, by a

preponderance of the evidence, that the wage differential resulted from one of the allowable

causes enumerated by the statute.'" *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344

(4th Cir. 1994) (quoting *Fowler v. Land Mgmt. Groupe, Inc.*, 978 F.2d 158, 161 (4th Cir. 1992)).

Thus, unlike in Title VII claims, the plaintiff "need not prove that the employer acted with

14

discriminatory intent to obtain a remedy under the statute." *E.E.O.C. v. Md. Ins. Admin.*, 879
F.3d 114, 120 (4th Cir. 2018).

Doe has made a prima facie case of sex-discrimination under the federal EPA. CRS
provides dependent benefits for the male spouses of female employees who perform work of
similar skill and effort, hold similar responsibilities, and share a "common core" of tasks with
Doe, a male employee with a male spouse. (*See* ECF 42-2, Ex. 3, McCullough Decl. ¶¶ 3–8;
ECF 42-3, Ex. 4, Vejzagic Decl. ¶¶ 3–8). CRS has not challenged this showing or addressed the
EPA's subsequent burden shifting, instead focusing on its argument that RFRA prohibits the
application of the federal EPA and Title VII to CRS. (ECF 46-1 § III.B, Opp. at 28–36). As
explained previously in the Title VII context, however, RFRA does not apply to this suit (*see*
§ II.B, *supra*). CRS having conceded the substance of the federal EPA sex discrimination claim,
Doe will be awarded summary judgment on Count IX.

## IV.    State law discrimination and equal pay claims (Counts I–III)
### A.    *MFEPA sex and sexual orientation discrimination*

According to the Maryland Fair Employment Practices Act, "[a]n employer may
not . . . discriminate against any individual with respect to the individual's compensation . . . or
privileges of employment because of . . . sex, . . . sexual orientation, [or] gender identity. . ." Md.
Code. Ann., State Gov't § 20-606(a)(1)(i). MFEPA is "the state law analogue of" and in large
part modeled after Title VII. *Schwenke v. Ass'n of Writers & Writing Programs*, 510 F. Supp. 3d
331, 335–36, (D. Md. 2021) (quoting *Alexander v. Marriot Int'l, Inc.*, No. RWT-09-cv-2402,
2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011)); *see also Molesworth v. Brandon*, 672 A.2d
608, 614–15 (Md. 1996). Accordingly, the Maryland Court of Appeals frequently looks to

federal case law arising under Title VII when it interprets provisions of MFEPA.[7] *See, e.g.,*

*Taylor v. Giant of Md., LLC*, 33 A.3d 445, 459 (Md. 2011); *Molesworth*, 672 A.2d at 614–15;

*Chappell v. S. Md. Hosp., Inc.*, 578 A.2d 766, 772 (Md. 1990).

As with Title VII, MFEPA includes a religious exemption and "does not apply to . . . a

religious corporation . . . with respect to the employment of individuals of a particular religion,

*sexual orientation*, or gender identity to perform work *connected with the activities of the*

*religious entity*." Md. Code. Ann., State Gov't § 20-604(2) (emphasis added). The inclusion of

"sexual orientation" in the religious exemption and the nature of which activities are covered

arguably makes this exemption somewhat different from the exemption in Title VII § 702, which

applies only to individuals "of a particular religion."

Doe argues that Maryland courts read MFEPA *in pari materia* with Title VII, and so this

court's interpretation of Title VII (*see* § II, *supra*) should drive the statutory analysis of

MFEPA's religious exemption. According to Doe, an interpretation consistent with Title VII (*see*

§ II.A, *supra*) would apply only to religious activities, in contrast to a broader reading that would

protect a religious organization's right to discriminate in employment for non-religious job

functions like Doe's. Doe's reading of the Title VII religious exemption here is slightly unclear;

Title VII § 702 allows religious organizations to discriminate according to religion, but the

statute does not specify that it applies only to religious job functions.[8] *Kennedy*, 657 F.3d at 192–

94. Instead, Doe points to several sources of authority for his reading. First, he cites to a journal

article written by the General Counsel of the State of Maryland Commission on Human

Relations in which she writes that MFEPA does not apply to the "employment of individuals by

---

[7] Maryland courts, however, are not bound by Title VII in interpreting MFEPA. *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 749 (Md. 2007).
[8] The judicially created ministerial exception does apply specifically to religious or clerical job functions, but it is not at issue in this case.

16

religious institutions based on a particular religion or sexual orientation, as long as the employment is connected with the religious activity of the religious entity." Glendora C. Hughes, *The Evolution of Maryland's Commission on Human Relations Law*, Md. B.J. at 25 (July/Aug. 2009). Second, Doe points to the fact that MFEPA is "remedial in nature" and therefore "should be construed liberally in favor of claimants seeking its protection." *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 750–51 (Md. 2007). This, Doe argues, necessitates reading MFEPA to cover religious activities only.

CRS argues that a plain reading of MFEPA's state religious exception is broader than Title VII's federal religious exception, permitting religious institutions to engage in sexual-orientation-based discrimination against workers tied to all activities of the religious entity, not just religious discrimination tied to ministerial or even distinctly religious activities. To adopt Doe's reading, CRS says, would be to "sidestep[]" the principle of effectuating the plain meaning of the statute's text "in favor of relying on federal decisional law construing Title VII as a surrogate for analysis of the meaning of the terms used in Maryland enactments." *See Haas*, 914 A.2d at 749. Finally, CRS argues that MFEPA generally prohibits discrimination based on sex, sexual orientation, and gender identity but expressly exempts religious employers from claims based on discrimination due to sexual orientation and gender identity — but not sex. This, CRS, says, indicates an express choice of the General Assembly meriting judicial deference.

At the motion to dismiss stage of this litigation in March 2021, the court deferred considering the degree to which *Bostock* should affect the application of state anti-discrimination law. *Doe v. Catholic Relief Servs.*, 529 Supp. 3d 440, 447–48 (D. Md. 2021). CRS argued then and now that state laws' separate mentions of "sex" and "sexual orientation" indicate that they are actually separate and non-overlapping categories unaffected by *Bostock*'s reading of Title VII

17

discrimination against gay and lesbian employees as discrimination based on sex. The 2021 opinion pointed to a post-*Bostock* ruling that discrimination claims under MFEPA and Title VII are coterminous and that *Bostock*'s "expansion of Title VII" simply "include[s], in its definition of sex discrimination, protections already made explicit under Maryland Law[.]" *Doe*, 529 F. Supp. 3d at 448 (quoting *Schwenke*, 510 F. Supp. 3d at 336 (a non-religious-exemption case showing courts continuing to refer to Title VII when interpreting MFEPA post-*Bostock*)). The parties have identified no further guidance from Maryland courts in the year since.

Interpreting MFEPA involves important issues of state public policy around negotiating the tension between religious freedom and antidiscrimination law. Pursuant to the Maryland Uniform Certification of Questions of Law Act, the Maryland Court of Appeals is permitted to answer a question of law certified to it by a court of the United States "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." Md. Code Ann, Cts. & Jud. Proc. § 12–603. Doe's opening brief proposed a potential framing of a question for certification to the court of appeals.[9] I now ask counsel to confer and propose a joint question of law treating the proper interpretation of MFEPA's religious exemption either in line with, or departing from, Title VII. This court will deny without prejudice the cross-motions for summary judgment on Counts I and II until receiving guidance from the Court of Appeals.

### B. *MEPWA sex discrimination*

According to the Maryland Equal Pay for Equal Work Act ("MEPWA"), an "employer may not discriminate . . . by paying a wage to employees of one sex . . . at a rate less than the rate

---

[9] "Whether Md. Code Ann., SG § 20-604(2) authorizes a religious corporation, association, educational institution, or society to make decisions regarding the employment of individuals of a particular sexual orientation or gender identity to perform work connected to all activities of the religious entity or only those activities that are religious in nature." (ECF 42, Pl.'s Mot. Summ. J. at 26 n.7).

paid to employees of another sex . . . if both employees work in the same establishment and perform work of comparable character or work on the same operation, in the same business, or of the same type[.]" Md. Code Ann., Lab. & Empl. § 3-304(b)(1)(i). MEPWA was "patterned after the Federal [EPA]," *Gaskins v. Marshall Craft Assocs., Inc.*, 678 A.2d 615, 617 n.1 (Md. Ct. Spec. App. 1996), and their relationship is similar to that between MFEPA and Title VII. *See Cohens v. Md. Dep't of Hum. Res.*, 933 F. Supp. 2d 735, 745 (D. Md. 2013) ("'[C]ourts have applied the same analysis in reviewing MEP[W]A and EPA claims,' because '[t]he MEP[W]A essentially mirrors . . . the EPA.'") (quoting *Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 861–62 (D. Md. 2000)); *Gaskins v. Marshall Craft Assocs. Inc.*, 678 A.2d 615, 617 n.1 (Md. Ct. Spec. App. 1996). "In the absence of legislative intent to the contrary," the court will read MFEPA and MEPWA "in harmony" with their federal corollaries. *Chappell*, 578 A.2d at 772. Unlike MFEPA, however, MEPWA contains no religion-specific exceptions. And also unlike MFEPA, MEPWA mentions sex and gender identity but does not explicitly mention sexual orientation. Md. Code Ann., Lab. & Empl. § 3-304(b).

CRS's core argument for reading MEPWA to allow sexual orientation discrimination has two elements. First, the General Assembly amended the law in 2016 to include gender identity but not sexual orientation, which CRS says had to have been an express choice rather than an oversight because it shortly followed the announcement of *Obergefell v. Hodges*, 756 U.S. 644 (2015), and the rights of gay, lesbian, and bisexual Americans loomed large in the public consciousness at the time. Second, the 2016 updates having preceded *Bostock* by several years, the General Assembly very likely could not have foreseen the U.S. Supreme Court's routing of sexual orientation discrimination through sex discrimination in the Title VII context. Together, CRS argues these two points mean MEPWA does not cover sexual orientation discrimination.

19

Doe argues that the MEPWA claim should fare the same as the federal EPA claim (*see* §

III, *supra*), which includes sexual orientation discrimination by way of sex discrimination post-

*Bostock*. Doe notes the incongruity of intuiting that the General Assembly intended to expand

gender identity protections while ignoring or curtailing sexual orientation protections compared

to the federal EPA.

MEPWA contains no religious exception to speak of. Despite CRS's arguments for a

contrary reading of the statute, the outcome is clear: For the same reasons that a gay county

employee could bring a Title VII claim in *Bostock* and as described above in the federal EPA

context (*see* § III, *supra*), Doe will prevail on his state equal pay claim. A woman married to a

man would not have lost spousal health insurance benefits as Doe did. When CRS discriminates

against a gay employee like Doe, it "necessarily and intentionally discriminates against that

individual in part because of sex." *Bostock*, 140 S. Ct. at 1744. Doe will be granted summary

judgment on Count III.

## V.     Retaliation (Count X)

CRS also moved for summary judgment on Doe's retaliation claim. Title VII also

prohibits an employer from retaliating against an employee who has "opposed any practice made

an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3.

To establish a prima facie case of retaliation, a plaintiff must show that (1) she "'engaged

in protected activity,'" (2) the employer "'took adverse action against [her],'" and (3) "'a causal

relationship existed between the protected activity and the adverse employment activity.'"

*Westmoreland v. Prince George's Cnty., Md.*, 876 F. Supp. 2d 594, 612 (D. Md. 2012) (quoting

*Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). An employee engages in protected

activity if he "oppose[s] any practice made an unlawful employment practice by [Title VII], or ...

ma[kes] a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation,

proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3; *see Allen v. TV One, LLC*, No. DKC-15-1960, 2016 WL 337533, at \*10 (D. Md. Jan. 28, 2016) (same).

An action is sufficiently "adverse" to support a Title VII retaliation claim if it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Booth v. Cty. Exec.*, 186 F. Supp. 3d 479, 488 (D. Md. 2016) (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)) ("*Burlington Northern*"). In the Title VII context, this standard encompasses actions "beyond workplace-related or employment related retaliatory acts and harm." *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (citing *Burlington Northern*, 548 U.S. at 67–70). That does not mean, however, that any retaliatory actions will suffice. *Id.* Employees are only protected "from retaliation that produces an injury or harm," *i.e.* "materially adverse actions," as opposed to "trivial" ones. *Cepada v. Bd. of Educ. of Baltimore Cty.*, 814 F. Supp. 2d 500, 515 (D. Md. 2011) (citing *Burlington Northern*, 548 U.S. at 67–69). A proposed termination does not necessarily constitute an adverse employment action in a retaliation claim, even considering the lower bar in retaliation claims compared to discrimination claims.[10] *Wonasue*, 984 F. Supp. 2d at 492 (citing *Rock v. McHugh*, 819 F. Supp. 2d 456, 470–71 (D. Md. 2011)).

There does appear to be a dispute of fact as to whether CRS Executive Vice President for Human Resources Shawn Mood made certain statements during a July 2017 meeting with Doe. But as CRS points out, it did not in fact terminate Doe, but rather retained and even promoted him. (ECF 46-10, Ex. 14, Doe Dep. at 18:4-6, 18:19–22:1 (describing 2017 promotion and $8,000 raise and 2019 lateral position change with a compensation adjustment of an unspecified

---

[10] At least one court has found threats of retaliation sufficient to constitute an "adverse employment action" in the retaliation context. *See E.E.O.C. v. Cognis Corp.*, No. 10-CV-2182, 2011 WL 6149819, at \*7 (C.D. Ill. Dec. 12, 2011). But the threatened action in *Cognis* — an ultimatum to waive the right to file a discrimination claim or else to be terminated — was so explicitly retaliatory as to be distinguishable from Doe's case.

amount less than $8,000)). This alleged threat, assuming in Doe's favor that Mood made it, is insufficiently adverse. The threat was not explicit, it did not dissuade Doe, and no adverse action in fact followed. Doe's actual trajectory at CRS counteracts any notion that the alleged threat was materially adverse. Accordingly, CRS's motion for summary judgment on Doe's retaliation claim will be granted.

## VI.   Damages

The last of CRS's motions for summary judgment is on the question of damages. CRS argues (1) the $5,000 technical increase in Doe's salary more than offset his added healthcare expenses (perhaps leaving him slightly ahead financially); (2) CRS is not responsible for Doe's husband's delay of his dental treatment, which was due to his own personal reluctance; (3) a jury could apportion damages for emotional distress damages only with speculation; and (4) CRS did not act with malice or reckless indifference (especially considering the unsettled state of the law), so punitive damages would be improper.

Doe responds that the $5,000 did not make him whole and that the parties dispute whether the $5,000 was compensation for Doe's injuries or a collateral source. (ECF 50-11, Ex. 11, Palastis Dep. at 85:17–87:15 (CRS Human Resources former head denying that the increase was tied to the termination of Doe's spousal benefits); ECF 50-4, Ex. 4., Suppl. Mood Dep. at 62:16–66:10) (Mood explaining that he would not link the technical increase with the termination of benefits). A jury is best suited to hear the evidence and determine whether Mr. Doe's husband acted reasonably in finding alternative health insurance and dental treatment, including his May 2018 return to the dentist nine months after his initial procedure. The same is true of disentangling Doe's past trauma from the distress caused by the events of this case and captured by his mental health provider. These are genuine disputes of material fact that preclude summary judgment.

CRS's motion for summary judgment as to punitive damages, however, will be granted. Given the uncertainty of the scope of the religious exemption as well as CRS's admittedly unsuccessful attempts to work with Doe to arrive at some compromise solution that would be mutually acceptable, there is no valid claim for punitive damages.

## VII.   Expert

Finally, CRS moved to exclude the opinions of Dr. Todd Salzman, Doe's retained expert. Dr. Salzman's testimony has not been considered by the court, as there is no need for a RFRA analysis. (*See* § II.B, *supra*). Accordingly, CRS's motion in limine will be denied without prejudice.

**CONCLUSION**

For the reasons discussed herein, Doe's and CRS's motions for summary judgment will be granted in part and denied in part, and CRS's motion in limine will be denied without prejudice. A separate Order follows.

8/3/22
Date

_____
Catherine C. Blake
United States District Judge

23