**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JOHN DOE, | * | |
| Plaintiff, | * | |
| v. | * | Case No. JRR-20-1815 |
| CATHOLIC RELIEF SERVICES, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANT'S POST-TRIAL BRIEF WITH
<u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

# Table of Contents

**Page**

Statement of the Case..................................................................................................... 1

Proposed Findings of Fact .............................................................................................. 4

Argument ......................................................................................................................... 9

    I.    Plaintiff's claim in Count I is barred by MFEPA's religious entity exemption. ............ 9

        A.    The *Doe III* court established a narrow carve-out from an exemption that broadly applies to employees of religious corporations....................................................... 9

        B.    Plaintiff's work directly furthered Catholic Relief Services' core mission.......... 13

        C.    The additional factors Plaintiff would graft onto MFEPA are inconsistent with the Maryland Supreme Court's description of its ruling as the "narrowest reasonable reading" of the exemption.................................................................................... 21

        D.    A finding that Plaintiff did not directly further Catholic Relief Services' mission would imperil religious nonprofits across Maryland. ........................................... 23

        E.    In light of the constitutional avoidance doctrine, the Court can and should decide Count I in Catholic Relief Services' favor on statutory grounds......................... 25

    II.    Application of MFEPA as against Catholic Relief Services would substantially burden the agency's First Amendment free exercise rights..................................................... 25

        A.    After *Doe III*, MFEPA is not neutral and generally applicable. ........................... 26

        B.    A requirement that Catholic Relief Services must provide spousal health benefits for employees in same-sex unions would substantially burden Catholic Relief Services' sincere religious exercise. ...................................................................... 28

        C.    Application of MFEPA in this case is not the least restrictive means of furthering a compelling state interest...................................................................................... 32

        D.    The only party in this case with a valid constitutional argument is Catholic Relief Services. ................................................................................................................. 35

    III.    Catholic Relief Services respectfully maintains that it was entitled to judgment as a matter of law with respect to Plaintiff's federal claims. ............................................... 36

Proposed Conclusions of Law ....................................................................................... 37

Conclusion ..................................................................................................................... 40

# Table of Authorities

Page(s)

## Cases

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)..............................................................................................32

*Bear Creek Bible Church v. EEOC*,
   571 F. Supp. 3d 571 (N.D. Tex. 2021) ................................................................37

*Beddingfield v. Sec'y of Health & Hum. Servs.*,
   50 Fed. Cl. 520 (2001) ........................................................................................16

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020)..............................................................................................32

*Braidwood Mgmt., Inc. v. EEOC*,
   70 F.4th 914 (5th Cir. 2023) ...........................................................................32, 37

*Bryce v. Episcopal Church*,
   289 F.3d 648 (10th Cir. 2002) .............................................................................37

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)..............................................................................................30

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993)....................................................................................26, 33, 39

*Doe v. Catholic Relief Servs.*,
   484 Md. 640 (2023) ....................................................................................... *passim*

*Fulton v. City of Philadelphia*,
   593 U.S. 522 (2021).......................................................................................*passim*

*Hankins v. Lyght*,
   441 F.3d 96 (2d Cir. 2006)....................................................................................37

*Kane v. De Blasio*,
   19 F.4th 152 (2d Cir. 2021) ..................................................................................30

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94 (1952)................................................................................................31

*Larson v. Valente*,
   456 U.S. 228 (1982)..............................................................................................24

902248

*Lovelace v. Lee*,
    472 F.3d 174 (4th Cir. 2006) .......................................................................28, 35, 39

*McDaniel v. Paty*,
    435 U.S. 618 (1978)...............................................................................................33

*Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince
    George's Cnty.*,
    17 F.4th 497 (4th Cir. 2021) .................................................................................32

*Redemption Cmty. Church v. City of Laurel*,
    333 F. Supp. 3d 521 (D. Md. 2018).................................................................32, 39

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) .................................................................................35

*Seattle's Union Gospel Mission v. Woods*,
    142 S. Ct. 1094 (2022) ...........................................................................................24

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    239 F. Supp. 3d 77 (D.D.C. 2017)..........................................................................34

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ...........................................................................................27, 39

*Union Gospel Mission of Yakima, Wash. v. Ferguson*,
    No. 1:23-CV-3027-MKD, 2024 WL 4660918 (E.D. Wash. Nov. 1, 2024) ....................27, 36

*United States v. Hager*,
    721 F.3d 167 (4th Cir. 2013) .................................................................................25

*Woods v. Seattle's Union Gospel Mission*,
    481 P.3d 1060 (Wash. 2021) ..................................................................................35

**Statutes**

42 U.S.C. § 2000e-1.........................................................................................................36

Md. Code Ann., State Gov't § 20-601 ...........................................................26, 33, 37, 39

 Md. Code Ann., State Gov't § 20-604 ...........................................................20, 24, 26, 37

902248

**Other Authorities**

*2021 SUSB Annual Data Tables by Establishment Industry: U.S. and States, NAICS, Detailed Employment*, U.S. Census Bureau (Dec. 21, 2023), https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html (last visited Nov. 22, 2024) .......................................................................................33

Catechism of the Catholic Church, pt. II, § 2, art. 7, https://www.vatican.va/archive/ENG0015/__P50.HTM. ............................................3

Congregation for the Doctrine of the Faith, *Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons*, Vatican (June 3, 2003), https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20030731_homosexual-unions_en.html (last visited Nov. 16, 2024) ........................................................................................................................30

David Masci & Michael Lipka, *Where Christian Churches, Other Religions Stand on Gay Marriage*, Pew Res. Ctr. (Dec. 21, 2015), https://www.pewresearch.org/short-reads/2015/12/21/where-christian-churches-stand-on-gay-marriage/(last visited Nov. 22, 2024)..................................23

*Employed Persons by Detailed Occupation and Age*, BLS, https://www.bls.gov/cps/cpsaat11b.htm (last visited Nov. 22, 2024).....................................23

Rachel Baye, *High Court:  Maryland Laws Allow Religious Organizations to Discriminate Against Gay Employees*, WYPR (Aug. 15, 2023), https://www.wypr.org/wypr-news/2023-08-15/high-court-maryland-laws-allow-religious-organizations-to-discriminate-against-gay-employees  (last visited Nov. 22, 2024)...............................................................................................21

Vernon Brundage, Jr., *Profile of the Labor Force* by Educational Attainment, BLS (Aug. 2017), https://www.bls.gov/spotlight/2017/educational-attainment-of-the-labor-force/(last visited Nov. 22, 2024); ...................................................................23

902248

**Statement of the Case**

In his final message to his colleagues at Catholic Relief Services before his voluntary resignation, Plaintiff John Doe declared that he was "incredibly proud to have had the opportunity to contribute to CRS's mission to assist the poor and vulnerable overseas." (J. 33.) The evidence at trial confirmed that Plaintiff did exactly that. Through his work first implementing and later managing Gateway, Catholic Relief Services' premier tool for capturing its business pipeline and managing its project portfolio, Plaintiff improved Catholic Relief Services' ability to meet the demands of institutional donors who insist on ever more robust data before they will approve grants. And through his monitoring and evaluation work for Changing the Way We Care, Catholic Relief Services' flagship program devoted to keeping children out of orphanages and in the care of their families, Plaintiff helped Catholic Relief Services meet its goals of internal learning and external sharing in the target countries and beyond. Catholic Relief Services' core mission is to "assist the poor and vulnerable overseas," and it accomplishes that mission by working with "local, national and international Catholic institutions and structures, as well as other organizations." (J. 2.) Through his work on Gateway and Changing the Way We Care, Plaintiff advanced the agency's fundraising efforts, operational efficiency, and interagency information sharing, all in service of improving Catholic Relief Services' ability to reach and assist the global poor. In so doing, Plaintiff "directly further[ed] the core mission" of Catholic Relief Services. *Doe v. Catholic Relief Servs.* ("*Doe III*"), 484 Md. 640, 667 (2023).

As Plaintiff's counsel put it, "the person with the most and best knowledge about what he actually did would be Mr. Doe." Extract of Tr. of First Day of Trial ("Tr. 1") at 87:18-19, attached as Exhibit 1. Taking Plaintiff at his word, he, *inter alia*: "[d]esigned and implemented a tool the risk and compliance unit used to drive a 65% increase in evidence of agency

compliance to a USG policy requiring Catholic Relief Services to measure subrecipients' financial management capacity" (D. 209); was "influential in expanding the agency's Salesforce system to support new MEL-related business functions and ensure the system will continue to meet the agency's knowledge and information needs for years to come" (D. 238); "closely advis[ed his] managers' decision-making, strategy, and communication to agency leaders as it related to managing Gateway" (D. 210); "led the creation and implementation of [Catholic Relief Services'] knowledge management strategy" (D. 230); and "[c]ollaborate[d] with project staff to translate project learning/findings into donor reports, webinars, blog posts, etc., to advance [the] project's strategic objective of influence and learning" (D. 212).  Plaintiff's contemporaneous statements tell the story of an instrumental employee who harnessed the power of technology as he collaborated with a team that collectively advanced the mission of a data-driven NGO.

Plaintiff knows that he cannot prevail under the *Doe III* court's test.  He knows that his work was far more like that of the hypothetical executive director, who managed staff members behind the scenes to ensure successful fundraisers, than that of the janitor.  *Doe III*, 484 Md. at 673-74.  So Plaintiff proposes to change the test, offering a five-factor framework that nowhere appears in the Maryland Supreme Court's opinion.  Because the court already articulated the "narrowest *reasonable* reading" of the religious entity exemption, *id.* at 673 (emphasis added), Plaintiff's additional narrowing necessarily would be an *unreasonable* reading of the exemption. It also is contrary to the plain language and legislative history of MFEPA.  Plaintiff can point to no evidence that in exempting employees who "perform work connected with the activities of [a] religious entity," what the legislature actually meant was employees who "provide humanitarian relief," or "secure funding," or "direct decision-making authority," or "contribute directly to

2

meeting compliance standards," or have "unique" technical skills.  Extract of Tr. of Third Day of Trial ("Tr. 3") at 37:18-24, attached as Exhibit 2.

The Court's ruling in this case of first impression will have significant persuasive effect in future cases involving the MFEPA religious entity exemption.  Many nonprofit organizations are religious by affiliation, and it is no secret that, for many religious organizations, same-sex unions are contrary to their sincerely held religious beliefs.  For Catholic-affiliated organizations, an understanding of marriage as a union between one man and one woman is a religious imperative.[1]  If John Doe, a manager with advanced technical skills and a portfolio of work closely related to key organizational initiatives, did not "directly further" the mission of Catholic Relief Services, then thousands of employees who collectively advance their organizations' missions likewise will not qualify for the religious entity exemption.  That undoubtedly would come as a surprise to these nonprofits, which have relied on the balance the legislature struck twenty-three years ago when it prohibited sexual orientation discrimination in the workplace while carving out religious corporations from that prohibition.  *See* Antidiscrimination Act of 2001 (S.B. 205), ch. 340, 2001 Md. Laws 2112, 2116, 2118, extract attached as Exhibit 3.

The legislature did not intend the result Plaintiff seeks.  The Maryland Supreme Court did not prescribe such a result.  And this Court should not sanction such a result.  Plaintiff directly furthered Catholic Relief Services' core mission "to assist the poor and vulnerable overseas" (J. 2) by increasing agency efficiency and information sharing through the Gateway system and Plaintiff's monitoring and evaluation work on Changing the Way We Care.  Catholic Relief Services is exempt from Plaintiff's MFEPA sexual orientation discrimination claim.

---

[1]  Catechism of the Catholic Church, pt. II, § 2, art. 7, https://www.vatican.va/archive/ENG0015/__P50.HTM.

**Proposed Findings of Fact**

1.      Catholic Relief Services was founded by the United States Conference of Catholic Bishops with a mission to "assist the poor and vulnerable overseas."  The agency is "motivated by the Gospel of Jesus Christ to cherish, preserve, and uphold the sacredness and dignity of all human life, foster charity and justice, and embody Catholic social and moral teaching" as it acts to both promote human development and serve Catholics in the United States as they live their faith in solidarity with people worldwide.  Tr. 1 (Ex. 1) at 57:21-24; (J. 2.).

2.      Plaintiff John Doe worked for Catholic Relief Services from June 2016 until his voluntary resignation in August 2024.  Tr. 1 (Ex. 1) at 95:10-14; Extract of Tr. of Second Day of Trial ("Tr. 2") at 5:17-24, attached as Exhibit 4.

3.      Plaintiff joined Catholic Relief Services, in part, because he was drawn to the agency's work carrying out development projects overseas.  Tr. 2 (Ex. 4) at 38:1-6.

4.      Catholic Relief Services' transformative projects include those related to agriculture, capacity strengthening, education, emergency response, health, justice and peace building, microfinance, and water and sanitation.  (J. 19 at 4.)

5.      At present, over three-quarters of Catholic Relief Services' revenue derives from public sources.  (J. 17 at CRS00015795.)

6.      Without funding from the United States government, Catholic Relief Services "would have to abandon some of [its] partners" overseas and "would be a much, much smaller organization" with a reduced footprint in the NGO community.  Tr. 1 (Ex.1) at 56:22-25, 57:8-10.

7.      Both public and private donors take steps to ensure that Catholic Relief Services' resources are being deployed as intended.  *Id.* at 50:15 – 51:4.

905158

8.      Public donors, in particular, have a "large group of standard provisions" that grant recipients must adhere to.  *Id.* at 50:15-17.

9.      If a grant recipient fails to demonstrate that funds were spent in an approved manner, the grant recipient may have to "repay" the grant.  *Id.* at 50:15 – 51:20.

10.     Donors also require Catholic Relief Services to ensure that its local partner organizations "manage their money" and have "strong internal controls."  *Id.* at 225:24 – 226:5.

11.     Through its "sub-recipient management process," Catholic Relief Services "analyze[s] and review[s] . . . local organizations' ability to steward funds well," and then supplies that information to donors upon request.  *Id.* at 226:6-15.

12.     To accommodate the requirements of donors and to meet the needs of a growing agency with a global footprint, Catholic Relief Services has teams that "collect data around the world," and has made a "big investment in . . . knowledge management."  *Id.* at 48:16-17.

*Gateway*

13.     Gateway is Catholic Relief Services' "core knowledge management platform." *Id.* at 106:11.  Built on the Salesforce platform, Gateway houses the agency's data relating to funding awards, solicitations, and trends, as well as data related to program compliance, implementation, and monitoring.  *Id.* at 106:12 – 108:12.

14.     Catholic Relief Services uses Gateway to manage its relationships with key donors, including by keeping track of "who's interacting with whom."  *Id.* at 111:3-20.

15.     Catholic Relief Services has "doubled in size" in the time since it launched Gateway, and the technology has made the agency "[m]uch more efficient."  *Id.* at 90:15-17.

16.     Catholic Relief Services' Institutional Donor Engagement and Advancement ("IDEA") department, armed with the information aggregated in Gateway, is responsible for

905158

engaging with Catholic Relief Services' donors, submitting competitive proposals for funding sources, and negotiating the terms and conditions of donor agreements. *Id.* at 219:25 – 220:7. The funds secured by IDEA are used to "implement programming around the globe." *Id.*

17.    Gateway has "drastically improved" the ability of IDEA team members to capture funding opportunity data. Tr. 2 (Ex. 4) at 152:3-7.

18.    Gateway likewise led to a "drastic improvement" in the efficiency of Catholic Relief Services' sub-recipient compliance monitoring. *Id.* at 152:13-25.

19.    Catholic Relief Services also relies on Gateway "to decide things like [its] annual budget" and how to deploy its staff around the globe. Tr. 1 (Ex. 1) at 110:13-21.

20.    Three of Plaintiff's full-time positions at Catholic Relief Services were focused on implementing and improving Gateway: Program Data Advisor I (2016-17), Data Quality and Analytics Advisor II (2017-19), and Gateway Manager II (2022-24). Tr. 2 (Ex. 4) at 33:1 – 35:7, 62:25 – 63:21; (D. 274 at 5, 7); (D. 275).

21.    Plaintiff "oversaw the Pipeline and Projects Application," which is "by far the largest app in terms of consumption" within Gateway. Tr. 2 (Ex. 4) at 97:12-13, 98:21-24.

22.    Plaintiff's role in Gateway was "influential," and he played a "lead role" in hiring, onboarding, and training many of his direct supervisors, teammates, colleagues, and vendors on how to leverage Gateway's capabilities. (D. 210); (D. 238).

23.    Plaintiff was a close adviser to his managers on "decision-making, strategy, and communication" related to Gateway. (D. 210.)

24.    In his most senior role as Gateway Manager II, Plaintiff "manage[d] a three-person team supporting an internal information management platform . . . utilized by over 1,500 global users based in 70+ countries." (D. 261.)

905158

25.    Plaintiff "coordinated activities of a ten-person inter-departmental project team in designing a process to address data integration errors between . . . Salesforce and Oracle databases," and also "designed, documented, elicited feedback and achieved buy-in for this process that saves tens of hours in staff time each month." (*Id.*)

### *Changing the Way We Care*

26.    Changing the Way We Care is a flagship program at Catholic Relief Services focused on "end[ing] the institutionalization of children and ensur[ing] that children grow up in family-based care." Tr. 1 (Ex. 1) at 132:3-6, 133:3-4.

27.    Plaintiff held two positions with Changing the Way We Care, both of which involved Monitoring, Evaluation, Accountability, and Learning ("MEAL"):  Global MEAL Advisor, Program Manager 1 (2019-20); and Global MEAL Advisor, Program Manager II (2020-22). (J. 7); (J. 8); (D. 274 at 6-7).

28.    MEAL is "integral to all of [the] work" that Catholic Relief Services does:  it is a "compass" to help the agency determine whether it is "going in the right direction," and is part of the agency's "adaptive management strategy." Tr. 1 (Ex. 1) at 102:18-21.  MEAL also is a "core competency" for overseas programming staff.  *Id.* at 102:24 –103:1.

29.    MEAL is required by most donors.  *Id.* at 103:25 – 104:15.

30.    MEAL is "critical" to the success of Changing the Way We Care, and is one of "three objectives of the program," as Catholic Relief Services endeavors to "generate all of the evidence around how [the agency] did the program and then use that to influence larger bodies and effect change that would ripple beyond th[e] demonstration countries."  *Id.* at 134:14-19.

31.    In his MEAL roles with Changing the Way We Care, Plaintiff collaborated with colleagues in target countries to "establish frictionless processes and procedures to ensure the

flow of quality data" into three Excel-based databases that Plaintiff created, enabling the "initiative to have, for the first time, easy access to data for decision making and as evidence for indicator results reported historically." (D. 230.)

32.    Plaintiff led the implementation of a "knowledge management strategy, which . . . helped streamline the collection and sharing of knowledge the initiative generates." (*Id.*)

33.    Plaintiff also built the capacity of colleagues and partners "to leverage data for adaptation and learning, through participatory workshops," and synthesized, analyzed, and shared "routine monitoring data with colleagues, donors, and other stakeholders." (D. 238.)

34.    Plaintiff "was responsible for making sure that the MEAL work was actually done according to . . . policy." Tr. 1 (Ex. 1) at 143:2-3.

### *Temporary Duties Yonder*

35.    In addition to his full-time work on Gateway and Changing the Way We Care, Plaintiff held three "temporary duty yonder," or TDY, positions in Nigeria. Tr. 2 (Ex. 4) at 19:21-25, 73:4-5.

36.    In his first TDY position, Plaintiff worked as an information manager to produce a situation report for use by NGOs and government agencies. *Id.* at 73:24 – 74:19.

37.    While Plaintiff was stationed overseas, a cholera outbreak occurred, *id.* at 88:13 – 89:16, and Plaintiff was "instrumental in coordinating a five-INGO emergency response" to the outbreak "in a camp hosting 2500+ IDPs" (D. 233). Plaintiff "coordinated the rapid collection and mapping of 800+ water access points," and "organized and sent daily situational reports to local humanitarian actors and government officials." (*Id.*)

38.    In his second TDY position, Plaintiff supported the "director of [an] HQ MEAL department who was the lead facilitator" of a MEAL workshop. Tr. 2 (Ex. 4) at 75:3-9.

39.    In his third TDY position, Plaintiff "served as program manager for a $27M . . . emergency cash assistance program supporting 85K individuals," in which role he managed four project officers and "supported them to increase program efficiency."  (D. 244.)

40.    Because it is "difficult to find someone who has the experience of [Catholic Relief Services'] overseas work and an understanding of a platform like Salesforce," Catholic Relief Services anticipates that it will be challenging to replace Plaintiff following his voluntary resignation in August 2024.  Tr. 1 (Ex. 1) at 95:22 – 96:4.

<u>Argument</u>

I.    **Plaintiff's claim in Count I is barred by MFEPA's religious entity exemption.**

A.    **The *Doe III* court established a narrow carve-out from an exemption that broadly applies to employees of religious corporations.**

Although MFEPA itself says nothing about a "core" mission or duties that "directly further" such a mission, the Maryland Supreme Court, recognizing the remedial nature of MFEPA, gave the exemption its "narrowest reasonable reading" and concluded that "the General Assembly intended to exempt religious organizations from [specified] MFEPA claims brought by employees who perform duties that directly further the core mission (or missions) of the religious entity."  *Doe III*, 484 Md. at 667.  The court explained:  "when we refer to duties 'directly' furthering the core mission of a religious entity, we mean duties that are not one or more steps removed from taking the actions that effect the goals of the entity."  *Id.* at 673.  The

9

court also recognized that "a religious entity may have both religious and secular core missions, and more than one of each."  *Id.* at 674.[2]

As the Court will recall from the flowcharts Plaintiff presented during his closing argument, Plaintiff places great importance on the phrase, "one or more steps removed."  To Plaintiff, because he was not a C-suite policymaker or a field worker providing direct humanitarian aid, his work only indirectly furthered the organization's mission.  Yet the very next words in *Doe III* demonstrate that Plaintiff misunderstands the test:

> For example, consider a janitor who cleans the headquarters office of a religious entity which has as its core mission supplying housing to low-income communities.  The janitor's work allows other staff members to work in a clean environment and better focus on their duties in helping to provide low-cost housing to the needy.  In this case, the janitor's work indirectly furthers the core mission of the religious entity.
> Contrast that example with the executive director of a medium-sized religious charity, which has as its core mission the raising of funds to build new schools in underserved communities.  Assume that this person's job duties include managing other staff members to ensure that all fundraising events are scheduled, advertised, and ultimately successful.  The entity uses the proceeds collected from the fundraisers to help pay for the construction of new schools.  In this case, the executive director's duties directly further the entity's core mission.

*Id.* at 673-74.  The executive director in the *Doe III* court's hypothetical, like Plaintiff, holds a behind-the-scenes role.  The executive director does not build the schools.  Nor does she directly perform the activities that constitute the charity's mission (raising funds to build schools).  Rather, she provides back-office managerial support for the frontline fundraisers.  The executive

---

[2] The *Doe III* court identified other potentially relevant factors.  Most of these factors relate to how a "core mission" is determined, and both sides agree that the mission statement admitted as Joint Exhibit 2 accurately describes Catholic Relief Services' mission.  *See* Tr. 3 (Ex. 2) at 37:9-12.  The *Doe III* court also suggested that the "size of the religious entity may be relevant," since a "30-person religious non-profit may well have fewer employees whose work does not directly further the core mission(s) of the entity than an organization with a 300-person staff."  484 Md. at 674.  That may be true, although as a percentage of the workforce the numbers may look similar at any nonprofit that (like Catholic Relief Services) endeavors to limit its overhead.

director is one or more steps removed from the end goal, but not one or more steps removed from "taking the ***actions*** that ***effect*** the goals of the entity."  *Id.* at 673 (emphases added).

The *Doe III* test contemplates the arrangement at Catholic Relief Services:  many employees work together, some more visibly and others behind the scenes, to advance the mission.  The test does not require an employee to unilaterally accomplish the mission.  The test does not require that an employee is indispensable to the mission.  The test does not even require that an employee performs the final tasks that constitute the mission.  The question simply is whether the employee takes "actions that effect the goals of the entity," *id.*, that is, whether the employee is part of the collective effort to achieve the mission.  If so, the employee directly furthers the mission.  That is different from employees like janitors, food service workers, or security guards, whose work is unrelated to the mission but instead consists of providing ancillary services that help those who directly contribute to the mission.

The Maryland Supreme Court's janitor / executive director hypothetical leaves no ambiguity about what it means to indirectly further a mission:  the court had in mind a small class of workers who perform generic, entry-level, and likely lower-compensated tasks that most organizations (nonprofit or otherwise) require and that are unrelated to the goals of the organization.  The janitor hypothetical was first raised by Justice Gould at oral argument.  June 2, 2023 Oral Argument at 33:30, https://www.courts.state.md.us/scm/webcasts /webcastarchive2022term#june2023.  Justice Gould also inquired about "someone who sorts mail in the mailroom."  *Id.* at 40:53.  The court was concerned about an application of the religious entity exemption to "employees whose duties are materially indistinguishable from those performed by individuals at secular organizations, irrespective of the religious entity's core activities."  *Doe III*, 484 Md. at 672-73.  The court plainly did not have in mind a skilled and

highly paid professional, like John Doe, who performed specialized work critical to the goals of the organization (particularly with respect to its fundraising apparatus). The court's janitor hypothetical is a narrow carve-out, not the catch-all that Plaintiff wants it to be.

Relatively few employees indirectly further Catholic Relief Services' mission. This is so because Catholic Relief Services does not operate with heavy overhead. *See* Tr. 1 (Ex. 1) at 56:8-10. The organization is nimble and spends most of its resources on its mission. As a consequence, most employees of Catholic Relief Services directly further the mission and would qualify for the MFEPA religious entity exemption. But that fact is ***entirely consistent*** with the statute and its legislative history. The statute itself does not expressly limit the categories of employees covered by the exemption. And as the *Doe III* court recounted, while both MFEPA and Title VII "initially exempted claims against a religious entity where the plaintiff alleged discrimination based on religion and where the plaintiff performed work connected with the entity's 'religious activities,'" both Congress and the Maryland General Assembly later eliminated the "religious" qualifier. *Doe III*, 484 Md. at 668-69. Later, when the Maryland General Assembly amended MFEPA to prohibit first sexual orientation discrimination and later gender identity discrimination, it simultaneously amended the religious entity exemption to shield religious employers from those claims. *See id.* at 669-70; Antidiscrimination Act of 2001 (Ex. 3), 2001 Md. Laws at 2116, 2118; Fairness for All Marylanders Act of 2014 (S.B. 212), ch. 474, 2014 Md. Laws 3123, 3129-30, extract attached as Exhibit 5.

The legislature struck a deliberate balance, both expanding prohibitions against workplace discrimination and protecting religious employers from laws that would burden the employers' religious exercise. Nothing in the statute, the legislative history, or the Maryland

12

Supreme Court's opinion supports Plaintiff's request that the Court further erode the exemption

so subject-matter experts and management-level employees are excluded from its coverage.

**B.      Plaintiff's work directly furthered Catholic Relief Services' core mission.**

The Court heard extensive testimony, and reviewed documents generated by Plaintiff

himself, showing how Plaintiff furthered Catholic Relief Services' mission to "carr[y] out the

commitment of the Bishops of the United States to assist the poor and vulnerable overseas."  (J.

2.)  In Plaintiff's first two non-temporary positions (Program Data Advisor I and Data Quality

Advisor II), and in his fifth and final non-temporary position (Gateway Manager II), Plaintiff

was responsible for implementing, improving, and ultimately managing Gateway, Catholic

Relief Services' "core knowledge management platform" that is "built on the Salesforce system

and . . . houses all of [the agency's] information about funding awards, funding solicitations."

Tr. 1 (Ex. 1) at 106:10-13.  As Dr. Shannon Senefeld, Senior Vice President for Overseas

Operations, explained, the bulk of Catholic Relief Services' funding comes from public sources

after Catholic Relief Services competes for a grant.  *Id.* at 109:15-16, 24 – 110:1.  Catholic

Relief Services uses Gateway to track a grant application step-by-step and to "forecast . . .

financial models for the next year."  *Id.* at 110:5-7.  Gateway is used to address staff deployment,

and for "internal learning to see if there are certain types of awards that [the agency is]

competing for and not winning," allowing the agency to adjust its approach.  *Id.* at 110:15-19.

As Michele Gilfillan, Vice President for Institutional Donor Engagement, explained,

Gateway is used not only to track grant applications, but also to manage information that

institutional donors require in making decisions about whether to award grants.  Ms. Gilfillan

observed that the "environment has gotten more competitive," with "a lot more stringent rules

and regulations that we need to follow."  *Id.* at 229:7-10.  One example of this stringency relates

905158

to sub-recipient monitoring.  Catholic Relief Services "works through local partner organizations around the globe," and the ability of these partner organizations to "manage their money" and have "strong internal controls" is of "utmost interest to the donors who . . . trust CRS with their funds."  *Id.* at 225:24 – 226:5.  Through its "sub-recipient management process," Catholic Relief Services "analyz[e] and review[s] . . . local organizations' ability to steward funds well," and then extracts the information from Gateway upon request from donors.  *Id.* at 226:6-15; *see also id.* at 49:7-15 (Callahan testifying that "we have milestones linked with our strategy that are very specific on numbers of people we serve, [and] what we prove that we're going to do . . . . And then for our donors . . . they require us to do it.").  Catholic Relief Services' use of Gateway to supply data that donors require is integral to the agency's funding and execution of its mission.

Gateway also facilitates Catholic Relief Services' "institutional donor customer relationship management" and "house[s] all . . . project documents."  *Id.* at 107:10-15.  Gateway is an essential component of Catholic Relief Services' internal reporting, as the system is used to generate, *inter alia*, an annual organizational performance and effectiveness report to the board; monthly compliance reports; monthly business development reports; annual reports on the state of business development; and twice-annual reports to a board committee on key performance indicators within Overseas Operations.  *Id.* at 115:21-22, 116:4-6, 20 – 117:5; *see also id.* at 231:5-22 (Gilfillan describing weekly engagement reports, which allow her to "see all of the different engagements that have happened over the course of [a] week" and "stay on top of changing information").  The Gateway team also responds to intra-agency requests to adjust the system, determining which requests should move forward and coordinating with IT and other professionals to determine costs, timeline, and user interface.  *Id.* at 114:13-15, 22-25, 115:2-7.

14

Plaintiff did not dispute—because he could not dispute—that Gateway is an important tool for Catholic Relief Services.  Rather, he and his counsel emphasized (repeatedly) that Catholic Relief Services was able to carry out its mission "long before Salesforce or Gateway even were conceived."  Tr. 3 (Ex. 2) at 39:13-15.  That is true, but irrelevant.  Nothing in the *Doe III* court's test suggests that an incremental improvement in a process cannot directly further an entity's mission.  As Dr. Senefeld testified, Catholic Relief Services is "much more efficient and effective now with Gateway," particularly in light of the "move toward big data, toward data science, toward data use, data-driven decision-making," with donors increasingly "requiring sophisticated monitoring platforms and information."  Tr. 1 (Ex. 1) at 119:21-22, 120:1-6; *see also id.* at 125:3-8 ("I think that Gateway itself has been critical to our ability to effectively implement our mission. . . . Mr. Doe's work within that system has been critical to the effectiveness of that actually happening.").  Ms. Gilfillan agreed, testifying that Gateway "makes our work more efficient, it allows us to make decisions on certain things better, and also helps us communicate internally better."  *Id.* at 238:13-15.  With Gateway, her organization is "able to pull data in real time where [it] couldn't before and so . . . can really make better decisions," with "trend analysis" and "projections going forward."  *Id.* at 228:18-22.

Plaintiff also opined that because Gateway "allows people at specifically the HQ level and region levels ***who have a need*** to see . . . data," but "doesn't facilitate any process to delivering aid," employees working on Gateway must not directly further the agency's mission.  Tr. 2 (Ex. 4) at 18:20 – 19:1 (emphasis added).  But that testimony is belied by Plaintiff's own explanation of how Catholic Relief Services achieves its mission:  "They apply for grant funding. . . . CRS receives the money, looks for local partners to sub-grant that money to and collaborate on some type of development project that aligns with the country's development

15

agenda." *Id.* at 7:10-14.  Given Dr. Senefeld's and Ms. Gilfillan's unrebutted testimony about the ways that Gateway has improved the agency's fundraising and donor relations activities, by Plaintiff's own admission, Gateway is integral to the agency's mission.  *See also* Tr. 2 (Ex. 4) at 203:13-15 (Aida Vejzagic testifying that "it's very helpful because there are all types of analysis and reports that the leadership can extract from the system to make all kinds of decisions").

Gateway is a mission-critical system at Catholic Relief Services, but the system is only as good as the specialists tasked with implementing, improving, and managing it.  For years prior to his August 2024 resignation, Plaintiff served in that essential role.[3]  While Plaintiff characterized his work as insignificant at trial, his contemporaneous descriptions tell a very different story.  "As a general rule, oral testimony in conflict with contemporaneous documentary evidence deserves little weight."  *Beddingfield v. Sec'y of Health & Hum. Servs.*, 50 Fed. Cl. 520, 523 (2001).  In Plaintiff's own words in those contemporaneous statements, he:

- "[b]uilt a dashboard visualizing data from USG-required financial assessments conducted of CRS sub-recipients" that was used by management to "inform decisions that resulted in a 65% compliance increase" (D. 222);

- "contributed to the development and release of ten major business functions" (D. 243);

- took a "lead role in the hiring, onboarding, and training of three of [his] direct supervisors, all but one of [his] teammates, several supporting GKIM roles, and vendors," and "led the team through a department restructure, while . . . closely advising [his] managers' decision-making, strategy, and communication to agency leaders" (D. 210);

---

[3]  Plaintiff testified that, within Gateway, he was solely responsible for the Pipeline and Projects application, Tr. 2 (Ex. 4) at 12:1-4, the implication being that he was not responsible for all the benefits of Gateway that Catholic Relief Services' witnesses described.  Yet on cross, Plaintiff conceded that 1,500 users at Catholic Relief Services have access to the Pipeline and Projects application; that this application has by far the largest user base among the Salesforce applications at Catholic Relief Services; and that of the six bullets on Joint Exhibit 24, the Gateway summary about which Dr. Senefeld testified, five reflect content derived from the Pipeline and Projects application. *Id.* at 97:14-18, 98:21 – 99:23.

- assumed responsibility for developing a data quality tool, thereby saving the agency "thousands of dollars[] and drastically improv[ing] . . . data quality in Gateway" relative to the agency's sub-recipient financial monitoring policy (J. 26 at CRS00016136); and

- engaged with "business owners to collect requirements and fully understand business challenges, and then collaborate[d] with system administrators and external software developers to write functional and technical specifications, and collaborate on solutions" (D. 243).

From the outset, Plaintiff was an "extraordinary addition to the Gateway team and to CRS," making "well over a year's worth of positive impact on the team and agency" during his first year alone. (J. 25 at CRS00016155.) Plaintiff was "instrumental" in assisting with the "rollout with the Gateway system," and in "developing different ways to look at the data that had been inputted." Tr. 1 (Ex. 1) at 127:19-21, 128:5-6; *see id.* at 130:13-20 (Senefeld testifying that Plaintiff's first job description was "designed to help us figure out what we needed to do within the system" and "how we wanted to make sure that . . . we're able to use th[e] data"); (J. 26 at CRS00016145 ("[Plaintiff's] work has been a huge help to the . . . agency as a whole to improve data quality in Gateway related to the [sub-recipient financial monitoring policy].")). Plaintiff was "good at filling leadership vacuums," and while he "could have simply sat back and said, none of this is in my job responsibility," that was "just not in line with [his] work ethic and standards." Tr. 2 (Ex. 4) at 110:9-14.

Later, after he took over management of Gateway, Plaintiff "manage[d] a three-person team supporting an internal information management platform . . . utilized by over 1,500 global users based in 70+ countries." (D. 261.) Plaintiff "coordinated activities of a ten-person inter-departmental project team in designing a process to address data integration errors between [the agency's] Salesforce and Oracle databases," and also "designed, documented, elicited feedback and achieved buy-in for this process that saves tens of hours in staff time each month,

previously spent on troubleshooting." (*Id.*) Plaintiff served as the "business owner for [the] Gateway system that is representing Overseas Operations with [the] IT department, [the] vendors, et cetera, to . . . manage that project." Tr. 1 (Ex. 1) at 169:17-20.

Apart from his work on Gateway, Plaintiff also worked as a MEAL advisor for Changing the Way We Care, Catholic Relief Services' flagship program to "end the institutionalization of children and ensure that children grow up in family-based care." *Id.* at 132:3-6, 133:3-4. As Dr. Senefeld, the architect behind the program, explained, "MEAL was absolutely critical and it was one of the three objectives of the program," as the "idea behind it was to generate all of the evidence around how [the agency] did the program and then use that to influence larger bodies and effect change that would ripple beyond th[e] demonstration countries." *Id.* at 134:14-19. MEAL also is an institutional donor requirement. Plaintiff himself "know[s] for a fact" that the U.S. government requires project monitoring "to be submitted as part of [the] proposal development process and presumably would consider that in their decision [whether] to grant funds to Catholic Relief Services." Tr. 2 (Ex. 4) at 157:24 – 158:3.

In his MEAL roles, Plaintiff "collaborated with colleagues in Kenya, Guatemala, and Moldova to establish frictionless processes and procedures to ensure the flow of quality data" into three Excel-based databases that Plaintiff created, enabling the "initiative to have, for the first time, easy access to data for decision making and as evidence for indicator results reported historically." (D. 230.) Plaintiff "led the creation and implementation of [a] knowledge management strategy, which has helped streamline the collection and sharing of knowledge the initiative generates." (*Id.*) Plaintiff also "buil[t] the capacity of country team colleagues and partners to leverage data for adaptation and learning, through participatory workshops," and synthesized, analyzed, and shared "routine monitoring data with colleagues, donors, and other

18

stakeholders." (D. 238.)  And he "engaged with 8 staff from three local Kenya partners to successfully design, launch, and support a database that monitors and visualizes 15 child case management performance indicators for donor reports and adaptive management.  (D. 253.)

Plaintiff's MEAL work, like his Gateway work, was mission-critical, both because MEAL is required by the U.S. government and because MEAL was itself an objective of Changing the Way We Care.  The program is "about making sure that [children] are recognized and . . . that their care is in the forefront of social welfare systems and policies" in the target countries, but "the only way [the agency] can do that is via very strong monitoring and evaluation systems that show that the approaches [taken] are actually effective."  Tr. 1 (Ex. 1) at 143:19 – 144:2.  Plaintiff was "responsible for making sure that the MEAL work aws actually done according to . . . policy."  *Id.* at 143:2-3.  He also "regularly [brought] new insights into CTWWC's MEAL activities" and was not "afraid to challenge and question ideas in order to ensure the best possible solutions."  (J. 29 at CRS00016196.)

Plaintiff also held several temporary (TDY) positions.  In one such position, Plaintiff was "instrumental in coordinating a five-INGO emergency response to a cholera outbreak in a camp hosting 2500+ IDPs."  (D. 233.)  In another position, Plaintiff "served as program manager for a $27M . . . emergency cash assistance program supporting 85K individuals," in which role he managed four project officers and "supported them to increase program efficiency" by resolving system malfunctions, cash distribution errors, and fraud.  (D. 244.)  Thanks to Plaintiff's strong effort, thirty additional individuals received "lifesaving cash assistance."  (*Id.*)

Thousands of employees at Catholic Relief Services collaborate to carry out the agency's humanitarian mission.  No one would argue that Plaintiff was singlehandedly responsible for achieving any aspect of Catholic Relief Services' mission.  But the MFEPA religious entity

19

exemption does not require that.  It simply requires that an employee's duties "directly further the core mission(s) . . . of the religious entity."  *Doe III*, 484 Md. at 673.  Plaintiff's duties directly furthered Catholic Relief Services' mission, through his work on the groundbreaking Gateway system that both sides recognize to have improved Catholic Relief Services' operational efficiency; through Changing the Way We Care, where Plaintiff's MEAL work was integral to the program's goals; and through his hands-on TDY positions in the field.

Because the Maryland Supreme Court has directed courts to consider "the totality of the pertinent circumstances," *id.*, and because nothing in the court's opinion suggests that courts must silo each position an employee has held to determine whether that position directly furthered a core mission, the Court should consider the totality of Plaintiff's contributions to Catholic Relief Services across his eight years of employment.  Any other approach, apart from being inconsistent with the Maryland Supreme Court's guidance, would be contrary to the statute itself, which exempts religious corporations "with respect to the employment of individuals of a particular . . . sexual orientation . . . to perform ***work*** connected with the activities of the religious entity."  Md. Code Ann., State Gov't § 20-604 (emphasis added).  The statute does not say "perform ***only work*** connected with the activities of the religious entity," or "perform ***predominantly work*** connected with the activities of the religious entity."  Even if the Court were to find that some of Plaintiff's tasks did not directly further the agency's mission, his overall employment overwhelmingly encompassed mission-critical duties, and thus he was employed to "perform work" connected with Catholic Relief Services' activities.[4]

---

[4]  If the Court were required to address each position in a vacuum, this would have the effect of creating an arbitrary distinction between nonprofits, like Catholic Relief Services, that routinely promote employees from within and frequently reorganize positions, and those where employees may hold the same title for many years.  HR classifications do not matter:  what matters is what an employee does, and under *Doe III*, the analysis is holistic.

**C.  The additional factors Plaintiff would graft onto MFEPA are inconsistent with the Maryland Supreme Court's description of its ruling as the "narrowest reasonable reading" of the exemption.**

For not the first time in this litigation, and indeed not the first time in briefing over the meaning of MFEPA's religious entity exemption, Plaintiff has urged the Court to adopt a new test, cut from whole cloth, that has nothing to do with the statute as written or any legislative or judicial guidance to date.  Previously, Plaintiff advocated that the exclusion for employees who "perform work connected with the activities of the religious entity" must be construed to encompass only ministerial employees, Extract of Br. of Petitioner John Doe at 2, attached as Exhibit 6, despite that (i) the Maryland General Assembly deleted a prior limitation to employees performing "religious" activities, and (ii) Plaintiff's "ministerial "qualifier was *narrower* than the "religious" qualifier that the Maryland General Assembly deleted.  The *Doe III* court appropriately rejected Plaintiff's argument that "the exemption is coextensive with the First Amendment's ministerial exception."  484 Md. at 666.  And the court announced a test that would carve out some entry-level service workers, like janitors, from the ambit of what appears on its face to be a broad if not unqualified exemption, while preserving the balance that the legislature struck between prohibiting discrimination and protecting religious exercise.

Plaintiff understands that the *Doe III* test is inconvenient for his position.[5]  So Plaintiff proposes that the Court adopt a different test instead.  Plaintiff's new five-factor test is divorced from the text of *Doe III* and MFEPA.  Unlike Plaintiff, the Maryland Supreme Court said nothing about an employee directly providing humanitarian relief, or directly securing funding,

---

[5] *See* Rachel Baye, *High Court:  Maryland Laws Allow Religious Organizations to Discriminate Against Gay Employees*, WYPR (Aug. 15, 2023), https://www.wypr.org/wypr-news/2023-08-15/high-court-maryland-laws-allow-religious-organizations-to-discriminate-against-gay-employees (last visited Nov. 22, 2024) (Plaintiff's counsel stating that it is "disappointing that he's not being protected under Maryland law").

or exercising decision-making authority. Unlike Plaintiff, the Maryland Supreme Court said

nothing about an employee contributing directly to meeting compliance standards. And while

Plaintiff seems to think that the degree of uniqueness of his technical skills bears on his

eligibility for the exemption (a peculiar argument, since Plaintiff's advanced education and

technical expertise make him difficult to replace, *see* Tr. 1 (Ex. 1) at 95:24 – 96:4), the Maryland

Supreme Court said nothing about that either.

Plaintiff's new test is not only unrelated to anything that the *Doe III* court said, it also is

illogical. While Plaintiff identified zero people listed on Catholic Relief Services' organizational

chart whom he believes to directly further the agency's mission, Tr. 2 (Ex. 4) at 139:14 –141:11,

his test would include field workers who hand out bags of rice, as these employees "directly

provide humanitarian relief." Tr. 3 (Ex. 2) at 37:19; *see also* Tr. 2 (Ex. 4) at 150:7-9; Tr. 3 (Ex.

2) at 42:12-15. How is it possible that the legislature meant to exempt entry-level laborers, but

not corporate managers? Of course that is not possible, and there is no indication in *Doe III*,

MFEPA, or the legislative history that this upside-down test is what the legislature had in mind.

To be clear, an employee whose work encompasses the factors Plaintiff has proposed

may well further an NGO's mission. A decision maker, or a compliance enforcer, or a relief

provider almost certainly ***does*** further the mission. But the exemption sweeps much broader than

these limited roles that Plaintiff pulled from thin air. Plaintiff may not cherry-pick those tasks

that he (perhaps) did not perform and then say he is outside the scope of the exemption.[6] And

rather than focusing on things Plaintiff did ***not*** do, the Court should consider what he ***did*** do—

---

[6] Nor may Plaintiff avoid the exemption by disavowing personal knowledge of how his work contributed to Catholic Relief Services' mission, as Plaintiff did repeatedly at trial. *E.g.*, Tr. 2 (Ex. 4) at 48:8-11, 48:24 – 49:2, 50:7-16, 74:21-24, 75:20-23, 77:14-16, 89:22 – 90:10. Catholic Relief Services introduced affirmative evidence showing how Plaintiff contributed to the mission. Plaintiff's purported lack of awareness, even if true, is irrelevant.

work that, in Plaintiff's own words and as elucidated by Mr. Callahan, Dr. Senefeld, and Ms. Gilfillan, directly furthered Catholic Relief Services' humanitarian mission.

### D.    A finding that Plaintiff did not directly further Catholic Relief Services' mission would imperil religious nonprofits across Maryland.

While the Court must decide this case on the facts before it and the law as the Court understands it, the Court's ruling will be instructive and influential as courts seek to apply the MFEPA religious entity exemption in inevitable future litigation.  If an employee in Plaintiff's position does not qualify for the exemption, then the vast majority of Marylanders employed at religious nonprofits will not qualify (a result that would be satisfactory to Plaintiff and his counsel but is anathema to what the Maryland General Assembly intended and prescribed). Based on 2016 data, only 14.7% of the U.S. workforce holds an advanced degree, while based on 2023 data, only 13% of the U.S. workforce is employed in management occupations.[7]  Many of the largest religious organizations in the United States prohibit same-sex marriage, including the Roman Catholic Church.[8]  Religious nonprofits in Maryland have relied since the state first prohibited sexual orientation discrimination in the workplace on the carveout for religious corporations.  They have adopted personnel and benefits policies based on that reliance.  They have selected insurance coverage based on that reliance.  Plaintiff's preferred reading of the exemption would abrogate that reliance and leave these organizations in an untenable position, where they must choose between violating the law and violating their religious beliefs.

---

[7]  Vernon Brundage, Jr., *Profile of the Labor Force by* Educational Attainment, BLS (Aug. 2017), https://www.bls.gov/spotlight/2017/educational-attainment-of-the-labor-force/ (last visited Nov. 22, 2024); Employed Persons by Detailed Occupation and Age, BLS, https://www.bls.gov/cps/cpsaat11b.htm (last visited Nov. 22, 2024).

[8]  David Masci & Michael Lipka, *Where Christian Churches, Other Religions Stand on Gay Marriage*, Pew Res. Ctr. (Dec. 21, 2015), https://www.pewresearch.org/short-reads/2015/12/21/where-christian-churches-stand-on-gay-marriage/ (last visited Nov. 22, 2024).

905158

A narrow application of the exemption also would impact those religious nonprofits that preferentially hire from within their own faiths, as they are permitted under Title VII to do. The same direct furtherance test that the Maryland Supreme Court read MFEPA to apply for workers with sexual orientation discrimination claims presumably would apply to workers with religious discrimination claims. *See* Md. Code Ann., State Gov't § 20-604(2). At least one family of organizations, the General Conference of Seventh-Day Adventists and Adventist Risk Management, Inc., claims a "constitutional right to hire only those who share their faith and support their religious mission," a right "not contingent on whether Plaintiffs can convince a jury that a specific employee 'directly' furthers a 'core' mission of their organization." Verified Compl. ¶ 7, *Gen. Conf. of Seventh-Day Adventists v. Horton*, No. TDC-24-2866 (D. Md.). Because the Adventists must, for sincere religious reasons, hire solely from within their faith community, MFEPA as construed by the Maryland Supreme Court presents an Establishment Clause problem: the exemption now favors religions that permit interreligious hiring practices over those (like Adventism) that do not. Yet the "clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982); *see Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Statement of Alito, J., respecting the denial of certiorari) ("To force religious organizations to hire . . . personnel who do not share their religious views would undermine not only the autonomy of many religious organizations but also their continued viability.").

A ruling in Catholic Relief Services' favor would not eliminate the concern that the Adventists have raised, but it would mitigate the unexpected and unjustified risk that religious nonprofits are facing and would vindicate the Maryland General Assembly's choice to shield religious corporations from constitutionally suspect causes of action under MFEPA.

24

**E.    In light of the constitutional avoidance doctrine, the Court can and should decide Count I in Catholic Relief Services' favor on statutory grounds.**

If the Court were to find that Plaintiff's position did not directly further Catholic Relief Services' core mission, the Court would then have to determine whether application of MFEPA as against Catholic Relief Services would substantially burden Catholic Relief Services' religious exercise rights in violation of the First Amendment. That analysis would present constitutional questions of first impression, including whether MFEPA is neutral and generally applicable after *Doe III*, and whether an award of damages to a former employee for violation of MFEPA is the least restrictive means of furthering a compelling state interest.

The Court need not reach those issues. Instead, the Court should apply the "doctrine of constitutional avoidance, the principle that when 'choosing between competing plausible interpretations of a statutory text,' courts should 'presum[e] that [legislatures] did not intend the alternative which raises serious constitutional doubts.'" *United States v. Hager*, 721 F.3d 167, 210 (4th Cir. 2013) (alteration added and in original) (citations omitted). The Court should apply MFEPA in a manner consistent with its plain language, its legislative history, and the Maryland Supreme Court's test, and should hold that the exemption applies.

**II.    Application of MFEPA as against Catholic Relief Services would substantially burden the agency's First Amendment free exercise rights.**

If the Court finds that Plaintiff did not directly further Catholic Relief Services' mission, and assuming the Court finds that the termination of Plaintiff's spousal health benefits was prohibited by MFEPA, the Court must then determine whether application of MFEPA as against Catholic Relief Services is consistent with Catholic Relief Services' First Amendment rights. As discussed below, a holding that Catholic Relief Services violated federal law when it terminated

these benefits due to its sincerely held religious beliefs would substantially burden Catholic

Relief Services' religious exercise rights, and Plaintiff cannot demonstrate that enforcement of

MFEPA in this manner is the least restrictive means of furthering a compelling state interest.[9]

    **A.**    **After *Doe III*, MFEPA is not neutral and generally applicable.**

The U.S. Supreme Court repeatedly has held that, under the Free Exercise Clause, any

statute that is not "neutral and of general applicability" cannot be deployed in a manner that

would substantially burden religious exercise unless enforcement of the statute is the least

restrictive means of achieving a compelling state interest. *Church of the Lukumi Babalu Aye,*

*Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). "A law is not generally applicable if it

invite[s] the government to consider the particular reasons for a person's conduct by providing a

mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533

(2021) (citations and internal quotation marks omitted). "A law also lacks general applicability

if it prohibits religious conduct while permitting secular conduct that undermines the

government's asserted interests in a similar way." *Id.* at 534. Both circumstances apply here.

At summary judgment, Catholic Relief Services argued that MFEPA, like Title VII, is not

generally applicable because it generally applies only to those employers with fifteen or more

employees, and does not apply to an "an employer with respect to the employment of aliens

outside of the State." Md. Code Ann., State Gov't §§ 20-601(d)(1), 20-604(1). Yet

"government regulations are not neutral and generally applicable, and therefore trigger strict

---

[9] Pursuant to the Court's instructions in its October 17, 2024 email, Catholic Relief Services has included in this Part II a somewhat abridged version of the Free Exercise argument it presented at summary judgment, with appropriate updates, including to adjust for the Maryland Supreme Court's articulation in *Doe III* of a test that renders MFEPA non-neutral under U.S. Supreme Court precedent. Should the Court determine that Catholic Relief Services' Free Exercise defense cannot be resolved on the papers, Catholic Relief Services respectfully requests an opportunity to present live-witness testimony at what likely could be a one-day bench trial.

scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).  And "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*; *see Union Gospel Mission of Yakima, Wash. v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918, at *3 (E.D. Wash. Nov. 1, 2024) ("Like the regulations at issue in *Tandon*, the WLAD likely is not neutral or generally applicable. . . . The WLAD exempts employers with fewer than eight employees, putting for-profit, non-religious organizations on unequal footing with . . . religious organizations . . . ." (citation omitted)).  The Maryland legislature has no basis to extend an exemption from sexual orientation discrimination claims to small businesses, or employers of non-citizens, but not to religious organizations with traditional views of marriage.

While Judge Blake disagreed at the summary judgment stage with Catholic Relief Services' *Tandon* argument with respect to Plaintiff's Title VII claim, she did not address the argument with respect to his MFEPA claims.  Yet even if this Court were to apply Judge Blake's reasoning to the MFEPA claims, *Doe III* renders MFEPA not generally applicable for an independent reason:  courts must now "consider the particular reasons for [an employer's] conduct" pursuant to a "a mechanism for individualized exemptions."  *Fulton*, 593 U.S. at 533. What appeared before to be an exemption applicable to all employees of religious corporations now is an exemption that requires the Court to undertake "a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances."  *Doe III*, 484 Md. at 673.

Because of the "fact-intensive inquiry" the Court now must undertake, MFEPA is not generally applicable.  If enforcement of the statute would substantially burden Catholic Relief Services' free exercise rights, strict scrutiny applies.  *Fulton*, 593 U.S. at 540-41.  Judge Blake

27

did not previously consider the neutrality of MFEPA at all, let alone MFEPA in light of the *Doe III* framework. And because Judge Blake found Title VII to be generally applicable, she did not reach Catholic Relief Services' arguments about substantial burden or strict scrutiny. The law of the case is irrelevant to the questions before the Court.

**B.      A requirement that Catholic Relief Services must provide spousal health benefits for employees in same-sex unions would substantially burden Catholic Relief Services' sincere religious exercise.**

A "substantial burden" is one that places "'substantial pressure on an adherent to modify his behavior and to violate his beliefs,' or one that forces a person to 'choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (alterations in original) (citations omitted). Dr. John Haas, president of the National Catholic Bioethics Center, authored a Statement on the Immorality of Providing Spousal Benefits to Same-Sex Couples ("Haas Statement"), which Catholic Relief Services adopted as its statement of theological position. *See* Decl. of Robert Augustine Twele, attached as Exhibit 7. In his Statement, attached as Exhibit 8, Dr. Haas explains why any requirement that Catholic Relief Services must provide spousal health benefits for employees in same-sex unions would substantially burden Catholic Relief Services' religious exercise. First, "provision of spousal health benefits . . . for the same-sex partners of employees would amount to formal cooperation with evil." Haas Statement (Ex. 8) ¶ 57. Second, provision of these benefits could generate "scandal," *i.e.*, any "activity in which a Catholic may engage that would lead another into sin." *Id.* ¶ 67.

As Dr. Haas explains, the principle of cooperation was "developed by Catholic moralists to delineate the circumstances in which a Catholic might legitimately cooperate with someone

doing evil in order to achieve a common good." *Id.* ¶ 52. "Formal cooperation," which "occurs when an action . . . can be defined as a direct participation in an [immoral] act . . . or a sharing in the immoral intention of the person committing it," is never morally licit. *Id.* ¶ 55. Material cooperation can be licit, but only if "a great good is being achieved or a significant evil avoided, and one does not directly contribute to the immoral act of the Principal Agent." *Id.* ¶ 56. Scandal, by comparison, may occur even where the "actions of a cooperator with an 'evil-doer' . . . may be entirely licit according to the conditions of the Principle of Cooperation." Extract of Response to the Expert Witness Statement of Dr. Todd Salzman in the Case of *Doe vs Catholic Relief Services*, No. CCB-20-1815 (D. Md.) ("Haas Response") at 4, attached as Exhibit 9. If the Catholic cooperator's actions would "lead a third party to believe that the Catholic's action implies that he or she agrees with the evil acts of the principal agent, so that the third party would engage in the evil act believing it to be morally licit, then scandal has occurred." *Id.*

Plaintiff, who is agnostic about religion, disputes Catholic Relief Services' understanding of Catholic teaching. At summary judgment, Plaintiff argued that (i) other organizations that identify as Catholic have different benefits policies; and (ii) Dr. Haas acknowledged that—in a vacuum—an organization hypothetically could implement a "plus one" benefits model for the purpose of expanding healthcare coverage. *See* Mem. in Supp. of Pl. John Doe's Mot. for Partial Summ. J. ("MPSJ") at 35 [ECF No 41-1].

As to Plaintiff's argument about other Catholic organizations, these organizations' practices, whatever they may be, have no bearing on the religious exercise of Catholic Relief Services, an entity controlled by the United States Conference of Catholic Bishops ("USCCB"). Tr. 1 (Ex. 1) at 57:21-24; (J. 2). Religious exercise involves "'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious

905158

reasons.'"  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (citation omitted).

Catholic Relief Services refrains from providing spousal health benefits to the same-sex spouses

of its employees because of its religion.  Furthermore, denial of a religious accommodation

"based on someone else's publicly expressed religious views . . . runs afoul of the Supreme

Court's teaching that '[i]t is not within the judicial ken to question the centrality of particular

beliefs or practices to a faith, *or the validity of particular litigants' interpretations of those*

*creeds*.'"  *Kane v. De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (alterations added and in original)

(citations omitted).  The Vatican's Congregation for the Doctrine of the Faith teaches that where

homosexual unions have been given the legal status and rights belonging to marriage, "clear and

emphatic opposition is a duty.  One must refrain from any kind of formal cooperation in the

enactment or application of such gravely unjust laws and, as far as possible, from material

cooperation on the level of their application."[10]

As to Plaintiff's argument about the potential permissibility of a "plus one" benefits

model, Dr. Haas explained that the model, while "potentially morally licit in the abstract, is

largely unworkable and at the very least would substantially burden Catholic religious exercise,

particularly at large institutions like Catholic Relief Services."  Haas Statement (Ex. 8) ¶ 67.

Problems with the "plus one" model include the erosion of the Church's witness to the "unique

and irreplaceable role of marriage and family in society"; contribution to the "support of sexually

illicit relationships on the part of some employees"; a diminution in support for true marriages;

and scandal, which turns not on the intent of the Catholic actor but rather on the perception of

third parties who stumble into sin.  *Id.*  Catholic Relief Services determined that the "plus one"

---

[10]  Congregation for the Doctrine of the Faith, *Considerations Regarding Proposals to Give Legal Recognition to Unions Between Homosexual Persons*, Vatican (June 3, 2003), https://www.vatican.va/roman_curia/congregations /cfaith/documents/rc_con_cfaith_doc_20030731_homosexual-unions_en.html (last visited Nov. 16, 2024).

model is a "shell game" and a "façade for providing the same-sex spouse benefits," a "clever workaround that when you really looked deep into it, it was no workaround at all."  Extract of Tr. of Dec. 13, 2021 Dep. of R. Twele ("Twele Dep.") at 114:4-14, attached as Exhibit 10.

Plaintiff also has urged the Court to parse Catholic Relief Services' religious beliefs in light of the benefits made available to other categories of employees whose lifestyles are not wholly consonant with Catholic teaching.  *See* MPSJ at 36-37.  The First Amendment prohibits this exercise and instead enshrines "a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).  In any event, Catholic Relief Services distinguishes between a public union between persons of the same sex, and nonpublic (or at least nonobvious) lifestyle choices, such as a remarriage without annulment or conception of a child through in vitro fertilization.  *See* Extract of Tr. of Dec. 7, 2021 Dep. of J. Haas ("Haas Dep.") at 207:15-19, attached as Exhibit 11 ("giving public testimony . . . to the fact that one believes in and encourages same-sex relationships to be on a par with God's plan for marriage [is] what can't be acceptable"); Twele Dep. (Ex. 10) at 128:14-15 ("IVF is not a public act like marriage to a person of the same sex.").

Much as Catholic **<u>Social</u>** Services concluded that "certification" of foster parents in same-sex relationships "is tantamount to endorsement," *Fulton*, 593 U.S. at 532, Catholic **<u>Relief</u>** Services has concluded that provision of spousal health benefits to the same-sex spouses of employees "would indicate that CRS . . . did consider these non-spouses to be spouses."  Haas Dep. (Ex. 11) at 148:9-14.  Religious beliefs "need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."  *Fulton*, 593 U.S. at

31

532 (rejecting city's argument that certification does not equal endorsement).  Catholic Relief Services amply has demonstrated that any holding that its spousal health benefits policy violates MFEPA would substantially burden its religious exercise.

      **C.**    **Application of MFEPA in this case is not the least restrictive means of furthering a compelling state interest.**

Because enforcement of MFEPA would substantially burden Catholic Relief Services' religious exercise, application of the statute "must be justified by a compelling governmental interest that is advanced in the least restrictive means available." *Redemption Cmty. Church v. City of Laurel*, 333 F. Supp. 3d 521, 536 (D. Md. 2018); *accord Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cnty.*, 17 F.4th 497, 510-11 (4th Cir. 2021) (RLUIPA case).  While the state undoubtedly has an interest in addressing discrimination in the workplace, it also has an interest in upholding free exercise of religion.  Even as the U.S. Supreme Court reinterpreted Title VII to prohibit sexual orientation discrimination, the Court emphasized its concern with "preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 681 (2020); *see Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 928 (5th Cir. 2023) (referencing the *Bostock* Court's "siren call" as to religious liberty concerns in employment litigation).  The U.S. Supreme Court has never found a government interest in eradicating sexual orientation discrimination to override other constitutional rights.  *E.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 602-03 (2023); *Fulton*, 593 U.S. at 542-43.

32

Any compelling interest asserted by the state—or, here, by Plaintiff, standing in the shoes of the state[11]—cannot be articulated "at a high level of generality," as strict scrutiny "demands a more precise analysis." *Fulton*, 593 U.S. at 541. "Rather than rely on 'broadly formulated interests,' courts must 'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants.'" *Id.* (alteration in original) (citation omitted). The question is "not whether the [state] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to C[R]S." *Id.*

Plaintiff has never explained how denial of an exemption to Catholic Relief Services could be the least restrictive means of furthering a compelling interest. Nor could he, because during his employment with Catholic Relief Services, the agency offered him a less restrictive alternative: it provided him with a $5,000 technical increase in his compensation and offered to place his spouse on a COBRA-like alternative to employee benefits. Extract of Tr. of Oct. 1, 2021 Dep. of S. Mood at 56:3-17, attached as Exhibit 12. Moreover, the fact that MFEPA generally excludes small businesses with fewer than fifteen employees, Md. Code Ann., State Gov't § 20-601(d)(1), which together make up over 80% of firms in Maryland,[12] "undermines" Plaintiff's contention that Maryland's "nondiscrimination policies can brook no departures." *Fulton*, 593 U.S. at 542. "It is established in . . . strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Church of the Lukumi Babalu Aye, Inc.*

---

[11] While some courts, including Judge Blake in earlier proceedings, have found the Religious Freedom Restoration Act to be inapplicable in litigation between private parties, it is settled law that the First Amendment's Free Exercise Clause can provide a defense to the application of law substantially burdening religious exercise in private-party litigation. *See McDaniel v. Paty*, 435 U.S. 618, 621 (1978).

[12] *See 2021 SUSB Annual Data Tables by Establishment Industry: U.S. and States, NAICS, Detailed Employment*, U.S. Census Bureau (Dec. 21, 2023), https://www.census.gov/data/tables/2021/econ/susb/2021-susb-annual.html (last visited Nov. 22, 2024).

*v. City of Hialeah*, 508 U.S. 520, 547 (1993) (alteration in original) (citations omitted).  Plaintiff

can offer "no compelling reason" why the state would have a "particular interest in denying an

exception to C[R]S while making them available to others." *Fulton*, 593 U.S. at 542.

Plaintiff's case for strict scrutiny is even weaker now than it was before he resigned from

his position.  At least before, Plaintiff had a theory that the equitable relief he sought (forcing

Catholic Relief Services to change its employee benefits policy in violation of its sincerely held

religious beliefs) might benefit other LGBT employees, though Plaintiff never attempted to

quantify that population.  But, as reflected in the parties' Joint Proposed Pretrial Order [ECF No.

115], Plaintiff no longer seeks (and would not be entitled to) equitable relief.  *See id.* at 15.  The

most he can get in this case is a stipulated damage award of $60,000, together with some amount

of attorneys' fees (his counsel claim he had incurred over $1.5 million as of September 30, 2024,

compared with Catholic Relief Services' fees of just over $326,000 as of that date).

There is nothing compelling about denying Catholic Relief Services an exemption so

Plaintiff can receive a small payment and his lawyers can receive up to seven figures.

Conversely, a federal court decision holding that Catholic Relief Services' health benefits policy

violates Maryland law would have a profound impact on the agency, which then would have to

determine whether to compromise its convictions or risk further adverse actions by employees or

the state.  Of course, monetary penalties alone may constitute a substantial burden, *e.g.*, *Standing

Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 96 (D.D.C. 2017), but a

judicial opinion holding that a senior employee like John Doe does not directly further the

agency's mission and, therefore, is not barred from bringing a MFEPA sexual orientation

discrimination claim would place "substantial pressure" on Catholic Relief Services "to modify [its] behavior and to violate [its] beliefs." *Lovelace*, 472 F.3d at 187 (citation omitted).

> **D.    The only party in this case with a valid constitutional argument is Catholic Relief Services.**

In briefing in connection with *Doe III*, Plaintiff argued for the first time that application of the MFEPA religious entity exemption to bar his claims would violate Maryland's corollary to the Free Exercise Clause of the First Amendment, Article 36 of the Declaration of Rights. Article 36 states in relevant part:

> [A]ll persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights . . . .

Plaintiff's argument is remarkable, as Article 36 exists to protect religious exercise, not to protect litigants *from* religious exercise.  The argument also is waived, as Plaintiff did not allege in his Complaint that application of the religious entity exemption would be unconstitutional as applied to him.  "It is well-established that parties cannot amend their complaints through briefing or oral advocacy."  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

In any event, Plaintiff's argument fails.  Plaintiff has never offered any authority for his leap of logic from the plain text of Article 36, which *allows* the State to abridge free exercise in limited circumstances, to his assertion that the State *must* abridge the free exercise rights of employers like Catholic Relief Services in circumstances where MFEPA's religious entity exemption otherwise would apply.  Article 36 does not require the State to exercise its police power in any particular way.  The primary case on which Plaintiff has relied, *Woods v. Seattle's*

35

*Union Gospel Mission*, 481 P.3d 1060 (Wash. 2021) (en banc), does not help his argument, as in

that case the court considered whether a religious entity exemption in Washington's Law Against

Discrimination ("WLAD") that is even broader than the MFEPA exemption violates the

privileges and immunities clause of Washington's state constitution. A Washington case about

the lawfulness of a broader exemption in light of a fundamentally different state constitutional

provision than the Maryland free exercise provision that Plaintiff cites does not further Plaintiff's

argument.[13] If the Court reaches Plaintiff's waived argument, the Court should reject it.

## III.    Catholic Relief Services respectfully maintains that it was entitled to judgment as a matter of law with respect to Plaintiff's federal claims.

At summary judgment, Judge Blake rejected Catholic Relief Services' defenses to

Plaintiff's Title VII (Count VIII) and federal Equal Pay Act (Count IX) claims, and entered

judgment in Plaintiff's favor as to liability only on those claims. Catholic Relief Services does

not seek reconsideration of Judge Blake's rulings at this time, but intends to seek appellate

review of those rulings once trial court proceedings conclude. To ensure that the record is

preserved, Catholic Relief Services incorporates by reference its arguments relating to those

federal claims as set forth in its summary judgment briefing, *see* Mem. in Supp. of Def. Catholic

Relief Services' Resp. in Opp'n to Pl.'s Mot. for Partial Summ. J., Cross-Mot. for Summ J., &

Mot. to Exclude Expert Opinion Test. by Dr. Todd A. Salzman [ECF No. 46-1]; Reply in Supp.

of Cross-Mot. for Summ. J. & Mot. to Exclude Expert Opinion Test. by Dr. Todd A. Salzman

[ECF No. 54-1]. Without limitation, those arguments include:

- That Title VII's religious employer exemption, 42 U.S.C. § 2000e-1(a), "is not limited to religious discrimination claims; rather, it also exempts religious employers from other forms of discrimination under Title VII, so long as the

---

[13] Just this month, a federal court found that the WLAD as reinterpreted by the *Woods* court likely violates the Free Exercise Clause as applied to religious nonprofits. *Union Gospel Mission*, 2024 WL 4660918, at *3-4.

employment decision was rooted in religious belief," *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 591 (N.D. Tex. 2021), *rev'd in part on other grounds sub nom. Braidwood Mgmt.*, 70 F.4th 914;

- That the Religious Freedom Restoration Act ("RFRA") applies where private parties seek to enforce federal laws, because the "substance of [statutory] prohibitions cannot change depending on whether [they] are enforced by the EEOC or an aggrieved party," *Hankins v. Lyght*, 441 F.3d 96, 103-04 (2d Cir. 2006); and that application of the laws Plaintiff has invoked would substantially burden Catholic Relief Services' religious exercise and could not withstand strict scrutiny under RFRA;

- That Title VII and the federal Equal Pay Act are not neutral and generally applicable, such that application of these statutes is subject to strict scrutiny review under the Free Exercise Clause even if RFRA does not apply; and

- That all of Plaintiff's claims are barred by the church autonomy doctrine, as the "alleged misconduct is 'rooted in religious belief,'" *Bryce v. Episcopal Church*, 289 F.3d 648, 657, 659 (10th Cir. 2002) (citation omitted).

## **Proposed Conclusions of Law**

### *MFEPA Religious Entity Exemption*

1.    The Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20-601 *et seq.*, prohibits specified forms of employment discrimination but excludes from that prohibition "a religious corporation . . . with respect to the employment of individuals of a particular . . . sexual orientation . . . to perform work connected with the activities of the religious entity." *Id.* § 20-604(2).

2.    In *Doe v. Catholic Relief Services*, 484 Md. 640, 667 (2023) ("*Doe III*"), the Maryland Supreme Court held that the "narrowest reasonable reading" of the religious entity exemption would exclude sexual orientation discrimination claims "brought by employees who perform duties that directly further the core mission (or missions) of the religious entity."

3.    Plaintiff John Doe directly furthered Catholic Relief Services' core mission to assist the poor and vulnerable overseas through his technical and managerial work on the

37

Gateway program and his monitoring and evaluation work for Changing the Way We Care. In each position Plaintiff held, he performed duties that were "not one or more steps removed from taking the actions that effect the goals of the entity." *Doe III*, 484 Md. at 673.

4.      In his work on Gateway, Plaintiff was responsible for implementing, improving, and ultimately managing Catholic Relief Services' "core knowledge platform." Tr. 1 (Ex. 1) at 106:10-13. The platform improves Catholic Relief Services' business pipeline tracking, institution relationship management, partner assessment and compliance tracking, and project portfolio management, among other features. (J. 24.) Gateway has made Catholic Relief Services more efficient and effective. Tr. 1 (Ex. 1) at 119:21-22, 238:13-15.

5.      In his work on Changing the Way We Care, a flagship program at Catholic Relief Services, Plaintiff was responsible for Monitoring, Evaluation, Accountability, and Learning, or MEAL, services. MEAL is "absolutely critical" to the success of the program and is "one of the three objectives of the program," as Catholic Relief Services seeks to generate evidence and then use that evidence to "influence larger bodies and effect change that would ripple beyond th[e] demonstration countries." *Id.* at 134:14-19.

6.      As a MEAL advisor, Plaintiff collaborated with global colleagues to "establish frictionless processes and procedures to ensure the flow of quality data" into Excel-based databases that Plaintiff created, enabling the "initiative to have, for the first time, easy access to data for decision making and as evidence for indicator results reported historically." (D. 230.) Plaintiff "led the creation and implementation of [a] knowledge management strategy, which . . . helped streamline the collection and sharing of knowledge the initiative generates." (*Id.*)

38

7.    Because Plaintiff's duties directly furthered Catholic Relief Services' core mission, the MFEPA religious entity exemption applies, and Plaintiff's sexual orientation discrimination claim in Count I is barred.

### First Amendment Free Exercise Clause (alternative defense)

8.    Any statute that is not "neutral and of general applicability" cannot be applied in a manner that would substantially burden religious exercise unless the application is the least restrictive means to further a compelling state interest.  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); *Redemption Cmty. Church v. City of Laurel*, 333 F. Supp. 3d 521, 536 (D. Md. 2018).

9.    MFEPA is not neutral and generally applicable because, following *Doe III*, it "invite[s] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions."  *Fulton v. City of Phila.*, 593 U.S. 522, 533 (2021) (citations and internal quotation marks omitted).  MFEPA also is not neutral and generally applicable because the statute treats "comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam), through its exclusion of many small businesses, Md. Code Ann., State Gov't § 20-601(d)(1).

10.    Because MFEPA is not neutral and generally applicable, its application in this case is subject to strict scrutiny provided Catholic Relief Services can establish a substantial burden on its sincere religious exercise.

11.    Application of MFEPA would place "substantial pressure" on Catholic Relief Services to "modify [its] behavior and to violate [its] beliefs," *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (citation omitted), as any finding that Catholic Relief Services must provide

905158

spousal health benefits for employees in same-sex unions would be incompatible with Catholic Relief Services' beliefs about marriage and sexuality.

12.    Catholic Relief Services established that the agency believes provision of spousal health benefits for same-sex spouses of employees would amount to formal cooperation with evil, and also could give rise to the sin of scandal.  Haas Statement (Ex. 8) ¶¶ 57, 67.

13.    Because application of MFEPA would substantially burden Catholic Relief Services' religious exercise, Plaintiff must show that application of the statute is the least restrictive means to further a compelling state interest.  The question is not whether the state "has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception" to Catholic Relief Services.  *Fulton*, 593 U.S. at 541.

14.    Plaintiff cannot carry that burden, both because Catholic Relief Services offered him a less restrictive alternative (a technical increase in pay coupled with COBRA-like coverage for his spouse) and because the Maryland legislature's decision to generally exclude small businesses from MFEPA "undermines the . . . contention" that the state's "non-discrimination policies can brook no departures."  *Id.* at 542.  Plaintiff has offered "no compelling reason" why the state has a "particular interest in denying an exception" to Catholic Relief Services "while making them available to others."  *Id.* at 542.

15.    Accordingly, MFEPA cannot be applied as against Catholic Relief Services in this case, and Plaintiff's sexual orientation discrimination claim in Count I is barred.

## Conclusion

The Court should enter judgment in Catholic Relief Services' favor under Count I.

905158

Respectfully submitted,

**GALLAGHER EVELIUS & JONES LLP**

_____/s/ Joe Dugan_____
David W. Kinkopf, Fed. Bar No. 23366
dkinkopf@gejlaw.com
Joe Dugan, Fed. Bar No. 19637
jdugan@gejlaw.com
Brandon K. Wharton, Fed. Bar No. 30312
bwharton@gejlaw.com
218 N. Charles Street, Suite 400
Baltimore, Maryland 21201
Tel: (410) 727-7702
Fax: (410) 468-2786

*Attorneys for Defendant Catholic Relief Services—*
*United States Conference of Catholic Bishops*

Date:  November 22, 2024

905158

41