**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JOHN DOE, | * | |
| Plaintiff | * | |
| v. | * | Case No. 1:20-cv-01815-JRR |
| CATHOLIC RELIEF SERVICES, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## [PROPOSED] ORDER

Upon consideration of the evidence and the argument of counsel at the bench trial held on October 15-17, 2024, and the further argument of counsel as set forth in their respective post-trial briefs; in view of the entire record in this matter; and pursuant to Federal Rule of Civil Procedure 52(a), the Court now FINDS and CONCLUDES as follows:

### Findings of Fact

**I.    John Doe**

1.    Plaintiff John Doe is a gay, cisgender man married to another man. Joint Stip. ¶ 1.

2.    Mr. Doe has a bachelor's degree in computer engineering and a master's degree in international affairs. Trial Tr. II 6:6–8.

3.    CRS hired Mr. Doe as a Program Data Analyst in June 2016. Joint Stip. ¶ 5; Trial Tr. II 5:20–22.

4.    Mr. Doe has held the following five positions at CRS on the following dates:

    a.    Program Data Advisor I from June 1, 2016, through January 31, 2017;

    b.    Data Quality and Analytics Advisor II from February 1, 2017, through October 31, 2019;

     c.   Global MEAL Advisor, Program Manager I from November 1, 2019, through October 31, 2020;

     d.   Global MEAL Advisor, Program Manager II from November 1, 2020, through October 31, 2022; and

     e.   Gateway Manager II from November 1, 2022, through August 30, 2024.

Joint Stip. ¶ 8; Joint Ex. 33; Trial Tr. II 19:12–17; *id.* at 33:19–34:17.

5.      Until his resignation, Mr. Doe was a full-time employee of CRS and eligible for all employee benefits. Joint Stip. ¶ 3.

6.      CRS provided Mr. Doe with spousal health benefits from June 2016 through October 1, 2017. Joint Stip. ¶ 6.

7.      Mr. Doe currently holds a position as a Salesforce Implementation consultant at a secular company where he assists third-party companies with implementing and expanding their Salesforce systems. Trial Tr. II 5:2–15.

8.      Prior to working at CRS, Mr. Doe had experience using Salesforce for various secular companies. Trial Tr. II 10:17–11:1.

9.      Mr. Doe has never held a position that CRS considers "ministerial." Joint Stip. ¶ 10.

10.     Mr. Doe has never held a position that CRS considered "representational." Joint Stip. ¶ 11.

11.     Mr. Doe has never held a position that CRS considered "explicitly religious." Joint Stip. ¶ 12; Trial Tr. I 198:24–199:1.

12.     In all of Mr. Doe's roles, he was never responsible for directly providing humanitarian relief to the poor and vulnerable overseas. Trial Tr. II 85:9–25; *id.* at 86:4–6; *id.* at 189:12–25; *id.* at 207:23–208:2; *id.* at 225:17–20.

13.    In all of Mr. Doe's roles, he was never responsible for working directly with CRS's donors or pursuing funding opportunities. Trial Tr. II 86:1–3; *id.* at 86:16–18; *id.* at 208:3–6; *id.* at 225:25–226:3.

14.    In all of Mr. Doe's roles, he was never responsible for traveling to or visiting college campuses or parishes in the United States. Trial Tr. II 86:7–12.

15.    In all of Mr. Doe's roles, he was never responsible for making decisions about how to implement CRS's programs. Trial Tr. II 86:13–15; *id.* at 190:1–8; *id.* at 225:21–24.

16.    Mr. Doe has the best knowledge about what he did on a day-to-day basis when he served in his various positions. Trial Tr. I 73:23–74:2, 87:8–88:3, 203:18–204:5.

## II.    CRS

17.    Defendant CRS is a 501(c)(3) social services agency constituted by the United States Conference of Catholic Bishops. Joint Stip. ¶ 2.

18.    CRS employs over 8,000 people worldwide, Joint Stip. ¶ 9; Trial Tr. I 59:18–22, with approximately 7,000 employees working in the 600-plus projects overseas, i*d.* 156:7–22.

19.    CRS's core mission is to assist the poor and vulnerable overseas by providing humanitarian relief. Joint Ex. 2; Joint Ex. 3 at CRS00015708; Joint Ex. 4 at CRS00016681; Joint Ex. 10 at CRS00016813; Joint Ex. 11 at CRS00016897; Joint Ex. 12 at CRS00016982; Joint Ex. 13 at CRS00017064; Joint Ex. 14 at CRS00017138; Joint Ex. 15 at CRS00015842; Joint Ex. 16 at CRS00016724; Joint Ex. 18 at CRS00015814; Joint Ex. 19 at CRS00016641; Trial Tr. I 94:5–7; *id.* at 151:7–10; Trial Tr. II 6:21–7:6.

20.    CRS provides humanitarian relief to a variety of communities, many of which are underserved in their respective countries, in various forms, including, for example, providing agricultural support, education, emergency responses such as housing and shelters, healthcare

aid, justice and peace building, financial support, and water and sanitation. Trial Tr. I 43:13–47:11; *id.* at 153:25–154:9; Trial Tr. II 7:7–22; *id.* at 199:8–25.

21.      Individuals who receive humanitarian aid from CRS are called "Participants." Trial Tr. I 151:11–17; Trial Tr. II 8:9–22; *id.* at 218:4–10.

22.      CRS Country Representatives are the top managers of CRS's country offices overseas. Trial Tr. I 181:12–15.

23.      CRS Heads of Programming are CRS employees located overseas who oversee all of CRS's programs in a specific country office. Trial Tr. I 181:16–19.

24.      CRS Project Managers are the CRS employees responsible for the day-to-day implementation of CRS's programs. Trial Tr. I 181:20–22.

25.      Sean Callahan is CRS's current Chief Executive Officer ("CEO"). Trial Tr. I 41:23–42:1.

26.      Dr. Shannon Senefeld is currently CRS's Senior Vice President of Overseas Operations. Trial Tr. I 92:17–21.

27.      In all of the positions Mr. Doe held, Dr. Senefeld worked with Mr. Doe only "sporadically." Trial Tr. I 94:20–95:9.

28.      Michele Gilfillan is CRS's Vice President of Institutional Donor Engagement and Advancement ("IDEA") Division. Trial Tr. I 215:16–19.

29.      In all of the positions Mr. Doe held, Ms. Gilfillan worked with Mr. Doe only in a limited capacity when he trained her staff on how to use Gateway or in infrequent instances when there were specific tasks for which she needed assistance. Trial Tr. I 242:4–19.

30.     CRS's Executive Leadership Team ("ELT"), headed by Sean Callahan, and its Board of Directors are the final decision makers for setting CRS's goals and deciding how it will carry out its mission. Trial Tr. I 69:15–18; *id.* at 155:20–22; *id.* at 239:13–16.

31.     Mr. Doe has never served on CRS's ELT or Board of Directors. Trial Tr. I 252:20–22; Trial Tr. II 171:8–22.

32.     Mr. Doe never held a position as an honorary board member or as an honorary or ad hoc committee member to advise the Board and the ELT. Trial Tr. I 88:6–89:8.

33.     The vast majority of CRS's budget is allocated to funding its programs through Overseas Operations. Trial Tr. I 196:13–17.

34.     CRS allocates its funding to specific programs through donor requirements or decisions made by CRS's ELT. Trial Tr. I 193:23–195:20.

35.     Opposite-sex spouses of domestic employees of CRS who meet the minimum requirements for weekly hours are eligible for dependent health benefits and may be enrolled within the first month after an employee's hire date or during special or annual enrollment periods thereafter. Joint Stip. ¶ 7.

### III.     Gateway

36.     Gateway is CRS's agency-wide business pipeline and project portfolio system built on a customized version of Salesforce's Customer Relationship Management product. Joint Stip. ¶ 4; Trial Tr. I 71:4–13; *id.* at 106:10–108:12; Trial Tr. II 8:23–9:18; *id.* at 183:9–19; *id.* at 200:21–201:14.

37.     Mr. Doe held the following three positions on the "Gateway Team": Program Data Advisor I; Data Quality and Analytics Advisor II; and Gateway Manager II. Trial Tr. II 11:2–8; *id.* at 11:23–12: 4; *id.* at 13:7–22; *id.* at 15:24–16:1; *id.* at 16:6–17:6; *id.* at 19:12–20.

38.     Amy Damsker-Wright was employed at CRS from April to October 2017 as CRS's Gateway Manager and was Mr. Doe's direct supervisor. Trial Tr. II 35:8–18; *id.* at 182:10–23; *id.* at 185:3–8; *id.* at 182:8–11.

39.     Aida Vejzagic worked with Mr. Doe on the Gateway Team as an End User Support Advisor. Trial Tr. II 206:2–24.

40.     Amanda McCullough worked with Mr. Doe in various capacities when he was on the Gateway Team. Trial Tr. II 215:20–216:12.

41.     CRS has been carrying out its mission since 1943, 71 years before it began using Gateway in 2014. *See* Trial Tr. I 57:5–24; *id.* at 65:20–66:11; *id.* at 77:5–12; *id.* at 118:21–119:14; *id.* at 163:14–164:3; *id.* at 208:4–10; *id.* at 238:4–17; *id.* at 247:8–16; Trial Tr. II at 186:3–8; *id.* at 203:16–204:5.

42.     CRS did not change its mission after it began using Gateway. Trial Tr. I 64:15–65:9; *id.* at 150:8–151:6.

43.     Salesforce is a cloud-based customer relationship management software—originally created to track sales opportunities—that serves as an information database with a user interface that allows users to interact with the data. Trial Tr. II 9:7–10:8.

44.     Salesforce is analogous to an iPhone that contains various apps that can be modified to suit a user's needs. Trial Tr. II 9:25–10:16.

45.     Gateway is one tool that CRS uses to track data relating to its programs and business development projects. Trial Tr. I 51:21–24; Trial Tr. II 200:21–201:14.

46.     One of the various Gateway applications or "apps" is the Pipeline and Projects App. Trial Tr. II 11:2–8.

47.     CRS's Pipeline and Projects App is primarily used to track funding opportunities and collect information related to compliance policies. Trial Tr. II 11:2–18:6.

48.     "End Users" is a term that CRS uses to refer to the 1,300 to 1,500 CRS employees out of its 8,000+ who have a license to access the Gateway Pipeline and Projects App. Trial Tr. II 22:24–23:17 (not all CRS employees are end users); *id.* at 186:19–24; *id.* at 217:4–12.

49.     Participants are not End Users and do not have access to the Gateway Pipeline and Projects App. Trial Tr. II 23:15–24; *see also id.* at 183:6–8; *id.* at 217:4–12.

50.     At all times while he was on the Gateway Team, Mr. Doe was responsible for maintaining solely the Pipeline and Projects App and no other apps within Gateway. Trial Tr. II 11:2–8; *id.* at 11:23–12: 4; *id.* at 13:7–22; *id.* at 15:24–16:1; *id.* at 16:6–17:6; *id.* at 65:19–22.

51.     Gateway collects data to allow CRS employees to view donor opportunities and aggregate information to assist CRS decisionmakers in making better decisions. Trial Tr. I 48:6–9; *id.* at 104:21–105:3; *id.* at 110:13–21.

52.     "Business Owners" is a term that CRS uses to refer to CRS employees at headquarters who are experts in a specific business process or area and are responsible for making sure that specific functions are carried out at CRS. Trial Tr. I 167:16–24; Trial Tr. II 27:23–28:5.

53.     Gateway is not a form of humanitarian relief CRS provides to Participants. Trial Tr. II 18:18–19:11; *id.* at 225:14–16.

54.     The Gateway Pipeline and Projects App has no direct impact on the delivery of aid to Participants, but instead makes it easier for CRS employees at Headquarters to access certain data. Trial Tr. II 33:1–13; *id.* at 121:7–122:3.

55.     CRS works with Local Partners in countries where it provides humanitarian relief. Trial Tr. I 47:12–17; *id.* at 111:21–112:16; *id.* at 153:7–15.

56.     Mr. Doe did not interact with Local Partners in any capacity when he was on the Gateway Team. Trial Tr. II 174:2–13; *see also id.* at 224:14–225:5.

57.     At CRS, the information technology department ("IT") was considered the owner of the Gateway system. Trial Tr. II 184:19–20.

58.     Mr. Doe's first position on the Gateway Team as a Program Data Advisor I was an entry-level position. Trial Tr. I 130:8–23.

59.     As a Program Data Advisor I, Mr. Doe's primary responsibilities were to: provide End User troubleshooting support; identify and alert IT of any bugs in the Gateway Pipeline and Projects App; provide in person and virtual trainings to End Users on functions of and how to use the App; and to work with external third-party vendors, also known as Salesforce implementation partners, that CRS contracted with to expand the functionality of the App. Trial Tr. II 22:18–23; *id.* at 23:25–27:21; *id.* at 113:14–25; *id.* at 218:11–219:15.

60.     In his second position as a Data Quality and Analytics Advisor, Mr. Doe was a liaison between CRS Business Owners and IT to expand and build out the Pipeline and Projects App to assist with Business Owners' specific needs. Trial Tr. II 34:22–7; *id.* at 112:15–115:8.

61.     To modify Gateway, a CRS employee first submits a request for a change in the system. Trial Tr. I 114:16–23; *id.* at 168:5–15; Trial Tr. II 29:2–30:12; *id.* at 219:4–220:6.

62.     After a request is submitted, a member of the Gateway Team meets with the requestor to better understand their needs and assess whether the system can be modified. Trial Tr. I 168:20–169:3; *id.* at 170:17–22.

63.    Modifications to the Gateway Pipeline and Projects App require approval from Business Owners before the Gateway Team can initiate any change to the App, and, other than minor fixes to improve user experience or bugs, neither Mr. Doe nor the Gateway Team can change the App without prior approval. Trial Tr. I 168:5–15; *id.* at 170:5–10; Trial Tr. II 27:23–28:20; *id.* at 29:2–30:12; *id.* at 70:20–24; *id.* at 219:4–21.

64.    Once a request to change the Gateway Pipeline and Projects App is approved, the Gateway Team works with IT to assess the timeline, identify resources, and modify the system. Trial Tr. I 115:2–7; *id.* at 171:11–13; Trial Tr. II 30:13–32:9.

65.    The process for modifying CRS's Gateway Pipeline and Projects App does not differ from the process for modifying Salesfoce at a secular organization. Trial Tr. II 32:10–14; *see also id.* at 13:23–14:20 (Mr. Doe testifying in response to the Court's colloquy that apps designed for use in Gateway are developed using Salesforce's technical foundational requirements).

66.    The Gateway Team falls under CRS's Knowledge, Management and Learning ("KML") Department. Trial Tr. I 75:11–14; *id.* at 165:20–166:4.

67.    CRS's KML Department's objective is to gather knowledge so that it makes it easier for other CRS employees to do their jobs more efficiently. Trial Tr. I 76:15–20; *id.* at 101:10–19; Joint Ex. 22.

68.    One of the purposes of tracking project-level data in Gateway is so that decision-makers implementing CRS's programs can learn and improve their programs. Trial Tr. I 174:23–175:2.

69.     When Mr. Doe served as Gateway Manager II, he worked with Aida Vejzagic as an End User Support Advisor and Amanda McCullough in a Change Management Enablement role. Trial Tr. II 63:16–64:10.

70.     Other than some supervisory related responsibilities, Mr. Doe's role as Gateway Manager II was largely the same as his position as Data Quality and Analytics Advisor, wherein he would make minor bug fixes and changes to clean up the system and liaise between IT and Business Owners who wanted to modify the Gateway Pipeline and Projects App for their business needs. Trial Tr. II 65:23–67:11; *id.* at 69:18–70:11; *id.* at 184:2–20; *id.* at 222:3–16.

71.     Mr. Doe played a minor role in integrating CRS's Enterprise Risk Resource Planning system in Oracle, which CRS internally calls Insight, into Gateway by contributing to the functional and technical specifications of the project, which was a standard output of any type of technology project at CRS. Trial Tr. I 237:12–238:3; Trial Tr. II 67:24–68:19.

72.     In all of his positions on the Gateway Team, Mr. Doe was never responsible for inputting data into any of the Gateway Apps. Trial Tr. I 171:22–172:4; Trial Tr. II 202:23–203:6.

73.     Information contained within CRS's Consolidated Financial Statements comes from a financial system outside of Gateway. Trial Tr. I 82:4–15.

74.     Mr. Doe did not play a role with respect to gathering or pulling data from Gateway to contribute to CRS's Consolidated Financial Statements. Trial Tr. I 82:16–22.

75.     Mr. Doe has never played a role in contributing to CRS's Annual Reports. Trial Tr. II 77:21–80:24.

76.     Power BI is a Microsoft application that CRS uses to connect to a database and visualize data to make it more user friendly. Trial Tr. II 81:2–9.

77.     Mr. Doe's involvement in Power BI was solely for the purpose of maintenance of the Gateway Pipeline and Projects App. Trial Tr. II 81:10–9.

78.     CRS is required to submit an annual Organizational Performance and Effectiveness Report to its Board every June. Trial Tr. I 115:13–24.

79.     Mr. Doe did not have the discretion to generate reports, extract data, or input data; instead, other CRS employees would make requests for certain reports or data or input data themselves. Trial Tr. I 172:25–173:20; *see also e.g., id.* at 191:25–192:19 (Dr. Senefeld testifying in an example where she utilized Gateway to extract information before meeting with a congregation of Sisters and that Mr. Doe did not extract the information in Gateway for her or put that information into the system itself); Trial Tr. II 226:11–25.

80.     CRS has compliance standards that come from a variety of sources, including CRS's own internal compliance standards and external funding sources. Trial Tr. I 78:4–79:1, 119:23–120:15, 177:11–32; Trial Tr. II 170:1–17.

81.     In some instances, donors, both private and public, require CRS to meet certain reporting requirements as a condition of funding. Trial Tr. I 49:14–18.

82.     CRS employees use the Gateway Pipeline and Project App to collect information related to compliance policies. Trial Tr. II 17:18–22.

83.     In all of his roles, Mr. Doe was never responsible for, or ever set, any of CRS's compliance requirements. Trial Tr. I 79:2–7, 177:8–12.

84.     In all of his roles, Mr. Doe was never responsible for submitting information to satisfy or meet any of CRS's compliance requirements. Trial Tr. I 80:5–15, 177:25–178:12, 226:4–6.

85.    Although Gateway can be used to store information related to CRS's funding proposals, Trial Tr. I 176:3–6, the process for creating and finalizing funding proposals is not done entirely in Gateway. Trial Tr. I 239:24–240:3, 240:24–241:1, 241:10–14.

86.    CRS's IDEA Division is CRS's fundraising arm and works across CRS with country programs and regions globally to engage donors, submit competitive proposals, and help negotiate the terms and conditions of funding agreements to finance and implement programming. Trial Tr. I 219:23–220:7.

87.    CRS business development employees in CRS's IDEA Division are considered subject matter experts and determine how Gateway should be modified to suit their fundraising needs. Trial Tr. I 176:7–15.

88.    CRS's IDEA employees utilize Gateway to maintain and track donor engagement records, track proposal opportunities, and manage funding awards, agreements, and contracts with donors. Trial Tr. I 223:6–224:4; Trial Tr. II 11:2–21, 17:9–18:6, 186:25–187:17.

89.    Mr. Doe has never held a position in CRS's IDEA Division. Trial Tr. I 162:15–21, 219:3–15.

90.    CRS employees working in the IDEA Division, not Mr. Doe, are responsible for inputting data relating to business funding opportunities. Trial Tr. I 225:1–19, 231:5–22, 242:20–243:7.

91.    CRS's IDEA Division employees rely on Gateway to create weekly engagement reports that include information about all of CRS's fundraising engagements that occur over the prior week. Trial Tr. I 231:5–22.

92.    Mr. Doe was not responsible for generating CRS's IDEA Division's weekly engagement reports. Trial Tr. I 244:10–245:2.

93.     Mr. Doe has never directly interacted with donors. Trial Tr. I 243:8–10.

94.     Mr. Doe had no involvement analyzing or discerning whether CRS wins or loses a competitive fundraising proposal. Trial Tr. I 243:20–244:9.

95.     Mr. Doe has never held a role where he had any decision-making authority with respect to how CRS would obtain funding for its programs. Trial Tr. I 176:16–21; Trial Tr. II 70:16–19, 188:14–16 (Ms. Damsker corroborating that in her role as Gateway Manager she never made decisions about what sources of funding CRS should pursue).

96.     Mr. Doe has never played a role in working with the IDEA Division and CRS's country programs to strategize or make decisions about how to approach business development and funding opportunities to support CRS programs. Trial Tr. I 245:12–246:12, 248:5–25.

97.     CRS's IDEA Division uses a Business Pipeline Power BI Dashboard to visualize funding opportunities stored in the Pipeline and Projects App. Trial Tr. II 84:6–18.

98.     Mr. Doe had no involvement with creating or inputting data into CRS's IDEA Business Pipeline Power BI Dashboard. Trial Tr. II 84:19–85:7.

**IV.    MEAL**

99.     MEAL is an acronym standing for Monitoring, Evaluation, Accountability, and Learning that CRS uses as an applied concept to evaluate its programs. Trial Tr. I 102:6–103:9; Trial Tr. II 38:14–17.

100.     MEAL is a concept that is not unique to CRS and is used across other nonprofits and in the field of international development. Trial Tr. I 103:21–104:20, 182:15–183:2; Trial Tr. II 38:18–39:8.

101.     MEAL skills are transferable to other organizations, and companies like CRS hire external contractors to perform certain MEAL tasks. Trial Tr. I 183:6–184:1, 212:15–213:6; Trial Tr. II 38:18–39:8.

102.    CRS MEAL officers working on projects in the field collect data for the purpose of proving what CRS is doing in the field. Trial Tr. I 48:18–49:1.

103.    MEAL is not a part of CRS's mission statement. Trial Tr. I 183:3–5, 211:14–18.

104.    The most fundamental application of MEAL is done at CRS's project-level. Trial Tr. I 179:17–180:4.

105.    In 2019, Mr. Doe applied for a MEAL Team position because he wanted to be closer to working on a programmatic team, rather than his technical role on the Gateway Team, and obtained a position on CRS's MEAL Team working as a MEAL Advisor I on CRS's Changing the Way We Care Program ("CTWWCP"). Trial Tr. II 37:25–38:9.

106.    Mr. Doe held two positions on the CTWWC MEAL Team: Global MEAL Advisor, Program Manager I and Global MEAL Advisor, Program Manager II. Joint Stip. ¶ 8.

107.    No Gateway or MEAL Team employee has ever served as an honorary board member or as an honorary or ad hoc committee member to advise the Board and the ELT. Trial Tr. I 88:24–89:8.

108.    CRS's CTWWCP is one of CRS's programs designed to end the institutionalization of children and ensure that children grow up in family-based care. Trial Tr. I 132:3–6, 184:19–23; Trial Tr. II 38:7–13.

109.    CRS implemented CTWWCP in five countries: Kenya, Guatemala, Moldova, India, and Haiti. Trial Tr. I 142:1–3, 184:24–185:5; Trial Tr. II 41:7–11.

110.    Although there are MEAL team roles based in each of the countries where the program is implemented, Mr. Doe's MEAL roles were headquarters-based. Trial Tr. II 54:7–14.

111.    When Mr. Doe started working on CTWWCP as a MEAL Advisor Program Manager I, there were approximately 50–60 people working on the Program. Trial Tr. II 41:2–6.

112.    Mr. Doe played no role in selecting the five countries where CRS implemented CTWWCP. Trial Tr. I 135:3–17, 191:19–21; *see also id.* at 135:18–136:2 (Dr. Senefeld explaining that Government willingness, rather than data, was the most important factor CRS considered in deciding which countries to implement CTWWCP).

113.    Mr. Doe's responsibilities as a Global MEAL Advisor Program Manager I were largely devoted to assisting with a quantitative portion of a Quarterly Report required by donors funding the Program. Trial Tr. I 190:18–22; Trial Tr. II 42:9–21.

114.    Mr. Doe was only responsible for a small portion of the Quarterly Report made up of an Excel spreadsheet where he collected data related to certain indicators (*i.e.*, ways to measure how a program is achieving its goals) that were established before he started on the Program and were collected by MEAL Leads and staff assigned to the project in the implementation countries. Trial Tr. II 42:21–45:2, 122:4–17.

115.    Mr. Doe streamlined the process for reporting the indicators collected by his colleagues implementing CTWWCP in the five countries. Trial Tr. II 45:3–46:21.

116.    Mr. Doe's role with respect to the Quarterly Reports primarily involved inputting data from one Excel template to another. Trial Tr. I 189:24–190:8.

117.    Mr. Doe had no way of knowing whether the data collected from his MEAL colleagues implementing the Program was reliable. Trial Tr. II 124:4–21.

118.    Mr. Doe did not finalize the Quarterly Report, nor did he submit it to donors to satisfy reporting requirements. Trial Tr. II 47:2–48:11.

119.    As Global MEAL Advisor Program Manager I, Mr. Doe also coordinated and served as administrative support for monthly webinars presented to other CRS employees working on CTWWCP. Trial Tr. II 49:3–50:5.

120.    Mr. Doe's second role on the CTWWCP Team was as a Global MEAL Advisor Manager II, where he supervised another position that was focused on collecting indicator results and provided troubleshooting assistance to the MEAL Teams in the Program's implementing countries. Trial Tr. II 51:7–52:15.

121.    One of CTWWCP's objectives was to "influence policies and practice that lead to the redirection of funding to support family care" in other countries outside of the five countries where CRS implemented the Program. *See* Joint Ex. 7 at CRS00016713 (identifying the three main components of CTWWCP); Joint Ex. 8 at CRS00016716 (same); *see also* Trial Tr. I 134:12–24.

122.    In both of Mr. Doe's MEAL Team positions, Mr. Doe did not play any role in expanding CTWWCP into other countries. Trial Tr. II 52:20–23.

123.    In both of Mr. Doe's MEAL Team roles, Mr. Doe did not recall having any involvement with the CTWWCP Steering Committee that met to discuss the program's progress. Trial Tr. I 95:4–9; Trial Tr. II 53:15–21.

124.    MEAL is not one of the three primary objectives of CTWWCP. *See* Joint Ex. 7 at CRS00016713 (identifying the three main components of CTWWCP); Joint Ex. 8 at CRS 16716 (same); *see also* Trial Tr. I 134:12–24.

125.    In both of Mr. Doe's CTWWC MEAL Team positions, Mr. Doe did not play any role in obtaining funding for the Program or have decision-making authority as to how CRS allocated funding for the Program. Trial Tr. I 187:2–189:2; Trial Tr. II 55:8–21, 59:19–60:11.

126.    In both of Mr. Doe's MEAL Team roles, Mr. Doe did not work directly with CTWWCP's Participants. Trial Tr. II 58:11–14.

127.    In both of Mr. Doe's MEAL Team roles, Mr. Doe's interaction with Local Partners implementing the Program was limited to working with only Local Partners in Kenya to train them on how to document and track certain indicators that were identified before Mr. Doe's involvement in the Program. Trial Tr. I 185:22–187:1; Trial Tr. II 58:15–59:18.

128.    Mr. Doe left his position with the CTWWCP Team because he was not getting the direct program experience he wanted and accepted a position back on the Gateway Team as Gateway Manager II. Trial Tr. II 63:1–15.

## V.    TDYs

129.    CRS offers assignments known as Temporary Duty Yonders ("TDYs"), which are voluntary short-term assignments in other divisions typically lasting a few weeks or months. Trial Tr. II 19:21–20:8.

130.    Mr. Doe held three TDYs over his 8 years at CRS, Trial Tr. II 19:21–20:5, 72:19–24, lasting a total of 10 and a half weeks, *id.* at 73:6–11.

131.    At the completion of his TDYs, Mr. Doe returned to his regular positions. Trial Tr. I 193:18–22.

132.    Mr. Doe's TDY assignments were completely separate and unrelated to the five main positions he held at CRS. Trial Tr. II 20:9–13, 72:11–15.

133.    Mr. Doe's first TDY was coordinating humanitarian actors operating in a certain area of Nigeria to collect information and disseminate it to individuals implementing programs in the area. Trial Tr. II 73:15–74:24.

134.    Mr. Doe's second TDY was supporting a MEAL training workshop and supporting a MEAL director in Nigeria. Trial Tr. II 74:25–75:23.

135.    Mr. Doe's third TDY was in Nigeria where he assisted with administrative support, record keeping, and checking basic math in a cash assistance program. Trial Tr. II 75:24–77:16, 167:7–25.

136.    Mr. Doe highlighted his limited TDY program experience in various cover letters because he wanted to tailor his applications to other jobs to suit the roles he was applying for—roles that were typically more focused on project implementation. Trial Tr. II 88:22–89:15.

## VI.    Damages

137.    CRS stipulates to damages in the amount of $60,000 for all liability, subject to appeal. Sept. 10, 2024 Stipulation as to Plaintiff's Damages, ECF 115-1.

**Conclusions of Law**

## I.    MFEPA's Religious Exemption Is Inapplicable to All of Mr. Doe's Positions.

1.    Maryland Fair Employment Practices Act's (MFEPA's) antidiscrimination provisions do not apply to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion, sexual orientation, gender identity, or military status to perform work connected with the activities of the religious entity." Md. Code Ann., State Gov't § 20-604(2)

2.    The application of MFEPA's religious exception is an affirmative defense for which CRS bears the burden of proof by a preponderance of the evidence. *See Witherspoon v. Brennan*, 449 F. Supp. 3d 491, 501 (D. Md. 2020).

3.    In interpreting MFEPA's religious exemption, the Supreme Court of Maryland held that the General Assembly did not intend "to allow religious entities to discriminate on the basis of sexual orientation or gender identity against employees whose duties are materially indistinguishable from those performed by individuals at secular organizations, irrespective of

18

the religious entity's core activities." *Doe v. Cath. Relief Servs.*, 484 Md. 640, 672–73 (2023) ("Doe III") (emphasis added).

4.    To balance the rights of a religious employer and individual employee, the Court concluded that "the narrowest reasonable reading of this language is that, in order for the exemption to apply, the employee's duties must directly further the core mission(s) – religious or secular, or both – of the religious entity." *Id.* at 673.

5.    Because there is no dispute as to CRS's mission, the Court need only focus on the Supreme Court of Maryland's first three factors, which "entail[] a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances," whether Mr. Doe's duties in any of his positions were "not one or more steps removed from taking the actions that effect the goals of the entity," and consideration of the size of the religious entity, meaning that "[a] 30-person religious non-profit may well have fewer employees whose work does not directly further the core mission(s) of the entity than an organization with a 300-person staff."  *Id.* at 673.

6.    Because the Supreme Court of Maryland dictated that whether the exception applies is contingent on the employee's duties—and Mr. Doe held five discrete roles with varying duties—the Court need only find that *one* of his positions did not *directly effect* the mission of CRS to hold CRS liable for violating MFEPA.

7.    The Supreme Court of Maryland carved out an exemption for a narrow set of employees, not those that "incremental[ly]" contribute to an organization's mission. Trial Tr. III 12:15–13:6.

8.    Given CRS's size of more than 8,000 employees worldwide, Joint Stip. ¶ 9; Trial Tr. I 59:18–22, the Supreme Court's guidance suggests that there will be "fewer employees" who

directly further CRS's core mission compared to "[a] 30-person religious non-profit . . . ." *Doe III*, 484 Md at 674.

9.      The Gateway Pipeline and Projects App had no direct impact on aid to Participants; instead, it made it easier for CRS employees at Headquarters to access certain data. Trial Tr. II 33:1–13, 121:7–122:3; *cf. Massie v. Gen. Motors Co*., No. 1:20-CV-01560-JLT, 2021 WL 2142728, at *7–8 (E.D. Cal. May 26, 2021).

10.      Because Mr. Doe's Gateway roles had no role in collecting or inputting data, Trial Tr. I 171:22–172:4; Trial Tr. II 202:23–203:6; *see also e.g*., Trial Tr. I 191:25–192:19; Trial Tr. II 226:11–25, assisted other employees in expanding the Pipeline and Projects app to serve their needs by liaising with IT, Trial Tr. II 34:22–7, 112:15–115:8, 65:23–67:11, 69:18–70:11; *see also id.* at 184:2–20, 222:3–16, and involved cleaning the system by identifying bugs, these roles were one or more steps away from effectuating CRS's core mission, much like the Supreme Court's description of a janitor. *Compare* Joint Ex. 6, with Trial Tr. II 81:10–19, 113:14–25 *with Doe III*, 484 Md. at 674. *See also* Trial Tr. II 81:10–19; *id.* 22:18–23, 23:25–27:21, 218:11–219:15.

11.      Mr. Doe's positions on the MEAL Team were similarly one or more steps removed from directly furthering CRS's core mission because he did not interact directly with CRS Participants or Local Partners like his 50–60 colleagues implementing the CTWWCP. *See* Trial Tr. I 185:22–187:1; Trial Tr. II 41:2–6, 58:11–59:18; 63:8–10. Mr. Doe's responsibilities on the CTWWCP MEAL Team were largely administrative and he played no direct role in advancing CWWCP or its objectives. *See, e.g.*, Trial Tr. I 135:3–17, 191:19–21; *see also id.* at 135:18–136:2; Trial Tr. II 52:20–23; Trial Tr. I 95:4–9, 187:2–189:2; Trial Tr. II 53:15–21, 55:8–21, 59:19–60:11.

12.    Moreover, none of Mr. Doe's five roles were considered "ministerial," Joint Stip. ¶ 10, "representational," Joint Stip. ¶ 11, or "explicitly religious," Joint Stip. ¶ 12; Trial Tr. I 198:24–199:1, all of which are closer to directly furthering CRS's core mission than Mr. Doe's technical positions. Because it is undisputed that Mr. Doe never served in these roles or provided direct humanitarian relief like the majority of CRS employees, Trial Tr. III 8:13–14; Trial Tr. I 156:7–22, Mr. Doe's limited technical data roles on the Gateway and MEAL Teams were at least one step removed from directly furthering CRS's core mission. *Doe III*, 484 Md. at 673–74.

13.    "Incremental" or incidental effects of a job on CRS's mission are insufficient to satisfy the legal test. *Cf. Costello v. BeavEx, Inc*., 810 F.3d 1045, 1055 (7th Cir. 2016); *Wilson v. Sw. Airlines Co*., 517 F. Supp. 292, 302 (N.D. Tex. 1981).

14.    Because Mr. Doe did not play any role in pursuing, securing, or administering funding for CRS's programs,  Trial Tr. II 86:1–3, 86:16–18, 208:3–6, 225:25–226:3, his position stands in stark contrast to the Supreme Court's example of an "executive director of a medium-sized religious charity, which *has as its core mission the raising of funds* to build new schools . . ." *Doe III*, 484 Md. at 674 (emphasis added).

15.    That Mr. Doe never held a position with decision-making authority, Trial Tr. II 86:13–15, 190:1–8, 225:21–24; *compare* Trial Tr. I 48:6–9, 69:15–18, 104:22–105:3, 110:13–21, 155:20–22; 193:21–195:20, 239:13–16, *with* Trial Tr. I 88:6–89:8, 252:20–22; Trial Tr. II 171:8–22; Trial Tr. I 174:23–175:2, 48:18–49:1, 180:9–181:22; Trial Tr. I at 95:4–9; Trial Tr. II 53:15–21; *see also* Trial Tr. I 73:23–74:2, 87:8–88:3, 203:18–204:5; *Compare* Joint Ex. 7 at CRS00016713, *and* Joint Ex. 8 at CRS00016716, *with* Trial Tr. I 134:12–24, 135:3–136:2, 191:19–21; *see also id.* at 135:18–136:2; 190:18–22; Trial Tr. II 42:9–46:21, 47:2–48:11, 49:3–

50:5, 51:7–52:15, 52:20–23, 122:4–17, is further evidence that none of Mr. Doe's roles directly furthered the mission of CRS.

16.     Finally, because Gateway is simply a customized version of Salesforce—a cloud-based program used both by secular and nonsecular organizations, s*ee* Trial Tr. II 9:25–10:16, Mr. Doe performed Salesforce-related work before and after CRS at secular organizations, Trial Tr. II 5:2–15, 6:6–8, 10:17–11:1, 32:10–14, and MEAL is a concept used across international development organizations, Trial Tr. I 103:21–104:20, 182:15–183:2; Trial Tr. II 38:18–39:8, Mr. Doe's skills at CRS were "indistinguishable from those performed by individuals at secular organizations, irrespective of [CRS's] core activities," and thus weigh against a finding that the exemption applies. *Doe III*, 484 Md. at 673.

17.     Mr. Doe's three brief TDY positions do not mandate the application of MFEPA's exception.

18.     Because the evidence established that in each of his five roles, Mr. Doe (1) did not provide direct humanitarian relief to the poor and vulnerable overseas; (2) played no direct role in fundraising; (3) had no decision-making authority; (4) did not set, contribute to, or satisfy compliance requirements; and (5) utilized skills that were "indistinguishable from those performed by individuals at secular organizations," *Doe III*, 484 Md. at 672–74, the totality of pertinent circumstances establishes that all of Mr. Doe's positions were at least one step removed from directly effecting CRS's core mission.

19.     As such, none of Mr. Doe's five positions are exempt from MFEPA's antidiscrimination provisions, and CRS is liable for stipulated damages. *See* ECF 115-1.

II.   **If Applicable, MFEPA's Religious Exemption Would Violate Mr. Doe's Constitutional Rights.**

20.   Alternatively, as a matter of Maryland law, if MFEPA's religious exemption applies to any of Mr. Doe's five positions, then it would be unconstitutional as applied to him.

21.   Article 36 of the Maryland Declaration of Rights limits free religious exercise in instances where a religious practice "injure[s] the natural" and "civil . . . rights" of others. Md. Decl. Rts. art. 36. Article 36 "guarantee[s] an absolute freedom to believe and a somewhat circumscribed freedom to act upon those beliefs." Dan Friedman, The Maryland State Constitution at 71 (Oxford Univ. Press, 1st ed. 2011); accord *Craig v. State*, 220 Md. 590, 599 (1959); *McMillan v. State*, 258 Md. 147, 152 (1970); *Snyder v. Holy Cross Hosps.*, 30 Md. App. 317, 326–27 (1976).

22.   The Court may abridge religious practices when an interest in protecting a competing right is sufficiently compelling. *See McMillan*, 258 Md. at 152 (citing *Sherbert v. Verner*, 374 U.S. 398 (1963)); *accord E.E.O.C. v. R.G. &. G.R. Harris Funeral Homes, Inc*., 884 F.3d 560, 590 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty., Ga*., 590 U.S. 644 (2020).

23.   Mr. Doe's constitutional right to his sexual orientation and marriage are sufficiently compelling to establish that MFEPA's exemption would be unconstitutional as applied to him under the circumstances. A finding to the contrary would serve to elevate CRS's purported "free exercise" rights in a way that would "disturb the good order, peace, or safety of the State" by "infring[ing] the . . . natural . . . or civil" rights of Mr. Doe to be free from workplace discrimination and injure his constitutional right to obtain the benefits of marrying the individual of his choosing, rendering the exemption unconstitutional. Friedman, *supra*, at 70–71; *see also Archdiocese of Wash. v. Moersen*, 399 Md. 637, 640–41 (2007*); accord Snyder*, 30 Md. App. at 330–31.

**III.    CRS's First Amendment Defense Fails as a Matter of Law and Fact.**

24.    CRS has not produced any admissible evidence—in the Summary Judgment Record or otherwise—to prove that providing Mr. Doe with spousal benefits "has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citation omitted).

25.    CRS "bears the burden of 'demonstrat[ing] an infringement of [its] rights under the Free Exercise . . . Clause[.]'" *Mahmoud v. McKnight*, 102 F.4th 191, 205 (4th Cir. 2024), *petition for cert. filed* (Sept. 16, 2024) (quoting *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022)). In other words, CRS must show that providing Mr. Doe with spousal health benefits "has the incidental effect of burdening a particular religious practice." *Lukumi Babalu Aye*, 508 U.S. at 531 (citation omitted). The admissible evidence fails to support such a finding.

a.    Complying with MFEPA does not equate to forced endorsement of Mr. Doe's marriage. *See Harris Funeral Homes*, 884 F.3d at 588; *Rumsfeld v. Forum for Acad. & Inst. Rts.*, 547 U.S. 47, 52 (2006); *Harris Funeral Homes*, 884 F.3d 589.

b.    Because of alternative options available like the Plus-One model, CRS could provide spousal benefits to MR. Doe without acknowledging Mr. Doe's relationship as a marriage. *See* ECF 42-20; ECF 42-21; ECF 42-22 at CRS0001590; ECF 42-23; *see also* ECF 42-12 at 157:17–24. Unlike *Fulton v. City of Philadelphia*, where a religious foster care agency was required to "certify[] a family" as a central step in pursuing its core mission, 593 U.S. 522, 529–30 (2021), CRS need not provide a stamp of approval on Mr. Doe's legal union to comply with the law. Thus, "preventing the sex discrimination" here has "no significant impact on [CRS's] religious beliefs or doctrines." *Fremont*, 781 F.2d at 1368.

     c.    CRS's burden arguments are speculative and "argument . . . based on pure speculation . . . is insufficient to demonstrate a substantial burden on [the] right to practice . . . religious beliefs." *Smith v. Gipson*, No. 20-CV-01110-WHO, 2022 WL 35619, at \*10 (N.D. Cal. Jan. 4, 2022). Mr. Doe was married to a man prior to beginning his tenure at CRS and, counter to CRS's contention, there is simply no nexus between the provision of dependent benefits and any perceived illicit immoral activity that would legally result in a burden on CRS's religious practice. *See Rumsfeld*, 547 U.S. at 65; *see also La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, No. 2:11-CV-00395-ODW, 2012 WL 2884992, at \*8 (C.D. Cal. July 13, 2012); *Sprouse v. Ryan*, 346 F. Supp. 3d 1347, 1358 (D. Ariz. 2017).

     d.    CRS's concerns about the "presumed biases" of unknown others do not equate to burdening religious practice. *See Harris Funeral Homes*, 884 F.3d at 586. Speculation that "other Catholics, [or] people in general" would judge CRS for complying with the law is insufficient to establish a burden. *Compare* ECF 42-24 at 52:15–16, *with DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009); *see also* ECF 41-1 at 37–40; ECF 49 at 22–23; *accord Rumsfeld*, 547 U.S. at 65.

     e.    Administrative or financial costs are insufficient to qualify as burdens on the exercise of religion. *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 392 (1990) (quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 115 (1943)); *see also Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 698 (1989); *Goodall by Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995) (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961))); *Mahmoud*, 102 F.4th at 215 (citing *Braunfeld*, 366 U.S. at 605–06); *D.L. ex rel. K.L. v. Balt. City Bd. of Sch. Comm'rs*, 706 F.3d 256, 263

(4th Cir. 2013)). CRS has established no evidence to support that increased costs would impact its religious practice *See* Joint Ex. 17 at CRS00015784; *accord Garner v. Kennedy*, 713 F.3d 237, 246 (5th Cir. 2013).

26.     MFEPA is neutral and generally applicable. *See Lukumi Babalu Aye*, 508 U.S. at 531; *see also Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990).

      a.     MFEPA statutorily exempts small employers from certain "administrative process[es] . . . but not from the public policy" of the statute. *Molesworth v. Brandon*, 341 Md. 621, 628 (1996); *accord Kerrigan v. Magnum Ent., Inc.*, 804 F. Supp. 733, 736 (D. Md. 1992). Thus, CRS's argument that MFEPA provides for "automatic exemptions" for businesses with fewer than 15 employees, Md. Code Ann., State Gov't § 20-601(d)(1), and is, therefore, not generally applicable under *Fulton*, 593 U.S. 522, Trial Tr. I 19:16–23, is incorrect.

      b.     CRS's reliance on the exemption to argue that the law is not generally applicable fails because small businesses are not comparable to CRS. *See* ECF 61 at 12 (citing *Lukumi Babalu Aye*, 508 U.S. at 543; *Fulton*, 593 U.S. at 533–34)).

      c.     "Individualized exemption mechanisms are not at issue in this case." ECF 61 at 12, n.5.

      d.     Unlike *Fulton*, MFEPA's exemption, like the ministerial exemption, does not grant the government entity authority to make discretionary decisions about where the exemption applies. *See, e.g.*, *Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 748 (4th Cir. 2024); *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142 (W.D. Wash. 2023), *appeal filed* (May 22, 2024).

      e.     The law does not support a finding that MFEPA is not neutral. *Cf. Fulton*,

593 U.S. at 533 (citations omitted); *accord Doe III*, 484 Md. at 723 (Hotten, J., dissenting).

   f. The "remedial purpose" of MFEPA is "to eliminate discrimination in the workplace." *Id.* at 675. Thus, MFEPA, like Title VII, is categorically neutral. *See* ECF 49 at 17-20; *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389, 1398 (4th Cir. 1990); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985); *Redhead v. Conf. of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 230 (E.D.N.Y. 2006).

27. Because MFEPA is neutral and generally applicable, the Court need not reach the strict scrutiny analysis.

28. Even if MFEPA were not neutral and generally applicable, it survives strict scrutiny because it is narrowly tailored to further a compelling interest. *See Lukumi Babalu Aye*, 508 U.S. at 546; *Billard v. Charlotte Cath. High Sch*., No. 3:17-CV-00011, 2021 WL 4037431, at *23 (W.D.N.C. Sept. 3, 2021), *rev'd & remanded on other grounds*, 101 F.4th 316 (4th Cir. 2024); *Dole*, 899 F.2d at 1398.

   a. "[T]he 'elimination of workplace discrimination, including sex discrimination'" is a "compelling interest." *Harris Funeral Homes, Inc.*, 884 F.3d at 590; *accord United States v. Burke*, 504 U.S. 229, 238 (1992); *Rayburn*, 772 F.2d at 1168; *E.E.O.C. v. Miss. Coll.*, 626 F.2d 477, 488 (5th Cir. 1980). Like Title VII, MFEPA's interest in "eradicat[ing] the vestiges of discrimination in the categories designated," *Equitable Life Assur. Soc. of U.S. v. Comm'n on Hum. Rels.*, 290 Md. 333, 344 (1981) is compelling. *See Doe III*, 484 Md. at 656 (quoting *Molesworth*, 341 Md. at 632).

   b. Comprehensive, generally-applicable equal-protection laws such as MFEPA are considered the least restrictive way to achieve the compelling interest of

preventing workplace discrimination. *See Dole*, 899 F.2d at 1398; *Redhead*, 440 F. Supp. 2d at 222; *see also Rayburn*, 772 F.2d at 1169.

      c.      No viable, less restrictive "alternatives" to anti-discrimination laws like MFEPA and Title VII have been put forward. *See, e.g.*, *Harris Funeral Homes, Inc.*, 884 F.3d at 594; *Billard*, 101 F.4th at 329 (citing *Amos*, 483 U.S. at 339; *Shaliehsabou*, 363 F.3d at 306)). Because MFEPA's religious exemption is *broader* than its federal counterpart, and therefore affords greater protections to CRS, *see* ECF 99 at 2, CRS cannot establish that it fails the narrowly tailored inquiry, *see Billard*, 101 F.4th at 327; *Dole*, 899 F.2d at 1399; *see also Doe III*, 484 Md. at 675.

      d.      Maryland's interest in protecting the rights of individuals like Mr. Doe is as compelling as protecting the rights of religious employers, making an exemption to anti-discrimination laws the least restrictive way of honoring both compelling interests. *See McMillan*, 258 Md. at 152 (citation omitted); *accord Harris Funeral Homes*, 884 F.3d at 590.

      29.      CRS has not shouldered its burden to establish that its religious practice would be burdened or that MFEPA's exemption does not pass constitutional muster. Accordingly, CRS is liable for violating Maryland law.

      FOR THE FOREGOING REASONS, it is ORDERED and ADJUDGED that judgment shall be entered in John Doe's favor under Count I of Plaintiff's Complaint.

Date: _____

                                        _____
                                        Hon. Julie R. Rubin
                                        United States District Judge