**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **JOHN DOE,** | |
| *Plaintiff*, | |
| **v.** | **Case No.: 1:20-cv-01815-JRR** |
| **CATHOLIC RELIEF SERVICES,** | |
| *Defendant*. | |

**MEMORANDUM OPINION**

Plaintiff John Doe initiated this action against Defendant Catholic Relief Services ("CRS") on June 12, 2020. (ECF No. 1.) Following extensive motions practice and litigation that endured more than four years, the parties proceeded to a three-day bench trial on October 15, 2024. The sole remaining claim before the court is Doe's claim of sexual orientation discrimination under the Maryland Fair Employment Practices Act ("MFEPA"). As discussed in greater depth below, at the core of the parties' dispute is CRS's assertion of its affirmative defense of the religious entity exemption under MFEPA. MD. CODE ANN., STATE GOV'T § 20-604. The parties agree that the court's determination of whether Doe has prevailed on Count I turns on application of the exemption. Doe argues the exemption is inapplicable; CRS argues the opposite. Pursuant to Federal Rule of Civil Procedure 52(a), and upon careful consideration of the evidence presented and the parties' arguments, the court now issues its findings of fact and conclusions of law. For the reasons that follow, by accompanying order, the court enters judgment in favor of Doe and against CRS on Doe's claim of sexual orientation discrimination under MFEPA.

**I.  INTRODUCTION**

As relayed above, on June 12, 2020, Doe initiated action against CRS for discrimination based on sex and sexual orientation. His complaint set forth ten counts:

   **Count I**: Discrimination (Sexual Orientation) in Violation of MFEPA;

   **Count II**: Discrimination (Sex) in Violation of MFEPA;

   **Count III**: Discrimination (Sex) in Violation of the Maryland Equal Pay for Equal Work Act ("MEPEWA");

   **Count IV**: Failure to Pay Wages in Violation of the Maryland Wage Payment & Collection Law ("MWPCL");

   **Count V**: Common Law Breach of Contract;

   **Count VI**: Common Law Detrimental Reliance;

   **Count VII**: Common Law Negligent Misrepresentation;

   **Count VIII**: Discrimination in Violation of Title VII of The Civil Rights Act ("Title VII");

   **Count IX**: Discrimination (Sex) in Violation of the Equal Pay Act ("EPA"); and

   **Count X**: Retaliation in Violation of Title VII, Equal Pay Act, MFEPA, and MEPEWA.

(ECF No. 1.)    Following CRS's motion to dismiss, the Honorable Catherine C. Blake, then presiding, dismissed Doe's claims for breach of contract, detrimental reliance, negligent misrepresentation, and MWPCL violations.  (ECF Nos. 23, 24.)  The parties then proceeded to discovery on Doe's remaining claims of discrimination under MFEPA, MEPEWA, Title VII, and EPA.  (ECF No. 30.)

   Following the close of discovery, the parties filed cross motions for summary judgment. (ECF Nos. 41, 45.) Judge Blake granted in part and denied in part the parties' cross-motions (with some amendments by subsequent order on CRS's motion for reconsideration), entering judgment for Doe on his claims of sex discrimination in violation of Title VII and the EPA, and judgment for CRS on Doe's claim of retaliation.  (ECF Nos. 61, 62, 66, 67.)  Judge Blake denied the cross

motions as to Doe's claims of sex and sexual orientation discrimination under MFEPA and MEPEWA (Counts I, II, and III) pending certification by the court of the following three questions to the Supreme Court of Maryland:

> 1. Whether the prohibition against sex discrimination in the Maryland Fair Employment Practices Act, MD. CODE ANN., STATE GOV'T § 20-606, prohibits discrimination on the basis of sexual orientation;

> 2. Whether, under MD. CODE ANN., STATE GOV'T § 20-604(2), the Maryland Fair Employment Practices Act applies to a religious corporation, association, education institution, or society with respect to the employment of individuals of a particular sexual orientation or gender identity to perform work connected with all activities of the religious entity or only those that are religious in nature; and

> 3. Whether the prohibition against sex discrimination in the Maryland Equal Pay for Equal Work Act, MD. CODE ANN., LAB. & EMPL. § 3-304, prohibits discrimination on the basis of sexual orientation.

*Doe v. Cath. Relief Servs.*, 484 Md. 640, 648 (2023) (hereinafter, *Doe III*).

The Supreme Court of Maryland answered "no" to the first and third questions. *Id.* at 653–65. As to the second question, the Supreme Court of Maryland concluded that "the language of the exemption is ambiguous."[1] *Id.* at 666. It held: "Giving the exemption its narrowest reasonable reading, we conclude that the General Assembly intended to exempt religious organizations from these kinds of MFEPA claims brought by employees who perform duties that directly further the core mission (or missions) of the religious entity." *Id.* at 666–67. In reaching its conclusion, the Supreme Court of Maryland rejected both parties' positions. *Id.* at 666.

Following receipt of the Supreme Court of Maryland's decision on the certified questions, the parties filed stipulations of dismissal with prejudice as to Doe's claim of MFEPA sex

---

[1] The Supreme Court of Maryland did not decide whether the religious entity exemption applied to Doe's sexual orientation discrimination claim under MFEPA. *Doe v. Cath. Relief Servs.*, 484 Md. 640, 675 (2023).

discrimination (Count II) and MEPEWA sex discrimination (Count III). (ECF Nos. 85, 89.) The

parties have also since stipulated as to Doe's damages, agreeing that Doe is "entitled to $60,000

in compensatory damages corresponding to any and all claims for which [CRS] has been found

liable or may be found liable," subject to CRS's reservation of its right to seek appellate review.

(Damages Stip., ECF No. 115-1.) The parties then proceeded to a bench trial on Doe's claim of

sexual orientation discrimination under MFEPA (Count I) and CRS's affirmative defense that it is

exempt pursuant to the statute's "religious entity exemption."

## II.    FINDINGS OF FACT

The court makes the following findings of fact based on the parties' stipulations and

evidence presented at trial:

### About Catholic Relief Services

1. CRS "is a 501(c)(3) Catholic Church social services agency constituted by the United States

   Conference of Catholic Bishops." (Jt. Stip., ECF No. 115 ¶ 2.)

2. Since at least 2008, CRS's mission has been as follows:

   > Catholic Relief Services carries out the commitment of the Bishops
   > of the United States to assist the poor and vulnerable overseas. We
   > are motivated by the Gospel of Jesus Christ to cherish, preserve and
   > uphold the sacredness and dignity of all human life, foster charity
   > and justice, and embody Catholic social and moral teaching as we
   > act to:
   >
   > **PROMOTE HUMAN DEVELOPMENT** by responding to major
   > emergencies, fighting disease and poverty, and nurturing peaceful
   > and just societies; and,
   >
   > **SERVE CATHOLICS IN THE UNITED STATES** as they live
   > their faith in solidarity with their brothers and sisters around the
   > world.
   >
   > As part of the universal mission of the Catholic Church, we work
   > with local, national and international Catholic institutions and

> structures, as well as other organizations, to assist people on the basis of need, not creed, race or nationality.

(Jt. Ex. 2 at CRS00015687; Trial Tr. I, ECF No. 138 at 65:1–9.)

3. Stated more simply, CRS's mission is to serve the poor and vulnerable overseas.  (Trial Tr. I at 94:5–7, 105:17–18; Trial Tr. II, ECF No. 139 at 7:3–6, 223:21–24.)

4. CRS's mission statement has remained the same since September 11, 2008.  (Jt. Ex. 2 at CRS00015687; Trial Tr. I at 64:14–65:3.)

5. Sean Callahan is CRS's President and Chief Executive Officer.  (Jt. Ex. 1; Trial Tr. I at 41:23–42:1.)

6. Dr. Shannon Senefeld is CRS's Senior Vice President of Overseas Operations.  (Jt. Ex. 1; Trial Tr. I at 92:17–18.)

7. CRS's Board of Directors (the "Board") is the ultimate decisionmaker on CRS goals, and the Executive Leadership Team ("ELT"), headed by Callahan, presents recommendations on CRS strategy and budget to the Board for approval.  (Trial Tr. I at 68:22–69:18.)

8. Relevant here, no Gateway or MEAL employee (discussed at greater length below) has served on the Board or ELT.  (Trial Tr. I at 88:6–89:8.)

9. CRS employs over 8,000 people worldwide.  (Jt. Stip. ¶ 9.)

10. Most CRS employees "are not required to adhere to the Catholic faith, though all employees are expected to exercise good judgment to ensure that their professional actions and communications are consistent with CRS values, principles, and policies."  *Id.* ¶ 13.

11. For positions that are "representational," CRS job postings include specific language to notify the applicant of the requirement "to adhere to the tenets of the Catholic faith."  *Id.* ¶ 14.

12. "Opposite-sex spouses of domestic employees of CRS who meet the minimum requirements for weekly hours are eligible for dependent health benefits and may be enrolled within the

first month after an employee's hire date or during special or annual enrollment periods thereafter." *Id.* ¶ 7.

13.  In 2024, CRS's revenue was primarily derived from public sources, mostly from departments within the U.S. government. (Trial Tr. I at 50:4–11; Jt. Ex. 17 at CRS00015795.)

14.  Public donors like the U.S. government have a "large group of standard provisions" with which CRS must comply, and CRS's receipt of funding is contingent on meeting its objectives. (Trial Tr. I at 50:12–51:14.)

15.  When asked whether CRS would be able to achieve its mission without U.S. government resources, Callahan testified:

> We would be a much smaller organization. Right now, I think in the FY25 budget, it's over 50 percent of our resources come from the U.S. government and then that doesn't include the Global Fund or the EU or the UN, which the U.S. government contributes substantially to. So if all of those sources were reduced, we would not be able to fulfill the needs of people overseas and, in fact, would have to abandon some of our partners in some of the locations.[2]

(Trial Tr. I at 56:13–25.)

### CRS Programming

16.  "Participants" are individuals who receive CRS humanitarian aid. (Trial Tr. I at 151:11–17; Trial Tr. II at 8:9–22.)

17.  "Country Representatives" are the top managers in CRS country offices. (Trial Tr. I at 181:12–15.)

18.  "Heads of Programming" are CRS employees in country offices that oversee CRS programs in that country. *Id.* at 181:16–19.

---

[2] In the time since the bench trial and parties' post-trial briefing, there have been significant changes to federal funding of organizations like CRS, including through the United States Agency for International Development. The court can infer such funding changes have likely had a significant impact on CRS. Nonetheless, the impact of such changes is not pertinent to the present action and is not before the court.

19. "Project Managers" are CRS employees who implement its programs on a day-to-day basis. *Id.* at 181:20–22.

20. CRS works with its local partners on the ground in the countries where it seeks to serve communities and "plug into their system." *Id.* at 47:4–17.  CRS also provides services that local partners are unable to provide. *Id.*

21. CRS provides a number of humanitarian services throughout the world, including in areas of agriculture, capacity strengthening, education, emergency, health, justice and peacebuilding, microfinance, and water and sanitation.  (Jt. Ex. 18 at CRS00015815; Jt. Ex. 19 at CRS000016642.)  These categories frequently overlap.  (Trial Tr. I at 46:20–24.)

    a) CRS agricultural programming focuses on increasing environmental activities and productivity, particularly with "small landholder agriculturists."  (Trial Tr. I at 43:13–22.)  As of 2023, CRS agriculture programming consisted of 129 projects in 42 countries, serving nine million Participants.  (Jt. Ex. 19 at CRS000016642.)

    b) CRS capacity strengthening programming focuses on building local capacity for services.  (Trial Tr. I at 43:23–44:5.)  As of 2023, CRS capacity strengthening programming consisted of 236 projects in 53 countries, serving four million Participants.  (Jt. Ex. 19 at CRS000016642.)

    c) CRS education programming focuses on early childhood development centers that provide education to mothers and small children.  (Trial Tr. I at 44:6–14.)  As of 2023, CRS education programming consisted of 76 projects in 40 countries, serving eight million Participants.  (Jt. Ex. 19 at CRS000016642.)

    d) CRS emergency programming focuses on providing housing and shelter, food, water, sanitation, and health interventions where local services are unavailable.  (Trial Tr. I at

44:16–23.)  As of 2023, CRS emergency programming consisted of 227 projects in 65 countries, serving 24 million Participants.  (Jt. Ex. 19 at CRS000016642.)

e)  CRS health programming focuses on supporting safe motherhood, child survival, malarial programs, and responses to COVID-19, Ebola, and Marburg viruses.  (Trial Tr. I at 45:2–7.)  As of 2023, CRS health programming consisted of 120 projects in 42 countries, serving 176 million Participants.  (Jt. Ex. 19 at CRS000016642.)

f)  CRS justice and peacebuilding programming focuses on promoting peace in areas where CRS works to develop just systems.  (Trial Tr. I at 45:8–12.)  As of 2023, CRS justice and peacebuilding programming consisted of 54 projects in 45 countries, serving 14 million Participants.  (Jt. Ex. 19 at CRS000016642.)

g)  CRS microfinance programming focuses on microfinance groups that collect and save resources to share with community members to enable investment in enterprise activities.  (Trial Tr. I at 45:19–46:1.)  As of 2023, CRS microfinance programming consisted of 84 projects in 38 countries, serving three million Participants.  (Jt. Ex. 19 at CRS000016642.)

h)  CRS water and sanitation programming focuses on the provision of wells, clean water, and clean sanitation facilities for young women in schools.  (Trial Tr. I at 46:5–19.)  As of 2023, CRS water and sanitation programming consisted of 89 projects in 35 countries, serving 18 million Participants.  (Jt. Ex. 19 at CRS000016642.)

22.  CRS's Overseas Operations Department is the "heart" of what CRS does; as Dr. Senefeld phrased it, "It's why we exist at Catholic Relief Services."  (Trial Tr. I at 98:12–19.)  It encompasses all CRS work "that happens overseas."  *Id.*

23. CRS Institutional Donor Engagement and Advancement ("IDEA") and Knowledge Management and Learning ("KML") Teams fall within the Overseas Operations Department. (Jt. Ex. 1; Trial Tr. I at 215:16–23.)

24. CRS's IDEA Team is a "support team that works across [CRS] to both engage donors to submit competitive proposals and then to help negotiate the terms and conditions on those agreements." (Trial Tr. I at 219:23–220:7.) It is "part of the engine of those helping CRS win . . . proposals to implement programming around the globe." *Id.* at 220:5–7.

25. At the time of trial, CRS's two largest institutional donors were the U.S. government, through the United States Aid for International Development office and the Global Fund to Fight AIDS, Tuberculosis, and Malaria. *Id.* 221:8–12, 20–21.

26. About 80% of CRS's overall development budget comes from institutional donors; 20% comes from private donors. *Id.* at 224:5–20.

27. CRS's KML Team "aims to structure and drive a systemic approach where knowledge is generated, collected, and curated so that persons who need it can easily access and use it to improve knowledge, skills, systems, and processes so that [CRS's Overseas Operations] becomes more agile and efficient in the way it operates." (Jt. Ex. 22.) *See also* Trial Tr. I at 76:15–20, 101:10–19.

28. CRS's IDEA and KML Teams collaborate on several initiatives, including on IDEA's use of Gateway, learning materials, and after-action reviews. (Trial Tr. I at 222:18–223:5.)

29. Also within CRS's Overseas Operations Department is its flagship program, Changing the Way We Care, which is "designed to end the institutionalization of children" and promote family-based care. (Trial Tr. I at 132:3–6, 133:1–10; Jt. Ex. 8 at CRS00016716.)

30. CRS has implemented Changing the Way We Care in five countries: Kenya, Guatemala, Moldova, India, and Haiti. (Trial Tr. I at 142:1–3.) "Government willingness" was the most important factor in selecting the countries for program implementation. (Trial Tr. I at 135:18–136:2.)

### *CRS's Use of Gateway*

31. Gateway is CRS's agency-wide business pipeline and project portfolio system built on the Salesforce.com platform;[3] it is one of CRS's "core knowledge management platform[s]." (Jt. Stip. ¶ 4; Trial Tr. I at 106:8–11.)

32. CRS began using Gateway in 2014; and it was "rolled out" in 2015. (Trial Tr. I at 65:4–6, 163:14–16.)

33. CRS's Gateway Team was originally housed in its Operational Excellence Department before transitioning to the KML Department. (Trial Tr. I at 165:20–166:4; Trial Tr. II at 22:4–9.)

34. Much like a smart phone, Gateway contains a number of applications. (Trial Tr. II at 9:2–10:16.)

35. One particular application is the Pipeline and Projects application, which is "completely custom" for CRS. *Id.* at 13:15–22. The Pipeline and Projects application is one of CRS's largest Gateway applications in terms of consumption. *Id.* at 139:21–24.

36. An "end user" of the Pipeline and Projects application is a CRS employee who has a license for use of, and access to, the Pipeline and Projects application. *Id.* at 22:24–23:3. The number of end users depends on the time of year and, during Doe's employment, ranged between 1,300 to 1,500. *Id.* at 23:8–11.

---

[3] Salesforce is a cloud-based customer relationship management software. (Trial Tr. II at 9:7–10:8.) Salesforce provides a "base functionality" upon which a user can download applications. *Id.* at 10:9–16.

37. Gateway is an important administrative tool for management and facilitation of CRS operations. Gateway houses information about CRS funding awards and solicitations, compliance data for fundraising projects overseas, CRS institutional donor customer relationship management, and CRS project-level and institutional data. (Trial Tr. I at 106:8–108:12.) CRS uses Gateway to make decisions related to its annual budget and staff deployment. *Id.* at 110:13–21. In all, Gateway has made CRS "much more efficient." (Trial Tr. I at 90:13–17, 238:4–17, 247:8–13; Trial Tr. II at 152:8–25.)

38. With specific regard to the IDEA Team, Gateway has "drastically improved" IDEA's ability to capture funding opportunity data. (Trial Tr. II at 152:1–7.) *See also* Trial Tr. I at 223:6–224:4. The IDEA Team uses Gateway to "capture donor engagement records," "track all . . . proposal opportunities," manage its awards, and track its wins and losses over the past 10 years. (Trial Tr. I at 223:6–224:4, 225:1–8.)

39. Data input into Gateway was also sourced for inclusion in CRS's FY 2023 Organizational Performance & Effectiveness Report to its Board (dated June 2024). (Jt. Ex. 20; Trial Tr. I at 115:15–116:12.)

40. Gateway, including its Pipeline and Projects application, does not deliver or connect aid to the poor and vulnerable overseas; it is also not a tool or form of aid provided to Participants. (Trial Tr. II at 18:18–19:11, 225:14–16.)

### CRS's Use of MEAL

41. MEAL refers to "Monitoring, Evaluation, Accountability, and Learning." (Trial Tr. I at 102:9–10; Trial Tr. II at 38:14–17.) The MEAL framework is not unique to CRS. (Trial Tr. I at 103:21–104:20, 182:15–20; Trial Tr. II at 38:18–39:8.)

42. CRS uses MEAL as a part of its adaptive management strategy and continuous improvement efforts. (Trial Tr. I at 102:14–22.) It provides a framework for monitoring and evaluating CRS projects. *Id.* at 103:21–104:9. CRS requires implementation of MEAL in all of its overseas projects. *Id.* at 102:23–103:4. Relatedly, the standardized monitoring and evaluation framework under MEAL is "required by most donors." *Id.* at 104:10–15.

43. The three primary components of Changing the Way We Care are government promotion of family care; keeping children with, or returning children to, families; and promoting family care globally. (Jt. Ex. 7 at CRS00016713; Jt. Ex. 8 at CRS00016716.) *See also* Trial Tr. I 134:12–24.

   ***About John Doe***

44. Doe is a gay, cisgender man married to another man. (Jt. Stip. ¶ 1.)

45. CRS hired Doe as a Program Data Analyst in June 2016. *Id.* ¶ 5.

46. Prior to Doe's employment at CRS, he had experience working with Salesforce at secular companies. (Trial Tr. II at 10:17–11:1.) At the time of trial, Doe held a Salesforce consultant position with a secular company. *Id.* at 5:1–15.

47. From the start of his employment with CRS on June 1, 2016, through his voluntary resignation on August 30, 2024, Doe was a full-time employee and was eligible for all employee benefits. (Jt. Stip. ¶ 3; Trial Tr. II at 20:14–17; Jt. Ex. 33.)

48. Doe's spouse received spousal health benefits from CRS from June 2016 through October 1, 2017. (Jt. Stip. ¶ 6.)

49. Overall, Doe held five positions during his employment with CRS: Program Data Advisor I; Data Quality and Analytics Advisor II; Global MEAL Advisor, Program Manager I; Global

Meal Advisor, Program Manager II; and Gateway Manager II.   (Jt. Stip. ¶ 18; Trial Tr. I at 120:16–121:10.)

50.   Doe and his supervisor are in the best position to describe his day-to-day-duties in each of his positions.[4]  (Trial Tr. I at 73:23–74:2, 87:8–10, 203:18–204:5.)

51.   From June 1, 2016, through January 31, 2017, Doe worked as a Program Data Advisor I working on the Gateway Program, specifically the Pipeline and Projects application.  (Trial Tr. II at 20:14–21:6.)   In this role, Doe provided training and support to CRS end users of the Pipeline and Project application.  *Id.* at 22:18–23.  The trainings were mainly focused on end user compliance and data entry.  *Id.* at 24:11–23.  On at least one occasion, Doe traveled to a different country to provide training in person.  *Id.* at 23:25–24:10.

52.   From February 1, 2017, to October 31, 2019, Doe was a Data Quality and Analytics Advisor II working on the Gateway Program, and specifically the Pipeline and Projects application. (Trial Tr. II at 33:19–34:15; Def. Ex. 274 at p. 5.)  In this role, Doe moved away from end user support and focused more on carrying out the process of expanding and modifying the systems, assisting with business needs, and acting as a liaison between Information Technology ("IT") and business owners, as well as conducting occasional trainings.  (Trial Tr. II at 34:22–35:7.)  A "business owner" refers to a CRS employee (mostly if not always in Headquarters), who offers final approval for changes to any system processes in his or her

---

[4] CRS understandably makes much of Doe's representations about his CRS positions contained in his cover letters sent to employers with which he sought work; specifically, CRS suggested through Doe's cross-examination that his trial testimony was at times in conflict with the content of his cover letters.  Therefore, according to CRS, the court should afford Doe's oral testimony regarding his positions "little weight."  (ECF No. 132 at p. 16.)  CRS's position is not persuasive. The court found Doe very credible overall, including with respect to his job search and related cover letters.  Moreover, his testimony regarding his CRS positions did not contradict his cover letter statements; nor was Doe's testimony about his CRS job duties the sole source of evidence regarding same.  In any event, the court takes cover letters for what they are—an effort to market oneself for employment with statements that are, as Doe testified, catered to the potential employer.  (Trial Tr. II at 88:22–89:44, 110:4–21.)

respective business area.  *Id.* at 27:23–28:8.  Amy Damsker-White acted as Doe's supervisor in this position from April 2017 through October 2017.  *Id.* at 35:8–18, 182:8–11, 184:25–8.

53.  From November 1, 2019, through October 31, 2020, Doe worked as a Global MEAL Advisor, Program Manager I.  (Trial Tr. II at 33:19–34:15; Def. Ex. 274 at p. 6.)  In this role, Doe worked primarily on the quantitative portion of the quarterly report that was submitted to donors per their respective donation agreement.  (Trial Tr. II at 42:9–43:4.)  He collected data from MEAL leads and consolidated the data into a final Excel document.  *Id.*  He also coordinated monthly learning webinars (*e.g.,* identifying a presenter, providing technical support).  *Id.* at 49:3–50:5.

54.  From November 1, 2020, through October 31, 2022, Doe worked as a Global Meal Advisor, Program Manager II.  (Trial Tr. II at 33:19–34:15; Def. Ex. 274 at p. 7.)  In this role, Doe supervised a Temporary Yonder Duty ("TDY")[5] position focused on collecting indicator results on influence, learning, and engagement.  (Trial Tr. II at 51:7–23.)  He also provided troubleshooting assistance to MEAL project staff in the Changing the Way We Care implementing countries.  *Id.* at 51:7–52:15.

55.  From November 1, 2022, until his voluntary termination on August 30, 2024, Doe worked as a Gateway Manager II, again working on the Pipeline and Projects application.  (Jt. Ex. 33; Trial Tr. II at 33:19–34:15, 65:19–22; Def. Ex. 274 at p. 7.)  In this role, Doe supervised direct reports, consulted with business owners with interest in the Pipeline and Projects application for some business need, and acted as a liaison between the business owner and IT in developing functionality of the application.  (Trial Tr. II at 65:23–66:17.)  He also worked to troubleshoot issues integrating data between a financial management system and the Pipeline

---

[5] *See* paragraph 59, *infra.*

and Projects application, and at times made suggestions about interface improvement to IT. *Id.* at 69:16–70:5.

56. In Doe's work on Gateway, he worked exclusively with the Pipeline and Projects application. *Id.* at 11:2–8.

57. While working on the Gateway Team, Doe never input data into Gateway. (Trial Tr. I at 171:22–172:4; Trial Tr. II at 202:23–203:6.)

58. While working on the Changing the Way We Care Team, Doe had no direct contact with Participants. (Trial Tr. II at 58:11–14.)

59. During his employment with CRS, Doe also completed three short-term, temporary assignments in Nigeria, referred to as "Temporary Duty Yonders," or "TDYs."[6] (Trial Tr. II at 19:21–20:5.) The TDYs were unrelated to Doe's other positions with CRS. *Id.* at 20:9–13.

   a) In or around 2017, Doe completed his first TDY, which lasted about six weeks. *Id.* at 72:25–73:11. In this TDY, Doe worked as an informational manager in a humanitarian response department to develop a situation report that was sent to government and international non-governmental organizations to coordinate the activities of humanitarian actors in the corridor. *Id.* at 73:15–74:9. During this TDY, the local community experienced a cholera outbreak; Doe's team worked to coordinate actors in that area to collect and map out water access points. *Id.* at 88:13–90:6.

   b) In or around 2017 or 2018, Doe completed his second TDY, which lasted less than a week. *Id.* at 72:25–73:11. In this TDY, Doe supported the director of the Headquarters MEAL Department who worked as lead facilitator of a MEAL workshop to establish

---

[6] CRS uses a TDY to fill a temporary staffing gap in a specific area. (Trial Tr. I at 86:24–7; Trial Tr. II at 72:11–15.)

components of a MEAL system in a large malaria project. *Id.* at 74:25–75:16. Doe

also facilitated at least one MEAL workshop on data. *Id.*

   c) In or around 2019, Doe completed his third (and last) TDY, which lasted about 3.5

weeks. *Id.* at 72:25–73:11. In this TDY, Doe worked as a Cash and Markets Program

Manager to support a project team with field responsibilities for which he helped

troubleshoot administrative issues. *Id.* at 75:24–77:13.

60. None of Doe's positions were "ministerial," "representational," or "explicitly religious" in

nature. (Jt. Stip. ¶¶ 10–12.)

61. Doe did not provide direct humanitarian relief in any of his CRS roles. (Trial Tr. II at 85:9–

22, 189:12–25, 207:23–208:2, 225:14–20.) *See also id.* at 19:9–11.

62. Doe did not work directly with donors in any of his CRS roles. *Id.* at 86:1–3, 208:3–6,

225:25–226:3.

63. Doe did not directly pursue funding opportunities on behalf of CRS in any of his roles. *Id.* at

86:1–3, 208:3–6, 225:25–226:3; *see also id.* at 86:16–18.

64. Doe never served on CRS's ELT or the Board. (Trial Tr. I at 252:20–22; Trial Tr. II at 171:8–

22.)

65. Doe generally had the opportunity to "contribute" to CRS's determination of its goals, but did

not make decisions about how to implement CRS relief projects in any of his roles. (Trial Tr.

I at 68:16–69:18; Trial Tr. II at 86:13–15, 190:1–8, 225:21–24.)

   **Damages**

66. The parties stipulate that Doe's compensatory damages are $60,000. (Damages Stip., ECF

No. 115-1.)

III.    **CONCLUSIONS OF LAW**

As discussed above, the sole trial issue is whether CRS is entitled to the MFEPA religious entity exemption.  Specifically, CRS contends as an affirmative defense that, as a religious entity, it is exempt from MFEPA's prohibition of employment discrimination on the basis of sexual orientation.[7]

### A. MFEPA's prohibition on employment discrimination on the basis of sexual orientation does not apply to a religious entity's employment of an individual of a particular sexual orientation whose duties directly further a core mission.

Under MFEPA, an employer may not "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment" or "limit, segregate, or classify its employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee" because of, relevant here, the individual's sexual orientation.  MD. CODE ANN., STATE GOV'T § 20-606(a)(1).  This prohibition, however, does not apply to "a religious corporation . . . with respect to the employment of individuals of a particular . . . sexual orientation . . . to perform work connected with the activities of the religious entity."  *Id.* § 20-604.

As set forth above regarding the questions certified by this court in the instant case, the Supreme Court of Maryland concluded that "the language of the exemption is ambiguous" and provided the following guidance: "Giving the exemption its narrowest reasonable reading, we

---

[7] Briefly, the court addresses CRS's repeated assertions in its post-trial brief that this court's ruling will constitute persuasive precedent for future cases.  (ECF No. 132 at pp. 3, 23–25.)  The court appreciates that its opinion in this matter will be one of the first (if not the first) to apply the religious entity exemption test as set out by the Supreme Court of Maryland in *Doe III*.  The task before this court is to apply the test to the facts at issue here, not to speculate about the potential impact of its decision outside of the case before it, and surely not to allow such thoughts to influence or affect the outcome.  Every district court opinion carries with it some measure of persuasive precedential value; and as important as that prospect may be as a general principal, it is of no moment with respect to the fundamental tasks before the court—to render findings of fact and conclusions of law, and to set forth a reasoned explication of the evidence and legal arguments presented.

conclude that the General Assembly intended to exempt religious organizations from these kinds of MFEPA claims brought by employees who perform duties that directly further the core mission (or missions) of the religious entity." *Doe v. Cath. Relief Servs.*, 484 Md. 640, 666–67 (2023).

Before the Supreme Court of Maryland, the parties argued their respective positions. Doe argued the exemption should be read as "coextensive with the First Amendment's 'ministerial exception,'" which is to say, that it would "appl[y] to any employee whose primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Id.* at 665 (quoting *Archdiocese of Wash. v. Moersen*, 399 Md. 637, 644 (2007)). In contrast, CRS argued "the exemption unambiguously exempts all claims for religious, sexual orientation, and gender identity discrimination against religious entities, because all work of every employee is 'connected with' the 'activities' of their employer." *Id.* at 666.

The court rejected both positions. Instead, the court concluded, with the "narrowest reasonable reading" of the exemption, "in order for the exemption to apply, the employee's duties must directly further the core mission(s) – religious or secular, or both – of the religious entity." *Id.* at 673. The court "offer[ed] the following guidance to courts that are called upon to analyze the applicability of the exemption:"

> First, focusing on the duties of the employee and the core mission(s) of the entity entails a fact-intensive inquiry that requires consideration of the totality of the pertinent circumstances.
>
> Second, when we refer to duties "directly" furthering the core mission of a religious entity, we mean duties that are not one or more steps removed from taking the actions that effect the goals of the entity. For example, consider a janitor who cleans the headquarters office of a religious entity which has as its core mission supplying housing to low-income communities. The janitor's work allows other staff members to work in a clean environment and better focus on their duties in helping to provide low-cost housing to the needy.

> In this case, the janitor's work indirectly furthers the core mission of the religious entity.
>
> Contrast that example with the executive director of a medium-sized religious charity, which has as its core mission the raising of funds to build new schools in underserved communities. Assume that this person's job duties include managing other staff members to ensure that all fundraising events are scheduled, advertised, and ultimately successful. The entity uses the proceeds collected from the fundraisers to help pay for the construction of new schools. In this case, the executive director's duties directly further the entity's core mission.
>
> Third, the size of the religious entity may be relevant. A 30-person religious non-profit may well have fewer employees whose work does not directly further the core mission(s) of the entity than an organization with a 300-person staff.
>
> Fourth, a religious entity may have both religious and secular core missions, and more than one of each.
>
> Fifth, in determining what constitutes a core mission of a religious entity, a trial court may consider, among other things: the description of its mission(s) that the entity provides to the public and/or regulators; the services the entity provides; the people the entity seeks to benefit; and how the entity's funds are allocated.

*Id.* at 673–75.

In advancing their trial arguments as to whether Doe directly furthered a core mission of CRS, the parties' briefing focuses primarily on the first two aspects of the *Doe III* court's guidance. (ECF No. 131 at p. 18; ECF No. 132 at p. 10 n.2.)  Upon a totality of the pertinent circumstances, the court finds that Doe did not, in any of his positions, directly further a CRS core mission.

**B. Doe did not directly further a CRS core mission.**

The court concludes by a preponderance of evidence that Doe did not directly further a CRS core mission in any of his five positions held during his employment by CRS.

1. ***Doe's Gateway Positions***

As the court found above, there can be no doubt that Gateway is an important tool used by CRS. (Trial Tr. I at 90:13–17, 106:8–108:12, 110:13–21, 238:4–17, 247:8–13; Trial Tr. II at 152:8–25.) Gateway greatly improved (and improves) CRS's efficiency. (Trial Tr. I at 90:13–17, 238:4–17, 247:8–13; Trial Tr. II at 152:8–25.) CRS uses Gateway for important data collection and coordination, tracking funding opportunity data, and tracking and managing CRS's institutional donor relationships. (Trial Tr. I at 106:8–108:12, 115:15–116:12, 223:6–224:4, 225:1–8; Trial Tr. II at 152:1–7.) The question, therefore, is whether, in doing so, Doe "directly further[ed]" CRS's mission to serve the poor and vulnerable overseas; which is to say, the court must assess whether his Gateway duties were or were not "one or more steps removed from the actions that effect the goals of the entity." *Doe III*, 484 Md. at 673–74.

On this point, the court finds Damsker-White's[8] testimony to be particularly salient:

> Q. And in your experience as the Gateway manager at CRS, how would you describe the way your position contributed to CRS's mission?
>
> A. I mean, I would—I would hope that we played at least a small part in just supporting the important work that CRS did but, you know, I think that data is always beneficial. But as I mentioned, the information that you would get out of a system like Gateway is only as good as the information that goes into it. And, you know, I do, as busy as our jobs were, I think that if Gateway ceased to exist, CRS would still be able to carry out its mission and do its work.

(Trial Tr. II at 188:17–189:2.) The court agrees.

Doe's work on the Gateway Team was important and certainly benefitted CRS; nonetheless, his duties were, indeed, one or more steps removed from the actions that effect CRS goals. To effect such goals means to "bring [CRS goals] about" or "make [CRS goals] happen," *see Effect*, *Black's Law Dictionary* (12th ed. 2024), not, as CRS argues, to support "an incremental

---

[8] Amy Damsker-White was Doe's supervisor from April 2017 through October 2017. (Findings of Fact, ¶ 52, *supra*.)

improvement in a process." (ECF No. 132 at p. 15.) The evidence does not support a conclusion that Doe was not one or more steps removed from the actions that make CRS goals happen in any of his roles on the Gateway Team. Said differently, the court concludes that the evidence preponderantly demonstrates that Doe's Gateway Team duties and responsibilities were sufficiently apart from effectuating CRS goals (and core mission) such that his Gateway job activities and responsibilities were far attenuated from, and not reasonably capable of bringing about (or preventing effectuation of), CRS goals or missions. Doe did not directly serve the poor and vulnerable overseas, solicit or secure funding for projects, or possess authority to determine how CRS would pursue its mission through its programs. Nor did Doe manage or supervise any employee with such responsibilities. The trainings he conducted focused on how to use the Pipeline and Projects application, including inputting and accessing the data therein. The evidence is that from time to time, he may have been called upon to assist those who were responsible for undertaking actions that effect CRS's goals; yet he was always one or more steps removed from taking action that effect CRS goals or that bear such responsibility. *See Doe III*, 484 at 673, *supra*.[9]

The court considers each of Doe's Gateway positions. In his role as a Program Data Advisor I, Doe provided training and support to end users of the Pipeline and Project application. Doe's duties did not include serving the poor and vulnerable overseas; soliciting, selecting, or securing funding; or making decisions about CRS's programmatic goals and its efforts to fulfill its mission. Doe did not directly manage, supervise, or train employees as to same. Instead, his duties were focused on helping others use a system that helped improve CRS's efficiency. Based on the

---

[9] The court is not, as CRS contends, fashioning a new multi-factor test separate and distinct from guidance set forth in *Doe III*. Instead, the court considers factors such as providing humanitarian aid, securing funding, and decision making in its analysis of the totality of the circumstances, as required. (CRS presumably does not challenge that securing funding, directing the goals of CRS, and serving the poor and vulnerable overseas are actions that effect its goals.)

foregoing, the court finds that Doe's duties as Program Data Advisor I did not directly further CRS's mission, because, as a Program Data Advisor I, Doe was "one or more steps removed from taking the actions that effect" CRS's goals.

In his role as Data Quality and Analytics Advisor II, Doe helped to expand and modify the systems to assist with business needs, acted as a liaison between IT and business owners, and conducted occasional trainings. Doe's duties did not include serving the poor and vulnerable overseas; soliciting, selecting, or securing funding; or making decisions about CRS's programmatic goals and its efforts to fulfill its mission. Doe did not directly manage, supervise, or train employees as to same. His duties in this position were, again, focused on working with the Gateway system to aid CRS in its use of the system. The evidence preponderantly demonstrates that Doe's service as Data Quality and Analytics Advisor II did not directly effect or further a CRS core mission, because, as Data Quality and Analytics Advisor II, he was at all times "one or more steps removed from taking the actions that effect" CRS's goals.

Finally, in his role as Gateway Manager II, Doe supervised direct reports, worked with business owners in their use of the Pipeline and Projects application, liaised with IT to improve functionality, and helped troubleshoot data integration across systems. Doe's duties did not include serving the poor and vulnerable overseas; soliciting, selecting, or securing funding; or making decisions about CRS's programmatic goals and its efforts to fulfill its mission. Doe did not directly manage, supervise, or train employees as to these activities. As with his other job roles, Doe's duties here focused on working with the Gateway system to aid CRS in its use of the system. Based on the foregoing, the court concludes by a preponderance of evidence that Doe's duties as Gateway Manager II did not directly effect or further a CRS core mission, because, as

Gateway Manager II, he was at all times "one or more steps removed from taking the actions that effect" CRS's goals.

In summary, Doe's Gateway team roles and duties did not directly further or effectuate a CRS mission.

    2.    ***Doe's Changing the Way We Care Positions***

Similar to CRS's use of Gateway, there can be no doubt that MEAL is an important (indeed, required) framework utilized in CRS's Changing the Way We Care Team. (Trial Tr. I at 102:14–104:15.) Having closely considered Doe's MEAL-specific duties with the Changing the Way We Care Team, the court concludes Doe did not directly further or effectuate a CRS mission.

In his role as Global MEAL Advisor, Program Manager I, Doe collected data from MEAL leads in each project, compiled data into a quantitative portion of the quarterly report provided to donors, and coordinated monthly webinars. (Trial Tr. II at 42:9–43:4, 49:3–50:5.) Although his role here was more programmatic in nature than when he served on the Gateway Team, Doe's duties did not include securing or soliciting funding for the Changing the Way We Care program; serving the poor and vulnerable overseas; or working directly with Changing the Way We Care Participants. He did not make decisions about CRS's Changing the Way We Care programmatic goals or its efforts to fulfill its mission (and he did not direct the actions of any employee who possessed such authority or had such responsibility). Doe's duties were focused on aiding CRS in its collection and reporting of data related to the Changing the Way We Care Program. Based on the foregoing, the court finds by a preponderance of evidence that Doe's duties as Global MEAL Advisor, Program Manager I did not directly further or effectuate a CRS mission, because he was "one or more steps removed from taking the actions that effect" CRS's goals and core mission.

In his role as Global Meal Advisor, Program Manager II, Doe's duties included his MEAL-related work, supervising a TDY position focused on collecting indicator results, and providing troubleshooting assistance to MEAL project staff in the Changing the Way We Care implementing countries. (Trial Tr. II 51:7–52:15.) As with his other MEAL position, Doe's duties did not require him to solicit or secure funding for the Changing the Way We Care program, to serve the poor and vulnerable overseas, to work directly with Changing the Way We Care Participants, or to make decisions about CRS's Changing the Way We Care programmatic goals and its efforts to fulfill its mission (and he did not direct the actions of an employee who possessed such authority or had such responsibility). His duties were focused on aiding CRS in its collection and reporting of data related to the Changing the Way We Care Program, as well as acting in a "technical troubleshooting support role" for the employee he supervised. Based on the foregoing, the court concludes that Doe's duties as Global MEAL Advisor, Program Manager II did not directly further or effectuate a CRS mission, because he was "one or more steps removed from taking the actions that effect" CRS's goals and core missions.

**B. In this case, CRS is not protected by the MFEPA Religious Entity Exemption**

Because the court concludes that none of Doe's five full-time positions[10] with CRS directly furthered a CRS mission, and that each of his positions was one or more steps removed from taking

---

[10] The parties agree that Doe's TDYs, as temporary assignments, are not dispositive of CRS's affirmative defense. (Trial Tr. III, ECF No. 140 at 26:22–27:8, 59:19–60:2; ECF No. 131 at p. 20 n.4.) The court agrees. There is no evidence that CRS's decision to terminate Doe's spousal health benefits was related to his TDYs or his TDY work; nor does either party contend that Doe's spousal health benefits were terminated or suspended during his time on a TDY. Nonetheless, the court concludes that Doe's duties in his first TDY directly furthered a CRS mission. Like the executive director in the *Doe III* hypothetical, Doe's efforts were coordinative in nature, but he coordinated a response to a cholera outbreak to ensure access to clean water—humanitarian aid in one of CRS's key programs. The court thus concludes that Doe's duties in his first TDY directly furthered a CRS mission. That notwithstanding, as CRS concedes in candor to the court, that alone is insufficient to demonstrate that MFEPA's religious entity exemption applies here. And, importantly, the court does not conclude that Doe's duties in his two other TDY's directly furthered a CRS mission. His duties in both roles were one or more steps removed from the actions taken to effect a CRS goal or mission.

the actions that effect CRS goals, the court similarly concludes that CRS has not met its burden to show that MFEPA's religious entity exemption applies here.

Briefly, the court addresses CRS's argument related to the janitor illustration provided by the Supreme Court of Maryland in *Doe III*.  In its post-trial briefing, CRS asserts as follows:

> The Maryland Supreme Court's janitor/executive director hypothetical leaves no ambiguity about what it means to indirectly further a mission: the court had in mind a small class of workers who perform generic, entry-level, and likely lower-compensated tasks that most organizations (nonprofit or otherwise) require and that are unrelated to the goals of the organization.

(ECF No. 132 at p. 11.)  The court is not persuaded that CRS's narrow framing is consistent with the Supreme Court of Maryland's decision in *Doe III*.  Stated simply, if, as CRS claims, the *Doe III* court intended the exemption to capture only a "small class of workers who perform generic, entry-level, and likely lower-compensated tasks," it would have so stated.  Instead, the court called for fact-specific analysis based upon the totality of circumstances, which the court has undertaken here.

### C.  CRS violated Doe's rights under MFEPA.

As discussed above, under MFEPA, an employer may not "discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment." MD. CODE ANN., STATE GOV'T § 20-606(a)(1).  It is not in dispute that CRS terminated Doe's spousal health benefits because he is a man married to another man.  It is further undisputed that "[o]pposite-sex spouses of domestic employees of CRS who meet the minimum requirements for weekly hours are eligible for dependent health benefits and may be enrolled within the first month after an employee's hire date or during special or annual enrollment periods thereafter."  (Jt. Stip. ¶ 7.)  Accordingly, having concluded that Doe's positions did not directly further a CRS mission and, thus, that the MFEPA religious entity exemption is inapplicable here,

the court concludes that CRS violated MFEPA in its termination of Doe's spousal health benefits

for his same sex spouse.

### D. CRS has not demonstrated that MFEPA is not neutral and generally applicable in its application to CRS.[11]

CRS argues that if the court concludes, as it has here, that Doe's duties did not directly

further a CRS mission, application of MFEPA would (unlawfully) burden its First Amendment

free exercise rights.  (ECF No. 132 at pp. 25–36.)  Assuming without deciding that CRS has made

the threshold showing of a burden on its free exercise rights by operation of MFEPA, *see Mahmoud*

*v. McKnight*, 102 F.4th 191, 208 n.12 (4th Cir. 2024), *cert. granted sub nom. Mahmoud v. Taylor*,

No. 24-297, 2025 WL 226842 (U.S. Jan. 17, 2025), the court concludes that CRS fails to

demonstrate that MFEPA is not neutral and generally applicable in its application to CRS here.

"The Free Exercise Clause of the First Amendment, applicable to the States under the

Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free

exercise' of religion."  *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) (quoting U.S.

CONST. AMEND I).  "At a minimum, the protections of the Free Exercise Clause pertain if the law

at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because

it is undertaken for religious reasons."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508

U.S. 520, 532 (1993); *see Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92,

108 (4th Cir. 2023) (providing that "the Free Exercise Clause protects against laws that

---

[11] Following the bench trial and the parties' post-trial briefing, CRS filed correspondence with the court advising that the United States Supreme Court granted a petition for writ of certiorari in *Mahmoud v. Taylor*, No. 24-297, a case involving a free exercise challenge.  CRS does not affirmatively request a stay; rather it asserts that the outcome of *Mahmoud v. Taylor* "could impact" this court's analysis of CRS's constitutional arguments.  The court declines to delay its ruling pending the Court's opinion in *Mahmoud v. Taylor* based upon myriad factors; most saliently, the court declines to speculate whether or how the Supreme Court's decision might bear upon the case at bar, and no formal request for stay has been made.

discriminate against or among religious beliefs or that restrict certain practices because of their religious conduct").

Importantly, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens J., concurring in judgment)). "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 593 U.S. at 533 (citing *Smith*, 494 U.S. at 878–82). While a law that is not neutral and generally applicable "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest," *see Church of Lukumi Babalu Aye*, 508 U.S. at 531–32, "the Supreme Court has made clear that neutral laws of general application which only incidentally burden religion are not constitutionally suspect." *Firewalker-Fields v. Lee*, 58 F.4th 104, 114 n.2 (4th Cir. 2023) (citing *See Fulton*, 593 U.S. at 532–33). To that end, a party can demonstrate a free exercise violation by showing that a statute "has burdened [its] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Smith*, 494 U.S. at 879–881); *see Church of Lukumi Babalu Aye*, 508 U.S. at 533 (holding that "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral . . . .").

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Church of Lukumi Babalu Aye*, 508 U.S. at 531. A law is not "neutral and generally applicable" where it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S.

61, 62 (2021) (citing *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 592 U.S. 14, 17–19 (2020)

(*per curiam*)).   A law is not neutral "if it is 'specifically directed at . . . religious practice,'" "if it

'discriminate[s] on its face,' or if a religious exercise is otherwise its 'object.'" *Kennedy*, 597 U.S.

at 526 (first quoting *Smith*, 494 U.S. at 878; then quoting *Church of Lukumi Babalu Aye*, 508 U.S.

at 533).   Relatedly, "[a] law is not generally applicable if it 'invite[s]' the government to consider

the particular reasons for a person's conduct by providing 'a mechanism for individualized

exemptions,'" or if it "prohibits religious conduct while permitting secular conduct that

undermines the government's asserted interests in a similar way."   *Fulton*, 593 U.S. at 533–34

(quoting *Smith*, 494 U.S. at 884); *see Kennedy*, 597 U.S. at 526 (2022) (same); *Kim v. Bd. of Educ.*

*of Howard Cnty.*, 93 F.4th 733, 748 (4th Cir. 2024) (same).

> The Fourth Circuit recently offered the following guidance:

> > [G]overnment action might not be "neutral" because it intentionally
> > discriminates or targets religious practice, *Church of Lukumi Babalu*
> > *Aye, Inc.*, 508 U.S. at 532, 113 S. Ct. 2217, or "proceeds in a manner
> > intolerant of religious beliefs or restricts practices because of their
> > religious nature," *Fulton*, 141 S. Ct. at 1877; *see Masterpiece*
> > *Cakeshop*, 138 S. Ct. at 1730–32. Or it might not be "generally
> > applicable" because it "invites the government to consider the
> > particular reasons for a person's conduct by providing a mechanism
> > for individualized exemptions" or "prohibits religious conduct while
> > permitting secular conduct that undermines the government's
> > asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877
> > (cleaned up); *see Smith*, 494 U.S. at 884, 110 S. Ct. 1595
> > (distinguishing from its holding instances involving "individualized
> > governmental assessment of the reasons for the relevant conduct").

*Mahmoud v. McKnight*, 102 F.4th 191, 206–207 (4th Cir. 2024), *cert. granted sub nom. Mahmoud*

*v. Taylor*, No. 24-297, 2025 WL 226842 (U.S. Jan. 17, 2025).

> CRS's argument that MFEPA is not generally applicable appears two-fold in nature: first,

relying on *Tandon v. Newsom*, 593 U.S. 61 (2021), CRS argues that MFEPA is not generally

applicable because "it generally applies only to those employers with fifteen or more employees"

and not with respect to the employment of "aliens outside of the State"; and second, relying on *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), CRS argues that MFEPA is not generally applicable because the *Doe III* religious entity exemption test requires a fact-intensive inquiry and, thus, requires the court to consider an employer's particular reasons for the conduct.  (ECF No. 132 at pp. 26–28.)  The court disagrees and concludes that CRS has failed to demonstrate that MFEPA is not neutral and generally applicable in its application to CRS.

Akin to its argument raised on summary judgment, CRS first argues that MFEPA is not neutral and generally applicable because it exempts "comparable" employers of 15 or fewer employees, and employers "with respect to the employment of aliens outside of the State."  (ECF No. 132 at pp. 26–27.)  *See also* MD. CODE ANN., STATE GOV'T §§ 20-601(d)(1), 20-604(1).  The court agrees with Judge Blake that "CRS is too liberal in its understanding of the word 'comparable.'"  *Doe v. Cath. Relief Servs.*, 618 F. Supp. 3d 244, 255 (D. Md. 2022), *opinion vacated in part on reconsideration,* No. CV CCB-20-1815, 2023 WL 155243 (D. Md. Jan. 11, 2023).  That MFEPA is "selective to some extent" is hardly unique; this describes most, if not all, laws.  *See Church of Lukumi Babalu Aye*, 508 U.S. at 542.  Importantly, MFEPA does not "in a selective manner impose burdens only on conduct motivated by religious belief."  *Id.*

CRS relies upon *Tandon v. Newsom* where the Supreme Court concluded that the plaintiffs were likely to succeed on the merits of their free exercise claim challenging California's COVID-19 restrictions that "treat[ed] some comparable secular activities," like "hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants," "more favorably than at-home religious exercise."  593 U.S. 61, 63 (2021).  The Court explained: "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue."  *Id.* at 62

(explaining that, in the public health context, "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather") (citation omitted).

The circumstances of the instant case are materially distinct from those in *Tandon*. As it did on summary judgment, CRS asks this court to conclude that it, an 8,000-person organization, is comparable to an employer with fewer than 15 employees (or an employer with respect to the employment of aliens). Judge Blake's analysis continues to pertain:

> While reasonable minds can disagree over whether those differences too thoroughly erode the comparison between commercial and religious gatherings, at the very least, the categories are similar in that they each involved people from multiple households occupying the same indoor physical space during a pandemic. *See Fulton*, 141 S. Ct. at 1921–22 (Alito, J., concurring) (discussing the complexity of identifying appropriate secular comparators for burdened religious activities under *Smith*, which the *Fulton* court declined to overturn). CRS offers no such relatively close comparison, instead asking this court to find that — for the purposes of laws against employment discrimination — businesses with 15 or fewer employees . . . are secular activities comparable to the religious activity of a social services nonprofit with over 7000 employees. CRS has pointed to secular institutions not covered by Title VII, but it has not pointed to reasonably comparable institutions. Our Constitution's solicitousness of religious exercise is not *carte blanche* for any religious institution wishing to place itself beyond the reach of any neutral and generally applicable law. This court need not engage in a strict scrutiny analysis that would apply if a truly comparable secular institution were being treated favorably compared to CRS.

*Doe*, 618 F. Supp. 3d at 256 (footnote omitted).

The same is true here. That MFEPA has some limitation in its application does not render it not neutral and generally applicable, and CRS offers no argument to suggest how it is comparable to exempt employers.[12] Indeed, CRS's "obviously secular counterpart"—a large, secular

---

[12] On this point, CRS cites to a recent decision from the Eastern District of Washington in which the court held that the Washington Law Against Discrimination ("WLAD") is likely not neutral and generally applicable because it treats a religious organization differently than a secular employer with fewer than eight employees. *Union Gospel Mission of Yakima, Wash. v. Ferguson*, No. 1:23-CV-3027-MKD, 2024 WL 4660918, at *4 (E.D. Wash. Nov. 1, 2024). Its

nonprofit—is subject to identical treatment under MFEPA.  *See Beahn v. Gayles*, 550 F. Supp. 3d 259, 275 (D. Md. 2021).  Conversely, a religious employer of fewer than 15 employees (or with respect to its employment of aliens) would be exempt from MFEPA in the same manner as would be a secular employer with fewer than 15 employees—which is to say, potentially exempt employers include religious and secular employers alike.  *See McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142–43 (W.D. Wash. 2023) (holding that "the mere existence of an exemption for *all small* employers—religious and secular alike—does not transform Title VII and [Washington's state counterpart] from neutral and generally applicable laws into those triggering strict scrutiny").  *Cf. Kim*, 93 F.4th at 748 (holding that the Maryland law at issue was generally applicable where it made "no distinction between religious and secular" and simply barred "non-public-school students, religious and nonreligious alike, from choosing or serving as the student member").

CRS's second (and seemingly main) argument is that MFEPA is not neutral and generally applicable in light of *Doe III*, because the court is now tasked with conducting a fact-intensive inquiry to determine the applicability of MFEPA's religious entity exemption.  According to CRS, a *Doe III*-based application of the religious entity exemption now constitutes "a mechanism for individualized exemptions" under *Fulton*.  The court disagrees.  In focusing on the fact-specific nature of the analysis, CRS oversimplifies (or perhaps overcomplicates) the matter.

As the *Fulton* Court explained, "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism

---

sister court reached a different conclusion, holding that the exceptions under WLAD, unlike in *Tandon*, did not "demonstrate disparate treatment between comparable secular and religious activity," and explaining that "the mere existence of an exemption for *all small* employers—religious and secular alike—does not transform Title VII and WLAD from neutral and generally applicable laws into those triggering strict scrutiny."  *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142–43 (W.D. Wash. 2023).  For the reasons discussed in this opinion, the court finds *McMahon* persuasive.

for individualized exemptions.'" 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884). The Court's

cited example provides greater instruction:

> For example, in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10
> L.Ed.2d 965 (1963), a Seventh-day Adventist was fired because she
> would not work on Saturdays. Unable to find a job that would allow
> her to keep the Sabbath as her faith required, she applied for
> unemployment benefits. *Id.*, at 399–400, 83 S.Ct. 1790. The State
> denied her application under a law prohibiting eligibility to
> claimants who had "failed, without good cause . . . to accept
> available suitable work." *Id.*, at 401, 83 S.Ct. 1790 (internal
> quotation marks omitted). We held that the denial infringed her free
> exercise rights and could be justified only by a compelling interest.
> *Id.*, at 406, 83 S.Ct. 1790.
>
> *Smith* later explained that the unemployment benefits law in
> *Sherbert* was not generally applicable because the "good cause"
> standard permitted the government to grant exemptions based on the
> circumstances underlying each application. *See* 494 U.S. at 884, 110
> S.Ct. 1595 (citing *Roy*, 476 U.S. at 708, 106 S.Ct. 2147; *Sherbert*,
> 374 U.S. at 401, n. 4, 83 S.Ct. 1790). *Smith* went on to hold that
> "where the State has in place a system of individual exemptions, it
> may not refuse to extend that system to cases of 'religious hardship'
> without compelling reason." 494 U.S. at 884, 110 S.Ct. 1595
> (quoting *Roy*, 476 U.S. at 708, 106 S.Ct. 2147); *see also Lukumi*,
> 508 U.S. at 537, 113 S.Ct. 2217 (same).

*Id.* at 533–34. *Fulton* arose from a circumstance where the government had a system of individual

exemptions in which it exercised discretion to assess an individual's claim of religious hardship.

*Id.* This case, and MFEPA, are materially distinct from the circumstances noted above.

The exemption at issue here is categorical and statutory, not discretionary, in nature; it does

not require State approval or disapproval. Stated differently, the individualized exemption

mechanism that CRS incants is not a discretionary mechanism exercised by the State. The fact-

specific analysis required by *Doe III* provides the foundation on which to apply a test to determine

if the exemption applies in a given case. Across the fabric of our jurisprudence, fact-specific

inquiries are common as dishwater in deciding whether or not a particular statutory exemption or

exception applies.  The court does not find the question before it remotely similar to the "mechanism of individualized exemptions" discussed in *Fulton*.

In all, CRS fails to demonstrate that MFEPA is not generally applicable in its application to CRS here.[13]  Accordingly, the court need not reach CRS's strict scrutiny argument.  Rational basis review is applicable, whereby MFEPA must only be "rationally related to a legitimate governmental interest" to pass muster.  *Canaan Christian Church v. Montgomery Cnty., Maryland*, 29 F.4th 182, 199 (4th Cir. 2022) (citation omitted).  And CRS does not argue or demonstrate that MFEPA is not rationally related to a legitimate governmental interest.  Its argument that MFEPA is unconstitutional in its application to CRS thus fails.[14]

## IV.    <u>CONCLUSION</u>

For the reasons set forth herein, by separate order, judgment of $60,000.00 will be entered in favor of Doe and against CRS on Count I of the Complaint.[15]


Date: April 21, 2025                                                    /S/

                                                                    _____
                                                                    Julie R. Rubin
                                                                    United States District Judge


---

[13] To the extent MFEPA exempts other categories of employers, CRS has presented no argument relative same.  (ECF No. 132 at pp. 26–27.)  The court constrains its analysis to the issues before it.

[14] The court is not persuaded that additional briefing is appropriate or necessary.  Accordingly, CRS's Motion for Leave to File Response to Doe's Post-Trial Brief at ECF No. 134 will be denied.

[15] At the conclusion of its post-trial brief, CRS asserts for the sake of appellate review that it maintains its position that Judge Blake erred in her summary judgment ruling as to Doe's claims under Title VII and the EPA.  (ECF No. 132 at pp. 36–37.)  CRS is clear that it does not ask this court to reconsider Judge Blake's ruling; the court therefore does not consider whether to do so.  *Id.* at p. 36.